**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**PUBLISH**

**March 14, 2019**

UNITED STATES COURT OF APPEALS

**Elisabeth A. Shumaker**
**Clerk of Court**

FOR THE TENTH CIRCUIT

_____

| | |
|---|---|
| ALYSSA BISTLINE; RUBY JESSOP; SUSAN BROADBENT; GINA ROHBOCK; NOLAN BARLOW; JASON BLACK; MAY MUSSER; HOLLY BISTLINE; T.B.; M.B.; P.B.; A.B.; A.B.; DERRELL BARLOW; ALICIA ROHBOCK; R.R.; R.R.; B.J.R.; WALLACE JEFFS; LAWRENCE BARLOW; STEVEN DOCKSTADER; MARVIN COOKE; HELEN BARLOW; VERGEL BARLOW; CAROLE JESSOP; BRIELL LIBERTAE DECKER; LYNETTE WARNER; AMY NIELSON; SARAH ALLRED; THOMAS JEFFS; JANETTA JESSOP, | No. 17-4020 |

Plaintiffs - Appellants,

v.

RODNEY R. PARKER; SNOW
CHRISTENSEN & MARTINEAU, P.C.,

Defendants - Appellees,

and

WARREN STEED JEFFS,

Defendant.

_____

TABLE OF CONTENTS

I.  Background…………………………………………………………   5

A.  The United Effort Plan Trust…………………………………….....   5

B.  The Formation of Attorney-Client Relationships………………………   11

C.  Concealment of Viable Causes of Action………………………………   13

D.  Procedural History…………………………………………………   17


II.  Standard of Review………………………………………………...   18


III.  Discussion…………………………………………………………   19

A.  Whether Plaintiffs' Allegations State a Claim…………………………   21

1.  Legal Malpractice and Breach of Fiduciary Duty………………………   21

i.  Attorney-Client relationship…………………………………………...   22

a.  *Subjective beliefs of representation*…………………………………   24

b.  *Reasonableness of beliefs under the circumstances*……………………   28

2.  Fraudulent and Negligent Misrepresentation…………………………   32

3.  Civil Conspiracy…………………………………………………...   32

4.  RICO Violations……………………………………………………   32

5.  Violations of the TVPRA……………………………………………   33

i.  The means used to force labor or services………………………………   35

ii.  Specific plaintiffs' labor or services……………………………………   37

iii.  Venture liability…………………………………………………...   40

B.  Statutes of Limitations……………………………………………….. 45

1.  Applicable Statutes of Limitations…………………………………… 47

i.  Fraudulent misrepresentation………………………………………… 47

ii.  Negligent misrepresentation…………………………………………. 48

iii.  Malpractice, breach of fiduciary duty, and civil conspiracy…………… 49

iv.  TVPRA…………………………………………………………… 49

2.  Tolling the Limitations Periods………………………………………. 50

i.  The age of majority…………………………………………………. 50

ii.  Continuing tort doctrine……………………………………………. 50

3.  Tolling Through the Discovery Rule………………………………... 52

i.  Statutory tolling……………………………………………………. 54

ii.  Equitable tolling – fraudulent concealment…………………………... 61

a.  *Concealment*……………………………………………………….. 61

b.  *Reasonableness*…………………………………………………… 63

4.  Tolling for Individual Plaintiffs………………………………………. 66


IV.  Conclusion……………………………………………………………71

**Appeal from the United States District Court
for the District of Utah
(D.C. No. 2:16-CV-00788-TS)**

_____

Brett Godfrey (Karen J. Porter with him on the brief), Godfrey Johnson, P.C.,
Englewood, Colorado, for Plaintiffs-Appellants.

Mark F. James (Brent O. Hatch and Mitchell A. Stephens with him on the brief),
Hatch, James & Dodge, P.C., Salt Lake City, Utah, for Defendants-Appellees.

_____

Before **BRISCOE**, **SEYMOUR**, and **LUCERO**, Circuit Judges.

_____

**SEYMOUR**, Circuit Judge.

_____

Plaintiffs are all former members of the Fundamentalist Church of Jesus Christ of

Latter-Day Saints ("FLDS"), which illegally practices polygamy.  On July 13, 2016,

plaintiffs brought this action against the FLDS Prophet, Warren Jeffs ("Mr. Jeffs"), and

Mr. Jeff's lawyers, the law firm of Snow Christensen & Martineau ("SC&M") and one of

its partners, Rodney Parker.

Plaintiffs allege that defendants: (1) directly worked with Mr. Jeffs to create a

legal framework that would shield him from the legal ramifications of child rape, forced

labor, extortion, and the causing of emotional distress by separating families; (2) created

an illusion of legality to bring about plaintiffs' submission to these abuses and employed

various legal instruments and judicial processes to knowingly facilitate the abuse; (3)

held themselves out to be the lawyers of each FLDS member individually, thus creating a

duty to them to disclose this illegal scheme; and (4) intentionally misused these attorney-

client relationships to enable Mr. Jeffs' dominion and criminal enterprise.  Mr. Jeffs

defaulted, and the district court dismissed every cause of action against the remaining

defendants under Fed. R. Civ. P. 12(b)(6).  The issue on appeal is the district court's

dismissal of all claims against SC&M and Mr. Parker (collectively "defendants").

Reviewing the facts in the light most favorable to plaintiffs, as we must, *see SEC v.

Shields*, 744 F.3d 633, 640 (10th Cir. 2014), we affirm in part and reverse in part.


# I.

## Background

### A.      The United Effort Plan Trust

Plaintiffs allege that the legal framework defendants created to facilitate Mr. Jeffs'

crimes took shape through the 1998 amendment and reinstatement of the United Effort

Plan Trust ("Reinstated Trust").  The original UEP Trust ("Trust") was created in 1942

by the predecessors of the FLDS.  *Snow, Christensen & Martineau v. Lindberg*, 299 P.3d

1058, 1061 (Utah 2013).  It was founded upon the tenets of the FLDS faith, and

membership was established through consecrating real and personal property to the Trust

(which would then be redistributed to each family according to its "just wants and

needs").  *Town of Colo. City v. United Effort Trust Plan*, 2013 WL 1932838 at *2 (D.

Ariz. May 8, 2013).  The original Trust's stated purpose was primarily "charitable and

philanthropic."  *Lindberg*, 299 P.3d at 1061.  However, on September 1, 1998, the Utah

Supreme Court ruled that the Trust was not charitable because it benefitted specific

individuals.  *Jeffs v. Stubbs*, 970 P.2d 1234, 1252–53 (Utah 1998).  In response to this

decision, the Reinstated Trust was executed on November 3, 1998.[1] *In the Matter of the UEP Trust*, No. 053900848 (Utah Dist. Ct. Dec. 13, 2005).

The Reinstated Trust was theoretically amended and reinstated by Rulon Jeffs, the sole surviving beneficiary of the UEP Trust, who was Warren Jeffs' father and predecessor as Prophet of the FLDS. *See Lindberg*, 299 P.3d at 1062; Aplt. App. at 27–28. However, plaintiffs allege a different mechanism laboring beneath this superficial reality. By 1997, Rulon Jeffs was growing old, in ill health, becoming progressively less aware of his surroundings, and demonstrating increasing loss of memory and cognitive function. Aplt. App. at 27. The complaint asserts that under Rulon Jeffs' leadership the FLDS had not practiced the atrocities defining plaintiffs' claims.

> [T]he concept of celestial or spiritual "marriage" of children was not yet broadly practiced within the FLDS Church, at least to the extent of large-scale sexual domination of children and the use of the badges of religious ceremony to formalize the criminal sexual abuse of minors under the guise of "religious" practices. Up to that point, FLDS Church marriage practices were largely if not exclusively confined to adults, and while the polygamy laws of Utah were violated by the practice of plural marriage, underage marriage and outright child rape was not common within the FLDS Church; neither were extortion, kidnapping, forced labor or, most importantly for the purposes of this averment, the use of lawyers to

---

[1]    The Trust has gone through multiple periods of revision, and it is worth clarifying the various versions. The original Trust in 1942 ("Trust") was revised as described into the 1998 "Reinstated Trust." In 2004, the Trust was subject to suit in two separate tort actions, and the appointed special fiduciary expressed concern that the Trust needed to be reformed. *M.J. v. Wisan*, 371 P.3d 21, 23-24 (Utah 2016). On October 25, 2006, the "Reformed Trust" was created by the state district court. *Town of Colo. City*, 2013 WL 1932838 at *6. The court identified two primary purposes of the 1998 Reinstated Trust, and reformed it to advance the charitable purpose using "neutral, non-religious principles." *Wisan*, 371 P.3d at 24. That court has since retained jurisdiction over the administration of the resulting 2006 Reformed Trust. *Id*. Therefore, the Trust has three iterations: (1) the 1942 "Trust," (2) the 1998 "Reinstated Trust," and (3) the 2006 "Reformed Trust." Plaintiffs' allegations largely concern the 1998 Reinstated Trust, so this is the focus of our analysis.

create a basis of community-wide misplaced belief in the legality of what is
actually fundamentally illegal conduct harming large numbers of persons.

*Id*. at 28.  But in Rulon Jeffs' declining years, his son Warren "began to assume the
mantle of authority and control."  *Id*. at 27.  In early August 1998, Rulon Jeffs suffered a
massive stroke that "left him largely impaired and paved the way for [Warren] Jeffs to
eventually assume complete and absolute control of the FLDS."  *Id*. at 28.  Although the
Reinstated Trust was nominally executed by Rulon Jeffs, "[his] signature on the Trust
instrument  . . . was placed with physical assistance and guidance of others holding [his]
pen hand, at the direction of [Warren Jeffs]."  *Id*. at 32–33.

> FLDS members knew Rulon Jeffs was ill at this time, but
>
> the extent of Rulon's incapacity was kept secret from the people.  [Warren] Jeffs
> controlled what little information was given to them about Rulon's incapacity and
> claimed to be "the mouthpiece and memory of the Prophet."  By "speaking for the
> Prophet," Warren Jeffs stepped into the Prophet's shoes and took over his roles in
> late 1998 and early 1999.  Warren Jeffs' assertion of power and authority
> continued—and became complete—while Rulon Jeffs' mental and physical health
> continued to decline.

*Id*. at 111–12.  Warren Jeffs had thus become acting president of the church.  *See M.J. v.
Wisan*, 371 P.3d at 24 (labeling Warren Jeffs "acting president of both the FLDS Church
and the Board of Trustees of the Trust" in 2001).  He retained this role until his father's
death in 2002, when he formally took over the titles of both Prophet and President of the
Reinstated Trust.  Aplt. App. at 112.

The complaint describes how Warren Jeffs' activities included the "direction of
legal counsel" in his father's declining years.  *Id*. at 27.  It then outlines the process by
which the Reinstated Trust was intentionally designed to establish Mr. Jeffs' dominion.

Plaintiffs allege that Warren Jeffs

> was obsessed with the creation of a controlled society in which he was the
> absolute ruler and the wholesale rape of young girls by himself and others
> was treated as a ceremonially sacrosanct ritual.  He sought to
> institutionalize this atrocious practice and to cloak it with the superficial
> trappings of legal acceptance, so he retained SC&M to develop an
> overarching scheme and plan . . .

*Id*. at 28.  During 1997 and 1998, prior to executing the Reinstated Trust, Mr. Jeffs and

Mr. Parker allegedly had meetings to discuss the "complex and ongoing series of

legalistic maneuvers to be carried out by SC&M in order to provide [Mr. Jeffs] absolute,

unfettered control" over the FLDS members.  *Id*. at 32.  The complaint asserts that

defendants then

> contrived a complex and detailed scheme to manipulate the law in such a
> fashion to not only take advantage of the relatively lax marital laws of
> Nevada, but to create a new enterprise, under the guise of the existing
> FLDS Church, which would be legally structured to give Jeffs absolute
> control over all of the bodies, possessions, homes and funds of the FLDS as
> beneficiaries of the UEP Trust.

*Id*. at 31.

This absolute control allegedly enabled Mr. Jeffs to subject FLDS members to

physical torture, extortion, severe and extreme emotional distress, unlawful

imprisonment, kidnapping, and "other extreme and atrocious inhumane punishments in

order to secure their utter and complete obedience."  *Id*. at 32.  Defendants benefited from

creating this scheme because rewriting the Trust would give them "peace of mind that

their fees would be paid."  *Id*. at 111 ("[B]efore the UEP Trust was rewritten, the only

assurance that Parker and SC&M had that they would be paid was the unsecured

signature of FLDS Prophet, Rulon Jeffs, who was in his late 80s and ill.").

The Reinstated Trust served religious purposes, as the Utah Supreme Court

described:

> The [Reinstated] Trust makes clear that participation in the
> [Reinstated] Trust is conditioned on living in accordance with the principles
> of the United Effort Plan and the FLDS Church as determined by spiritual
> leaders. It provides that

>> [p]articipants who, in the opinion of the Presidency of the
>> Church, do not honor their commitments to live their lives
>> according to the principles of the United Effort Plan and the
>> Church shall remove themselves from the Trust property and,
>> if they do not, the Board of Trustees may … cause their
>> removal.

*Lindberg*, 299 P.3d at 1062 (quoting Reinstated Trust).  This structure gave Mr. Jeffs

absolute control over the church members by granting him the authority to strip them of

"nearly all of their possessions, their familial connections, their shelter and their

livelihoods."  Aplt. App. at 34.  The complaint states that the Priesthood Record, Mr.

Jeffs' detailed contemporaneous account of the events that transpired in his life, contains

many examples of how the Reinstated Trust was used to control the FLDS who lived on

Trust lands.  When revising this instrument into the Reformed Trust in 2006, one state

district court concluded, and the Utah Supreme Court expressly or impliedly affirmed,

that the Reinstated Trust had been drafted to facilitate illegal practices such as child rape.

*In the Matter of the UEP Trust*, No. 053900848 (Utah Dist. Ct. Dec. 13, 2005). [2]

---

[2]     In its December 2005 decision, this Utah judge expressed a number of concerns
about the Reinstated Trust, including that: individuals who were no longer active
participants in the church would be excluded from consideration as Trust beneficiaries,
notwithstanding their prior consecrations to the Reinstated Trust, *id*. at ¶¶ 36, 45;
religious criteria were being utilized to determine who received the privilege to live on
Trust property and to guide relocation and location-sharing arrangements, *id*. at ¶ 44; the

Although the allegations in the complaint begin with the Reinstated Trust, plaintiffs also detail how defendants continued to take action to perpetuate this scheme. On one occasion in 2004, for instance, defendants represented the UEP Trust "in an eviction action filed in Arizona to expel a family in retaliation for the mother's refusal to consent to the 'marriage' (rape) of her fifteen-year-old daughter." Aplt. App. at 49; *United Effort Plan Tr. v. Holm*, 101 P.3d 641, 643 (Ariz. Ct. App. 2004). On another occasion, defendants apparently represented the FLDS in negotiations with the Attorney General of Utah, who had "offered to lessen or terminate the prosecution of bigamy and illegal polygamy if the FLDS would stop marrying (raping) underage girls." Aplt. App. at 47. Mr. Jeffs described this 2003 negotiation in his Priesthood Record and confirmed that his position was "[t]here will be no compromise." *Id*. (quoting Priesthood Record, January 16, 2003). Throughout these entries, Mr. Jeffs narrated Mr. Parker's

---

church president had extraordinary powers, including the power to appoint or remove trustees who "serve at the pleasure of the President of the Church," and the president's approval was required for any action by the Board of Trustees (particularly considering Warren Jeffs' serious and continued breach of fiduciary duties), *id*. at ¶¶ 48–50; there was language granting the church president great discretion, using terms such as "absolute, sole, or uncontrolled," *id*. at ¶ 21 (internal quotation marks omitted); and the church president was delineated as the remainder beneficiary, thus "directly further[ing] illegal practices" and creating "a significant risk for abuse," *id*. at ¶¶ 52–53. In addition to these flaws in the structure of the Reinstated Trust itself, the court acknowledged the suspended trustees' (including and especially Warren Jeffs') "serious breach[es] of trust," "unfitness, unwillingness, or persistent failure . . . to administer the trust effectively on behalf of the beneficiaries," and violation of duties including "the duties of loyalty and prudent administration of the Trust." *Id*. at ¶ 21 (internal quotation marks omitted). Concluding that it could excise the illegal goals of the Reinstated Trust, the reformation effectively "stripped the FLDS Church president of several powers" and removed any requirement that the president approve actions on behalf of the Reinstated Trust (among other revisions). *M.J. v. Wisan*, 371 P.3d at 24.

involvement in the negotiations, stating:

> Uncle Sam [Barlow[3]] reported that he gave Rod Parker the message that I wanted any lawyers fired that would talk compromise, and Rod Parker said he stands with us. *So Uncle Sam will use Rod Parker to help convince these other lawyers.*
>
> . . .
>
> I got a call from Uncle Sam.  He had me talk to Rod Parker, our lawyer from Salt Lake who flew south yesterday. He had quite a long talk with the Chief Deputy Attorney General, David Myers, who is a former judge. Rod Parker reported to me that none of our lawyers compromised our position.  *They only tried to convince the Attorney Generals what a useless effort this is because, you are not going to change that community*, and how damaging it was to the families.

*Id*. at 47 (quoting Priesthood Record, January 21, 2003), 48 (quoting Priesthood Record, January 22, 2003) (emphasis added).  The complaint contains numerous such averments and specific factual assertions of defendants' ongoing actions to enable and facilitate Jeffs' reign of terror over plaintiffs and other FLDS members.

## B.    The Formation of Attorney-Client Relationships

Significantly, plaintiffs allege that SC&M continually held itself out as representing individual FLDS members.  Citing a number of specific factual allegations from the complaint, their opening brief describes the defendant law firm as "knowingly misus[ing] its self-acclaimed status as the victims' personal, individual legal counsel to bring about their submission," Aplt. Br. at 4; "creating a means to ensure that each individual FLDS member was responsible for SC&M's fees," *id* at 22; and "empower[ing] the firm to act as Jeffs' enforcers, compelling absolute submission on the

---

[3]      Plaintiffs allege that Sam Barlow was "an FLDS leader as well as a paralegal, legal assistant, case manager or agent of SC&M who worked as a liaison for that firm with the leadership of the FLDS Church."  Aplt. App. at 22.

part of its own clientele," *id* at 42. The complaint alleges that over the years these representations and assurances were repeatedly made to FLDS members themselves, as well as to courts, governmental agencies, and the public at-large. Aplt. App. at 42–43, 67, 70. At church services, the FLDS congregation was also regularly given legal updates by Sam Barlow regarding their personal representation by defendants.

Plaintiffs in fact contend that SC&M has never withdrawn from its legal representation of the FLDS members. Plaintiffs claim they were told that their only access to legal counsel was through SC&M and that they were therefore required to personally pay the firm's legal fees. Aplt. Br. at 15. They allege in the complaint that Mr. Jeffs would consistently "call[] out to the FLDS in weekly meetings to pay the lawyers: [because] there is a 'great need for financial help . . . resting upon us.'" *Id*. at 48. For example, on one occasion, Mr. Jeffs purportedly told the FLDS members "*we* owe the lawyers $400,000.00 and it will grow quickly." *Id.* at 56 (emphasis added). At another time, in early 2013, the complaint describes "a call from Jeffs to all FLDS to 'bow their backs' and submit everything they had to pay more attorney fees." *Id* at 114. During one phase, "FLDS leadership regularly demanded more and more money from all FLDS for attorney fees . . . [and] $1,000 to $2,000 donations were [] demanded from each parishioner at least once a month," *id.* at 85–86; during another, "[c]alls for amounts up to $1,000 came almost weekly," *id.* at 103.

> After the Texas raid in 2008, the call for attorney fees grew intense. All FLDS people were ordered to contribute *all* their extra income. The FLDS leadership ordered all FLDS people to max their credit cards, get additional jobs, take loans on their cars and business equipment, and do anything possible to get more money to contribute toward attorney fees.

*Id.* at 113.  Plaintiffs further assert that some of this money came from the labor of children, who would work countless hours just to see their paychecks taken for attorney fees.  *See, e.g.*, *id.* at 91.

## C.    Concealment of Viable Causes of Action

The complaint alleges that at the same time plaintiffs were "assured that they were being protected by their lawyers, [defendants were] working continuously from at least 1997 to the present day to keep [them] and similarly situated persons completely in the dark" about the illegal conduct violating their rights.  *Id.* at 43.  Defendants were aware of restrictions imposed on FLDS members by Mr. Jeffs, who effectively ended members' "access to any information and media from outside the[ir] community."  *Id.* at 46.  This constraint was allegedly accomplished through, in part, Jeffs' July 16, 2002[4] "address entitled 'Our Prophet's Call — Leave Apostates [non-members] Alone Severely,' in which he commanded the FLDS to 'severely' restrict and limit their communications with the outside world."  *Id.* at 34.

> It was accompanied by Jeffs' *strict commands to strictly shun all non-FLDS Church information by not watching television, reading newspapers or magazines, listening to the radio, reading books, or using the internet.*  In this way, Jeffs prevented the FLDS adherents from learning about the fraud being perpetrated on them, that their rights were being violated and how those rights were being violated with the help of Parker and SC&M.  This was intended to and did prevent discovery by Plaintiffs of the nature and extent of the various breaches of duties owed to them by Parker and SC&M.

*Id.* at 34–35 (emphasis added).  Jeffs also forbade any communication with prior

---

[4]    Later in the complaint this address is cited as taking place two years earlier (on July 16, 2000).  Aplt. App. at 73.

members that he had sent away or excommunicated, and he commanded the FLDS to stop patronizing businesses of non-FLDS members or using medical services outside of the FLDS community, even under emergency circumstances.  *Id*. at 46, 73, 110; *see also id*. at 78–79.

These restrictions compounded already existing limitations which resulted from the seclusion and isolation of the FLDS community.  As the Utah Supreme Court explained in 1998, decades ago the FLDS Church "decided to settle its membership in an isolated area to avoid interference with their religious practices." *Jeffs v. Stubbs*, 970 P.2d at 1239.  The complaint includes many specific allegations of plaintiffs' confinement in increasingly secluded and hidden communities throughout remote parts of the country, *see, e.g*., Aplt. App. at 46, 92, 98, 133, with this sequestration being both compelled and intensified by FLDS-directed security[5] and law enforcement personnel, *see, e.g., id*. at 104 ("Steven was regularly followed by the private FLDS Church security force that protects Defendant Jeffs[] and the FLDS enterprise and by law enforcement in Short Creek who, despite being deputized officers, are loyal to Defendant Jeffs."); *id*. at 122 (After Amy Nielson learned at her deposition that Mr. Jeffs had denounced himself as a religious fraud, she planned to escape but was told that her home "was under constant video surveillance"); *see also id.* at 81, 113, 129.  One plaintiff describes how she was "*moved [twenty-six] times between secret homes and compounds in Texas, South Dakota, Colorado, Nevada, Wyoming, Arizona and Utah*," *id*. at 118 (emphasis added),

---

[5]     The private security force protecting FLDS church leaders and their interests was known as "Church Security" or the "God Squad."  Aplt. App. At 113.

and how she was "treated essentially as a prisoner . . . and was seldom allowed to leave the secret houses and compounds in which she was hidden without being accompanied and watched by a Priesthood Caretaker," *id*. Another plaintiff alleges a period of placement in hiding "inside a walled and gated compound . . . where they were cut-off from all communications with everyone, except those who lived with them in that compound." *Id*. at 125. Local law enforcement and church security officers were "ordered" by church leaders to monitor one plaintiff "in case he attempted to leave and take his younger siblings with him," *id*. at 105, while another plaintiff "desperately tried to run away several times but was caught by the FLDS police," *id*. at 136. The general allegations further describe FLDS members being "ordered by Jeffs to move to Texas to live in and around . . . secret 'lands of refuge,' in 'safe houses,' or at other secret locations in various western states, as well as in Canada." *Id*. at 54.

According to plaintiffs, both the restricted access to external communication and the physical isolation were supplemented by plaintiffs' lack of education. Several plaintiffs recount the rigorously limited nature of their education within FLDS communities. *See, e.g*., *id.* at 83, 91–92. One plaintiff describes how

> she had had only a small taste of life outside the religion. She had been allowed to attend Kindergarten before Defendant Jeffs pulled the FLDS children out of the public schools. . . . She had also attended religious schools where they taught reading, writing, while indoctrinating the children until those schools were also shut down. Then when she was thirteen-years-old the religious schools were replaced by homeschooling and Alyssa herself became a teacher of reading, math and the basics to thirty or forty other children.

*Id*. at 95–96. The complaint thus alleges plaintiffs' continuing unawareness of their claims as ensured through a combination of physical isolation, forbidden access to media,

and inadequate and biased education, all circumstances of which defendants purportedly had knowledge.

Although plaintiffs were kept ignorant of the crimes being perpetrated against them, awareness of these atrocities and accompanying media attention was growing in the external world.  Law enforcement initiated various criminal and fraud investigations into Mr. Jeffs, throughout which the alleged active concealment by defendants continued unabated.  Mr. Jeffs was arrested in Nevada in August of 2006 and was incarcerated in Utah pending trial for charges related to his arrangement of illegal marriages between adult men and young girls.  While awaiting trial, Mr. Jeffs "repeatedly confesse[d] that he [wa]s a religious fraud and ha[d] deceived the FLDS," and he gave instructions to defendants that the FLDS members be told so they could "begin to put their families back together."  *Id*. at 56.  Plaintiffs assert that these instructions were ignored by defendants, who kept Mr. Jeffs' admissions from the FLDS.  *Id*.  Moreover, they allege that

> [i]n April of 2007, Jeffs was frustrated that his efforts to tell the FLDS he [was] a fraud had been stymied, so *he attempted to admit in open court that he is a fraud, that he is not a prophet and had never been the Prophet.  He [was] stopped by his defense lawyers.*  Although Parker was heavily involved in Jeffs' criminal defense in Utah, he attempted to keep his involvement secret by meeting with the rest of the defense team at a home in Santa Clara, Utah and other places and by not appearing at the trial.  *Despite knowing that Jeffs was still trying to publicly confess that he was a religious fraud, Parker made no effort to advise the FLDS that their "Prophet" was, by his own repeated and insistent admissions, not a prophet, but a complete fraud*, and as a result continued to further the FLDS enterprise to the detriment of the FLDS [members].

*Id*. at 56–57 (emphasis added).

On September 25, 2007, Mr. Jeffs was convicted in Utah on two counts of rape as

an accomplice, and in November he was sentenced to imprisonment for ten years to life.
*Id*. at 21.  But on July 27, 2010, the Utah Supreme Court overturned his convictions due
to incorrect jury instructions.  *Id*.  Mr. Jeffs was subsequently extradited to Texas for
trial, on pending charges which had arisen out of a 2008 law enforcement raid on a Texas
FLDS compound called the YFZ Ranch.  *Id*. at 21, 55.  He was convicted for sexual
assault and aggravated sexual assault of children, and sentenced to life in prison plus
twenty years, to be served consecutively.  *Id*. at 21.  Significantly, during the process of
Mr. Jeffs' prosecutions, defendants allegedly sought to obtain judicial approval of its
efforts to keep its individual FLDS member clients uninformed of the evidence regarding
how Jeffs abused them.  *See* Aplt. App. at 40–44.

## D.    Procedural History

The complaint's general allegations are supplemented by detailed assertions of
plaintiffs' individual losses and recurrent traumatic experiences, which they each assert
were facilitated by defendants.  Each plaintiff brought claims against Mr. Parker and
SC&M for (1) legal malpractice, (2) breach of fiduciary duty, (3) fraud, (4) negligent
misrepresentation, (5) civil conspiracy, (6) civil violations of the Racketeer Influenced
and Corrupt Organizations Act ("RICO"), and (7) violations of the Trafficking Victims
Protections Reauthorization Act ("TVPRA").  SC&M and Mr. Parker moved to dismiss
the complaint under Rule 12(b)(6) of the Federal Rules of Civil Procedure for failure to
state a claim, further arguing that all of plaintiffs' claims were barred by the applicable
statutes of limitations.  The district court granted defendants' motion to dismiss.  The
court dismissed the first six claims of all plaintiffs except one minor plaintiff as barred by

the relevant statute of limitations, and it dismissed the claims of that minor plaintiff as well as all TVPRA and RICO claims for failure to state a claim.

## II.

### Standard of Review

We review *de novo* the dismissal of a complaint for failure to state a claim under Rule 12(b)(6). *Childs v. Miller*, 713 F.3d 1262, 1264 (10th Cir. 2013). With respect to claims dismissed as barred by the various statutes of limitations, the critical issue is the date on which the claims and causes of action "accrue" and thus "start [] the clock ticking on the limitations period." *Robert L. Kroenlein Tr. v. Kirchhefer*, 764 F.3d 1268, 1275 (10th Cir. 2014). When the dates on which the pertinent acts occurred are not in dispute, the date a statute of limitations accrues is a question of law. *Edwards v. Int'l Union, United Plant Guard Workers,* 46 F.3d 1047, 1050 (10th Cir. 1995); *see also Strong v. Cochran*, No. 2:14-cv-788-TC, 2017 WL 4620984, at *5 n.10 (D. Utah Oct. 13, 2017) ("Certainly a federal court may evaluate whether dates of events pleaded in the complaint indicate on the complaint's face that a claim is time-barred."). The traditional rule in Utah is that a right accrues "upon the happening of the last event necessary to complete the cause of action." *Colosimo v. Roman Catholic Bishop of Salt Lake City*, 156 P.3d 806, 810 (Utah 2007) (internal citation omitted). In certain circumstances, however, Utah courts will apply a discovery rule under which "the limitations period does not begin to run until the discovery of facts forming the basis for the cause of action." *Myers v. McDonald*, 635 P.2d 84, 86 (Utah 1981).

The applicability of a statute of limitations and…the discovery rule are questions

of law, which we review for correctness.  But the application of the discovery rule also involves a subsidiary factual determination—the point at which a person reasonably should know that he or she has suffered a legal injury.  Therefore, while we review the [lower court's] decision for correctness, we apply a summary judgment standard of review to the subsidiary factual determination, which requires us to view the facts and all reasonable inferences drawn therefrom in the light most favorable to the non-moving party.

*Colosimo*, 156 P.3d 806 at 810 (internal citations and quotation marks omitted); *see also*

*Arnold v. Grigsby*, 417 P.3d 606, 616 (Utah 2018) ("The issue of when [the plaintiff]

knew of [his or her] legal injury is a question of fact, but the applicability of the

discovery rule to the statute of limitations—whether [he or she] should have known about

[his or her] legal injury—is a mixed question of law and fact.").

With respect to the claims dismissed as inadequately pled, "[a]t this stage in the

litigation, we accept as true the well pleaded factual allegations and then determine if the

plaintiff has provided 'enough facts to state a claim to relief that is plausible on its face.'"

*Hogan v. Winder*, 762 F.3d 1096, 1104 (10th Cir. 2014) (quoting *Bell Atl. Corp. v.*

*Twombly*, 550 U.S. 544, 547 (2007)).  "A claim has facial plausibility when the plaintiff

pleads factual content that allows the court to draw the reasonable inference that the

defendant is liable for the misconduct alleged."  *Ashcroft v. Iqbal*, 556 U.S. 662, 678

(2009).

### III.

### Discussion

The district court dismissed the majority of plaintiffs' non-TVPRA claims on

statute of limitations grounds.  The court then turned to the remaining plaintiff, whose

claims were tolled until she reached the age of eighteen, considering each non-TVPRA

claim in turn and dismissing it for failing to state a claim.  Finally, the court held that

plaintiffs' TVPRA claims were inadequately pled.

   We begin by examining whether plaintiffs properly stated their various claims.

We will then address the pertinent statutes of limitations, viable avenues for tolling the

limitations periods, and the application of tolling to specific plaintiffs.  We will conclude

with an overview of what claims remain after this appeal, and what issues must be

addressed on remand.[6]

---

[6]     The dissent complains that we fail to adhere to the district court's ruling and the
parties' appellate arguments, and further declares that plaintiffs' opening brief does not
contest the district court's dismissal of their TVPRA claim or the individual claims of
Ms. May Musser.  Dissent at 1.  It is worth noting that the dissent's admonishment to
"confine [the opinion] to the precise arguments asserted on appeal," *id.* at 3, is
undermined by its subsequent criticism of the complaint's "fail[ure] to comply with Fed.
R. Civ. P. 8(a)(1)'s 'short and plain statement' requirement,"*id.* at 4—an argument that
was itself never discussed by the district court or mentioned in any appellate briefs.
Nevertheless, the dissent's concerns are misplaced.  This is perhaps most astutely
observed in the plaintiffs' general assertion on appeal that "the district court persistently
re-cast the factual allegations in a manner substantially different from what was actually
pleaded, ignoring many key averments and altering others."  Aplt. Br. at 37.  Plaintiffs
also specifically argue that the district court improperly dismissed each of plaintiffs'
claims, and they footnote citations to the complaint where it so alleges.  *See, e.g.*, Aplt.
Br. at 20 (arguing that district court improperly dismissed malpractice claims and
supporting this argument with footnotes citing to controlling case law and nineteen
different pages/page ranges of relevant factual allegations in the complaint).  Plaintiffs
identify the district court's errors in dismissing their claims as inadequately pled at each
stage of their opening brief.  *See id.* at 6 (issues presented for review), 38 (summary of
the argument), 43 (argument), 59 (conclusion).  We in turn focus our opinion on the
detailed factual allegations made in the complaint and the ways in which the district court
and the dissent both ignore and mischaracterize these allegations in dismissing the
various claims.

A.      **Whether Plaintiffs' Allegations State a Claim**

1.      **Legal Malpractice and Breach of Fiduciary Duty**

To succeed on a claim of legal malpractice based on negligence, a plaintiff must prove: "(i) an attorney-client relationship; (ii) a duty of the attorney to the client arising from their relationship; (iii) a breach of that duty; (iv) a causal connection between the breach of duty and the resulting injury to the client; and (v) actual damages." *Christensen & Jensen, P.C. v. Barrett & Daines*, 194 P.3d 931, 938 (Utah 2008).  The elements of a legal malpractice claim based on breach of fiduciary duty are substantially the same.  *Id*.

Plaintiffs allege that defendants committed legal malpractice by failing to inform them of their legal rights and the extent to which such rights were being violated on an ongoing basis by Mr. Jeffs; by failing to withdraw from representation when conflicts of interest arose between plaintiffs and the FLDS; and by failing to disclose to plaintiffs the true nature and structure of the legal framework they created that was used to terrorize FLDS members.  Plaintiffs similarly allege that defendants breached fiduciary duties to them by purporting to represent their best interests while simultaneously "facilitating a plan to exploit and harm them."  Aplt. App. at 65.  The district court held that the factual allegations in the complaint were not legally sufficient to plead an implied attorney-client relationship between defendants and plaintiff May Musser, the only plaintiff to survive the statute of limitations analysis.  It accordingly dismissed these claims as inadequately pled.  For the following reasons, we reverse this holding with respect to the plaintiffs set forth below, and we leave it to the district court on remand to determine whether the

remaining elements of these claims have been adequately pled.

   i. Attorney-client relationship

  Plaintiffs do not claim the formation of express attorney-client relationships with defendants but argue instead that they adequately pled implied attorney-client relationships in their complaint.  An attorney-client relationship may arise without an express contract.  *Cole v. Ruidoso Mun. Schs.*, 43 F.3d 1373, 1384 (10th Cir. 1994); *Margulies v. Upchurch*, 696 P.2d 1195, 1200 (Utah 1985).  Once formed, "[t]he attorney-client relationship is an ongoing relationship giving rise to a continuing duty to the client unless and until the client clearly understands, or reasonably should understand, that the relationship is no longer to be depended on."  *Roderick v. Ricks*, 54 P.3d 1119, 1127 (Utah 2002), *citing In re Weiner*, 586 P.2d 194, 197 (Ariz. 1978).

  Under Utah law, "the proper determination of whether an implied attorney-client relationship exists hinges on whether the party had a *reasonable belief* that it was represented."  *Kilpatrick v. Wiley, Rein & Fielding*, 37 P.3d 1130, 1139 (Utah 2001) (emphasis in original).  "In order for a person to 'reasonably believe' that an attorney represents the person, (1) the person must subjectively believe the attorney represents him or her and (2) this subjective belief must be reasonable under the circumstances." *Roderick*, 54 P.3d at 1127.  The totality of the circumstances should be considered. *Kilpatrick*, 37 P.3d at 1140.

  The general rule in Utah is that representation of an entity does not of itself compel representation of that entity's members, but such an implied attorney-client relationship may arise under certain circumstances.  *Id.*  "[D]irect involvement [of the

attorney with the client's individual interests is] . . . only one factor to consider in determining whether the specific circumstances of the case demonstrate the [client's] belief concerning representation is reasonable." *Id.* at 1140–41. For example, in *Marguiles*, the Utah Supreme Court concluded that it was not unreasonable for the individual members of a limited partnership to "believe that [the firm] was acting for their individual interests as well as the interests of the partnership" because the firm's successful representation of the limited partnership would have in turn "protected the [individual members] from substantial . . . liability." 696 P.2d, at 1200. In a later case, the court clarified that the test is whether, under the totality of the circumstances, the individual members reasonably believed the lawyer "represented their interests as individuals as distinguished from their common interests with the other limited partners." *Norman v. Arnold*, 57 P.3d 997, 1002 (Utah 2002).

In *Norman,* the Utah Supreme Court cited the existence of facts that "both discredit and support a conclusion that an implied attorney-client relationship existed" to ultimately conclude that the "question is properly answered by a factfinder, [and] it was error for the district court to determine, as a matter of law, that [the lawyer] did not owe the [individual members of a joint venture agreement] any fiduciary duties." *Id*. Likewise, the complaint here alleges facts that both discredit and support a conclusion that implied attorney-client relationships existed. Reading these facts in the light most favorable to plaintiffs on defendants' motion to dismiss, we conclude that the totality of the circumstances in this case could lead a fact-finder to decide that the individual FLDS members reasonably believed defendants were representing their individual interests.

Defendants argue that any finding of implied attorney-client relationships here would create a slippery slope where "no law firm could represent a company or organization without the risk of being found to represent every individual constituent affiliated with that entity." Aple. Br. at 42. But plaintiffs do not argue that their individual representation was either automatic through reformation of the UEP Trust or merely incidental to their FLDS membership. *See* Aple. Br. At 15. Rather, as we discuss below, they contend that their attorney-client relationships arose through (1) repetitive solicitation of money from them to pay legal fees to defendants and (2) the representations made to them over the years by FLDS leaders and by SC&M affiliates. Imputation of attorney-client relationships under the specific and *unique* facts of this case will not undercut the general rules of implied representation.

### a. *Subjective beliefs of representation*

An implied attorney-client relationship requires that the client subjectively believe the attorney represents him or her, so it is necessary to examine each individual plaintiff to determine whether sufficient facts were pled to support a finding of this subjective belief. The district court specifically ruled only with respect to Ms. May Musser's claims. Ms. Musser alleges facts that both support and discredit the conclusion that an implied attorney-client relationship existed between her and defendants. Ms. Musser does not allege a personal belief of an attorney-client relationship with defendants, but she does allege that various demands were made for donations of attorney fees and that her paychecks were withheld at least in part for this purpose. Aplt. App. at 91. Contrary to the district court's determination, these conflicting allegations create a genuine issue of

fact under Utah law that is not appropriate for dismissal at this stage.  *See Norman*, 57 P.3d at 1002.

The district court never reached the issue of implied attorney-client relationships between defendants and the rest of the plaintiffs.  Still, many of the allegations discussed by the district court in dismissing Ms. Musser's claims are widely applicable across all plaintiffs.  *See, e.g.*, *Bistline v. Jeffs*, No. 2:16-cv-788-TS, 2017 WL 108039 at *7 (D. Utah Jan. 11, 2017) (listing the relevant allegations regarding Ms. Musser's claim as her financial contributions for attorney fees and defendants' representation of the church as a whole).  Therefore, for the convenience of the district court, we highlight the relevant factual assertions regarding each plaintiff's subjective belief.

Because plaintiffs Derrell Barlow, Gina Rohbock, Janetta Jessop, and Wallace Jeffs are barred by all applicable statutes of limitations, as discussed *infra*, the existence of an individual attorney-client relationship is a moot point with respect to them. Although Alyssa Bistline, Briell Decker and Ruby Jessop are not barred by the statutes of limitations, we nevertheless dismiss their claims as a matter of law for the following reasons.  Alyssa Bistline and Briell Decker pled no facts whatsoever in reference to either their subjective understanding of defendants as representing them legally or their personal payment of any of the attorney fees.  Ruby Jessop was theoretically represented by Mr. Parker in 2008 as one of the FLDS members on the YFZ Ranch, but she never alleges a subjective belief of personal representation or an understanding of the defendants' role with respect to her community.  Most importantly, she undertook pro se legal action in 2012 against her husband, who was represented by defendants, which

indicates that at least by that point she had absolutely no belief that she was personally represented by defendants.  Thus, neither Alyssa Bistline, Briell Decker, nor Ruby Jessop plead adequate facts to support a finding of an implied attorney-client relationship.

Like Ms. Musser, several other plaintiffs allege facts both supporting and discrediting the existence of an implied attorney-client relationship.  Although Vergel Barrow perhaps had a more sophisticated legal perspective gained through his father's work as a legal liaison, he still regularly contributed large sums of money for attorney fees based on specific requests therefor and he attests to having trusted Parker as "his" lawyer.  Aplt. App. at 111–14.  Steven Dockstader admits "not hav[ing] much knowledge of the FLDS lawyers," but he made regular payments in response to donation requests and states it was common knowledge that the majority of this money was being used to pay attorney fees, even when not specifically earmarked.  *Id*. at 103.  Susan Broadbent does not attest to paying any specific attorney fees but alleges her subjective belief that the lawyers "were protecting her and the FLDS people."  *Id*. at 82.  The same is true of Jason Black, who does not specifically allege personal payment of legal fees but states that he knew based on legal updates at church meetings that defendants were the lead attorneys for the FLDS and that they needed to be paid for their representation.  *Id*. at 87. He further alleges that he "believed that [defendants] had the people's full interests at heart, [] was assured regularly that they were his lawyers as well as the lawyers for all the FLDS[,] . . . [and] [i]f a legal problem arose, the people were put in contact with the Lawyer Defendants."  *Id*. at 88.

The remaining plaintiffs specifically allege their subjective belief and consequent

payments in reliance thereof.  Marvin Cooke believed that Mr. Parker was his lawyer and

represented his interests "[t]hrough most of his adult life," understanding that defendants

represented the FLDS both as a group and as individuals.  *Id*. at 107.  He routinely

contributed money in response to specific requests for attorney fees, including his

substantial income tax refunds.  Thomas Jeffs states that he trusted defendants to protect

him, and describes several ways that he financially contributed to pay attorney fees and

other expenses, including taking out signature loans and a line of credit.  *See id*. at 128–

131.  Helen Barlow was familiar with Mr. Parker and "believed that he had been hired to

defend her best interests and the interests of the FLDS," also believing that the "attorney

fees she regularly contributed her paychecks to pay were going to [defendants]."  *Id*. at

108.  While growing up, Carole Jessop was "told that Parker was the FLDS' attorney

many times" and understood that "he was to be trusted as the lawyer protecting her and

all FLDS people."  *Id*. at 115.  She remembers many specific demands for attorney fees,

and believes her family's payments were being made in large part to defendants.  Sarah

Allred "knew that Parker was the spokesman and head lawyer for the FLDS," "trusted

that he was protecting her," "knew she would be directed to him" if she ever needed help

with a legal problem, and "had personally paid money for his services."  *Id*. at 128.

Nolan Barlow "was taught to look to [defendants] for himself [and] his wife and children

if a legal matter arose" and had "seen example after example of FLDS people with legal

problems contact FLDS leaders who then . . . would contact [defendants]."  *Id*. at 91.

The complaint describes him as among the FLDS members who had been "sacrificing to

pay [defendants'] legal bills."  *Id*. at 90.  Lawrence Barlow understood that defendants

27

were "'our lawyers' representing 'our best interest,'" and faithfully made monthly

payments for attorney fees under the belief that they were going to approved FLDS

lawyers. *Id*. at 99. He also understood that "there was a process you were required to

follow as a member of the FLDS church to obtain legal assistance," and if a personal

legal matter arose individual FLDS members would be directed first to the legal liaison

Sam Barlow and then to "approved FLDS lawyers, typically Parker." *Id*.

Finally, several plaintiffs allege actual receipt of individual representation by

defendants. Alicia Rohbock was taken to Texas because of her children's involvement in

the 2008 raid, and there she witnessed Mr. Parker's representation of each FLDS member

on the ranch. *Id*. at 79. Holly Bistline was instructed to divorce her husband in 2003,

was referred to Mr. Parker, and he handled the matter. *Id*. at 93. Amy Nielson received

personal representation by Mr. Parker in a divorce case that did not conclude until April

2013, and she "often spoke with Parker on his cell phone and exchanged emails on many

occasions." *Id*. at 121. Her subjective belief is evidenced through her August 2014 email

specifically requesting release from their attorney-client relationship. *Id*. at 122.

### b. *Reasonableness of beliefs under the circumstances*

Under Utah law a subjective belief is not enough. The specific circumstances of

the case, in totality, must also demonstrate that the client's belief in individual

representation is reasonable. The district court incorrectly focused on the 1998 revision

of the UEP Trust as the capstone of plaintiffs' alleged implied attorney-client

relationships, and discounted plaintiffs' fee solicitation arguments because "it is not

objectively reasonable to believe that simply donating funds to a church creates an

implied attorney-client relationship with that church's retained attorneys." *Id*. at 833.

While plaintiffs do reference the Reinstated Trust throughout their arguments, the

majority of the complaint's relationship-based allegations involve a fee solicitation

scheme far greater than the mere passing of a Sunday tithing plate.

Plaintiffs rely on the following to support the reasonableness of their belief that

defendants represented each of them individually: their complete sequestration within the

FLDS Church that limited their information sources to those provided by church leaders;

the ongoing attorney fee solicitation within this insulated environment that church leaders

and SC&M affiliates explained as payment for individual as well as collective

representation; and the weekly legal updates in front of the entire congregation by a

person affiliated with defendants.  For example, plaintiffs allege that:

> The representations, promises and inferences discussed throughout this
> Complaint were *repeated with the knowledge and consent of Parker and
> SC&M on their behalf in ongoing, weekly and occasionally more frequent
> meetings* in which virtually all the FLDS assembled, either in person or
> listened remotely to sermons in which Plaintiffs and similarly situated
> persons were actively instructed to part with their funds, including
> sometimes entire paychecks, *to "keep the lawyers paid," because "they are
> representing you and all of your brothers and sisters"* . . . .

*Id.* at 66 (emphasis added).  As outlined previously, many individual plaintiffs reiterate

how they understood that defendants were protecting both them and the FLDS as a whole

"in exchange for the large sums of money they were paying for that protection."  *Id*. at

77.  The complaint further plausibly alleges that defendants' regular discussions with Mr.

Jeffs and other FLDS representatives ensured defendants' actual knowledge of both the

express representations being made and the direct individual reliance of FLDS members.

Unlike cases falling under the general rule that representation of an entity does not include representation of that entity's members, the circumstances in this case reasonably imply individual attorney-client relationships.  Like the limited partners in *Marguiles*, FLDS members were informed that defendants' successful representation of the FLDS church as a whole would in turn protect them individually.  *See, e.g., id*. at 42 (a legal update by Sam Barlow assured the church members that defendants were involved in their defense and that "all of you who are not named as defendants, if you believe in the work…you are in fact a defendant in this lawsuit…[as] they have made each and every [sic] one of us a defendant.").  Furthermore, they knew they would be directed to defendants with any personal legal issues that may arise, and personally paid attorney fees in recognition of this individual guarantee.

Most importantly, on multiple occasions including one in 2008 and one in 2011, defendants held themselves out to government officials and the public-at-large as representing the individual rights of individual members of the FLDS church.  *See* Aplt. App. at 57, 58, 60.  On yet another occasion, also in 2011, the affidavit of a liaison between defendants and the FLDS leadership stated that Mr. Parker and another lawyer called the FLDS to ask "if one or more of the FLDS defendants might want them to provide representation."  *Id*. at 60.  This once again evidences defendants' status as "on call, standing by and willing to perform at the direction of the leadership of the Church . . . [and] willing to represent any or all FLDS Defendants."  *Id*. (internal quotation marks omitted).  With the many types of explicit and implicit statements made by defendants regarding individual representation, plaintiffs' assertions that they believed they were

personally represented are far from unreasonable.  Thus, the totality of the circumstances indicates that individual FLDS members would have been reasonable in believing that defendants were protecting their legal interests as individuals, as distinguished from merely representing their common interests as a church.

Finally, we emphasize that plaintiffs' factual allegations describe extremely unusual circumstances.  Accordingly, what may be reasonable in this situation varies significantly from what may be reasonable when there are more typical, less insular living conditions.  *See, e.g.*, *Keate v. State*, No. 03-10-00077-CR, 2012 WL 896200, at *12 (Tex. Ct. App. Mar. 16, 2012) (expert witness stating that "[FLDS] indoctrination practices, based on the doctrines and teachings of FLDS, allowed members to become compliant with and complicit in underage marriages [and] sexual activity with underage children").  If individuals have been cut off from outside resources because of sincerely held religious beliefs and have been actively and repeatedly deceived as to an attorney's responsibilities and allegiances towards them personally, it is plausible that they reasonably believed they were individually and collectively represented by that attorney.

Although the district court only addressed the existence of an attorney-client relationship between Ms. Musser and defendants, this analysis of the reasonability of subjective beliefs of representation under the totality of these circumstances can be similarly applied to all plaintiffs.  We therefore reverse the district court on this issue and remand for a factual determination of whether implied attorney-client relationships existed between defendants and each of the following plaintiffs:  Sarah Allred, Helen Barlow, Lawrence Barlow, Nolan Barlow, Vergel Barlow, Holly Bistline, Jason Black,

Susan Broadbent, Marvin Cooke, Steven Dockstader, Thomas Jeffs, Carole Jessop, May Musser, Amy Nielson, and Alicia Rohbuck.

### 2.  Fraudulent and Negligent Misrepresentation

Plaintiffs base their fraudulent and negligent misrepresentation claims on allegations that defendants falsely held themselves out as representing and acting in the best interests of the entire FLDS membership and that plaintiffs reasonably relied on these representations in donating several millions of dollars in attorney fees.  *See* Aplt. App. at 66–69.  The district court dismissed the fraudulent and negligent misrepresentation claims because it concluded that the only plaintiff not barred by the statute of limitations failed to allege an implied attorney-client relationship.  Because we are reversing that determination with respect to certain plaintiffs, the district court will need to determine whether those plaintiffs sufficiently pled the remaining elements of these claims.

### 3.  Civil Conspiracy

The district court dismissed the majority of plaintiffs' civil conspiracy claims on statute of limitations grounds, and then dismissed Ms. Musser's claim because it concluded that none of the underlying torts alleged by plaintiffs were adequately pled. Once again, the district court will now need to determine whether plaintiffs sufficiently pled the remaining elements of this claim.

### 4.  RICO Violations

Plaintiffs did not adequately address this part of the district court's holding in their opening brief.  When discussing the district court's alleged mischaracterization of their

specific claims regarding participation in a criminal enterprise, for example, plaintiffs

stated, "[t]he District Court based its dismissal of Plaintiff-Appellants' TVPRA (and

RICO) claims upon the absence of specific facts which are in fact pleaded throughout the

Complaint with specificity." Aplt. Br. at 47.  Although the brief then specifically argues

why the TVPRA claims should survive, plaintiffs never again mention their RICO claim.

"[W]e routinely have declined to consider arguments that are not raised, or are

inadequately presented, in an appellant's opening brief." *WildEarth Guardians v. U.S.

E.P.A.*, 759 F.3d 1196, 1204 (10th Cir. 2014) (internal citation omitted).  We do so here

and decline to address plaintiffs' RICO claims.

### 5.    Violations of the TVPRA[7]

The TVPRA provides a civil cause of action for victims of any crime under

chapter 77 of title 18 of the U.S. Code.  18 U.S.C. § 1595.[8]  Plaintiffs brought claims

---

[7]    The dissent claims that "[n]owhere in their opening brief do plaintiffs argue that the district court erred in dismissing their TVPRA claims as inadequately pled." Dissent at 2.  But the dissent itself contradicts this alleged "procedural fact" with citations to specific arguments in plaintiffs' opening brief concerning the "flaws in the District Court's reasoning [regarding the TVPRA claim]." *Id.* at 10 (alterations in original) (citing Aplt. Br. at 47–48).  This concern thus appears illusory in light of the dissent's own acknowledgment and analysis of these arguments that it paradoxically declares to be entirely absent.  Notably, defendants did not argue that plaintiffs' TVPRA claims were time-barred and the district court expressly did not dismiss these claims on statute of limitations grounds.  *See Bistline*, 2017 WL 108039 at *3.  Accordingly, any and all TVPRA arguments asserted by plaintiffs on appeal inevitably concern the sufficiency of these allegations to state a claim.  To avoid any further confusion, we note that plaintiffs specifically argue the district court erred in dismissing their TVPRA claims as inadequately pled on pages 45–48 of their opening brief.

[8]    Section 1595 provides:
An individual who is a victim of a violation of this chapter may bring a
civil action against the perpetrator (or whoever knowingly benefits,

pursuant to the TVPRA, alleging that they were subjected to violations of 18 U.S.C.

§ 1589's prohibition on forced labor or services.[9]   Section 1589 provides the following:

> (a) Whoever knowingly provides or obtains the labor or services of a person by any one of, or by any combination of, the following means—
>
>> (1) by means of force, threats of force, physical restraint, or threats of physical restraint to that person or another person;
>>
>> (2) by means of serious harm or threats of serious harm to that person or another person;
>>
>> (3) by means of the abuse or threatened abuse of law or legal process; or
>>
>> (4) by means of any scheme, plan, or pattern intended to cause the person to believe that, if that person did not perform such labor or services, that person or another person would suffer serious harm or physical restraint shall be punished as provided under subsection (d).
>
> (b) Whoever knowingly benefits, financially or by receiving anything of value, from participation in a venture which has engaged in the providing or obtaining of labor or services by any of the means described in subsection (a), knowing or in reckless disregard of the fact that the venture has engaged in the providing or obtaining of labor or services by any of such means, shall be punished as provided in subsection (d).

The statute defines "serious harm" to include "any harm, whether physical or

nonphysical, including psychological, financial, or reputational harm, that is sufficiently

---

financially or by receiving anything of value from participation in a venture which that person knew or should have known has engaged in an act in violation of this chapter) in an appropriate district court of the United States and may recover damages and reasonable attorneys fees.

[9]   Plaintiffs also allege they were subjected to violations of 18 U.S.C. §§ 1583 and 1591, which prohibit involuntary servitude and sex trafficking.  But plaintiffs did not mention these statutes in either their response in opposition to defendants' motion to dismiss or in their opening brief to this court.  We therefore consider their claims under §§ 1583 and 1591 to be forfeited.

serious, under all the surrounding circumstances, to compel a reasonable person of the same background and in the same circumstances to [render labor] . . . to avoid incurring that harm." *Id.* § 1589(c)(2).

One can violate the statute either as a primary offender or simply by benefiting financially from participation in a "venture" with the primary offender. Plaintiffs allege the FLDS Church in general, and Mr. Jeffs in particular, were the primary offenders who forced FLDS members to engage in labor and sexual acts. Defendants' liability is alleged to stem from their participation in a "venture" that benefitted financially from this prohibited conduct. Therefore, to succeed in avoiding dismissal of their § 1589 claims against defendants, plaintiffs must plausibly allege that they provided labor or services that were procured by a method that is prohibited under the TVPRA, and that defendants knowingly benefited from participating in this venture. We will first address whether plaintiffs have pled facts sufficient to support a claim against a primary offender, because this is a necessary element for venture liability.

> i.   The means used to force labor or services

As recognized by this circuit in *United States v. Kaufman*, 546 F.3d 1242, 1261–63 (10th Cir. 2008), and described by plaintiffs in their response to defendants' motion to dismiss, Aplt. App. at 233–36, the TVPRA was enacted to encompass more subtle forms of psychological abuse and nonviolent coercion than those previously required to hold perpetrators accountable. Nine plaintiffs have pled sufficient facts to maintain a claim against Mr. Jeffs and the FLDS church under the TVPRA. According to the general allegations in the complaint, when FLDS members were "ordered" to do something they

had no choice but to comply.  This was due to Mr. Jeffs' purported control over every aspect of their lives, which "create[d] the ability to punish malcontents or recalcitrant followers with swift and horrendous punishments, including the loss of all shelter, food, medical care, cash, livelihood, and other essential support mechanisms necessary to an endurable daily existence." *Id*. at 29; *see also id*. at 106 ("The FLDS Church represented not just a way of living, but over time, it made the FLDS dependent and captive. It [] entrapped them because it was their 'retirement plan' in this world and their ticket to salvation in the next.").  The complaint alleges that "[p]laintiffs were threatened with force, kidnapped, physically restrained, [and] threatened with other harms . . . if they failed to cooperate with the dictates of the Prophet." *Id*. at 73.  Other articulated punishments include "intense and prolonged forced labor for underage workers and adults alike, which labor was typically performed in dangerous construction or excavation activities in which safety precautions were regularly ignored." *Id*. at 34.

Furthermore, plaintiffs maintain that "Jeffs employed the instrumentalities of the law to illegally punish those who appeared to be unwilling to submit . . . [through] loss of property, loss of a place to live, [and] loss of livelihood." *Id*. at 46.  This domination was allegedly enabled through the Reinstated Trust and Mr. Jeffs' resulting control of FLDS members' property.  For example, one plaintiff claims he was ordered to pay more in religious "contributions" upon threat of expulsion and that he did so out of fear of the "repercussions for disobedience, which include expulsion from the FLDS Church and UEP Trust property where [he] both lived and worked." *Id*. at 104; *see also id.* at 49–50 (example of this threat being carried out, with defendants using the Trust to evict an

FLDS family that disobeyed Jeffs).  Another plaintiff allegedly lost her job as a result of

her "disobedience" when she stated that she was not yet ready to be married.  *Id*. at 115.

Such tangible losses and the use of legal processes to enforce these harms legitimize

plaintiffs' claims under the TVPRA.  These and other similar general allegations, when

combined with the specific facts outlined below, are sufficient to plead violations of

§ 1589(a).

> ii.    Specific plaintiffs' labor or services

Three plaintiffs focus their claims solely on labor in the traditional sense.  They

claim that the described threats and punishments were used to "induce them to work for

free or at unlawful rates of compensation for years on end at dangerous, difficult,

demeaning and unpleasant jobs as well as at jobs that would be considered acceptable but

for the fact that [they] were not permitted to keep fair compensation for such work."  *Id*.

at 73.  Steven Dockstader states that in 2004 he was ordered as a twelve-year-old to move

to Texas and engage in hard physical labor to build up the YFZ Ranch.  For the following

seven years he "did little other than construction and other forms of hard labor, receiving

no payment for his work."  *Id*. at 103.  Mr. Dockstader worked extreme hours without

breaks, and "[t]he stress of the labor he engaged in while in Texas caused [his] appendix

to burst."  *Id*.  Similarly, Thomas Jeffs explains that his formal education stopped in 2002

when he was fifteen-years-old and he was subsequently assigned to work for a series of

FLDS controlled companies.  *Id*. at 129.  For the first couple of years, Thomas Jeffs states

that he received only approximately one-fourth of each paycheck, with the rest taken by

FLDS leadership.  In following years, he often received a full paycheck but was expected

to immediately turn it over for payment of FLDS expenses.  Finally, May Musser claims

that she was required at age thirteen to work at a clinic under her older sister's name, with

her paychecks made out to her older sister and surrendered to the FLDS church as part of

a mandated practice.  She further states that as a child she was "required to perform

manual work for which she was not paid, which caused an injury to her back, and was not

allowed the medical care she needed."  *Id*. at 91.

Notably, "[l]abor or services in § 1589 is not limited to work in an economic sense

and extends to forced sexual acts." *Ricchio v. McLean*, 853 F.3d 553, 556 (1st Cir. 2017)

(citing *Kaufman*, 546 F.3d 1259–63) (internal quotation marks omitted).  This court's

analysis in *Kaufman* assessed a variety of sources to reach this ultimate conclusion.  546

F.3d at 1261–63.  These included one academic article observing that the context of

compelled sexual chores surrounds the Thirteenth Amendment's prohibition against

forced labor, another article reasoning that slaves who were victims of sadism and torture

(instead of being put in the fields) were still covered by the core of the Thirteenth

Amendment, and a Fourth Circuit case recognizing sexual abuse as a badge and incident

of servitude.  *See id*. at 1262.  A number of plaintiffs here sufficiently allege such

compelled sexual acts and sexual abuse.

Janetta Jessop alleges both coerced sexual activity and forced labor in the

traditional sense.  She was "married" to Mr. Jeffs in 2003, when she was only sixteen-

years-old.  After their marriage, she "approached Defendant Jeffs and told him she

wanted to have a baby.  Without giving her any explanation, Jeffs told Janetta to take off

all her clothes and sit on his lap.  She obeyed.  He then engaged in sexual activity with

her without intercourse." Aplt. App. at 135. She also worked at a clinic where, although

she was paid for her work, her father made her turn all of the money she earned over to

the Prophet. During this period "she desperately tried to run away several times but was

caught by the FLDS police based in Short Creek and returned to her FLDS parents." *Id*.

at 136.

Susan Broadbent alleges that Jeffs commanded her to enter into a "spiritual

marriage" with her 51-year-old cousin when she was sixteen-years-old. *Id*. at 83. She

actively avoided sexual relations with him for as long as possible but eventually

"succumbed to the pressure to [have] sex with her 'husband' on the night before

September 1, 2003." *Id*. Gina Rohbock states that she was "spiritually married" at age

16 on December 28, 2001, "at the command of Defendant Jeffs." *Id*. at 83. Although

sixteen-year-old Gina did not meet 23-year-old Richard until the day of her "spiritual

marriage" to him, he soon engaged in sexual relations with her. *Id*. at 84. The complaint

states that in 2001, at age fourteen, Ruby Jessop had to stop attending ninth grade and

was forced into a marriage with her second cousin and step-brother, who proceeded to

"viciously rape[]" her. *Id*. at 80. Eighteen-year-old Carole Jessop allegedly received a

message from Mr. Jeffs on May 1, 2003, informing her that she would be married to a

grown, already-married man later that same day. Although Ms. Jessop protested, she was

told that she had no choice. *Id*. at 115. Finally, Briell Decker asserts she was "coerced

by Jeffs to enter into a plural spiritual marriage" on January 18, 2003, when she was

eighteen-years-old. *Id*. at 117. She was then subjected to extensive "training" which

included "the deprivation of certain freedoms, foods and personal items; punishments and

rewards; intense indoctrination and study; medication; [and] sexual activities." *Id*. at 118.

Each of these plaintiffs was a teenager at the time she was purportedly ordered into a sexual relationship with a significantly older man—ordered by her Prophet, whom she had been raised since birth to believe "only does right." *See id*. at 121. "A victim's age or special vulnerability may be relevant in determining whether a particular type or a certain degree of physical or legal coercion is sufficient to hold that person to involuntary servitude." *United States v. Kozminski*, 487 U.S. 931, 948 (1988). In the same way, these plaintiffs' youth and vulnerability, particularly with respect to the parties who were forcing them into this labor, contribute to the plausibility of their allegations under §1589.

Each of the plaintiffs listed above alleges facts sufficient to preclude dismissal on the issue of whether or not they were victims of forced labor under §1589. We now turn to whether they allege sufficient facts to support liability for defendants.

       iii.    Venture liability

As we stated above, § 1589 holds not just primary offenders accountable but also anybody who knowingly "benefits, financially or by receiving anything of value, from participation in a venture which has engaged in" forced labor. § 1589(b). While the term "venture" has not been defined in the context of § 1589(b), the First Circuit recently persuasively applied the definition from another TVPRA subsection to the forced labor context. *See Ricchio*, 853 F.3d at 556. In § 1591(e)(6), "venture" is defined as "any group of two or more individuals associated in fact, whether or not a legal entity." The

district court here held that defendants did not participate in a "venture." We disagree.

In *Ricchio*, the First Circuit became the first court to elaborate on the definition of "venture" in the context of the TVPRA. In that case, defendant McLean took Lisa Ricchio captive and brought her to a motel owned by husband and wife defendants, the Patels. Mr. McLean "physically and sexually abused Ricchio, repeatedly raping her, starving and drugging her, and leaving her visibly haggard and bruised." *Id*. at 555. The Patels and Mr. McLean had previously collaborated in unspecified "commercial dealings." *Id.* While Ms. Ricchio was captive,

> McLean and Mr. Patel enthusiastically expressed [intent to reinstate these commercial dealings] by exchanging high-fives in the motel's parking lot while speaking about "getting this thing going again," in circumstances in which McLean's coercive and abusive treatment of Ricchio as a sex slave had become apparent to the Patels. Ms. Patel had not only nonchalantly ignored Ricchio's plea for help in escaping from McLean's custody at the motel but, when visiting the rented quarters to demand further payment, had shown indifference to Ricchio's obvious physical deterioration. And in plain daylight view of the front office of the motel, either of the Patels on duty there would have seen McLean grab Ricchio, kick her, and force her back toward the rented quarters when she had tried to escape.

*Id.*

The First Circuit concluded that these facts supported, among other TVPRA claims, a plausible § 1589 forced labor claim against the Patels. It reasoned that the Patels profited from McLean's renting of space to use in obtaining forced sexual labor or services and thus benefited from McLean's conduct. *Id*. at 556. Because knowingly benefitting made them equally liable, the First Circuit reversed the district court's dismissal for failure to state a claim with respect to venture liability under § 1589(b). The opinion, written by retired Supreme Court Justice David Souter sitting by

41

designation, emphasized that the court "[gave] attention to the whole body of allegations as circumstantially supplying meaning to particular acts by the Patels that the trial judge found too ambiguous to support the claims when considered in isolation." *Id.* at 557.  For instance, "the district court found it 'meaningless' that McLean and Mr. Patel exchanged high fives." *Id.*  But the First Circuit disagreed, explaining that "[i]n isolation this may be so, but the complaint is to be read as a whole, and we read the statement in light of the allegations of the Patels' complaisance in response to the several alleged exhibitions of McLean's coercive and brutal behavior to a physically deteriorating Ricchio." *Id.*

In the present case, the complaint recounts in great detail how defendants were responsible for creating the intricate scheme that both enabled forced labor and allowed the threats which enforced that labor to be effective: a scheme far surpassing the district court's limited description of merely "help[ing] with Trust documents." *Bistline*, 2017 WL 108039 at *9.  Defendants had ample notice of the illegal activities which were taking place within the FLDS community while they were actively seeking to enforce Mr. Jeffs' control and simultaneously protecting him from any liability.

> Jeffs' Priesthood Record makes various references to Parker and his awareness of Jeffs' practices with underage brides and the manner in which he claimed that the Lord instructed him to ignore the legal actions and complaints against him and the FLDS and to never compromise or retreat from his present course of action, but instead to rely upon Parker and other lawyers operating under his direction to strategically battle and evade the attacks brought by non-believing victims.

Aplt. App. at 51.  The complaint alleges that the scheme set up by defendants was designed *expressly* for the purpose of facilitating these crimes and also ensuring that defendants would personally reap ample benefits therefrom.  For instance, plaintiffs

allege that defendants and Mr. Jeffs "actively discussed [Jeffs'] illegal goals" in setting
up the Reinstated Trust, *id*. at 29–30, and that Mr. Jeffs retained defendants' legal counsel
for the purpose of developing a scheme to "cloak" forced labor and ritual rape of young
girls "with the superficial trappings of legal acceptance," *id*. at 28.  They also allege that
"a large part of the reason for rewriting the Trust was to give Parker and SC&M peace of
mind that their fees would be paid."  *Id*. at 111.

Plaintiffs further claim that defendants actively maintained and extended this
scheme over the years.  Their conduct purportedly included, but was not limited to, using
the Reinstated Trust to carry out the types of threats that compelled plaintiffs' obedience
to Mr. Jeffs and consequent forced labor by, for example, representing the Trust in an
eviction action "to expel a family in retaliation for the mother's refusal to consent to the
'marriage' (rape) of her 15-year-old daughter."  *Id*. at 49–50; *see also id.* at 50.
Importantly, like in *Ricchio*, some facts alleged in the complaint here indicate defendants'
"complaisance" in response to exhibitions of TVPRA violations.  One enumerated
example is the negotiation in which defendants explained Jeffs' refusal to compromise
with the Attorney General, reiterating that "you are not going to change that community"
and attempting to convince everyone involved that it was a "useless effort" to try and
interfere with the marriage of underage girls.  *Id*. at 48.  Another is the allegation that Mr.
Parker personally and knowingly utilized manual labor in exchange for legal services,
through construction and remodeling work on his real estate, despite knowing that he was
not actually representing the best interests of these individuals and that they would not
receive the benefit of their labor.  *See id*. at 72, 212.

43

As in *Ricchio*, these acts fully support the TVPRA claims when read in light of the
complaint as a whole.  Defendants' knowledge extended beyond the generic religious
practices that they had acknowledged as raising "serious legal questions" and included
graphic evidence of the ceremonial rape of little girls (which was provided to them by the
FBI in 2005 at the latest, and was also garnered from their many representations of
church members accused of sexual crimes).  *Id*. at 49, 75.  Plaintiffs contend that despite
extensive knowledge of the ways Mr. Jeffs was using his power to harm plaintiffs and
other similarly-situated individuals, defendants continued to use their legal expertise to
uphold this scheme.  *See, e.g., id*. at 57 ("Parker participated behind the scenes in the
[Texas] criminal defense of [Mr.] Jeffs and the other men by interviewing and organizing
teams of defense lawyers and by assuring that those lawyers did not share information
about Jeffs' conduct with the FLDS.")  All of these allegations are set within the
previously described context of plaintiffs' extreme isolation from the external world,
circumstances of which defendants were well aware, as well as with defendants' express
and sanctioned reassurances that they individually represented plaintiffs and with their
solicitation of large financial payment from plaintiffs for these purposes.  To top it off,
plaintiffs allege that some of defendants' legal fees were being funded by the forced labor
of children, with defendants' awareness and acquiescence.  *Id*. at 46 ,72, 91.  We do not
present this summary as necessarily exhausting every variant of statutory violation and
basis for civil liability that could survive the motion to dismiss, but merely to indicate
that the claims so summarized are supported by factual allegations and reasonable
inferences sufficient to pass muster under the plausibility standard.  *See Ricchio*, 853 F.3d

at 557.

In *Ricchio*, the owners of a motel were aware of a woman being held against her will and sexually abused while in their hotel.  *Id*. at 555.  They did nothing to expose the cruel conduct, even tacitly approving of it through a high-five with the offender, and benefitted from this conduct through the offender's continued payment for a room.  In this case, plaintiffs allege facts supporting their claims that defendants were well aware of the crimes being committed against plaintiffs, did nothing to expose these atrocities, tacitly approved of the conduct by constructing a scheme for the purpose of enabling it, and benefited for years from plaintiffs' payments of a considerable amount of attorney fees.  These combined allegations create a reasonable inference that defendants were participating in a venture with Mr. Jeffs which involved forced labor and services.  Considering all of these circumstances, the previously enumerated plaintiffs have sufficiently pled that defendants "benefit[ted], financially . . . from participation in a venture which [w]as engaged in" a proscribed action under §1589 of the TVPRA.[10]

## B.    Statute of Limitations

A complaint need not anticipate any affirmative defenses that may be raised by the defendant, including the statute of limitations; it is the defendant's burden to plead an

---

[10]    The dissent claims that plaintiffs failed to cite any authority that would render defendants vicariously liable for Jeffs' TVPRA violations, and that "plaintiffs do not identify any additional legal or other work that these defendants performed [beyond drafting the Trust] to support Jeffs' scheme."  Dissent at 11.  However, this sweeping declaration ignores all the above-enumerated allegations as well as our entire analysis regarding *Ricchio*.  *See also* Aplt. Reply Br. at 24 (citing *Ricchio* to support defendant's TVPRA liability).

affirmative defense. *Fernandez v. Clean House, LLC*, 883 F.3d 1296, 1299 (10th Cir.

2018) (citing *Gomez v. Toledo*, 446 U.S. 635, 640 (1980)); *see also* Federal Rule of Civil

Procedure 8(c)(1) (explicitly listing statute of limitations as an affirmative defense).

Indeed, it is only proper to dismiss a complaint based on an affirmative defense when the

complaint itself admits all the elements of the affirmative defense. *Id.*[11]

     With respect to plaintiffs' state-based claims, we apply Utah's statutes of

limitations. We must also apply Utah's tolling rules, which are "an integral part of the

several policies served by the statute of limitations." *Elm Ridge Expl. Co., LLC v. Engle*,

721 F.3d 1199, 1210 (10th Cir. 2013). Plaintiffs' claims cannot be properly dismissed,

therefore, unless they allege facts plainly establishing that their claims have expired and

cannot be tolled under Utah law. We now turn to plaintiffs' various claims to ascertain

the applicable statutes of limitations.[12]

---

[11]    Utah law, which governs what party bears the ultimate burden of proof on this issue, is to the same effect. *See Young Res. Ltd. P'ship v. Promontry Landfill LLC*, 427 P.3d 457, 466 (Utah Ct. App. 2018) (statute of limitations is an affirmative defense); *Pierucci v. Pierucci*, 331 P.3d 7, 13 (Utah Ct. App. 2014).

[12]    Overlooking these precedents, the dissent believes plaintiffs "failed to offer the district court sufficient allegations to allow it to conclude that the applicable statutes of limitations were or at least might have been tolled." Dissent at 8. But the application of tolling through the discovery rule is relevant only to a statute-of-limitations defense; accordingly, plaintiffs did not have the burden to plead on this issue. *See Fernandez*, 883 F.3d at 1299. Nevertheless, plaintiffs here actually did allege facts underlying the application of the discovery rule. *See, e.g.,* Aplt. App. at 43 (complaint alleges defendants were "working continuously from at least 1997 to the present day to keep the Plaintiffs and similarly situated persons completely in the dark about these matters"); *id.* at 35, 41, 45, 91 (other allegations in the complaint that defendants' misconduct prevented plaintiffs' discovery of their claims); *id.* at 245–247 (plaintiffs' argument to the district court that plaintiffs did not discover their claims until "shortly before this action was filed."); *see also Pierucci*, 331 P.3d at 13 (noting that, in Utah, a general statement

### 1.       Applicable Statutes of Limitations

i.       Fraudulent misrepresentation

Claims in Utah for fraudulent misrepresentation have a three-year statute of

limitations.  Utah Code Ann. § 78B-2-305(3).  Although plaintiffs did allege relevant

activities taking place throughout 2012-2014, there is no question that many of the crucial

events related to their causes of action transpired more than three years before they filed

suit.  As the district court noted:

> The Trust was amended in 1998.  The collection of donations from members for
> attorney's fees began at least as early as 2001.  Defendants allegedly held
> themselves out as representing individual FLDS members in 2008 and 2011.  Jeffs
> allegedly admitted that he was not the Prophet around 2007.  Defendants'

---

that plaintiff did not discover causes of action until a date within the limitations period is
sufficient to survive a motion to dismiss, even if general statement is not expanded upon).
Accordingly, only those plaintiffs who alleged additional facts admitting that the relevant
statutes of limitations were not sufficiently tolled with respect to their individual
claims—for example, by pleading specific dates of discovery outside the limitations
periods—may be dismissed on limitations grounds.

Case law in the Third and Seventh Circuits supports our analysis.  *See Sidney
Hillman Health Ctr. of Rochester v. Abbott Labs., Inc*., 782 F.3d 922, 928–29 (7th Cir.
2015) ("Dismissing a complaint as untimely at the pleading stage is an unusual step,
since a complaint need not anticipate and overcome affirmative defenses, such as the
statute of limitations. . . . It is true that, if a plaintiff alleges facts sufficient to establish a
statute of limitations defense, the district court may dismiss the complaint on that ground.
But we have cautioned that this irregular approach is appropriate only where the
allegations of the complaint itself set forth everything necessary to satisfy the affirmative
defense. *As long as there is a conceivable set of facts, consistent with the complaint, that
would defeat a statute-of-limitations defense, questions of timeliness are left for summary
judgment (or ultimately trial)*, at which point the district court may determine compliance
with the statute of limitations based on a more complete factual record.") (emphasis
added) (internal citations and quotation marks omitted); *Schmidt v. Skolas*, 770 F.3d 241,
251–52 (3d Cir. 2014) ("This court has stated, in the context of the discovery rule, that
when the pleading does not reveal when the limitations period began to run ... the statute
of limitations cannot justify Rule 12 dismissal. Several of our sister circuits have held the
same.") (internal citation omitted).

involvement with the Trust ended in 2005.

*Bistline*, 2017 WL 108039 at *3.

Plaintiffs are incorrect in assuming that their claims failed to accrue until the occurrence of the very last associated event.[13]  A cause of action accrues (and is complete) when a plaintiff could have first filed and prosecuted an action to successful completion.[14]  *DOIT, Inc. v. Touche, Ross & Co.*, 926 P.2d 835, 843 (Utah 1996).  As alleged in the complaint, there are events which occurred many years before plaintiffs brought suit that fulfill each element of a cause of action for fraud.  *See* Aplt. App. at 209–219.  Accordingly, absent tolling, plaintiffs' fraud claims are time-barred.

> ii.    Negligent misrepresentation

The district court applied the three-year limitations period for fraud, relying on a 2012 Utah case.  *See Mackay v. America's Wholesale Lender*, 2012 WL 464648, at *2 (D. Utah Feb. 13, 2012) ("The statute of limitations applicable to a negligent misrepresentation claim is three years.").  The parties do not argue otherwise.

---

[13]    The dissent ostensibly falls prey to this same legal misunderstanding, claiming that plaintiffs fail to provide any examples of defendants' wrongful conduct "that would have served as the events necessary to save their various causes of action from a statute of limitations bar."  Dissent at 3.  Nevertheless, the complaint and plaintiffs' appellate briefs did in fact list many relevant events as taking place after the 2008 marker that the dissent cites as the end of defendants' involvement, which are in turn frequently cited throughout this opinion.

[14]    But see *infra* for discussion of potential application of the continuing tort doctrine.

iii.    Malpractice, breach of fiduciary duty, and civil conspiracy[15]

Legal malpractice and breach of fiduciary duty both require the formation of a

relationship of trust between plaintiffs and defendants, and defendants' subsequent

breach of that duty.  A four-year statute of limitations applies to plaintiffs' legal

malpractice and breach of fiduciary duties claims.  Utah Code Ann. § 78B-2-307(3).

Subject to the analysis above, these claims are also time-barred unless they are equitably

tolled.

iv.    TVPRA

Plaintiffs also allege claims under the federal TVPRA statute.  A claim under the

TVPRA must be brought within ten years either after the cause of action arose or after the

victim reaches eighteen years of age (if the victim was a minor at the time of the alleged

offense).  18 U.S.C. § 1595(c).  The district court did not dismiss plaintiffs' TVPRA

claims on statute of limitations grounds, and defendants do not argue that the claims

should be time-barred.  As will become clear from our analysis below, some of the events

that could trigger a TVPRA cause of action happened outside of this ten year window.

However, because plaintiffs had no reason to brief any theories as to why those particular

claims should be tolled, we will not address any statute of limitations issues with respect

---

[15]    Because the validity of the civil conspiracy claims is tied to the validity of the
claims upon which they are based, we will not address them separately. *Strong*, 2017 WL
4620984 at *11 n.6.  The district court dismissed these claims on the basis that the
underlying torts were not adequately pled; in the same way, plaintiffs' opening brief tied
their analysis of civil conspiracy to the adequacy of their pleadings of the underlying
torts.  Because plaintiffs claim the district court was incorrect in dismissal of these claims
and argue specifically why this is so in the context of arguing the underlying torts, we
will not consider this argument forfeited.

to plaintiffs' TVPRA claims.

### 2.    Tolling the Limitations Periods

#### i.    The age of majority

There are multiple exceptions to the rule that "a statute of limitations begins to run upon the happening of the last event necessary to complete the cause of action." *Colosimo*, 156 P.3d at 810.  One such exception is that "in the case of a plaintiff who is under the age of majority or mentally incompetent, the statute of limitations will be tolled until plaintiff is free from the disability." *Id*.  In this case, plaintiff May Musser turned eighteen-years-old in 2015.  Accordingly, the limitations period on all of her claims only began to run in 2015, and none are time-barred because the complaint here was filed on July 13, 2016.

The complaint lists eight other minor plaintiffs: A.B., A.B., M.B., P.B., T.B., R.R., R.R., and B.J.R.  But they are included only by reference in their mothers' sections, their claims do not have a nexus to defendants, and there are no allegations of facts upon which relief could be granted.  Therefore, despite not being time-barred by the statute of limitations, their claims do not survive.  The district court did not err in dismissing them.

#### ii.    Continuing tort doctrine

Plaintiffs argue in their opening brief that the district court failed to consider key factual averments in their complaint when determining the commencement of the statutory periods, including ignoring "continuing tortious conduct."  Aplt. Br. at 41.  "A tort cause of action accrues when all its elements come into being and the claim is actionable." *Hatch v. Davis,* 102 P.3d 774, 784 (Utah Ct. App. 2004) (internal citation

omitted).  However, where a tort involves a pattern of continuous and ongoing tortious conduct, the cause of action accrues and the period of limitations begins to run at the time the last injury occurred or the tortious conduct ceased.  *See Tiberi v. CIGNA Corp*., 89 F.3d 1423, 1430 (10th Cir. 1996); *see also Bingham v. Roosevelt City Corp*., 235 P.3d 730, 745 (Utah 2010).  Continuing damages stemming from a single initial violation do not constitute a continuing tort.  *Hatch,* 102 P.3d at 785 n.18.

The Utah Supreme Court has recognized the continuing tort doctrine (also referred to as "continuing wrong," "continuing harm," or "continuing violation") as an exception serving to toll the statute of limitations, and has applied it in a variety of situations including nuisance, trespass, intentional infliction of emotional distress, continuous negligent treatment, and continuing negligence.  *Bingham*, 235 P.3d at 745.  Utah courts have not mentioned the doctrine when analyzing any of the types of tort claims at issue here.  But a number of cases bear mentioning.  Construing New Mexico law, we have applied the doctrine to toll the statute of limitations for fraud and negligent misrepresentation.  *See Tiberi*, 89 F.3d at 1431; *see also Corbeau USA, LLC v. Corbeau Seats, Ltd*., 2007 WL 1964516, at *4 (D. Utah July 2, 2007) (federal district court in Utah cited *Tiberi* but recognized that Utah courts have not ruled on this matter).  Recognizing that New Mexico courts have not adopted the continuing harm doctrine with respect to legal malpractice claims, we declined to adopt it on their behalf in *Spencer v. Sommer*, 91 Fed. Appx. 48, 52 (10th Cir. 2004) (unpublished).  But state courts elsewhere have applied the continuing harm doctrine to legal malpractice and associated fraud-based claims.  *See, e.g.*, *Giulietti v. Giulietti,* 784 A.2d 905, 926 (Conn. App. Ct. 2001).  And,

notably, the Utah Court of Appeals has cited with approval California's application of the continuing wrong doctrine to civil conspiracy, although it has not itself applied the doctrine. *See Currier v. Holden*, 862 P.2d 1357, 1377 (Utah Ct. App. 1993) (citing *Wyatt v. Union Mort. Co.,* 598 P.2d 45, 53 (Cal. 1979)).

Adoption of the continuing tort doctrine raises the question of how it interacts with the discovery rule (another tolling doctrine, discussed in more depth below). In the only Utah-based cases explicitly mentioning both doctrines, the federal district court appeared to treat them as alternative methods of tolling the statute of limitations. *See Sasser v. Salt Lake City Corp*., 2017 WL 5991732 * 4–5 (D. Utah Dec. 1, 2017); *see also Corbeau,* 2007 WL 1964516 at *2.

Because we hold below that there are still factual issues to be resolved regarding tolling under the discovery rule, we leave any additional analysis regarding the application of the continuing tort doctrine to further proceedings in the district court.

### 3.    Tolling Through the Discovery Rule

The discovery rule is another exception to the general statute of limitations. "Under the discovery rule, the limitations period does not begin to run until the discovery of facts forming the basis for the cause of action." *Berenda v. Langford*, 914 P.2d 45, 51 (Utah 1996) (internal citations and quotation marks omitted). Utah courts recognize three situations in which the discovery rule applies: when there is (1) a statutory tolling provision, (2) an exceptional circumstance, or (3) fraudulent concealment. *Colosimo*, 156 P.3d at 810. The latter two are referred to as "equitable" discovery rules. *Russell Packard Dev., Inc. v. Carson*, 108 P.3d 741, 747 (Utah 2005). Plaintiffs do not mention

the exceptional circumstances doctrine anywhere in their opening or reply briefs, even

though the district court analyzed this exception in its order.  We therefore consider this

particular discovery argument forfeited.  *WildEarth Guardians., 759 F.3d at 1204.*

Utah courts consistently acknowledge that, at root, the application of the discovery

rule is a factual matter.  *See, e.g.*, *Colosimo*, 156 P.3d at 817; *see also Arnold v. Grigsby*,

417 P.3d 606, 616 (Utah 2018). The analysis of the fraudulent concealment iteration of

the discovery rule at this stage of court proceedings is outlined as follows:

> The question of when a plaintiff reasonably would have discovered the facts
> underlying a cause of action in light of a defendant's affirmative concealment is a
> highly fact-dependent legal question that is necessarily a matter left to trial courts
> and finders of fact . . . preclud[ing] [summary judgment or dismissal] in all but the
> clearest of cases, i.e., when the facts fall on two opposite ends of a factual
> continuum. These include situations in which either (1) the facts are so clear that
> reasonable persons could not disagree about the underlying facts or about
> application of the governing legal standard to the facts, or (2) the facts underlying
> the allegation of fraudulent concealment are so tenuous, vague, or insufficiently
> established that the claim fails as a matter of law.

*Carson,*108 P.3d at 750–51 (internal citations and quotation marks omitted).  As

explained below, the present situation does not fall on either end of this factual

continuum.  The Utah Supreme Court has acknowledged that "[a]lthough deceptively

simple in theory, the [discovery] rule has led to disarray as courts have attempted to

articulate and apply hard and fixed subrules to determine whether a statute of limitations

should be tolled as a matter of law on the particular facts of specific cases." *Berenda*,

914 P.2d at 52.

The district court's analysis in the present case relied on *Colosimo*, *Berenda*,

*Carson,* and *Baldwin v. Burton,* 850 P.2d 1188 (Utah 1993), to conclude that the statutes

of limitations here are not eligible for tolling.  As we articulate *infra*, we are not

persuaded that those cases support the district court's conclusion.

      i.   Statutory tolling

     Plaintiffs' misrepresentation claims are the only ones that contain a statutory

discovery provision.  Utah Code Ann. § 78B-2-305(3) provides that "the cause of action

does not accrue until the discovery by the aggrieved party of the facts constituting the

fraud or mistake."  Under Utah's statutory version of the discovery rule, the limitations

period is triggered when the plaintiff "has actual knowledge of the fraud or by reasonable

diligence and inquiry should know[] the relevant facts of the fraud perpetrated against

him." *Colosimo*, 156 P.3d at 811 (internal citations and quotation marks omitted).  This

knowledge, actual or constructive, signifies accrual of the claim and triggers the

immediate running of the statute of limitations because the facts known to the plaintiff

should have incited suspicion of fraud and would have prompted a reasonably prudent

person to begin to investigate.  *See Donner v. Nicklaus*, 197 F. Supp. 3d 1314, 1325 (D.

Utah 2016).  When a statutory tolling provision exists, as is the case for fraud, "the

question is not *whether* the discovery rule applies—it does by virtue of the statute, but

rather, *when* a plaintiff either discovered or should have discovered his or her cause of

action, thereby triggering the running of the statute of limitations." *Carson*, 108 P.3d at

746 (internal citations and quotation marks omitted) (emphasis in original).

     In this case, plaintiffs allege that they were not on notice of a duty to inquire into

their causes of action until recently (less than three years before their July 2016 filing

date).  *See, e.g.*, Aplt. Br. at 11; *see also* Aplt. App. at 247.   The fraud statute of

limitations involved here almost always presents a question of fact as to when plaintiff did discover or should have discovered the defendants' wrongdoing. *Dah v. Gardner*, 583 F. Supp. 1262, 1266 (D. Utah 1984) (internal citation and quotation marks omitted); *see also Strong,* 2017 WL 4620984 at *4 (the relevant question for accrual purposes is "when the Trustee should have discovered the existence of, for example, the fraud based claims," which is "factual in nature").  The question here is when plaintiffs knew or should have known that defendants were falsely claiming to be legally representing the best interests of individual FLDS members.  The district court held that the facts known to plaintiffs were sufficient to constitute a duty to inquire many years ago.  It based this conclusion on plaintiffs' purported knowledge of Mr. Jeffs' actions, the connections between him and defendants, and defendants' various legal representations of some FLDS members with respect to both the Trust and some custody disputes.  Aplt. App. at 828.  Concluding that "[t]he facts known to Plaintiffs were enough to trigger a duty to inquire into potential claims against Defendants," the district court held that "Utah Code Ann. 78B-2-305 does not toll the limitations period on Plaintiffs' fraud claim[s]."  *Id*.

In *Berenda*, the frequently cited Utah Supreme Court case, the state trial court relied on two letters the plaintiffs wrote more than three years before filing their complaint to determine that their claims were time-barred.  The trial court described the letters as reflecting "clear suspicions of wrongdoing [which] gave rise to a legal duty to make further inquiry."  *Berenda, 9*14 P.2d at 50.  But the Utah Supreme Court rejected this legal conclusion.  *Id.* at 55.  Explaining multiple different ways the letters could be interpreted, only one of which evidenced clear suspicion, the Utah Supreme Court

ultimately concluded it could not be said "as a matter of law that [plaintiff] should have suspected [defendant] of wrongdoing and, therefore, that he should have inquired further." *Id.*

Likewise, despite allegations here that *could* be interpreted to indicate plaintiffs' duty to inquire further, we cannot say as a matter of law that plaintiffs should have suspected defendants of wrongdoing prior to July of 2013.  Reading the complaint in the light most favorable to plaintiffs, particularly given the severely isolated circumstances in which plaintiffs were forced to live, reveals a factual question regarding the point at which a reasonably prudent person in these unusual circumstances should have become suspicious of defendants.  Plaintiffs assert that they were consistently informed of the ways defendants were operating on *their* behalf and protecting *their* rights, and that this "representation continued to at least 2014 and never officially ended."  Aplt. Br. at 44. The complaint supports that assertion.  It contains numerous specific allegations of defendants portraying themselves as legal representatives of the individual FLDS members after the February 2011 date cited by the district court.  For instance, plaintiffs describe fundraising events for legal fees taking place as late as 2014, based on expressed and repeated assurances of representation for the church and all of its members.  *See* Aplt. App. at 70.  Plaintiffs also explain how defendants' apparent condonation of Mr. Jeffs' behavior enabled Mr. Jeffs' domination (and likewise diminished their suspicion), and they allege that defendants' continuous involvement afforded Mr. Jeffs' wrongdoing the guise of legal legitimacy and societal approval.  *See id*. at 29.

In addition, plaintiffs allege many facts to support their lack of legal sophistication

and inability to "divine the impact of unknown machinations on the part of a law firm as sophisticated as SC&M." *Id*. at 246.  They described multi-generational entrenchment in a community entirely insulated from the outside world, a lack of outside education that could alert them to their legal rights and the impacts of defendants' action, and in some cases specialized schooling to indoctrinate them against recognizing their legal claims. *See, e.g., id*. at 73, 83, 91–92, 96; *see also id.* at 34 (articulating specialized mandatory schooling for girls in grades 3 through 8 where they were instructed they "never have the right to think [they] have been forced" when they were instructed to marry and commanded to sexual servitude).  Most plaintiffs had spent their entire lives isolated in these restricted communities, with their only education and source of information being supplied through their communities.

The complaint asserts that plaintiffs were continually informed in these severely isolated circumstances that defendants were their only legal resource, *id*. at 88, 170, and thus one of their sole links to the outside world.  And it is against this background that plaintiffs were regularly told defendants were protecting them and Mr. Jeffs' allegedly legal activities.  *See, e.g., id* at 43 (a legal update by Sam Barlow at a church meeting included statements that "I want to remind you again that we are all defendants in this matter," and "our attorneys feel good about the work we have done").  Finally, the complaint alleges facts highlighting defendants' active role in maintaining plaintiffs' ignorance and isolation.  *See id*.  (discussing statements Mr. Parker made in court in March 2014 arguing "that his FLDS clients should not have been exposed to any of the evidence used in Texas to convict Jeffs of child rapes").

57

While there are few cases comparable to the unique fact situation presented here, the analyses of two other jurisdictions regarding somewhat similarly situated plaintiffs are instructive. *See Barba v. Seung Heun Lee*, 2009 WL 8747368 (D. Ariz. Nov. 4, 2009) (unpublished); *Kolbek v. Twenty First Century Holiness Tabernacle Church, Inc*., 2013 WL 6816174  (W.D. Ark. Dec. 24, 2013).  In *Barba*, the plaintiffs became involved in a "totalistic, high demand group" that engaged in "indoctrination [and] psychological manipulation . . ." to induce its members to, among other things, "donate all the money they possess or can borrow."  *Barba*, 2009 WL 8747368 at *1.  Several of the plaintiffs there filed suit after the statutory limitations period once they "[broke] the psychological manipulation and indoctrination sufficiently to leave" the defendant organization. *Id*. at *24.  They argued that despite having left the community before the statutory limitations period ended, there was still a triable issue of fact regarding when they recovered sufficiently from the defendant's psychological manipulation and undue influence so as to be able to appreciate both the wrongful nature of defendant's conduct and the fact that they had suffered injury as a result, thereby finally discovering their claims.  *Id*. at *28. The court agreed that the plaintiffs provided enough evidence to raise a factual question "as to when they had the minimum requisite of knowledge sufficient to identify that a wrong occurred and caused injury."  *Id*. (internal quotation marks omitted).

Yet another plaintiff in *Barba* alleged that her continued work for the defendant organization in Korea, compelled by her lack of legal permission to work in Korea, essentially trapped her there until she could make enough money to return home, and that this "restricted (if not blocked) her access to the U.S. judicial system."  *Id*. at *26.  Citing

the maxim that "no man may take advantage of his own wrong," the court agreed and

concluded there were factual questions making it inappropriate to determine the issue of

equitable tolling at the dismissal stage. *See id.* at *27.

Similarly, the plaintiffs in *Kolbek* raised the discovery rule to preclude summary

judgment on the basis of the statute of limitations despite the fact that they had "escaped"

the defendants' control a number of years before the statutory period had run. *Kolbek*,

2013 WL 6816174 at *1, 3.  With facts comparable to the present case, the plaintiffs

there described a church organization where they were forced to become "spiritual

wives" of the leader while still minors and were successively subjected to frequent sexual

abuse. *Id.* at *1.  The defendants argued that the plaintiffs had discovered their injuries

by the time they each left the church, while the plaintiffs contended that "because of their

sheltered lives and the 'brainwashing' within Alamo's church, they did not really begin to

understand how wrong their relationships with Alamo were until *after* they left his

house." *Id*. at *10.  The court held that the testimony did not clearly indicate the

plaintiffs had discovered the effects of their sexual abuse injuries by the time they

escaped, and that the discovery question was further complicated by the plaintiffs'

allegations of brainwashing and being raised to believe their sexual relationships were

ordained by God. *Id.* at *11.  The court concluded it could not determine as a matter of

law that the plaintiffs' escapes conclusively demonstrated they had discovered the effects

of their sexual abuse injuries. *Id*.  "Given these unique conditions, a reasonable jury

could find that it was possible for Plaintiffs to have been fed up with their living

conditions in Alamo's house while not fully understanding the extent of the sexual abuse

or its effects." *Id*.

The facts in the present case are comparable to those in *Barba* and *Kolbek*. Like the plaintiffs in those cases, plaintiffs here allege that they were subjected to intensive indoctrination and seclusion that plausibly prevented them from identifying the wrongful nature of defendants' conduct. In fact, the circumstances pled here present an even more egregious version of indoctrination, with many plaintiffs being born and raised completely within this community, their education being provided in most cases solely through the community, and their interactions with anything outside the community intentionally and severely restricted. They were trapped "in [a] fog of misapprehension of their true rights." Aplt. Br. at 11. As in both *Barba* and *Kolbek*, several plaintiffs plead not just psychological but physical restraint and captivity by the community. *See* Aplt. App. at 80–81, 92, 136.

Like the district courts in *Barba* and *Kolbek*, we conclude that there are factual questions raised here regarding when plaintiffs' discovered the facts underlying their claims and whether they had a duty to inquire before July 2013. Many plaintiffs were still sequestered in the FLDS community until that date, and their lack of suspicion is evidenced by their continual payments of attorney fees to defendants through 2014. In light of the incredibly unique and extreme factual circumstances presented here, we conclude that the district court erred in dismissing the statutory fraud and negligent misrepresentation claims on statute of limitations grounds as a matter of law. This is not the creation of a fixed subrule but merely the proper application of Utah case law's fact-based analysis (see discussion regarding *Berenda* analysis, *infra* at 64).

ii.    Equitable tolling – fraudulent concealment

Utah precedent is clear that equitable tolling applies "only where a statute of limitations does not, by its own terms, already account for such circumstances." *Carson*, 108 P.3d at 747.  In the present case, this doctrine is applicable to plaintiffs' claims of legal malpractice, breach of fiduciary duty, and civil conspiracy.  The general rule clarified in Utah in 1996 and maintained since is that the fraudulent concealment analysis has two prongs: (1) the plaintiff must make a prima facie showing of fraudulent concealment and then (2) must demonstrate that, given the defendant's actions, a reasonable plaintiff would not have discovered his or her claim earlier.[16] *Berenda*, 914 P.2d at 53.  "The application of this legal rule to any particular set of facts is necessarily a matter left to trial courts and finders of fact." *Id.*

a.    *Concealment*

As a threshold matter, plaintiffs must first allege concealment by defendants.  The Utah Supreme Court has held that concealment includes non-disclosure where there is a duty to disclose. *Jenson v. IHC Hosps., Inc*., 944 P.2d 327, 333 (Utah 1997) (*reh'g granted on other grounds*) ("Fraudulent concealment requires that one with a legal duty or obligation to communicate certain facts remain silent or otherwise act to conceal

---

[16]    The Utah Supreme Court has clarified that once concealment has been established, there are two instances in which a plaintiff may rely on this equitable tolling doctrine. The plaintiff must demonstrate either that: (1) the plaintiff neither knew nor reasonably should have known of the underlying facts before the fixed limitations period expired; or (2) notwithstanding the plaintiff's actual or constructive knowledge before the limitations period expired, a reasonably diligent plaintiff would have delayed in filing. *Colosimo*, 156 P.3d at 816.  Because plaintiffs here rely only on the first situation, we similarly restrict our analysis.

material facts known to him."); *see also Anderson v. Kriser*, 266 P.3d 819, 823 n.11

(Utah 2011) ("elements for fraudulent concealment [are] (1) a legal duty to communicate,

(2) knowledge of information not disclosed, and (3) materiality of the nondisclosed

information").  "Such a duty or obligation may arise from a relationship of trust between

the parties, an inequality of knowledge or power between the parties, or other attendant

circumstances indicating reliance." *Jenson*, 944 P.2d at 333.  Utah's court of appeals has

formally extended the application of the fraudulent concealment doctrine to attorney

malpractice, reasoning that "the attorney-client relationship is based upon trust, and is a

situation in which one less knowledgeable must rely on another, who has special

expertise, for advice and assistance." *Merkley v. Beaslin*, 778 P.2d 16, 19 (Utah Ct. App.

1989).

The district court first concluded "Plaintiffs have not established that Defendants

concealed any of the alleged wrongdoings." *Bistline*, 2017 WL 108039 at *5.  To

buttress this conclusion, the court pointed to defendants' open assistance with the trust

and their open representation of the FLDS members.  In doing so, however, the court

mischaracterized plaintiffs' claims and emphasized the wrong facts.  Plaintiffs do not

maintain that defendants concealed their identity as the legal representatives of the church

and its members; to the contrary, plaintiffs rely on this "holding out" by defendants to

support their claims.  Instead, as plaintiffs' note in their opening brief, their complaint

> contains a particularized, factual basis to support the averment that SC&M *never*
> disclosed to the parishioner clients it claimed to personally represent that: (1) it
> had reformed the Trust for Jeffs specifically to facilitate their victimization; (2) the
> 1998 Restatement was declared void by the Utah Supreme Court in 2005 as

having been formed for an illegal purpose; (3) the powers created by the 1998
Restatement were continually and systematically employed by SC&M to victimize
its parishioner clients; or (4) SC&M had been facing inherent conflicts of interest
in victimizing its parishioner clients.

Aplt. Br. at 49.  Plaintiffs' arguments rely heavily on such non-disclosure, but they

further argue that defendant law firm "actively concealed" from plaintiffs the firm's

"conflicts of interest and tortious conduct," and "the fact that it was not in any manner

acting in their best interests, despite expressly holding itself out as doing so."  *Id*. at 24–

25 .  Defendants' alleged misrepresentations include the use of fundraising events for

attorney fees "based upon express and repeated assurances that Parker and SC&M were

representing the individual interests of plaintiffs," Aplt. App. at 70, juxtaposed against

defendants' active conduct undermining plaintiffs' best interests, s*ee, e.g.*, *id*. at 53

(defendants evidenced awareness of their tortious conduct by vocalizing concerns of

being "sued by somebody on [trust] land for not defending them properly"); *see also id*.

at 51 (Mr. Jeffs relied on defendants "to strategically battle and evade the attacks" against

his rape of underage brides).  These and other alleged facts are sufficient to support a

prima facie case of fraudulent concealment by defendants in the egregious circumstances

presented here.

  *b.*   *Reasonableness*

        Once concealment has been established, the court reaches the second prong of the

analysis: reasonableness.  The doctrine requires a determination of (a) "when a plaintiff

would reasonably be *on notice to inquire* into a defendant's wrongdoing despite the

defendant's efforts to conceal it," and (b) "whether a plaintiff, once on notice, would

reasonably have, *with due diligence*, discovered the facts forming the basis of the cause of action despite the defendant's efforts to conceal those facts." *Berenda*, 914 P.2d at 52 (emphasis added).

Plaintiffs allege that they were not on notice to inquire until shortly before filing this action.  Our prior conclusion that this is a question of fact inappropriate for dismissal under the statutory discovery rule for fraud applies equally to the fraudulent concealment analysis here.  While the determination of notice to inquire operates differently once there is an allegation of fraudulent concealment, the Utah Supreme Court has clarified that this "serves only to illustrate the concept that a plaintiff must be reasonably diligent in pursuing his claims." *Colosimo*, 156 P.3d at 816.  But Utah's requirement that plaintiffs must act in a reasonable and diligent manner in order to take advantage of the fraudulent concealment rule does not arise until a plaintiff has knowledge of enough underlying facts to constitute a duty to inquire.  *See Berenda*, 914 P.2d at 52.  Because Utah's case law indicates that due diligence becomes a pertinent aspect of the fraudulent concealment analysis *after* a duty to inquire arises, it is not relevant here where plaintiffs plausibly allege they did not have a duty to inquire until recently.

Furthermore, plaintiffs do not argue that they exercised due diligence in pursuing their claims but contend instead that an investigation would have proved futile.  In *Colosimo*, the Utah Supreme Court relied on policy considerations to conclude that permitting "mere speculation about the futility of a nonexistent inquiry is insufficient to toll the limitations period."  156 P.3d at 819.  *Colosimo* determined that a futility component to the fraudulent concealment doctrine would only be recognized in two

narrow circumstances, one of which is when the defendant affirmatively concealed from the plaintiff the facts necessary to put the plaintiff on notice of a duty to inquire. *Id*. ("Such was the situation in *Carson*, where during much of the limitations period, the plaintiffs had neither knowledge that a tort had been committed nor knowledge of facts sufficient to place them on inquiry notice."). This analysis applies in the present case.

In rejecting a wholesale futility rule and narrowing the application of a futility inquiry to specific circumstances, the court in *Colosimo* cited language in *Berenda* specifically declining to adopt this and other "artificial legal subrules" that could be employed to relax either the inquiry or diligence prongs of the fraudulent concealment rule. *Id.* at 817 (citing *Berenda*, 914 P.2d at 53). The court in *Berenda* reasoned that attempting to determine the effects of particular facts as a matter of law would create a fact-dependent case law beyond the appellate courts' ability to keep consistent. 914 P.2d at 53. The court therefore declined to "introduce such artificial legal subrules" and recognized that these are factual matters that should be left to fact-finders. *Id*. It further recognized that the fact-finder may look to a number of factors, including futility of inquiry, as relevant in determining "the difficulty a plaintiff may have in recognizing and diligently discovering a cause of action." *Id.* at 54.

In sum, defendants were allegedly tortfeasors who actively concealed wrongdoing from plaintiffs who plausibly contend they did not have enough knowledge to support a duty to inquire. Plaintiffs have alleged facts to support their claim that defendants had a direct fiduciary relationship of trust to plaintiffs, which they intentionally exploited to mislead plaintiffs over an extended period of time and arguably up to the time plaintiffs

filed this action.  The fraudulent concealment doctrine thus may operate to toll the limitations periods for plaintiffs' claims of legal malpractice, breach of fiduciary duty, and civil conspiracy, making it inappropriate to dimiss these claims at this stage.  We emphasize that our decision to reverse the district court's dismissal on this matter is based on the exceedingly unusual nature of the fact scenario here, which is distinguishable from the facts at issue in *Colosimo*.  Accordingly, our decision does not serve to undercut that court's emphasis on due diligence.

### 4.     Tolling for Individual Plaintiffs

Several plaintiffs allege dates and facts making it clear that all of their claims are time-barred except for those arising under the TVPRA, which has a ten-year statute of limitations.  Three plaintiffs who escaped their extreme confinement within the FLDS community before July 2012 are clearly barred by the applicable statutes of limitations as a matter of law: Gina Rohbock, Wallace Jeffs, and Janetta Jessop.  By this time, they were no longer subject to the alleged continued misrepresentations by defendants, and they were no longer immersed in the unique circumstances described above which reasonably delayed acting upon their suspicions regarding defendants.  Gina Rohbuck and Wallace Jeffs admit discovering information regarding wrongdoing shortly after leaving the community, and Janetta Jessop had access to such information.  *See* Aplt. App. at 87, 98, 136.  Moreover, Janetta Jessop's decision to run away from the community in 2006 evidences suspicion of wrongdoing at that time, and she had ten years of unconstrained living to investigate further before this complaint was filed.  Her failure to do so renders her non-TVPRA claims time-barred as a matter of law.

Although it is unclear when Derrell Barlow left the restrictive FLDS community, the facts pled likewise bar him from relying on the discovery rule to toll the non-TVPRA limitations periods.  Derrell Barlow claims that "after Jeffs' convictions in Utah and Texas," which took place in 2007 and 2010, he "started to access" and discover information that was being "kept from the FLDS."  Aplt. App. at 105.   Because Derrell Barlow was on notice of a duty to inquire and likely had actual knowledge well before the statutory periods, he cannot now claim tolling based on a lack of knowledge.

Plaintiffs Ruby Jessop, Nolan Barlow, Lawrence Barlow, and Jason Black are each barred by the three-year statute of limitations for fraudulent and negligent misrepresentation, although a question of fact remains regarding the claims subject to the four-year statutes of limitations.  Ruby Jessop alleges that she successfully escaped an FLDS compound at an unknown date in 2012.  *Id*. at 81.  She evidenced knowledge of wrongdoing at this point by quickly initiating custody proceedings to remove her children from the community.  Lawrence Barlow was expelled from the church on or around October 29, 2012, and during the several months he was away he "became aware that Jeffs was defrauding the FLDS."  *Id*. at 100–01.  Nolan Barlow states that he began investigating concerns about the FLDS community after the implementation of the United Order, which unfolded in late 2011 and early 2012.  *Id*. at 90, 88.  Jason Black alleges that in early 2012 he possessed "rare knowledge" about the church's teachings that enabled him to question and resist the requirements of the United Order, which placed him on a duty to inquire from that time forward.  *Id*. at 88.  As we have noted, notice which is sufficient to raise the duty to inquire starts the clock running on the

statutory discovery period, irrespective of when the investigation culminates in discovery. These plaintiffs therefore cannot claim tolling under the statutory discovery rule for fraudulent misrepresentation, although they are not facially barred with respect to the remaining claims.

There are plausible allegations for each of the remaining plaintiffs regarding whether they either discovered or should have discovered the facts underlying their various causes of action before July 2013. Marvin Cooke was purportedly expelled from the church on December 4, 2012. *Id*. at 107. While he admits learning about child abuse in the church during the first year after his expulsion, the complaint does not specify when during this year that knowledge was acquired. Alicia Rohbuck was expelled and fled the church presumably sometime in late 2012,[17] at the earliest, and claims she did not learn "the facts that FLDS Church leaders and lawyers had hidden from her" until "later." Sarah Allred was banished from the church in or around 2012[18] but she alleges that she continually wrote letters repenting of her sins and begging re-entrance into the community until her "cult thinking started to ease" in early 2014. *Id.* at 127. Amy

---

[17]     The complaint alleges that Ms. Alicia Rohbuck was moved to a home in Colorado City in 2011 and was subjected to shunning and other emotional abuses "throughout 2011 and 2012." Aplt. App. at 79–80. She did not leave the community until after first enduring these circumstances long enough to be "utterly broken," then approaching Seth about leaving, being admitted into the exclusive "United Order" for two weeks, and finally receiving "a revelation" from Jeffs that she was to be expelled. *Id*. at 80.

[18]     The complaint does not allege when Ms. Allred left the church but it does assert that she wrote letters repenting of her sins for two years and that her cult thinking started to ease in early 2014. *Id*. at 127. It is thus reasonable to infer that she was banished in or around 2012.

Nielson gained evidence regarding fraud and wrongdoing at a deposition in April 2012

and began "secretly plann[ing] to . . . get away" from the church.  *Id*. at 122.  But she also

contends that Mr. Parker represented her in litigation that was active until April 2013, and

Ms. Nielson evidenced her belief that he continued to represent her in an email she sent

on August 25, 2014, requesting that Mr. Parker "release [her] as a client."  *Id*.  Briell

Libertae Decker escaped physical captivity in the FLDS community on May 22, 2012,

but as in *Barba* the allegations regarding her psychological state around the time of her

escape raise a factual question regarding when she reasonably should have discovered her

claims.[19]  The complaint avers severe indoctrination and training "designed to achieve

absolute mental and physical control" over Ms. Decker, and further describes her battle

with mental illness that has continued since her escape and has led to her "often be[ing]

hospitalized."  *Id.* at 118–19.

     According to the complaint, plaintiffs Holly and Alyssa Bistline left the FLDS

church after July 2013.  *Id*. at 94, 95.  An additional five plaintiffs—Steven Dockstader,

Helen Barlow, Vergel Barlow, Carole Jessop[20], and Thomas Jeffs—allege that they left

---

[19]    Ms. Janetta Jessop also states that she experienced "extreme PTSD and
depression" after leaving the community.  Aplt. App. at 119.  However, she escaped the
FLDS church in 2006, ten years before filing the complaint.  The discovery rule would
have to continue to toll the statute of limitations for an additional six years *after* Ms.
Jessop escaped, compared to only two months for Ms. Decker.  This distinction makes it
appropriate to determine as a matter of law that Ms. Jessop should have discovered her
causes of action before July 2012, in spite of her ongoing struggle with mental illness, but
leaves a question of fact regarding Ms. Decker.

[20]    Ms. Carole Jessop alleges that she "endured over two years" of fear resulting from
the United Order restrictions "[p]rior to leaving the FLDS Church."  Aplt. App. at 117.
She further alleges that the restrictions were imposed in late 2011, meaning she left the

the church at some unknown time in 2013, continuing to pay attorney fees to defendant

law firm into that year.  *Id*. at 104, 110, 114, 117, 131.  Finally, the complaint does not

assert on what date Susan Broadbent escaped the FLDS community.

Unlike the plaintiffs we have determined are barred by the applicable statutes of

limitations as a matter of law, who each allege leaving the FLDS community and

discovering the facts underlying their claims many years before the complaint was filed,

the above-enumerated plaintiffs did not plead any dates which establish on the face of the

complaint that their claims are time-barred.  *See, e.g.*, *Fernandez v. Clean House, LLC*,

883 F.3d 1296, 1299 (10th Cir. 2018) ("To be sure, on occasion it is proper to dismiss a

claim on the pleadings based on an affirmative defense.  But that is only when the

complaint itself admits all the elements of the affirmative defense by alleging the factual

basis for those elements."); *see also Xechem, Inc. v. Bristol–Myers Squibb Co.*, 372 F.3d

899, 901 (7th Cir. 2004) ("Only when the plaintiff pleads itself out of court—that is,

admits all the ingredients of an impenetrable defense—may a complaint that otherwise

states a claim be dismissed under Rule 12(b)(6).").  Accordingly, the district court erred

in dismissing these claims on statute of limitations grounds.

---

church sometime in or around late 2013, at the earliest.  *Id*. at 116.  The complaint also
alleges that Vergel and Helen did not follow instructions to leave Carole, so it is a
reasonable assumption they all left the church at the same time (after July of 2013).  *Id*. at
114, 117.

# IV.

## Conclusion

In sum, the status of plaintiffs' claims moving forward are as follows.  For the legal malpractice and breach of fiduciary duty claims, the following fifteen plaintiffs pled facts sufficient to survive a motion to dismiss: Sarah Allred, Helen Barlow, Lawrence Barlow, Nolan Barlow, Vergel Barlow, Holly Bistline, Jason Black, Susan Broadbent, Marvin Cooke, Steven Dockstador, Thomas Jeffs, Carole Jessop, May Musser, Amy Nielson, and Alicia Rohbuck.  A factual question remains for each of these plaintiffs regarding whether (and how long) equitable tolling applies to their limitations periods, and whether individual implied attorney-client relationships existed.  On remand the district court will also have to address the remaining elements of their claims. Furthermore, because these underlying torts are no longer dismissed for failure to state a claim, the court on remand must determine with respect to these fifteen plaintiffs whether the elements for civil conspiracy have been sufficiently pled.

Twelve plaintiffs pled facts sufficient to survive dismissal of their fraudulent and negligent misrepresentation claims: all of the aforementioned plaintiffs *except* Lawrence Barlow, Nolan Barlow, and Jason Black.  Once again, for the plaintiffs whose claims survive there is a factual question regarding when they discovered their claims, thereby starting the running of the statutory period, and whether an implied attorney-client relationship existed.  The remaining elements of their claims must also be addressed on remand.

The civil RICO claims have been forfeited as inadequately presented in plaintiffs'

opening brief.  With respect to the TVPRA claims, nine plaintiffs have pled facts sufficient to pass muster under the plausibility standard and thus survive dismissal: Susan Broadbent, Steven Dockstader, Thomas Jeffs, Carole Jessop, Briell Decker, May Musser, Ruby Jessop, Janetta Jessop, and Gina Rohbock.

 For all the reasons set forth above, we reverse and remand to the district court for further proceedings consistent with this opinion.

No. 17-4020, *Bistline v. Parker*
**BRISCOE**, Circuit Judge, dissenting.

I respectfully dissent.  In my view, the majority opinion fails to adhere to either

the ruling made by the district court or the arguments actually asserted by plaintiffs in

their appellate brief, and also does most of the heavy-lifting for plaintiffs in terms of

fleshing out their claims, both factually and legally.  Focusing, as we must, on the district

court's ruling and plaintiffs' appellate challenges to that ruling, I would affirm the

judgment of the district court.

*a) The district court's ruling and plaintiffs' challenge to that ruling*

Defendants moved to dismiss plaintiffs' complaint on several grounds.

Specifically, defendants argued that: (1) plaintiffs' first five claims failed because

defendants did not owe a duty to plaintiffs; (2) plaintiffs' claim under the Trafficking

Victims Protection Reauthorization Act (TVPRA) failed as a matter of basic statutory

application; (3) plaintiffs' seventh claim for relief failed because 18 U.S.C. § 2 does not

create a private cause of action; (4) plaintiffs failed to allege a cognizable claim under the

Racketeer Influenced Corrupt Organizations Act (RICO); (5) plaintiffs' claims were

nonjusticiable because they required the district court to adjudicate religious beliefs; and

(6) plaintiffs' claims were barred by the applicable statutes of limitation.

The district court, in granting defendants' motion and dismissing the complaint,

focused primarily on the last of these arguments.  It concluded that, with the exception of

plaintiff May Musser, all of the plaintiffs' legal malpractice, breach of fiduciary duty,

fraud, negligent misrepresentation, civil conspiracy, and civil RICO claims were barred

by the relevant statutes of limitations.  Aplt. App. at 820.  The district court in turn

concluded that Musser's claims were inadequately pled and thus subject to dismissal.  Id.

As for plaintiffs' claim under the TVPRA, the district court concluded it was

inadequately pled and thus subject to dismissal.  Id. at 821, 837–843.

      Plaintiffs, in their appellate brief, assert two general issues, both of which concern

the district court's dismissal of their claims as untimely.  Nowhere in their opening brief

do plaintiffs argue that the district court erred in dismissing their TVPRA claim as

inadequately pled, nor do they argue that the district court erred in dismissing the

individual claims of May Musser.[1]  Defendants, in their appellate response brief, note

these deficiencies in plaintiffs' opening brief.  Plaintiffs, in their appellate reply brief,

argue for the first time that they are, in fact, intending to challenge the entirety of the

district court's dismissal order.  We have repeatedly held that a new argument raised for

the first time in a reply brief comes too late and will not be considered.  E.g., Sylvia v.

---

[1] To be sure, plaintiffs make passing references in their opening appellate brief to
their TVPRA claim and the district court's dismissal of it.  Aplt. Br. at 45–48.  But those
references are contained within the context of two general appellate arguments, both of
which focus exclusively on whether the district court erred in conducting its statute of
limitations analysis.  Id. at ii, 41–58.  Therefore, plaintiffs' fleeting references to their
TVPRA claim cannot reasonably be interpreted as a substantive challenge to the district
court's dismissal of that claim.  And, in turn, the district court's dismissal of the
plaintiffs' TVPRA claim must stand.  See Clark v. Colbert, 985 F.3d 1258, 1265 (10th
Cir. 2018) ("By offering an incomplete challenge to the district court's analysis, Clark
has effectively abandoned his appeal of its ruling.").
     The majority concludes otherwise, however, and states that "any and all TVPRA
arguments asserted by plaintiffs on appeal inevitably concern the sufficiency of these
allegations to state a claim."  Maj. Op. at 33 n.7.  As I shall outline in greater detail
below, even if this were true, the arguments contained in plaintiffs' appellate brief are far
too conclusory to constitute a serious challenge to the district court's dismissal of their
TVPRA claim.

Wisler, 875 F.3d 1307, 1332 n.7 (10th Cir. 2017) (noting that this court does not ordinarily review issues raised for the first time in a reply brief).

The majority opinion makes no mention of these procedural facts, which have for plaintiffs become a hurdle to be overcome. Nor does it attempt to confine itself to the precise arguments asserted on appeal by plaintiffs. Instead, the majority opinion addresses issues never reached by the district court—in particular, whether defendants owed a duty to plaintiffs. Although we have discretion to affirm a district court's judgment on any basis found in the record, I am unaware of any rule affording us discretion to reverse a district court's judgment on the basis of issues never reached by the district court. Thus, to the extent the district court was wrong on the statute of limitations issues, the proper course would be to remand to the district court to address for the first time the other issues raised by defendants in their motion to dismiss, including whether the complaint sufficiently alleged that defendants owed a duty to plaintiffs.

### b) The district court's statute of limitations rulings

In my view, both plaintiffs' response to the defendants' motion to dismiss, and their appellate brief, are conclusory in nature. Although plaintiffs allege that their complaint contained "many particularized examples" of wrongful conduct on the part of defendants Parker and Snow Christensen & Martineau (SC&M) that would have served as the last events necessary to save their various causes of action from a statute of limitations bar, they fail to discuss or cite to a single one. Aplt. Br. at 42. And that is particularly troublesome because their complaint is unnecessarily lengthy and clearly

3

fails to comply with Fed. R. Civ. P. 8(a)(1)'s "short and plain statement" requirement. The majority opinion makes no mention of these deficiencies and, instead, does most or all of plaintiffs' work in terms of locating and discussing allegations in the complaint that might be relevant to the issue of timeliness.

In any event, an examination of plaintiffs' complaint reveals that, with two general exceptions, all of the alleged misconduct on the part of defendants occurred in 2008 or before. More specifically, nearly the entirety of the alleged misconduct discussed in the complaint concerns defendant Jeffs' use of the 1998 United Effort Plan Trust (UEP Trust), from the time it was executed until he was arrested, to control the Fundamentalist Church of Jesus Christ of Latter-Day Saints (FLDS) and its members, to incorporate underage marriage as a routine FLDS practice, and to allegedly abuse FLDS children by making them work to pay for FLDS expenses (including the legal fees of defendants Parker and SC&M).

The two exceptions in the complaint that identify more recent events are allegations (1) that Parker "participated behind the scenes in the criminal defense of Jeffs and other men by interviewing and organizing teams of defense lawyers and by assuring that those lawyers did not share information about Jeffs' conduct with the FLDS," Aplt. App. at 57 (Complaint at 40), and (2) that Parker and SC&M appeared on behalf of the FLDS in a number of civil cases that were filed after Jeffs' arrest. With respect to the first of these allegations, the complaint does not provide any details as to Parker's criminal representation of Jeffs or other individuals, including the dates of such representation. With respect to the second of these allegations, the complaint likewise

4

provides few details.  To be sure, the complaint does discuss Parker making a closing

argument in March of 2014 in Utah state court.  Aplt. App. at 43 (Complaint at 26).  But

plaintiffs fail to discuss in their pleadings how this criminal and/or civil representation

impacted the accrual of any of their claims against Parker and SC&M.

At best, certain of plaintiffs' allegations can be read as suggesting that Parker and

SC&M somehow concealed their misconduct from plaintiffs.  But, in light of the arrest

and convictions of Jeffs and other male leaders of the FLDS, the raid of the FLDS's

ranch in Texas, and the various civil cases that were filed by certain FLDS members, it is

difficult to say the plaintiffs reasonably could not have known about the misconduct

alleged in the complaint and filed their suit earlier.  And, relatedly, the plaintiffs are quite

vague, both in their complaint and their other pleadings, concerning precisely when and

how they learned of the involvement of Parker and SC&M.  Thus, in sum, there was

simply no basis in the complaint for concluding that any of plaintiffs' claims (save for

their claim under the TVPRA, which carries a ten-year statute of limitations) were timely.

Of course, plaintiffs argue in their second issue on appeal that the district court

erred by failing to apply Utah's discovery rule to toll the applicable statutes of limitations

on the basis of particularized factual averments of concealment and nondisclosure.  Aplt.

Br. at 48.  In support, plaintiffs begin by arguing that the language employed by the

district court in its order of dismissal, i.e., that "'Plaintiffs have not established that

Defendants concealed any of the alleged wrongdoings,'" suggests that it relied on "the

absence of *evidence*, rather than the presence of well-pleaded facts which were

disregarded."  Id. (emphasis in original; quoting Aplt. App. at 830).  This argument,

however, lacks merit.  The district court's use of the word "established" does not, contrary to plaintiffs' assertions, indicate that the district court dismissed plaintiffs' claims due to a lack of evidence.  Quite clearly, the district court was aware that it was ruling on a motion to dismiss and it based its analysis on the allegations contained in the complaint.

Plaintiffs next argue that "the statute[s] of limitations ha[ve] no application in this matter" because SC&M never "withdr[e]w" from representing FLDS members "or t[ook] any steps to notify its parishioner clients that the attorney-client relationships it had aggressively formed with them had at some point ended." Id. at 49.  Plaintiffs in turn argue that applicable law "mandates affirmative disclosure by lawyers of conflicts of interest and tortious conduct, and provides that when lawyers do not do so, they may not invoke the statute of limitations as a shield." Id. at 50.

But plaintiffs point to no cases holding that statutes of limitations are inapplicable to claims against attorneys.  To be sure, plaintiffs cite to Jensen v. IHC Hosps., Inc., 944 P.2d 327 (Utah 1997), a case they did not cite in their response to defendants' motion to dismiss.  In Jensen, the Utah Supreme Court discussed the concept of fraudulent concealment as it relates to the tolling of a statute of limitations.  The Utah Supreme Court noted that "[f]raudulent concealment requires that one with a legal duty or obligation to communicate certain facts remain silent or otherwise act to conceal material facts known to him." 944 P.2d at 333.  The court in turn held that fraudulent concealment can operate to toll a statute of limitations, but that this is typically a question of fact for the jury. Id. at 334-35.  And, indeed, given the facts before it (i.e., a physician

6

who knowingly and intentionally, with the knowledge of his attorney brother, withheld

certain medical records indicating that he had committed medical malpractice), the Utah

Supreme Court remanded that very issue to the state trial court.  Quite clearly, <u>Jensen</u>

does not hold that statutes of limitations are inapplicable to attorneys who fail to comply

with duties to disclose matters to their clients.  Instead, <u>Jensen</u> indicates that a failure to

disclose or an active concealment can, depending on the particular facts at issue, operate

to toll a statute of limitations.

     Turning to plaintiffs' complaint, they do allege, albeit in conclusory fashion, that

Parker and SC&M failed to disclose certain information to them.  For example, they

allege that Parker and SC&M: (a) failed to inform them that "their legal rights . . . were

being violated on an ongoing and systematic basis by Jeffs and his favored cohorts within

the FLDS," Aplt. App. at 62 (Complaint at 45); (b) failed "to advise Plaintiffs . . . to seek

separate and independent legal counsel," <u>id.</u>; (c) "should have advised Plaintiffs to

forbear from contributing directly to fundraising activities carried out for the stated

objective of paying Parker and SC&M for the purported benefit of legal advice and

counsel for Plaintiffs and similarly situated persons," <u>id.</u>; and (d) "should have informed

and advised Plaintiffs, in a timely fashion, regarding the fact that the true nature of the

legal work and the true structure of the legal framework and pattern of tortious activity

implemented by SC&M was in furtherance of the unlawful, malicious and tortious plan

of Jeffs and his favored cohorts within the FLDS leadership," <u>id.</u> at 62-63.  The only

other specific examples that plaintiffs offer in their complaint are that Parker and SC&M

should have informed them about the 1998 UEP Trust being declared invalid in 2005 and about Jeffs' 2007 confession that he was not a prophet.

The problem (in addition to the fact that it should have been self-evident that Jeffs and his so-called favored cohorts were acting improperly, if not illegally) is that plaintiffs fail to explain, either in their complaint or in any of their pleadings, precisely how and why these alleged failures on the part of Parker and SC&M prevented them from filing their complaint until July of 2016, particularly given Jeffs' arrest and convictions and the multiple civil lawsuits involving the 1998 UEP Trust.  Relatedly, plaintiffs offer little to no explanation, either in their complaint or other pleadings, regarding how and when they learned of the wrongful acts alleged in the complaint against Jeffs, Parker and SC&M. Thus, they failed to offer the district court sufficient allegations to allow it to conclude that the applicable statutes of limitations were or at least might have been tolled due to conduct on the part of Parker and SC&M.

*c) The district court's dismissal of the TVPRA claim*

The district court, in dismissing the TVPRA claim, concluded that the Complaint "ma[de] no connection between [Parker and SC&M] and the alleged kidnapping aside from the tenuous connection that the YFZ camp was on 'Trust Lands' and that [Parker and SC&M] helped amend and reinstate the [1998 UEP Trust]."  Aplt. App. at 837.  The district court concluded that this did "not approach adequately pleading that [Parker and SC&M] 'kidnap[ped] or carrie[d] away another person' or enticed a person into slavery, or obstructed enforcement of 18 U.S.C. § 1583."  Id. at 837-38.  And, the district court concluded, "[t]he fact that Parker may have represented the interests of those who lived at

the YFZ Ranch following the raid d[id] not support Plaintiffs' allegations on this point."

Id. at 838 (citing Utah R. Prof'l Conduct R. 1.2(b) ("A lawyer's representation of a client

. . . does not constitute an endorsement of the client's political, economic, social or moral

views or activities.')).

As for the complaint's forced labor allegations, the district court concluded that

plaintiffs' theory of liability on the part of Parker and SC&M "would make attorneys

vicariously liable for the acts of a client in the mismanagement of a trust simply because

the attorneys prepared documents giving the client discretion in how the trust was

managed." Id. at 838-39.  Consequently, the district court concluded that "[t]his theory

[wa]s not sufficient to state a claim under 18 U.S.C. § 1589(a)." Id. at 839.

The district court also rejected plaintiffs' allegations "that Defendants engaged in

a scheme, plan, or pattern intended to cause the FLDS community to believe that they

would suffer serious harm or physical restraint if they did not perform forced labor or

services." Id.  In doing so, the district court noted that "[t]he only actions alleged by

Plaintiffs [we]re that Defendants helped with Trust documents and that Parker

represented an FLDS man facing a prosecution for rape." Id.  "This," the district court

concluded, "[wa]s insufficient to support a claim of a 'scheme, plan or pattern' designed

to cause the beliefs alleged by Plaintiffs." Id.  More specifically, the district court noted

that "[t]he Trust's provisions and the authority it g[ave] [we]re centered on the

distribution of property in a way that would meet the just wants and needs of the FLDS

community," and "[n]othing from the Trust or the facts alleged indicate[d] that

9

Defendants drafted Trust documents with the intent to make FLDS members believe that they would suffer harm if they did not perform forced labor." Id. at 840.

Lastly, the district court rejected plaintiffs' claim that, because Parker and SC&M benefitted monetarily from the alleged forced labor (in terms of having their legal fees paid with the fruits of the forced labor), they were liable under the TVPRA. Specifically, the district court noted that "[r]egardless of whether Defendants knowingly benefitted from alleged forced labor, Plaintiffs ha[d] failed to adequately plead that Defendants 'participat[ed] in a venture' to provide or obtain that labor," as would be required under 18 U.S.C. § 1589(b). Id. at 842.

In their opening appellate brief, plaintiffs argue that the district court, in analyzing and dismissing their TVPRA claim, "erect[ed] an imaginary barrier between the 1998 [UEP Trust] and Jeffs' conduct, which simultaneously highlights and ignores the importance of the extensive averments in the Complaint that detail precisely how SC&M continuously furthered Jeffs' control over the FLDS, where the 1998 [UEP Trust] was the legal machination enabling that control." Aplt. Br. at 45-46. Plaintiffs also argue, relatedly, that "[t]he flaws in the District Court's reasoning [regarding the TVPRA claim] are most evident in its failure to recognize the detailed allegations relating to SC&M's receipt and acceptance of fees derived from human trafficking, and the particularized averments of SC&M's written threats and active litigation to perpetuate the unlawful use of force and threats of force to coerce its victims." Id. at 47-48.

The problem, however, is that plaintiffs' arguments are as conclusory as the allegations in their complaint. For example, they fail—both in their complaint and in

their briefs—to point to any specific language in the 1998 UEP Trust that would legitimately connect Parker and SC&M to Jeffs' wrongful conduct.  At best, they allege simply that the financial structure created by the 1998 UEP Trust allowed Jeffs to carry out his illegal activities.  But, as the district court noted, and as plaintiffs have failed to refute (or even address), plaintiffs point to no legal authority that would make Parker and SC&M vicariously liable for Jeffs' acts in effectively mismanaging the 1998 UEP Trust to carry out his illegal goals.

In turn, plaintiffs have also failed to cite to any authority that would render Parker and SC&M vicariously liable simply because their legal fees were paid by Jeffs with the fruits of his wrongful conduct.  To be sure, 18 U.S.C. § 1589(b) employs the phrase "[w]hoever knowingly benefits," but it also requires any such person to have "participat[ed] in a venture which has engaged in the providing or obtaining of labor or services by any of the means described in subsection (a)" of the statute (means of force, threats of force, means of serious harm or threats of serious harm, means of the abuse or threatened abuse of law or legal process, or means of any scheme intended to cause the person to believe they would suffer serious harm or physical restraint if they do not comply).  Even assuming that Parker and SC&M "knowingly benefited" from Jeffs' wrongful acts in forcing FLDS members to engage in labor or services, the allegations in the complaint are insufficient to link Parker and SC&M to that wrongful conduct.  More specifically, the allegations cannot reasonably be read to indicate that Parker and SC&M actually participated in Jeffs' scheme.  Simply providing legal services to Jeffs, including drafting the 1998 UEP Trust, is not enough to constitute such participation.

11

In their appellate reply brief, plaintiffs refer to Jeffs' "scheme" being "facilitated by SC&M's empowerment," and to "SC&M work[ing] to maintain the legalistic construct that served as the latticework that supported the growth of Jeffs' poison ivy." Aplt. Reply Br. at 22–22.  These vague allegations, however, are insufficient, taken on their face, to indicate that SC&M knowingly participated in Jeffs' scheme.  Again, although it is undisputed that Parker and SC&M drafted the 1998 UEP Trust, plaintiffs do not identify any additional legal or other work that these defendants performed to support Jeffs' scheme.

Thus, in sum, I conclude that plaintiffs have failed to establish that the district court erred in dismissing their TVPRA claim.

I vote to affirm the district court's ruling in its entirety.

# UNITED STATES COURT OF APPEALS
## FOR THE TENTH CIRCUIT
## OFFICE OF THE CLERK

Byron White United States Courthouse
1823 Stout Street
Denver, Colorado 80257
(303) 844-3157

Elisabeth A. Shumaker
Clerk of Court

March 14, 2019

Chris Wolpert
Chief Deputy Clerk

Brett Marshall Godfrey
Godfrey Johnson
9557 South Kingston Court
Englewood, CO 80112

Matthew G. Grimmer
Grimmer & Associates
2975 West Executive Parkway, Suite 1982
Lehi, UT 84043

Karen J Porter
Godfrey Johnson
9557 South Kingston Court
Englewood, CO 80112

RE:   **17-4020, Bistline, et al v. Jeffs, et al**
      Dist/Ag docket: 2:16-CV-00788-TS

Dear Counsel:

Enclosed is a copy of the opinion of the court issued today in this matter. The court has entered judgment on the docket pursuant to Fed. R. App. P. Rule 36.

Pursuant to Fed. R. App. P. 40(a)(1), any petition for rehearing must be filed within 14 days after entry of judgment. Please note, however, that if the appeal is a civil case in which the United States or its officer or agency is a party, any petition for rehearing must be filed within 45 days after entry of judgment. Parties should consult both the Federal Rules and local rules of this court with regard to applicable standards and requirements. In particular, petitions for rehearing may not exceed 3900 words or 15 pages in length, and no answer is permitted unless the court enters an order requiring a response. If requesting rehearing en banc, the requesting party must file 6 paper copies with the clerk, in addition to satisfying all Electronic Case Filing requirements. *See* Fed. R. App. P. Rules 35 and 40, and 10th Cir. R. 35 and 40 for further information governing petitions for rehearing.

Please contact this office if you have questions.

Sincerely,

Elisabeth A. Shumaker

Elisabeth A. Shumaker
Clerk of the Court

cc:    Brent O. Hatch
       Mark F. James
       Warren Steed Jeffs
       Mitchell A. Stephens

EAS/jm