# IN THE UNITED STATES DISTRICT COURT
# DISTRICT OF UTAH

Civil Action No. 16-CV-00788-TS

---

ALICIA ROHBOCK; RUBY JESSOP; SUSAN BROADBENT; GINA ROHBOCK; NOLAN BARLOW; JASON BLACK; MAY MUSSER; HOLLY BISTLINE; LAWRENCE BARLOW; STEVEN DOCKSTADER; MARVIN COOKE; HELEN BARLOW; VERGEL BARLOW; CAROLE JESSOP; BRIELL LIBERTAE DECKER f/k/a, LYNETTE WARNER; AMY NIELSON; SARAH ALLRED; THOMAS JEFFS; and JANETTA JESSOP,

       Plaintiffs,

v.

WARREN STEED JEFFS; RODNEY R. PARKER; SNOW CHRISTENSEN & MARTINEAU, P.C.; and John Does I through X,

       Defendants.

---

## AMENDED COMPLAINT AND JURY DEMAND

---

Plaintiffs, by and through their respective undersigned attorneys of record, for their Complaint for Damages against the Defendants, hereby allege and aver as follows:

## I.   THE PARTIES

1.      Plaintiffs are former members of the Warren Jeffs' Fundamentalist Church of Jesus Christ of Latter-Day Saints (hereinafter the "FLDS Church"), beneficiaries of a trust known as the United Effort Plan Trust (hereinafter "UEP Trust," or simply the "Trust") and clients of Defendants Snow, Christensen & Martineau and Rodney R. Parker, Esq., who have incurred injuries, damages and losses as a result of the combined and concerted acts and omissions of Defendants herein. The Defendants owed Plaintiffs various duties as described more particularly herein by virtue of their status as past or present members of the FLDS Church and beneficiaries of the UEP Trust (and are also referred to herein collectively as the "FLDS," "FLDS members," or "Trust beneficiaries").

2.      The Plaintiffs are:

       a.   Ruby Jessop, an individual and resident of Arizona;

b.  Susan Broadbent, an individual and resident of Missouri;

c.  Gina Rohbock, an individual and resident of Utah;

d.  Jason Black, an individual and resident of Arizona

e.  May Musser, an individual and resident of Utah;

f.  Holly Bistline, an individual and resident of Idaho;

g.  Alicia Rohbock, an individual and resident of Utah;

h.  Lawrence Barlow, an individual and resident of Utah;

i.  Steven Dockstader, an individual and resident of Utah;

j.  Derrell Barlow, an individual and resident of Utah.

k.  Marvin Cooke, an individual and resident of Utah;

l.  Helen Barlow, an individual and resident of Arizona;

m.  Vergel Barlow, an individual and resident of Arizona;

n.  Carole Jessop, an individual and resident of Arizona;

o.  Briell Libertae Decker, fka, Lynette Warner, an individual and resident of Utah;

p.  Amy Nielson, an individual and resident of Arizona;

q.  Sarah Allred, an individual and resident of Utah;

r.  Thomas Jeffs, an individual and resident of Utah; and

s.  Janetta Jessop, an individual and resident of Iowa.

3.      Defendant Snow, Christensen & Martineau, P.C. (hereinafter "SC&M") is a Utah law firm with its principal place of business in Salt Lake City, Utah, and is comprised of shareholders (who we also refer to herein as "partners" for simplicity), associate attorneys and other employees and agents who are or were employed or engaged by SC&M during times relevant hereto to participate in and support the practice of law in Utah and other states. On information and belief, SC&M has further affiliated with attorneys as co-counsel and as "of counsel" in relationships that arise out of express or implied employment and joint representation agreements. SC&M operates as a professional corporation and as a *de-facto* partnership under Utah law. SC&M

also employs non-lawyers for the performance of paralegal, administrative and ministerial functions, including service as agents of SC&M in a liaison role with respect to FLDS-related legal matters and fundraising for legal fees in connection with the same, as more particularly outlined below. On the basis of the express and implied agreements between and among its various attorneys, shareholders and agents, as well as the fact that said attorneys acted in concert with one another at all times relevant hereto, Defendant SC&M is vicariously, by imputation, jointly and severally liable for the wrongful acts and omissions of Parker and its other shareholders, employees and agents, as detailed herein. Further, on the basis of the fact that SC&M and Parker consciously conspired with other Defendants herein, as well as with Defendant Warren Steed Jeffs, with whom SC&M conspired and acted in concert to commit tortious and wrongful acts, said Defendants are jointly and severally liable with one another pursuant to Utah common law, which expressly recognizes the ongoing validity of joint and several liability on the part of co-conspirators and co-tortfeasors acting in concert.

4.     Defendant Rodney R. Parker (hereinafter "Parker") is an individual licensed to practice law within the state of Utah who has been admitted to practice before the United States District Court for the District of Utah and has been admitted to practice before a variety of state and Federal courts outside of Utah. At all times relevant hereto, Parker was acting as an attorney, partner, shareholder and agent of SC&M, in the provision of legal services to Plaintiffs and other similarly situated persons, and in such capacity performed the acts and failed to perform the omissions detailed herein. At all times relevant hereto, Parker was acting in concert with Defendant Warren Steed Jeffs (identified below) in furtherance of a conscious conspiracy formed with him and certain of Jeffs' agents to design, develop, promulgate and execute an ongoing plan to carry out a continuous pattern and practice of illegal activity and tortious acts for which the laws of the United States and the State of Utah recognize liability on the part of one tortfeasor for the conduct of one another. At all times relevant hereto, Parker and SC&M were acting in concert with Defendant Warren Steed Jeffs (identified below) in a furtherance of a conscious conspiracy formed with him and certain of Jeffs' agents to design, develop, promulgate and execute an ongoing plan to carry out a continuous pattern and practice of illegal activity and tortious acts for which the laws of the United States and the State of Utah recognize liability on the part of one tortfeasor for the conduct of one another. At all times relevant hereto, Parker and SC&M were acting in concert with, and in a furtherance of, various illegal plans, schemes and enterprises operated by Jeffs as detailed more particularly herein.

5.     Defendant Warren Steed Jeffs (hereinafter "Jeffs" or the "Prophet") is an individual and resident of the State of Texas, where he is incarcerated for life in the Louis C. Powledge Unit of the Texas Department of Criminal Justice following conviction for various crimes which are part of the common nucleus of operative fact described and detailed herein. At times relevant hereto, Jeffs held himself out as the absolute ruler, by divine right, of an organization known as

the Fundamentalist Church of Jesus Christ of Latter-Day Saints, formerly part of The Work or The Priesthood Work, and now also known as the Corporation of the President of the Fundamentalist Church of Jesus Christ of Latter-Day Saints and the Corporation of the Presiding Bishop of the Fundamentalist Church of Jesus Christ of Latter-Day Saints (said organizations being collectively referred to herein as the "FLDS Church" as referenced above). Jeffs' rule included at times relevant hereto the ability to unilaterally control and dispose of assets owned by the UEP Trust. Jeffs conspired and worked with SC&M to convert the FLDS Church and Trust into an illegal and ongoing enterprise engaged in a continuous pattern of commission of various tortious acts, illegal racketeering activities, and breaches of fiduciary duties owed to Plaintiffs herein and other similarly situated persons who, as described more particularly below, were clients of SC&M during its ongoing facilitation of Jeffs' illegal scheme, plan and enterprise. Jeffs gained international notoriety in May 2006, when he was placed on the FBI's Ten Most Wanted List for unlawful flight to avoid prosecution on Utah state charges related to his alleged arrangement of illegal "marriages" between his adult male followers and hundreds of underage girls which effectively constituted institutionalized child rape. He was arrested in August 2006 in Nevada and taken to Utah for trial. In May and July 2007, Arizona charged him with eight additional counts in two separate cases, including incest and sexual conduct with minors. Beginning in early September 2007, Jeffs' St. George, Utah trial lasted less than a month, and on September 25 he was convicted of two counts of rape as an accomplice for arranging the "marriages." On November 20, 2007, Jeffs was sentenced to imprisonment for 10 years to life and began serving his sentence at the Utah State Prison. The conviction, however, was overturned by the Utah Supreme Court on July 27, 2010, due to incorrect jury instructions. Jeffs was extradited by Utah to Texas, where he was found guilty of sexual assault and aggravated sexual assault of children following a raid of the FLDS Church facility known as the Yearning For Zion ("YFZ") Ranch in 2008. Jeffs was sentenced to life in prison plus 20 years, to be served consecutively, and a $10,000 fine for sexual assault of both 12- and 15-year-old girls, which offenses were part of, and committed in accordance with, the pattern and practice of unlawful activity detailed herein. This Court previously entered default judgment against Jeffs on Plaintiffs' original complaint, and that judgment is not affected by this amendment.

6.      Defendants Does I-X include various agents and representatives of SC&M, as well as its associated co-counsel and of-counsel, who at times relevant hereto operated directly under the control of Jeffs and Parker in furtherance of the scheme and plan and related pattern of tortious acts detailed herein. Many of these individuals were at one time leaders within the FLDS Church and were generally "favored cohorts" of Jeffs, while others are lawyers not formally employed by SC&M on an ongoing basis but with whom SC&M coordinated for the performance of legal services in furtherance of the legal duties SC&M undertook while acting as counsel of record for Plaintiffs and similarly situated persons. On the basis of having gained favor with Jeffs, many of his favored cohorts were granted financial and other "rewards," including the granting of unlimited

sexual liberties with, and "ordination" to rape, FLDS children who were coerced and/or deceived into years of sexual servitude and forced labor. At times relevant hereto, said favored cohorts were operating under the direction and control of Jeffs, as informed and advised by Parker and SC&M, in preparation for and in furtherance of the illegal scheme, plan and enterprise described herein. One such favored cohort was, on information and belief, Sam Barlow, who was an FLDS leader as well as a paralegal, legal assistant, case manager or agent of SC&M who worked as a liaison between that firm and the leadership of the FLDS Church in the ongoing maintenance of the scheme and plan detailed herein. On information and belief, Barlow was provided with one or more computers or electronic devices by SC&M, operated out of the offices of SC&M for a period of years and was at times given an office in that firm on the same floor as Parker, who directly oversaw his activities, which activities included coordinating a number of legal matters involving Jeffs, the FLDS Church and its individual members, as set forth below. Barlow was also given access by SC&M to various SC&M files, confidential client data pertaining to the individual members of the FLDS Church and occasional use of certain SC&M support staff, telephones and other equipment to facilitate the association between SC&M and FLDS leaders during times relevant to the ongoing operation of the enterprise described herein. Barlow, while acting as an agent of SC&M, communicated information from SC&M and made representations to the Fundamentalist Latter-Day Saints (herein "FLDS"), including Plaintiffs and others similarly situated persons, obtained information for SC&M, and took other actions to further the illegal acts discussed herein on behalf of Jeffs, Parker and SC&M as described in greater detail below. Defendants Does I-X may also include other lawyers or law firms who were co-participants in the wrongful conduct that harmed Plaintiffs as detailed herein.

## II. JURISDICTION & VENUE

7.     Jurisdiction is proper under 28 U.S.C. § 1331 and 1345 in that certain claims for relief set forth herein include causes of action arising under the laws of the United States, including but not limited to various relevant provisions of 18 U.S.C.A. § 1595 (civil remedies for violations of the TVPRA). Jurisdiction for claims based upon Utah law is premised upon this Court's supplemental jurisdiction pursuant to 28 U.S.C. § 1367. This Court has personal jurisdiction over the parties pursuant to 28 U.S.C. § 1391(e).

8.     Venue is proper with this Court pursuant to Fed. R. Civ. P. 98 in that the actions complained of occurred principally within the State of Utah, and Defendants or some of them are subject to service of process within Utah, which is their state of residence.

# III. FACTUAL ALLEGATIONS COMMON TO ALL CLAIMS

***General Averments Regarding SC&M, Parker & Jeffs***

9.      At all times relevant hereto, Parker was acting within the course and scope of his authority and agency relationship with SC&M. Further, at all times relevant hereto, Parker was acting in concert with all other members of SC&M (to be identified through discovery), who profited financially from the wrongful acts and omissions described more particularly herein, who had actual or constructive knowledge of the wrongful acts and omissions detailed herein, and a duty to act to prevent these wrongful acts or omissions.

10.      At times relevant hereto, Parker and other attorneys and legal staff at SC&M held themselves out to the public and the state and Federal courts of Utah, Texas, Arizona and other jurisdictions as having formed individual attorney-client relationships with, and acting for the benefit of, Plaintiffs and similarly situated persons. Each individual Plaintiff subjectively believed that he or she was represented by SC&M and had formed an attorney-client relationship, and this belief was objectively reasonable. *See Bistline v. Parker,* 918 F.3d 849, 868 (10th Cir. 2019) ("Thus, the totality of the circumstances indicates that individual FLDS members would have been reasonable in believing that defendants were protecting their legal interests as individuals, as distinguished from merely representing their common interests as a church"). Several of the details that are known to Plaintiffs concerning the formation of attorney-client relations with them and the representations made by SC&M concerning such relations are set forth in greater detail below. At a minimum, under Utah law, an implied professional relationship between SC&M and Plaintiffs herein and similarly situated persons was formed by the words, deed, conduct and representations of SC&M. *Kilpatrick v. Wiley, Rein & Fielding*, 37 P.3d 1130, 1139 (Utah 2001).[1]

11.      As licensed professionals engaged in the practice of law, Parker and SC&M were required at all times relevant hereto to conform their conduct to the minimum standards of care required of attorneys and explicit requirements of Utah law governing the practice of law, including but not limited to the following requirements of the Utah Rules of Professional Conduct:

      a.  Rule 1.3, which requires a lawyer to act with reasonable diligence and promptness in representing a client;

      b.  Rule 1.4, which requires attorneys to promptly and reasonably inform clients regarding matters and circumstances affecting the client's interests and objectives, keeping clients reasonably informed of the status of matters and the means by which

---

[1]   S*ee also Margulies By & Through Margulies v. Upchurch*, 696 P.2d 1195, 1200 (Utah 1985) (citing *Westinghouse Elec. v. Kerr-McGee Corp*., 580 F.wd 1311, 1329–20 (7th Cir. 1978)); *E.F. Hutton & Co. v. Brown*, 305 F.Supp. 371, 387–92 (S.D. Tex. 1971).

the client's objectives are to be accomplished and to disclose any relevant limitations on the lawyer's conduct [such as a conflict of interest], to the extent reasonably necessary to permit the client to make informed decisions regarding the representation;

c.  Rule 1.7, which prohibits a lawyer from representing a client if the representation involves a concurrent conflict of interest, which exists if the representation of one client will be materially limited by the lawyer's responsibilities to another client, a former client or a third person, or by a personal interest of the lawyer, the comments to which Rule provide that loyalty and independent judgment are essential elements in the lawyer's relationship to a client;

d.  Rule 1.8, which prohibits a lawyer from entering into a business transaction with a client unless the client is advised in writing of the desirability of seeking and is given a reasonable opportunity to seek the advice of independent legal counsel on the transaction, and further prohibits a lawyer from using information relating to representation of a client to the disadvantage of the client unless the client gives *informed* consent which rule provides that prohibitions applicable to any lawyers of a firm are applicable to all of them;

e.  Rule 1.9, which provides that while lawyers are associated in a firm, none of them shall knowingly represent a client when any one of them practicing alone would be prohibited from doing so under Rule 1.7 or 1.9;

f.  Rule 1.13, which provides that if a lawyer for an organization knows that an officer, employee or other person associated with the organization is engaged in action, intends to act or refuses to act in a matter related to the representation that is a violation of a legal obligation to the organization, or a violation of law that reasonably might be imputed to the organization, and that is likely to result in substantial injury to the organization, then the lawyer shall proceed as is reasonably necessary in the best interest of the organization, and that if the lawyer reasonably believes that the violation is reasonably certain to result in substantial injury to the organization, then the lawyer may reveal information relating to the representation;

g.  Rule 1.14, which provides that when a client's capacity to make adequately considered decisions in connection with a representation is diminished, whether because of minority, mental impairment or for some other reason, the lawyer shall, as far as reasonably possible, maintain a normal client-lawyer relationship with the client, and that when the lawyer reasonably believes that the client has diminished capacity, is at risk of substantial physical, financial or other harm

unless action is taken and cannot adequately act in the client's own interest, the lawyer may take reasonably necessary protective action, including consulting with individuals or entities that have the ability to take action to protect the client and, in appropriate cases, seeking the appointment of a guardian ad litem, conservator or guardian, the comments to which Rule also provide that the fact that a client suffers a disability does not diminish the lawyer's obligation to treat the client with attention and respect; that the lawyer must keep the client's interests foremost and, except for protective action authorized under the Rule, must look to the client, and not family members, to make decisions on the client's behalf and that if a lawyer reasonably believes that a client is at risk of substantial physical, financial or other harm unless action is taken, and that a normal client-lawyer relationship cannot be maintained because the client lacks sufficient capacity to communicate or to make adequately considered decisions in connection with the representation, the lawyer may take protective measures deemed necessary, in this regard the lawyer should consider and balance such factors as: the client's ability to articulate reasoning leading to a decision; variability of state of mind and ability to appreciate consequences of a decision; the substantive fairness of a decision; and the consistency of a decision with the known long-term commitments and values of the client;

h. Rule 1.16, which provides that a lawyer shall not represent a client or, where representation has commenced, shall withdraw from representation of a client if the representation will result in violation of the rules of professional conduct or law;

i. Rule 5.1, which requires that a partner in a law firm, and a lawyer who individually or together with other lawyers possesses comparable managerial authority in a law firm, shall make reasonable efforts to ensure that the firm has in effect measures giving reasonable assurance that all lawyers in the firm conform to the Rules of Professional Conduct, specifying that a lawyer shall be responsible for another lawyer's violation of the rules of professional conduct if the lawyer orders or, with knowledge of the specific conduct, ratifies the conduct involved or if the lawyer is a partner or has comparable managerial authority in the law firm in which the other lawyer practices or has direct supervisory authority over the other lawyer and knows of the conduct at a time when its consequences can be avoided or mitigated but fails to take reasonable remedial action;

j. Rule 5.3, which in the context of the employment of non-lawyers, requires partners and managerial lawyers in a firm to make reasonable efforts to ensure

that the firm has in effect measures giving reasonable assurance that the person's conduct is compatible with the professional obligations of the lawyer and that the lawyer shall be responsible for the conduct of a non-lawyer he employs if that conduct would be a violation of the Rules of Professional Conduct if engaged in by a lawyer and the lawyer orders or knowingly ratifies the conduct or knows of the conduct at a time when its consequences can be avoided or mitigated but fails to take reasonable remedial action;

k.   Rule 5.4, which provides that a lawyer shall not practice with or in the form of a professional corporation or association authorized to practice law for a profit, if a nonlawyer has the right to direct or control the professional judgment of a lawyer; which Rule also expresses traditional limitations on permitting a third party to direct or regulate the lawyer's professional judgment in rendering legal services to another; and

l.   Rule 7.1, which prohibits a lawyer from making a false or misleading communication about the lawyer or the lawyer's services, identifying that a communication is false or misleading if it contains material misrepresentation of fact or law or omits a fact necessary to make the statement considered as a whole not materially misleading, is likely to create an unjustified or unreasonable expectation about results the lawyer can achieve or has achieved; the comments to which Rule also provide that whatever means are used to make known a lawyer's services, statements about them must be truthful.

12.   The various duties owed by the Lawyer Defendants to Plaintiffs were non-delegable as a matter of law insofar as they were owed by the Lawyer Defendants to the Plaintiffs and similarly situated persons in the context of the Lawyer Defendants' role as licensed professionals.

***Formation of A Common Scheme & Plan and The Use of Enterprise to Commit Ongoing And Continuous Wrongful and Illegal Acts***

13.   As more particularly set forth below, the shareholders of SC&M knowingly and intentionally directed, authorized, agreed and/or consented to the acts and omissions by Parker and SC&M (collectively referred to herein as "the Lawyer Defendants"), thereby ratifying the same, including Parker's conspiracy and furtherance of an ongoing scheme and plan with Jeffs as well as his favored cohorts and FLDS leaders. The pecuniary fruits of said unlawful conduct were shared by shareholders and employees of SC&M, including but not limited to those who agreed or approved, tacitly or explicitly, with the Firm's commission of the acts and omissions set forth herein. Said shareholders, employees and agents of SC&M are therefore jointly and severally liable with Defendants Parker and Jeffs on the basis of a common scheme or plan to commit tortious

acts, for the injuries, damages and losses, statutory penalties and other relief awarded in the instant civil action.

14.     As more particularly detailed below, Defendants were and are engaged in a conspiracy to defraud and each of them are liable for the actions of the others as if they themselves had committed the acts. All Defendants were acting as the agents of the others with either express or implied authority to so act in furtherance of their common goal to operate an unlawful enterprise, and all Defendants benefited financially therefrom and ratified the acts of the others. Therefore, all Defendants are jointly and severally liability for the actions of every other Defendant which were committed in furtherance of the conspiracy.

15.     In 1942, the FLDS formed a trust known as the United Effort Plan Trust, or UEP Trust. The original trust instrument did not expressly vest control solely in the leader of the religious movement. "The original trust was founded upon the tenants of the FLDS faith, and membership was established through consecrating real and personal property to the Trust (which would then be redistributed to each family according to its just wants and needs)." *Bistline*, 918 F.3d at 855.

16.     In 1997, Rulon Jeffs, the father of Warren Steed Jeffs, was the leader of the FLDS, and in this role, bore the title "Prophet." He was also president of the FLDS Church and the UEP Trust. He was growing old and was in ill health. His mental and physical faculties were declining. As Rulon Jeffs became progressively less aware of his surroundings and began to demonstrate increasingly worsening loss of memory and cognitive function secondary to old age, his son, Defendant Warren Steed Jeffs, began to assume the mantle of authority and control. In his father's declining years, Jeffs became more actively involved in many of the inner workings of the FLDS Church and UEP Trust, including the retention and direction of legal counsel, including Parker and SC&M.

17.     On or about August 6, 1998, Rulon Jeffs suffered a major stroke which left him largely impaired and paved the way for Jeffs to eventually assume complete and absolute control of the FLDS. As Defendant Jeffs assumed greater control over the FLDS during the following year, the concept of celestial or spiritual "marriage" of children was not yet broadly practiced within the FLDS Church, at least to the extent of large-scale sexual domination of children and the use of the badges of religious ceremony to formalize the criminal sexual abuse of minors under the guise of "religious" practices. Up to that point, FLDS Church marriage practices were largely if not exclusively confined to adults. While the polygamy laws of Utah were violated by the practice of plural marriage, underage marriage and outright child rape was not common within the FLDS Church prior to Jeffs' 'ministry'; neither were extortion, kidnapping, forced labor or, most importantly for the purposes of this averment, the use of lawyers to create a basis of community-wide misplaced belief in the legality of what is actually fundamentally illegal conduct harming

large numbers of persons. As he assumed the mantle of power that would later culminate in his self-avowed role as Prophet, Defendant Warren Steed Jeffs was committed to changing this state of affairs and was obsessed with the creation of a controlled society in which he was the absolute ruler and the wholesale rape of young girls by himself and others was treated as a ceremonially sacrosanct ritual. He sought to institutionalize this atrocious practice and to cloak it with the superficial trappings of legal acceptance, so he retained SC&M to develop an overarching scheme and plan, executed and developed by SC&M during period of years, to develop the legal framework within which Jeffs and his favored cohorts would possess means to enforce their lewd, sadistic, tortious and criminal wishes upon the FLDS people, including the Plaintiffs herein.

18.     Defendant Jeffs wished to expand and control the practice described herein to include the absolute physical and sexual domination of large numbers of FLDS, including large numbers of underage girls under the guise of unlawful "celestial" or "spiritual" marriages, and in that capacity directed and controlled a practice which involved non-consensual, coerced or unlawfully induced submission of children to his "divine will," resulting in transportation of underage girls across state lines (principally between Utah, Arizona, Nevada, Texas, Colorado, South Dakota and other states) to ceremonialize their ritual rape. Under the child sex trafficking program Jeffs controlled, large numbers of underage "brides" were spirited across state lines from Utah, Arizona and Canada to a motel in Caliente, Nevada under the guise of marriage. Jeffs was the sole arbiter of which girls would be ordered into "celestial marriage" (raped), and to which adult men unlimited sexual possession, control and domination of underage girls would be granted.

19.     In order to secure the unwavering obedience of thousands of FLDS in the evolving program of forced labor, forced sexual servitude, extortionate taking of property and disintegration of family units (which was itself a key ingredient in the plan), Jeffs employed age-old control mechanisms that have, throughout history, proven to be key ingredients in the domination of entire populations and the infusion of cultural beliefs that result in the sublimation of individual morals and ethics and society-wide acceptance of monstrous and inhuman practices as ordered by an all-powerful tyrant operating under the guise of divine right.

20.     The key ingredients to the overtaking of an entire society require more than mere religious dogma and personal charisma or other traits common to mystical dictators. These additional key ingredients are purely logistical in nature. One such key ingredient is the appearance of legal acceptance, which to the masses is seen as societal approval, of practices which would otherwise shock the conscience. Another key ingredient is the ability to systematically control the economy, assets, employment, commercial structure, distribution of resources and essential services within an entire community, thereby creating the ability to punish malcontents or recalcitrant followers with swift and horrendous punishments, including the loss of all shelter, food, medical care, cash, livelihood and other essential support mechanisms necessary to an

endurable daily existence. With each of these two keys in place, the psychological control they create then may be systematically exercised in a self-regenerating manner to tighten the perceived degree of control in the hands of the leaders of the captive society. One manifestation of that tightening of control is the use of the logistical powers described above in this averment to foster the ceremonialization of punishment, including eviction not only from one's home, but from one's family, community, and employment such that expulsion becomes a form of banishment from all that is familiar and known to a member of the society. As years roll by, and the legal framework tightens progressively, the indoctrination of the citizens of the community becomes more absolute and obedience becomes even more automatic, creating a dwindling spiral into the depths of tyranny and crime in what once was a healthy society.

21.     Jeffs assigned to SC&M, a piece at a time beginning in 1997 or 1998, the development of the two key ingredients alluded to above: (a) legal steps designed to create the appearance of legal recognition of practices under the guise of recognition of entity status, treating the program as a religious entity when in fact it was not (but was rather a criminal enterprise) to camouflage the illegal practices of the entity under a facade of protected legal status (such as that which is afforded to charitable and religious organizations); and (b) to restructure the financial framework of the entity in such a manner as to transfer all control of all material, resources and commercial activities to the leader of the community. When SC&M first undertook to work on these various measures, they were aware, through conversations between Parker and Jeffs and his favored cohorts and others who became agents of both SC&M and Jeffs simultaneously, in which Jeffs actively discussed his illegal goals, including most particularly the ability to institutionalize and protect the underage marriages of young girls who were to be taken across state lines, principally between Utah, Arizona, Nevada, Texas, Colorado, South Dakota and other locations for that purpose. Despite being actually or constructively aware of the criminal purpose tying the various actions ordered by Jeffs to an ongoing illegal enterprise, SC&M operated for years in complete obedience to the dictates of Jeffs, and quite skillfully provided him with each of the above two key ingredients through the conduct detailed below. SC&M then worked unceasingly for years to evolve, protect, strengthen and tighten the systematic control and to facilitate and enable Jeffs' ongoing criminal use of that power, with actual knowledge of how that control was being implemented to the detriment of Plaintiffs and similarly situated persons.

22.     Jeffs also sought to expand the practice of using children in general as forced labor to enrich himself and his favored cohorts, and also to help pay for SC&M's legal fees, which was the primary incentive for SC&M to participate in the scheme. By doing so, SC&M created a situation where virtually all members of the society it helped Jeffs to control were required to contribute large portions of any personal wealth they could accumulate to the payments made to SC&M, thus resulting in a situation where the victims were being forced to pay their lawyers to make them legally and functionally helpless in the presence of systematic human rights violations

against them. "[T]he majority of the [original] complaint's relationship-based allegations involve a fee solicitation scheme far greater than the mere passing of a Sunday tithing plate." *Bistline,* 918 F.3d at 867. Young boys would be trained from birth to forego normal activities such as playing with toys, family activities and other normal healthy activities in order to perform work equivalent to that of able adult males. Upon reaching an age in which young males were considered competition for the established male leadership, the young males (many at pre-teen age), would be discarded and abandoned by church leaders who would also require that their families abandon them or suffer severe and adverse consequences, both spiritual and otherwise. In fact, Parker would never have been able to receive his huge legal fees, and Jeffs would have never been able to successfully perpetrate the illegal scheme and plan detailed herein without the young slaves that gave FLDS businesses their financial edge. On information and belief, Parker directly benefitted from such "work projects," using underage workers who were ordered to perform remodeling to his own home in exchange for legal services. Western Precision, a company that had its start in Salt Lake City, would also perform "fundraisers" in the style of a telethon with a money board counting how much money that was made for the FLDS attorneys. Plaintiffs further believe that Reed Martineau and Scott Berry may also have benefitted from the labors of FLDS work crews.

23.    Jeffs remained in direct consultation with Parker and SC&M during this time. One subject of his meetings with those attorneys, which were attended by others, was the fear that the State of Utah was becoming more stringent in its enforcement of polygamy laws, as those laws related to underaged girls, based upon the issuance of an opinion by the Utah Court of Appeals to the effect that, even under the guise of marriage, consummation of the same through sexual congress with an underage "bride" constitutes outright rape of a child. In *State v. Chaney*, 989 P.2d 1091, 1098 (Utah App. 1999), the court affirmed a rape conviction of an individual who neither had sex with the child bride in question nor was present at the act based upon his actions in facilitating the "marriage." In that matter, the court held:

> In Utah, a person is criminally liable as a party to an offense when, acting with the requisite mental state, he "solicits, requests, commands, encourages, or intentionally aids another person" to commit the offense. Utah Code Ann. § 76–2–202 (1995). No mention is made of actual or constructive presence during the commission of the offense as a precondition to liability. Under the plain language of the statute, presence is not required for accomplice liability to attach.

> Moreover, we have previously concluded that an accomplice's "presence" at the location of a sexual assault is not a necessary precondition for liability to attach. See *State v. Beltran–Felix*, 922 P.2d 30, 36 (Utah Ct.App.1996). In *Beltran–Felix*, the defendant was convicted, in part

under section 76–2–202, of aggravated sexual assault. See *id.*

*State v. Chaney*, 1999 UT App 309, ¶¶ 36-37, 989 P.2d 1091, 1098.

24.     In view of the growing threat of prosecution resulting from Utah's increased stringency in the enforcement of laws prohibiting the sexual violation of children, Jeffs sought legal advice from Parker and SC&M to find ways of tightening his control over the FLDS. Parker and SC&M contrived a complex and detailed scheme to manipulate the law in such a fashion to not only take advantage of the relatively lax marital laws of Nevada, but to create a new enterprise, under the guise of the existing FLDS Church, which would be legally structured to give Jeffs absolute control over all of the bodies, possessions, homes and funds of the FLDS as beneficiaries of the UEP Trust.

25.     The earlier structure of the UEP Trust had not conferred upon Jeffs the legal ability to unilaterally, and without any checks, balances or interference of any kind from others, control the distribution of assets, property, funds and real estate used for residential and business purposes by the FLDS beneficiaries, so Jeffs and Parker conceived a plan to reform the UEP Trust, reorganize the FLDS structure, and further develop a legal and societal framework involving various actions and legal support on the part of Parker and SC&M in furtherance of that plan. Said legal representation was not aimed at the defense of a client facing criminal or civil liability for past acts; rather, it was designed to foster and facilitate the ongoing commission, on a large-scale basis, of a number of ongoing and future crimes and tortious acts, that would ruin the lives of thousands of people through the rape of children, destruction of families, extortion and blackmail of adults, kidnapping, assault, theft and breach of fiduciary obligations. The purpose of the plan was to empower Jeffs, under the guise of absolute spiritual and temporal authority over what professed to be a recognized religious organization, with unfettered control over the lives, physical persons, property, homes, family relations and all other aspects of life for thousands of FLDS Trust beneficiaries so that Jeffs could use that power to act out his pedophilic and dictatorial impulses.

26.     For several months, during 1997 and 1998, Jeffs and several of his favored cohorts within the leadership of the FLDS Church met with Parker and other employees of SC&M to discuss a complex and ongoing series of legalistic maneuvers to be carried out by SC&M in order to provide the Prophet absolute, unfettered control which enabled Jeffs to force hundreds or thousands of families to submit their minor children to unlawful sexual servitude and forced labor, destroy families and displace family members from their homes, subject FLDS members to physical torture, extortion based upon the same as well as severe and extreme emotional distress, fear, dread and the threat of forced banishment from their families and community, and subject them to unlawful imprisonment, kidnapping, and other extreme and atrocious inhumane punishments, all of which was designed to secure their utter and complete obedience.

27.     During the planning process described above, Jeffs and Parker reached several preliminary agreements, pursuant to which Parker agreed to develop an unlawful strategy to utilize the instruments of the law to facilitate the illegal objectives identified by Jeffs, as set forth above and described in greater detail below, in return for which Jeffs used his steadily increasing control over the FLDS Trust beneficiaries and the hundreds of millions of dollars in assets held by the Trust to squeeze and coerce the Trust beneficiaries and the FLDS to pay what would ultimately become millions of dollars in legal fees to Parker and SC&M. Parker, and through him SC&M, thereby knowingly, intentionally, and materially participated in and actively and prospectively facilitated and aided, under the badges and powers of their status as licensed attorneys under the guise of legal representation criminal and tortious acts (under state and Federal law) on behalf of SC&M's client Jeffs against some of its other clients—the FLDS members, including all of the Plaintiffs.

28.     One of the first material steps undertaken by Parker in furtherance of the aforementioned plan was to restructure the UEP Trust in order to cement the "one-man rule," vesting in Rulon Jeffs, who was then aging and largely under the influence and control of Defendant Warren Steed Jeffs, absolute control over the disposition of all Trust assets. As the FLDS were required, as a condition of membership, to consecrate all of their assets to the Trust, assigning control of the trust to "the prophet," the role which would soon be assumed by Warren Jeffs, gave that prophet unfettered power and control over the livelihood of all members of the FLDS. By that time, Rulon Jeffs' signature on the Trust instrument created by Parker and SC&M was placed with physical assistance and guidance of others holding Rulon Jeffs' pen hand, at the direction of Defendant Warren Steed Jeffs, as he signed documents prepared at Defendant Jeffs' direction by Parker and SC&M.

29.     The UEP Trust was thus restated in instruments drafted by Parker and other SC&M lawyers operating under the supervision and control of Parker to further and give effect to Jeffs' illegal purposes. More specifically, this revision of the UEP Trust, commonly known as the "1998 Restatement," expressly states that the Trust "exists to preserve and advance the religious doctrines and goals of the Fundamentalist Church" and that "The doctrines and laws of the Priesthood and the Church are found in . . . revelations received through the holder of those [Priesthood] keys [the Prophet] and are the guiding tenets by which the trustees of the United Effort Plan Trust shall act." The Trust was intended to advance illegal religious doctrines and law, including plural and underage marriage, and the rape and enslavement of children.

30.     The Trust has been expressly recognized by a number of courts in recent years as an illegal instrumentality. In one such action, SC&M was actually a party and in that context made many representations and averments on its own behalf to the court describing the role of Parker and SC&M. Details of that action and certain findings of the Utah Supreme Court relating to the

same are recited in greater detail below as averments herein and these court decisions are expressly incorporated herein in their entirety.

31.     By November of 2008 when the Restated Trust was signed, Defendant Jeffs was acting as, and was soon to become, the holder of Priesthood keys, the Prophet and the President of the FLDS Church, as well as the President of the Trust as restated by Parker and SC&M in furtherance of Jeffs' scheme and plan to employ the enterprise consisting of these entities and organizations, to command underage girls whose families lived on Trust land that he controlled in Utah, Arizona, Texas and other states to enter into "spiritual marriages" that required sexual consummation with adult men, most of whom were already married.

32.     Through the unlawful use of the aforementioned enterprise in its various guises and manifestations as identified herein and as conceived, designed, created or amended by Parker through various legal instruments, including but not limited to the 1998 restatement of the UEP Trust and the prosecution of legal action against Plaintiffs and similarly situated persons to capitalize upon the vulnerabilities which they had under said instruments,  Jeffs was able to perpetuate an ongoing and continuous pattern and practice of child rape, child kidnapping and transportation of adult and minor kidnapping victims across state lines, forced labor, slavery, involuntary sexual servitude, extortion, theft, fraud using interstate wire, mail and telephone, and other felonies against Plaintiffs for a period of nearly two decades.

33.     In 1997 and later years, as part of his psychological indoctrination of the FLDS community, applying the powers that were significantly strengthened by Parker and SC&M through their creation of a fundamentally illegal Trust restatement as detailed herein, Jeffs required young girls in grades 3 through 8 to take a Family Training Class at the Alta Academy. In that class, young girls were instructed that they must marry whomever Jeffs tells them to marry if they wish to get into heaven and that, if they obey Jeffs and marry who he chooses for them, they "never have the right to think [they] have been forced" into the sexual servitude that FLDS commanded marriages entail, for they came to him with their souls and their lives to enjoy the bounty of his spiritual leadership and because they were divinely "commanded to bring forth children in righteousness." Jeffs, a student of Hitler's Mein Kampf, used these indoctrination programs substantively similar to those used to indoctrinate young people in autocratic regimes, such as the infamous Hitler Youth of Nazi Germany, into believing that their oppression was not oppression at all. The tactics used by Jeffs and summarized herein are eerily similar to those used by the Nazis including his maintenance of his own personal paramilitary force, the corruption of public police forces, his building of a personal bunker to protect him from his enemies, and so on.

34.     Children were not the only victims of the scheme and ongoing enterprise created by Jeffs, Parker and SC&M. Similar commandments were issued to girls and women, who were then "reassigned" to other men as wives under pain of expulsion from the FLDS Church. Parents

of young girls who were summoned to be married by Jeffs faced a similar threat.

35.     The threat of expulsion was manifest in hundreds of "correction" orders to "repent at a distance," meaning that a person would be displaced from his or her home, separated from his family and most of his or belongings and in many cases deprived of any existing source of income or employment. Such individuals included children and adults alike, who were stripped of nearly all of their possessions, their familial connections, their shelter and their livelihoods through the use of the various legal instrumentalities and civil actions that were developed and overseen by Parker and SC&M. The psychological indoctrination program implemented by Jeffs with the assistance of SC&M made the threat of expulsion a powerful weapon of oppression because indoctrinated individuals, including all the Plaintiffs, believed that expulsion would doom their souls.

36.     Other less permanent (but even more harmful) punishments for any FLDS member who was perceived for any reason by Jeffs to be recalcitrant or uncooperative included extended periods of confinement in unheated buildings in Utah, Colorado, Wyoming, Canada and other places, physical corporal punishment, starvation, deprivation of medical care and intense and prolonged forced labor for underage workers and adults alike, which labor was typically performed in dangerous construction or excavation activities in which safety precautions were regularly ignored. These punishments were substantively similar to those traditionally used to control African American slaves prior to passage of the Thirteenth Amendment.

37.     On July 16, 2002, Jeffs, who had undertaken to give regular FLDS sermons in the place of his impaired father, delivered an address entitled "Our Prophet's Call — Leave Apostates Alone Severely," in which he commanded the FLDS to "severely" restrict and limit their communications with the outside world. This control over communications and relationships set the stage for later, more severe, restrictions on all types of relationships. It was accompanied by Jeffs' strict commands to strictly shun all non-FLDS Church information by not watching television, reading newspapers or magazines, listening to the radio, reading books, or using the internet. In this way, Jeffs prevented the FLDS adherents from learning about the fraud being perpetrated on them, that their rights were being violated and how those rights were being violated with the help of Parker and SC&M. This was intended to and did prevent discovery by Plaintiffs of the nature and extent of the various breaches of duties owed to them by Parker and SC&M for years as set forth below, and is similar to the highly successful information control methodologies used by the Peoples' Republic of China and which the United States (and the broader international community) abhor as a violation of basic human rights.

38.     Parker and SC&M were aware of these restrictions, which in fact heightened their duty to disclose critical facts to the general members of the FLDS and beneficiaries of the UEP Trust whom they had undertaken to represent as individuals, as more particularly described below,

because said persons, including all the Plaintiffs, were unaware of, but needed to know, these critical facts in order to make informed decisions to protect themselves, their families, home, and livelihood from the consequences of the criminal ambitions of Warren Jeffs. Indeed, they needed to know of the breaches by Parker and SC&M who purported to represent their interests under an attorney-client relationship but were in fact actively colluding with Jeffs to further his criminal schemes to oppress them.

39.     Particularly in view of the fact that Parker and SC&M expressly claimed to have undertaken a duty of representation of all individual members of the FLDS Church in connection with the protection of their civil and constitutional rights, as well as their rights as beneficiaries of the UEP Trust, the Lawyer Defendants had a duty to properly advise and inform their clients, including Plaintiffs herein, of material facts and the nature of the violations of their rights that were being perpetrated by Defendants herein. That all Plaintiffs were affirmatively led by SC&M and its agents and co-tortfeasors to subjectively believe, and did in fact believe, that SC&M represented them, and that belief was reasonable under these unique circumstances, further establishes that Parker and SC&M owed them the duties of an attorney (and a law firm) to a the Plaintiffs as clients of Parker and SC&M.

40.     Defendants Parker and SC&M further had an irreconcilable conflict of interest related to the incontrovertibly opposed interests of Jeffs and the uninformed individual FLDS Church members whom Parker and SC&M had undertaken to represent directly as individuals in addition to, and separate from, their representation of the FLDS Church as an entity. Based upon their acknowledged status as counsel not only for the FLDS Church, UEP Trust or other collective entities, Parker and SC&M, in view of their express acceptance of their status as counsel for said individuals (as more particularly detailed herein), owed each of these individual members, as either avowed and acknowledged individual clients of the Firm or alternatively under an implied attorney-client relationship, the duties applicable under the law in connection with said individual representation. Rather than disclosing the truth with respect to the unlawful and tortious objectives of Jeffs with respect to such individuals and further disclosing their conflict of interest, withdrawing from representation of clients with conflicting interests and advising the Firm's many individual clients to seek separate and independent counsel, which actions were required by the standards governing the legal profession as more particularly detailed herein and as to be proven at trial through expert testimony, Parker and SC&M continued in their impermissible role as advisors to Jeffs as the scheme and plan was further developed and continued by them over a period of years.

41.     An obvious manifestation and example of the manner in which Parker and SC&M continued to overtly act against the interests of the FLDS is found in a letter written by Parker on SC&M letterhead on March 7, 2001, to Jay Beswick in connection with the eviction of the Milton

and Lenore Holm family from their home on Trust land and the rejection of a tax check sent by Mr. Beswick on the family's behalf. Parker's letter stated:

> Your correspondence of February 22, 2001 addressed to Truman Barlow has been referred to me for response. In the future, if you would like to correspond with the United Effort Plan Trust or the Fundamentalist Church, please direct your correspondence to me.
>
> As you know, the United Effort Plan Trust has elected to seek the eviction of Mr. Holm in the Arizona courts. Accordingly, we do not believe it would be appropriate to accept your tendered payment of taxes on his behalf, even though he has not paid property taxes for many years. Your check is enclosed.

42.     Parker and SC&M's subsequent work in the trial and appellate courts of Arizona to evict this family was undertaken to effect Jeffs' illegal retaliation against the FLDS parents consistent with the illegal purposes of the Restated Trust they had crafted. Parker and SC&M thus once again participated in and facilitated through their representation of Jeffs' his illegal acts.

43.     As this example shows, the Lawyer Defendants knew Jeffs, who was ultimately listed among the FBI's Ten Most Wanted criminals in the United States, was harming the FLDS (including the Plaintiffs) through the Trust and, at a minimum, should have stopped enforcing it and taken steps to protect their clients (including the Plaintiffs), such as complying with the Rules of Professional Conduct. Nevertheless, as set forth in detail below, they utterly failed to discharge their duties as attorneys, especially and even after January of 2007, when Jeffs, in an audio and video recorded visit with his brother, Nephi, admitted that he was a religious sham, defrauding the FLDS and, in his words, "the most evil person on the face of the Earth in this dispensation." During this recorded confession, Jeffs acknowledged to his brother that he was not, and never had been, a prophet, and expressly instructed his brother to inform the FLDS of this critical fact and to tell them that they should try to put their families back together.

44.     Notwithstanding the fact that the Lawyer Defendants had drafted the Restated Trust to perpetuate the "doctrines and laws of the Priesthood and the Church" as commanded by the holder of the Priesthood "keys" — whom Jeffs admitted he was not — and notwithstanding the fact that they knew the Trust was being controlled and used by Jeffs for illegal purposes, they did not protect their clients (including the Plaintiffs); rather, Parker and SC&M participated in perpetrating the harm and after January of 2007, engaged in a cover up and conspired with FLDS leaders not to inform the FLDS of Jeffs' confessions which were critical to the decisions the FLDS were being required to make by their "Prophet," eventually resulting in the displacement of thousands of FLDS and the destruction of hundreds of FLDS families (including some or all of the

Plaintiffs as detailed further below).

***SC&M's Judicially Recognized Culpability with Respect to the Unlawful UEP Trust***

45.     Many of the facts upon which Plaintiffs' claims are premised are recited in the decision of the Utah Supreme Court in a case entitled *Snow, Christensen & Martineau v. Lindberg,* 299 P.3d 1058, 1061 (Utah 2013) as set forth in the following several paragraphs of this Complaint, and are advanced as averments:

46.     "[¶ 3] The UEP Trust was created in 1942 by the predecessors of a religious group known as the Fundamentalist Church of Jesus Christ of Latter–Day Saints (FLDS Church). The UEP Trust's stated purpose was primarily "charitable and philanthropic." Membership in the UEP Trust was established by "consecrating" property to the Trust "in such amounts as shall be deemed sufficient by the Board of Trustees."

47.     "[¶ 4] In 1987, the Trustees of the UEP Trust were sued by Trust land residents. The suit alleged several causes of action, including a claim for breach of fiduciary duty. The [state] district court dismissed these claims because it found that the UEP Trust was charitable and the plaintiffs therefore lacked standing. But in *Jeffs v. Stubbs,* we reversed the district court's decision and held that the UEP Trust was not charitable because it benefitted specific individuals. 970 P.2d 1234, 1252–53 (Utah 1998). In response to our decision, the sole surviving beneficiary of the UEP Trust, Rulon Jeffs, acting for himself and as the president of the Corporation of the FLDS Church, and other trustees amended and reinstated the UEP Trust (the "1998 Restatement"). *See Fundamentalist Church of Jesus Christ of Latter-Day Saints v. Lindberg,* 238 P.3d 1054, 1057 (Utah 2010). It is undisputed that the amended UEP Trust is a charitable trust. Unlike the original trust documents, which essentially limited the class of beneficiaries to the UEP Trust founders, the 1998 Restatement substantially broadened the class of beneficiaries to include FLDS Church members who "consecrate their lives, times, talents, and resources to the building and establishment of the Kingdom of God on Earth under the direction of the President of the [FLDS] Church."

48.     "[¶ 5] The primary purpose of the UEP Trust was religious. The 1998 UEP Trust's declaration expressly states that it "is a religious and charitable trust," and "a spiritual ... step toward[s] living the Holy United Order." The Trust further provides that the Holy United Order is a "central principle of the Church" that "requires the gathering together of faithful Church members on consecrated and sacred lands to establish as one pure people the Kingdom of God on Earth under the guidance of Priesthood leadership."

49.     "[¶ 6] [C]onsistent with its religious purpose," the UEP Trust states that it is to be administered "to provide for Church members according to their wants and their needs, insofar as

their wants are just (Doctrine and Covenants, Section 82:17–21)." The UEP Trust makes clear that participation in the Trust is conditioned on living in accordance with the principles of the United Effort Plan and the FLDS Church as determined by spiritual leaders. It provides that:

> Participants who, *in the opinion of the Presidency of the Church*, do not honor their commitments to live their lives according to the principles of the United Effort Plan and the Church *shall remove themselves from the Trust property* and, if they do not, the Board of Trustees may . . . cause their removal.

(emphasis added). The UEP Trust was "intended to be . . . of perpetual duration; however in the event of [its] termination, ... the assets of the Trust Estate at the time [were to] become the property of the Corporation of the President of the [FLDS] Church, corporation sole."

50.     "[¶ 7] In 2004, the UEP Trust and then FLDS president, Warren Jeffs, were sued in two separate tort actions. Rodney Parker, an attorney from the law firm of SCM entered an appearance as counsel for the UEP Trust and the FLDS Church in both of these actions but later withdrew when he was discharged by his clients. Because the controlling trustee, Warren Jeffs, did not appoint substitute counsel in either action, the UEP Trust was vulnerable to having default judgments entered against it. The Utah Attorney General (AG) responded by petitioning the district court for: (1) removal of the trustees for breach of fiduciary duty; (2) an order that the trustees provide an inventory, final report, and accounting of Trust assets; and (3) an appointment of a Special Fiduciary to administer the Trust until a new trustee was appointed."

51.     "[¶ 8] In June 2005, the district court entered an order for a preliminary injunction suspending the trustees of the UEP Trust and appointing Bruce Wisan as special fiduciary 'on a limited basis' to manage the affairs of the Trust. Additionally, the court asked the Special Fiduciary to identify any issues that the court needed to address before it appointed new trustees. In response to the court's request, the Special Fiduciary indicated that the Trust would need to be reformed before new trustees could be appointed."

52.     "[¶ 9] On December 13, 2005, the [state] district court issued an order that the UEP Trust be reformed. Using the doctrine of cy pres, the district court found that the UEP Trust had two primary purposes. It concluded that its first purpose was to advance the religious doctrines and goals of the FLDS Church and that its second purpose was to provide for the "just wants and needs" of FLDS Church members. The district court held that although the trust could not be reformed to advance its religious purposes, it could be reformed to advance its charitable purpose to provide for UEP Trust beneficiaries' "just wants and needs. [footnote 2]"

53.     Footnote 2 to the foregoing continued: "The district court determined that it could

not reform the UEP Trust to advance its religious purposes for primarily two reasons. *First, it determined that it could not advance the religious purposes of the UEP Trust insofar as those purposes were illegal. Specifically, the district court noted that it could not advance the FLDS doctrines of polygamy, bigamy, or sexual activity between adults and minors.* Second, the district court determined that it could not advance the religious purposes of the Trust because it was prohibited by the First Amendment to the United States Constitution from resolving property disputes on the basis of religious doctrines" (emphasis added).

54.     The main text of the foregoing opinion continued: "[¶ 10] Using secular principles, the district court reformed the UEP Trust. The purpose and provisions of the Reformed Trust are vastly different from those of the UEP Trust. The UEP Trust existed solely for the purpose of "preserv[ing] and advanc[ing] the religious doctrines and goals of the [FLDS Church]." In contrast, the Reformed Trust is "separate and distinct from ... the FLDS Church, as well as other religious efforts, objectives, doctrines or organizations." Additionally, the Reformed Trust was to be administered "based on neutral principles of law," independent of Priesthood input. But Priesthood input was critical to the administration of the UEP Trust. Indeed "[t]he doctrine and laws of the Priesthood . . . [were] the guiding tenets by which the Trustees of the [UEP] Trust" were to act. The beneficiaries of the Reformed Trust were also different from those of the UEP Trust. While participation in the UEP Trust was limited to FLDS Church members, beneficiaries of the Reformed Trust included nonmembers "who [could] demonstrate that they had previously made contributions to either the [UEP] Trust or the FLDS Church."

55.     "[¶ 11] . . . Unlike the UEP Trust, which was administered in a manner that advanced the FLDS Church and its members, petitioners contend that the Reformed Trust is administered in a manner that is hostile towards the FLDS Church and its members. To support their argument, they point to the Special Fiduciary's attorney's characterization of the administration of the trust as "sociological and psychological war with the beneficiaries." They also point to the Special Fiduciary's court filings, which refer to church members and the former Trustees of the UEP Trust, including the president of the FLDS Church, as "saboteurs" and "conspirators." Petitioners also note that the Special Fiduciary has admitted that a factor in determining whether Trust property will be conveyed to beneficiaries outright or subject to a spendthrift trust is whether the transferee is likely to participate in the United Holy Order. Petitioners claim that this practice discriminates against beneficiaries who practice the doctrines of the FLDS Church."

56.     "[¶ 13] In response to concerns over administration of the Trust, an association of members of the FLDS Church (Association) filed a petition for an extraordinary writ, which challenged the validity of the Reformed Trust on several grounds. In *Fundamentalist Church of Jesus Christ of Latter–Day Saints v. Lindberg,* we concluded that because the Association's

petition was filed three years after the district court's reformation of the UEP Trust, all but one of the Association's claims were barred by the doctrine of laches. 2010 UT 51, ¶ 1, 238 P.3d 1054. We further concluded that the remaining claim that was not barred by laches was not ripe for adjudication. *Id.* We therefore held that the district court's reformation of the UEP Trust was final and could not be challenged. *Id.* ¶ 35."

57.     "[¶ 14] On May 19, 2008, the Special Fiduciary served subpoenas on SCM seeking documents related to SCM's former representation of the UEP Trust. SCM objected, claiming that the requested documents contained privileged attorney-client information. SCM argued that the Special Fiduciary was not entitled to these documents because the Reformed Trust was not the same entity as the UEP Trust and because the Special Fiduciary and the Reformed Trust were, in fact, adversaries of the former UEP Trustees and the settlor of the UEP Trust. On June 26, 2008, the Special Fiduciary filed a motion to compel compliance with the subpoenas, and the district court granted the Special Fiduciary's motion."

58.     "[¶ 15] On August 14, 2008, Movants learned of the Special Fiduciary's intent to sell the Berry Knoll Farm and hired SCM to represent them in their efforts to prevent the sale. On August 25, 2008, the Special Fiduciary moved to disqualify SCM under rule 1.9 of the Utah Rules of Professional Conduct. The Special Fiduciary argued that because SCM had formerly represented the UEP Trust and because the Reformed Trust and the UEP Trust were the same entity, SCM was prohibited from representing Movants in any matter in which they were materially adverse to the Reformed Trust. SCM opposed the Special Fiduciary's motion. First, it argued that trusts are not capable of forming attorney-client relationships and therefore it never established a relationship with the Reformed Trust. Second, it argued that, even if it were possible to form an attorney-client relationship with a trust, the Reformed Trust is not the same entity as the UEP Trust. It therefore argued that it neither represented the Reformed Trust nor established an attorney-client relationship with that entity."

59.     "[¶ 16] The district court rejected SCM's arguments and disqualified SCM from representing Movants. Because SCM and Movants were not parties to the proceedings, they had no right to appeal. They therefore petitioned this court for a writ of extraordinary relief under rule 65B of the Utah Rules of Civil Procedure. We have jurisdiction pursuant to Utah Code section 78A–3–102(2)."

60.     Parker and SC&M thus formed the 1998 Restatement as a legal entity, controlled by Jeffs as an association and instrumentality in furtherance of a RICO enterprise that was engaged in a pattern and practice of racketeering activity as otherwise detailed herein. Concurrently, Parker and SC&M, individually and through their agents, represented to their victims, the courts and the world at large that the 1998 Restatement was a valid and legal trust agreement that operated in the Plaintiffs' best interest and in conformance with their beliefs.

61.     As observed by the court in the *Lindberg* matter above, such representations were patently false and misleading. These false and misleading representations and the failure of SC&M to disclose the truth to the Plaintiffs and similarly situated persons whom they purported to represent as individuals delayed and frustrated Plaintiffs' discovery of the unlawful nature of the involvement by Parker and SC&M in the scheme and plan described herein

***SC&M's Undertaking of Direct, Individual Attorney-Client Relationships with Plaintiffs in Furtherance of Jeffs' Tortious and Illegal Scheme and Plan***

62.     On several occasions, Parker and SC&M held themselves out as lawyers acting directly on behalf of the individual members of the FLDS Church (including all Plaintiffs), who were beneficiaries of the UEP Trust, even though that association and Trust had been restructured to permit those very persons to be victimized as ordered by Jeffs through the violation of their rights under the Trust, as well as their rights under the laws of Utah and other states in which they resided (such as Texas, New Mexico, Arizona, Montana, Colorado, South Dakota, Oklahoma, Idaho, and Wyoming). Some of those occasions are identified specifically below.

63.     In 2002, Sam Barlow, who was both a favored cohort of Jeffs *and* an agent or employee of SC&M as detailed above, was asked by Jeffs to address the FLDS at a Priesthood Session of FLDS General Conference. Jeffs stated, "Our prophet and the Celestial Law — the principle of revelation are under attack. There is a combined effort in the State of Utah and the State of Arizona to come against our prophet and this people trying to stop the work of God. I'll call on Brother Sam Barlow to give this report with any instructions he feels inspired to give." *April 13, 2002 Priesthood Session of Conference in Short Creek.*

64.     Barlow complied with this request, giving an address which defended the ongoing illegal operations of the FLDS as enabled by Parker and SC&M, stating:

> I'm trying to be careful because we are not talking about a civil lawsuit; . . . we are now talking about criminal conduct—things that by statute they have now legislated purposefully to bring us into collision with the judiciary. . .. [Utah and Arizona intend to] secure a conviction of somebody for this so-called behavior which they call sexual conduct with a minor. . .. The plan, so that you will understand it, is to prove this activity by focusing on children. In other words, if a baby is born, then that becomes evidence. If a father and mother have registered the birth of that baby, it shows the age of the mother, who the father is and that a baby was born, and the deduction is that there was some sort of sexual activity previous to that time. That's fairly good logic.

So they put these women in this condition where they question them about that and they can't deny the facts of the matter . . . and they want to entangle the mother and father of the girl for having given permission for that girl to enter into a religious covenant of marriage. They have already constructed laws and passed ordinances that make it unlawful for a mother or father to give permission for marriage and to make it so the only way they can . . . lawfully do that is to have the blessing and consent of a superior court judge [in Arizona] or a district court judge in the State of Utah.

If they can prove this, which they feel like their facts are such that they can, then they'd like to expand it into who's aiding and abetting the commission of this so called crime and then go after the religious leaders for facilitating it.

After they make their attack for aiding and abetting and facilitation and attempt and these other lesser crimes which go along with the crime they are identifying - so called crime, then they can cast a broad net over this entire people, including the church and the United Effort Plan, which is a conspiracy net and they can say that any person that got up in a meeting like we are having right now or a public meeting and advocated it or promoted it or advanced the idea of marriage by revelation is guilty of conspiracy to facilitate to urge this upon the young people. . . ."

*April 13, 2002 Priesthood Session of Conference in Short Creek.*

65.    More than a decade before delivering this "legal update" to the FLDS at their April 13, 2002 conference, Sam Barlow began giving regular "legal updates" to the FLDS in church meetings in which the FLDS were repeatedly assured that they were being represented by the Lawyer Defendants. For example, he assured the people that "[o]ur attorneys recognize we are a devoted people," and that he was "involved in the defense of this people," stating, "all of you who are not named as defendants, if you believe in the work . . . you are in fact a defendant in this lawsuit . . . [as] they have made each and everyone one of us a defendant." Barlow also stated, "In court this week, our attorneys stood up to the judge . . . . At one point our attorney jumped to his feet and let the judge know the other fellow was not telling him the truth . . . our attorneys feel good about the work we have done. We have not delivered the records to the opposition." He further stated:  "The Lord blessed us in the lawsuits," and "I want to remind you again that we are all defendants in this matter." Similar statements to the FLDS (including Plaintiffs) by Sam Barlow and others continued for decades and often included disclosures of attorney-client information from Parker, SC&M and other attorneys, as well as directions to give money to

pay the legal bills.

66.    The April 13, 2002 address by SC&M's agent accurately predicted the averments of the instant civil action, but SC&M has never, to this very day, taken any steps to alert the Plaintiffs themselves to the fact that the FLDS leader's unlawful (and, indeed, criminal) conduct should not be tolerated and that the FLDS (including the Plaintiffs) should seek to protect their rights. Rather, as outlined above and elsewhere herein, while the FLDS were being assured that they were being protected by their lawyers, SC&M was working continuously from at least 1997 to the present day to keep the Plaintiffs completely in the dark about these matters. In short, SC&M aided and abetted the enslavement and rape of its own clients.

67.    For example, though out of chronological sequence with other averments in this section of this Complaint, as late as March 14, 2014, Parker gave a closing argument to the Fifth Judicial District Court in Washington County, Utah in *Lorin Holm v. Jeffs,* Case No. 110502796 (which was combined with two other cases) and argued that his FLDS clients should not have been exposed to any of the evidence used in Texas to convict Jeffs of child rapes. In that matter, Parker argued on behalf of the FLDS generally as well as two FLDS clients specifically, as follows:

> Your Honor, the people in — in a the [sic] Short Creek community as the Court knows, they're in a really difficult position down there right now. It is — this is a hard time for those people because of — you know, their leader of their church being in prison and all of the things that have come out and everything else and we're seeing an — an expression of that in this courtroom today, but they do get through —
>
> Their faith, their religious tradition *with what they were seeing and hearing in this evidence from Texas, no person should be required to do that.*
>
> *And it's one of the reasons that I've been involved for so long in representing these people* is because I think that their religious faith is worth protecting, their right to believe that faith is worth protecting, and we're not going to have these kinds of issues if the Catholics or the Mormons are in front of the court and this is where the rubber meets the road on religious freedom.

(emphasis added).

68.    Actually, the Catholic Church has paid hundreds of millions to victims of Priest sexual abuse, and, on very rare occasions, the mainstream Church of Jesus Christ of the Latter-day Saints ("LDS" or colloquially the "Mormons") has paid millions to resolve abuse claims involving lay ecclesiastical or Boy Scout leaders, and, unlike the FLDS Church, neither the Catholic nor

Mormon doctrine permits the "religious" practice of underage marriage, much less *consecrating* child rape as "marriage." But more to the point, the *Lorin Holm v. Jeffs* cases were custody cases which involved FLDS mothers who lost the physical and legal custody of their minor children at trial, in part, because they could not protect their children due to their failure to accept the risks evidenced by Jeffs' and the FLDS Church's systematic abuse of children. Parker directly represented these mothers as counsel of record and, throughout that litigation, worked to shield the mothers from the very information that they needed to know to make an informed decision regarding the safety of their children. In a similar case, *Wallace Jeffs v. Jeffs*, Parker represented Plaintiff Amy Nielson and attempted, unsuccessfully, to shield her from information regarding Jeffs' illegal conduct. After learning details of Jeffs' crimes and other admissions during her deposition in the *Jeffs* matter, Amy Nielsen left the deposition committed to fleeing the FLDS to protect her children. Plaintiff Nielson continued to utilize Parker and SC&M as legal counsel and did not learn of their involvement in the facilitation of Jeffs' illegal scheme until much later.

69.     As another example of the ongoing representations made by Parker and SC&M that establish an attorney-client relationship (actual or implied) between SC&M and the individual FLDS members, including Plaintiffs: In a filing made by Parker on July 18, 2008 in the United States District Court for the District of Utah (from which an appeal was taken as referenced above in *SC&M v. Lindberg*), entitled "Opposition to Motion to Compel Compliance With Subpoenas," Parker and SC&M affirmatively asserted:

> *It is impossible to characterize legal advice given to FLDS leadership regarding the UEP Trust as having been given to them in any particular capacity*. The UEP Trust was regarded as a part of the religious institution of the Church, and was managed as a religious institution and tool used in the Church's *mission of providing for the spiritual and temporal needs of its members.*

(emphasis added. He further argued that the 1998 Trust was not a "person" with whom an attorney-client relationship could be formed and that there was therefore no privilege associated with its representation of that trust. In other words, Parker affirmatively stated that the attorney-client relationship between SC&M and the FLDS was inherently individualistic with its members (including the Plaintiffs), not to the FLDS Church as an organization, nor to its leadership, nor to the Trust. Parker's own words in open court are dispositive as to whether SC&M represented the Plaintiffs.

70.     Elsewhere therein, Parker and SC&M averred that the 1998 Restatement, which they crafted and enforced, afforded unilateral power to control the Trust to Jeffs (who had the authority to remove other trustees of the Trust at his discretion) but they recognized that the Trust involved a fiduciary obligation to the members, which included Plaintiffs. Parker and SC&M then

admitted that they had been retained in a variety of other litigated and non-litigated matters involving the Church and other related entities (p. 7), whom as detailed below, included individual members of the FLDS Church identified broadly to include all of the FLDS and Trust beneficiaries (including the Plaintiffs). These averments characterize the position that Parker and SC&M took on a number of other occasions in representation to the courts and the public at large concerning the scope of their representation. In short, Parker and SC&M claimed to represent the individual FLDS members (including the Plaintiffs) both in the courtroom, and before the general public.

71.     As Jeffs' control over the FLDS (and the FLDS towns of Hildale and Colorado City) became absolute, Defendants also gained control over local law enforcement, which gave him the ability to prevent various criminal activities from being interfered with by local law enforcement. Jeffs, Parker and SC&M were able to operate under the apparent color of law due to the combined legal measures systematically implemented by Parker and SC&M through the concomitant progressive tightening of Jeffs' authority and control over the FLDS, FLDS communities, and FLDS assets. Parker and SC&M actively worked to facilitate Jeffs' control over local law enforcement as part of the development, execution and propagation of the scheme and plan described herein.

72.     One of two headquarters of the FLDS during the years relevant to the instant civil action was located in a town known colloquially as "Short Creek," or simply "the Crick," which is actually two separate towns: Hildale, Utah, and Colorado City, Arizona (the town straddles the state line). The UEP Trust owned the vast majority, if not all, of the real property on which the FLDS lived in Short Creek, and where many of them worked. Accordingly, one of the key advantages of the legal structure that Jeffs, Parker and SC&M built over the years, commencing at least with the 1998 Restatement, was that the SC&M created the legal framework and activities afforded Jeffs the ability to control activities of the enterprise directly on a state line, which deprived outside law enforcement agencies of the ability to effectively surveille, detect and intercede in illegal affairs of the FLDS, including ongoing ceremonial rape, torture, imprisonment, starvation, human trafficking for sexual purposes, and abuse of large numbers of persons, and therefore frustrated law enforcement operations and delayed these Plaintiffs' discovery of the unlawful and tortious nature of the association and involvement of the Lawyer Defendants in the activities that harmed them as described in greater detail elsewhere herein.

73.     While Parker and SC&M had represented that the Trust agreement had been read, evaluated and analyzed by Defendant Parker, and that Plaintiffs' interests were protected under the document, no such interests were consciously evaluated or protected, and in fact the gravamen of the work of Parker and SC&M was not in the best interests of the beneficiaries under the 1998 Restatement as otherwise detailed herein, but was in fact to oppress the FLDS members (including the Plaintiffs) and systematically and intentionally ensure their absolute compliance with Jeffs'

dictates.

**Underage "Marriages" Are Nothing More Than Child Rape Thinly Disguised as a Religious Ritual**

74.     Defendants Parker and SC&M knew (or at the very least should have known) that "spiritual marriages" were against the law in Utah. As attorneys they are deemed to know the law. *See State v. Chaney*, 989 P.2d 1091, 1096 (Utah App. 1999) (holding that a marriage of female under 14 years of age was void *ab initio* and a nullity as a matter of law). Parker and SC&M nevertheless facilitated that unlawful form of child sexual abuse by developing and crafting strategies and advice for the FLDS leadership to use in the enforcement of illegal child marriage directives. Parker and SC&M knew that Jeffs and his favored cohorts regularly instructed FLDS members that any claim that such "marriages" were illegal or wrong was an attempt by 'outsiders' to deceive followers and should not be believed. In short, Jeffs recognized that "the powerless in society can be frightened of freedom," Paulo Freire, *Pedagogy of the Oppressed* (1968), and acted accordingly with the active assistance of SC&M to ensure that the FLDS members (including the Plaintiffs) did not even recognize their own oppression, much less that they had been subjected to legal wrongs for which the law might provide a remedy. Parker and SC&M knew that FLDS members (including Plaintiffs) were required to live by the Trust as re-written by Parker to facilitate Jeffs' unlawful objectives of sexual abuse of children, forced labor of adult and child victims, extortionate deprivation of property, destruction of family relations, infliction of severe and extreme emotional distress and other harmful patterns of conduct as detailed herein.

75.     Using the power created by Parker and SC&M through the various machinations described herein to facilitate a pattern of unlawful conduct, and with the ongoing cooperation and support of Parker and SC&M in the operation of an enterprise in the perpetration of a pattern and practice of such unlawful activities, Jeffs employed the instrumentalities of the 'law' to illegally punish those who appeared to be unwilling to submit to violations of their legal rights. These punishments included loss of property, loss of a place to live, loss of livelihood, loss of familial relations, starvation, loss of medical care, loss of personal liberty, loss of association and the forced observance of severe and extreme punishments of a similar nature levied against loved ones and friends. Thus, Jeffs—with the active assistance of Parker and SC&M—secluded the FLDS members from the world outside of the FLDS community, upon the threat of loss of livelihood and eternal damnation, to ensure that the members (including, at various times, all of the Plaintiffs) remained unaware of their unlawful treatment, or the potential remedies to the same, despite Parker & SC&M's attorney-client duty to inform them.

76.     To limit challenges to Jeffs' edicts as "Prophet," Jeffs ended the FLDS's access to any information and media from outside the community, commanding that members not watch television, read outside books, newspapers or magazines, listen to the radio, or use the internet.

Jeffs also forbid any communication with members he had sent away or excommunicated, ordering all members to "leave apostates alone severely" thus heightening the duty of the Lawyer Defendants to disclose critical facts to the now entirely ignorant FLDS (including Plaintiffs), which the Lawyer Defendants knew their clients needed to protect themselves, their families and their property. Jeffs also required that all members turn in or destroy any family photos, records, video, and electronic recordings which might serve as evidence in future legal proceedings. There is no evidence that Parker or anyone else associated with SC&M ever instructed Jeffs to preserve this information despite ongoing and reasonably anticipated litigation (for which this evidence was both relevant and material) that triggered SC&M's professional obligations—and obligations towards the claims of their other FLDS clients (including the Plaintiffs).

77.    In August of 2003 (at the latest) Jeffs began planning the construction of secret, fortified compounds in Texas, Colorado, South Dakota and elsewhere that he referred to as the "lands of refuge," one of which was named by Jeffs as the Yearning for Zion Ranch ("YFZ"), which he also referred to by the code "R17." The YFZ compound remained under construction for several years and was the subject of key actions of the Defendants as detailed below. Parts of the YFZ Ranch were designed as massive fortified concrete bunkers capable of withstanding the level of law enforcement raid that the Branch Davidian Compound in Waco, Texas, had been unable to withstand (because it had been constructed from wood) when law enforcement attempted to rescue the children apparently in danger on the premises.

78.    Much of the ongoing criminal and tortious enterprise and the progress of the scheme and plan averred herein was documented in detail by Jeffs (for 'posterity') contemporaneously with the events as they transpired in thousands of transcribed pages of Jeffs' dictations (which Jeffs referred to as the Private Priesthood Record of President Warren S. Jeffs, referred to hereinafter as the "Priesthood Record"). The Priesthood Record makes many references to the degree to which Jeffs relied upon the ongoing direct involvement by Parker and SC&M in the ongoing scheme and plan of the unlawful enterprise which they had helped to create. For example, in a series of entries recorded by Jeffs in 2003, he describes how the Utah Attorney General, Mark Shurtleff offered to lessen or terminate the prosecution of bigamy and illegal polygamy if the FLDS would stop marrying (and raping) underage girls. Jeffs describes Parker's involvement in this particular negotiation with the Attorney General as follows:

> [FLDS leader Fred Jessop] explained to me that one of the higher officials in the Attorney-General [Mark Shurtleff]'s office informed one of our lawyers that the Attorney-General wants out of this if he can help them save face through a compromise; and what they really want is the leadership of this Priesthood to say or even imply that we will no longer perform underage marriages . . . . I told Uncle Sam [Barlow] that I will

stand firm. There will be no compromise. I do not even want to imply a compromise. I said the instructions of the Lord are, Leave it in the Lord's hands. There will be no compromise.

Priesthood Record, January 16, 2003.

79.    Jeffs' Priesthood Record continues later on this issue:

Uncle Fred [Jessop] sent over $126,000 from the Elders—Donations to pay the lawyers [at SC&M] today.

Uncle Sam [Barlow] reported that he gave Rod Parker the message that I wanted any lawyers fired that would talk compromise, and Rod Parker said he stands with us. *So Uncle Sam [Barlow] will use Rod Parker to help convince these other lawyers.*

Rod Parker is flying from Salt Lake to join in the meeting in the morning. I would estimate a dozen lawyers were present or connected by phone. I talked briefly to Charles Dische – thanked him for his help and assured him that Sam Barlow was spokesman for me to the lawyers. They can trust his word. The lawyers were wanting to have me connected and talk to them in their meeting. I assured Charles Dische that Uncle Sam [Barlow] was voicing my mouth. Charles Dische was willing to help by voicing, "Uncle Rulon," as he called him, 'and Uncle Roy both stood firm – revelation is not debatable, and the word of God is the word of God to us,' and he helped those lawyers and *Rod Parker also helped the other lawyers understand that.*

80.    Once again, the Priesthood Record discusses this issue in an entry dated January 22, 2003, as follows:

I got a call from Uncle Sam [Barlow]. He had me talk to Rod Parker, our lawyer from Salt Lake who flew south yesterday. He had quite a long talk with the Chief Deputy Attorney-General, David Myers, who is a former judge. Rod Parker reported to me that none of our lawyers compromised our position. They only tried to convince the Attorney-Generals what a useless effort this is because, you are not going to change that community, and how damaging it was to the families.

81.    This entry from the Priesthood Record constitutes an admission by a Defendant

herein (Jeffs) that he worked in active concert with other Defendants (Parker and SC&M) to preserve and facilitate unlawful activities, including the enslavement and the ongoing rape of children (including some of the Plaintiffs as further detailed herein), with the intent that such conduct would continue into the future. This entry also demonstartes that Parker, SC&M and Jeffs conspired with knowledge that scheme they put into action was viewed by a duly authorized law enforcement official as unlawful, thereby removing any attorney-client privilege that might otherwise be imbued upon Parker as a result of his representation of a criminal defendant for past acts.

82.    At the same time Parker was assuring Jeffs that none of the lawyers would "compromise" Jeffs' absolute position that underage "marriages" (and the associated rapes) would continue, Jeffs was calling out to the FLDS (including the Plaintiffs) in weekly meetings demanding that they put forth funds pay 'the lawyers' at SC&M: there is a "great need for financial help . . . resting upon us [with] lawyer bills totaling $300,000. They [SC&M] are asking for their money to continue . . .." And Jeffs, of course, continued to instruct the FLDS (including the Plaintiffs) to "consecrate this week as the Lord requires" because the "legal attack [by the government] is against the whole people."

83.    Even without any reliance upon the Priesthood Record, it is clear that by 2002 at the very latest, Defendants Parker and SC&M had actual knowledge of the FLDS's practice of requiring and performing "spiritual" or "Celestial marriages" between underage girls and married men. For example, within a month of executing the 1998 Restatement, Jeffs was already commanding illegal marriages from FLDS members, which resulted in an FLDS police officer's unlawful sexual conduct with 16-year-old (Ruth Stubbs) on December 11, 1998. In late 2001 or early 2002, Ruth Stubbs fled the abuse with her three children who had been fathered by Rodney Holm, the 32-year-old FLDS police officer she had been commanded to "spiritually marry." The resulting custody case was reported by the New York Times News Service and picked up by major news publications. The article reported: "'There is clearly abuse going on, and it's clearly sexual abuse,' [Ruth Stubbs attorney] said. But while the accusations against Roman Catholic dioceses have centered on inadequate supervision of errant priests and on institutional cover-ups, [Ruth Stubb's attorney] said that the abuse here was inherent in the doctrine of the sect." In the same article, "[Officer] Holm's lawyer, Rodney R. Parker, acknowledged that the church's practices — which are sharply at odds with those of the much larger Mormon Church, which officially abandoned polygamy in 1890 — posed serious legal questions. But he said the custody dispute was not the place to resolve them." New York Times News Service, *The Baltimore Sun*, "Polygamist battles wife for child custody" (Jun. 16, 2002) (emphasis added).

84.    Nearly a year later, the State of Utah charged Officer Holm, and Parker undertook the defense of Holm in connection with the rape of Stubbs as part of his overall legal protection of

FLDS Church interests. In that proceeding, Officer Holm testified that he did not learn it was a crime to have sex with a 16-year-old from either Jeffs, Parker, or anyone else at SC&M—despite Parker and SC&M's clear duty to advise their client that his "marriage" was illegal and constituted statutory rape at best and forcible child rape at worst.

85.     On information and belief, all or substantially all of the contents of the Priesthood Record were known to Parker and SC&M because the entire record was provided to them (if not by Jeffs, then by the FBI in 2005, as later detailed herein). As mentioned below, in 2006, the Utah Supreme Court affirmed Rodney Holm's felony conviction for child rape.

86.     But Parker and SC&M had even earlier confirmation and actual knowledge of the fact that the UEP Trust mechanism and subsequent legalistic actions taken by them in furtherance of the scheme to use that Trust for its intended purpose of applying duress and coercion to facilitate the crimes described herein was working as they had intended it to do from before they designed the scheme, when they undertook to represent the UEP Trust in an eviction action filed in Arizona to expel a family in retaliation for the mother's refusal to consent to the rape of her 15-year old daughter under the guise of "marriage" ordered by Defendants herein acting in concert. That matter was dismissed by the Arizona trial court and affirmed by the Arizona Court of Appeals in a published opinion. *See United Effort Plan Trust v. Holm*, 101 P.3d 641 (Ariz. Ct. App. 2004). In that civil action, the retaliatory nature of the eviction and its connection to the refusal of the defendants therein to consent to the illegal "marriage" and rape of their young daughter was noted by the Arizona Court of Appeals (which also noted that Parker and SC&M were involved in the appeal):

> ¶ 11 The Declaration of the UEPT was amended in 1998. One of the apparent reasons for this action was to state that the residents on the UEPT land were tenants-at-will.

> ¶ 12 Another principle of the Church is plural marriage. In January 2000, Rulon Jeffs and Warren Jeffs interviewed Mr. and Mrs. Holm, and advised them that Wynn Jessop, a thirty-nine-year-old married man, wanted to enter a marriage with Mrs. Holm's fifteen-year-old daughter. Mrs. Holm consented to the marriage, and Church leaders scheduled the wedding for the next day.

> ¶ 13 Before the wedding, however, Mrs. Holm telephoned Warren Jeffs to revoke her consent to her daughter's marriage. Warren Jeffs then told Mrs. Holm that his father, Church President Rulon Jeffs, would be "very disappointed" in Mrs. Holm. Five to ten minutes later, Warren Jeffs called the Holms and informed Mr. Holm that his priesthood had been taken

away, that Mr. Holm had allowed his wife to rule over him, that Mr. Holm was no longer a member of the Church and that he was required to leave his home. Warren Jeffs also told Mr. Holm that Ruln Jeffs indeed was unhappy that Mrs. Holm had revoked her consent to her daughter's marriage.

¶ 14 When the Holms did not leave their home, the UEPT sent them a Demand for Possession of Real Property, revoking its permission for the Holms to possess the land and ordering the Holms to leave behind anything affixed to the property. Mr. Holm was unsuccessful in trying to resolve the matter with Rulon Jeffs, but he and his family did not move out of their home. Once the UEPT attempted to remove the Holms from their home, it refused to accept their payment for the property taxes.

¶ 15 On August 14, 2000, the UEPT filed a forcible-detainer complaint against the Holms in justice court seeking their eviction. The UEPT claimed that it owned the property on which the Holms had built their home, and that Mr. Holm was a tenant-at-will who had used the property with the permission of the UEPT but that the permission had been revoked.

101 P.3d at 643.

87.     It is manifest from the foregoing that Parker and SC&M were knowingly, intentionally, and actively involved in the use of the trust instrumentality *they had created* as a mechanism to facilitate the rape of young girls under the guise of religious "marriage." Moreover, they were not only aware of the way in which their ongoing legal work was being used by Jeffs, but they also were the active participants in the use of that instrumentality to enforce the child rape directives of the Prophet, Defendant Jeffs.

88.     In a later entry in his, Defendant Jeffs wrote:

As the government finds out about this, it will bring such a great pressure upon us, upon the families of these girls, upon the girls who are placed in marriage . . .. *And I will teach the young people that there is no such thing as an underage Priesthood marriage* but that it is a protection for them if they will look at it right and seek unto the Lord for a testimony. The Lord will have me do this, get more young girls married, not only as a test to the parents, but also to test this people to see if they will give the Prophet up.

Priesthood Record, November 24, 2003 (emphasis added). Therefore, Jeffs again manifested his

intent to use to legal structure of the FLDS community to enslave and oppress the FLDS (including the Plaintiffs) such that they would not even realize that they were being treated unlawfully, much less recognize that there were remedies potentially available to them. And once again, Parker and SC&M did nothing to help inform their clients—including the Plaintiffs—of their rights.

89.     Two days later, Jeffs wrote even more on this topic:

> . . . the Lord wanted me to receive this thirteen-year-old bride . . . for her deliverance as well as the Lord allowing this to be a reason in the government's eyes to come stronger against this people . . . .. [B]y me performing these works that would bring the wicked against us to justify the Lord in destroying them, at a quicker pace.

Priesthood Record, November 26, 2003.

90.     Elsewhere, Jeffs' Priesthood Record makes various references to Parker and his awareness of Jeffs' practices with underage rape victims and the manner in which he claimed that the Lord instructed him to ignore the legal actions and complaints against him and the FLDS and to never compromise or retreat from his present course of action, but instead to rely upon Parker and other lawyers operating under his direction to obfuscate, obstruct, and evade the "attacks" brought by non-believing victims and the government.

91.     As documented in the Priesthood Record, Jeffs persisted in his desire to continue and enforce underage marriages and the associated rapes and used the Lawyer Defendants to protect him and other child abusers within the FLDS Church from prosecution. This protection went far beyond defending Jeffs, but in fact constituted Parker and SC&M actively participating in an ongoing criminal enterprise (and, again, to the detriment of their clients, including the Plaintiffs). As discussed above, in 2002 Parker and SC&M (at the direction of Jeffs) defended Rodney Holm in connection with that FLDS police officer's unlawful sexual relations with an underage girl. Parker and SC&M were not successful and officer Holm's conviction for the aforementioned offenses was affirmed in *State v. Holm*, 137 P.3d 726 (Utah 2006). The representation by Parker and SC&M of defendant Holm is but one of many actions taken by the Lawyer Defendants to protect and facilitate the ongoing criminal enterprise detailed herein, and by itself evidences the representation of an accused by lawyers which by itself is not unlawful or tortious, in the overall context of the undertakings of SC&M in relation to the ongoing plan and scheme to protect, perpetuate and facilitate the ongoing and continuous institutional rape of minors, and other offenses detailed herein, and is thus an extension of an agreement to continue to actively facilitate ongoing tortious and criminal plans, schemes and the enterprise under which these offenses were committed against the Plaintiffs who SC&M, Parker, and Jeffs claimed were clients of the firm and its attorneys.

92.      Soon after creating and gaining control of the FLDS enterprise (by early 2004 at the latest) Jeffs began excommunicating men whom he perceived to be threats or potentially in disagreement with his teachings as "Prophet," ordering them shunned from the community, taking their money, property and families to be redistributed to others within the community. On January 1, 2004, for example, Jeffs expelled 21 men from the town of Short Creek, keeping their families and their homes as his personal property (the former as literal chattel slaves in violation of Federal statute, and of the 13th Amendment itself) or to distribute as he pleased, while demanding that any financial support given by the expelled men to their families be sent directly to the  FLDS Church—at least some of which made its way to SC&M and Parker. Jeffs' absolute control of the Trust made these acts possible and solidified his power over the FLDS. Jeffs' absolute control over the FLDS people continued from his various jail cells even after his arrests.

93.      On July 24, 2004, Brent Jeffs brought a civil action (*Jeffs v. Jeffs, et al*, Case No. 040915857, Third Judicial District Court of Utah) against Defendant Jeffs and the FLDS Church for damages he sustained when he was repeatedly sodomized as a minor by Jeffs under the guise of spiritual commandment. On August 13, 2004, Defendant Parker accepted service of process on behalf of the FLDS Church and the UEP Trust, establishing conclusively that he was aware of the averments and testimony claiming ongoing sexual abuse by Jeffs against the FLDS members (including the Plaintiffs)—all of whom were also (by his own representations in court and to the broader public) his clients. Parker and SC&M attempted to withdraw on December 16, 2004 based upon Utah Rule of Prof. Conduct 1.16(b)(4), premised on the assertion that Jeffs and the FLDS were bent upon a course of action and conduct with which the attorneys had a fundamental disagreement in view of a "revelation" claimed to have been received by Jeffs to the effect that he should "answer them nothing," meaning that he would not allow any defense to the action. The Lawyer Defendants were not permitted by the court in that matter to withdraw until 2005, but thereafter remained, on information and belief, in contact in an ongoing advisory manner with Jeffs and other FLDS leaders in connection with that matter and they continued to represent Jeffs and the FLDS enterprise in other civil actions. It is significant that Parker and SC&M based their withdrawal on Jeffs' refusal to defend the case—*not* on his continued use of their legal service to perpetuate unlawful activity against their other clients (including the Plaintiffs).

94.      On August 27, 2004, another lawsuit (referred to in media coverage as "the Lost Boys Case") *Ream, et al v. Jeffs, Barlow & FLDS*, Case No. 040918237, was filed in the Third Judicial District Court of Utah against Jeffs, Sam Barlow and the FLDS Church. On August 27, 2004, Parker and SC&M signed an acceptance of service of process on behalf of the FLDS Church and the UEP Trust and were thus, again, clearly aware of the averments of systematic sexual abuse, forced labor and expulsion of minor children and the destruction of families in connection with a

"state RICO" claim under the Utah Pattern of Unlawful Activity Act.[2]

95.     In September of 2004, the Priesthood Record notes that Parker threatened to withdraw as counsel and file an attorney's lien against FLDS property held in the Trust if not paid. An entry dated September 11, 2004, documents that SC&M had a partner meeting to evaluate Parker's performance in relation to SC&M's withdrawal in the Brent Jeffs and Lost Boys cases, which Jeffs had determined not to defend in light of the aforementioned "answer them nothing" 'revelation' (a revelation that also led to the default judgment in this case). As described herein, Parker and SC&M did not end their involvement and association with either Jeffs or the FLDS enterprise as required by the Rules of Professional Conduct and other rule and law, but instead continued to represent Jeffs to the detriment of the FLDS members (including the Plaintiffs)— whom they led to believe were their clients—as detailed elsewhere herein.

96.     On October 15, 2004, Sam Barlow, in his role as SC&M's liaison between Jeffs and the law firm, provided a written update to Jeffs, describing a conversation he had that day with Rod Parker. The conversation included discussion of the status of a number of legal matters being handled by Parker and SC&M for Jeffs and FLDS, and Barlow stated at the end of the memo that SC&M was seeking advice of outside counsel (on information and belief, the law firm of Parr, Waddoups, Brown and Gee) regarding how to withdraw, and that "The SCM law firm does not want to be sued by somebody on UEP land for not defending them properly." This memo established that Parker and SC&M themselves believed that they represented every FLDS member living on land governed by the Trust individually—including all of the Plaintiffs. The memo also stated that "SCM wants a road-map on how they are going to get paid" if they go ahead with certain other legal matters they were handling for Jeffs and the FLDS, and "Rod's thought: Money in the bank will probably be frozen as soon as the Apostates get the idea that a default judgment is possible . . . Money in the bank is a 'first' target when a judgment is obtained." There is no indication that this memo or its contents were ever communicated to the individual FLDS members, including the Plaintiffs. Therefore, Jeffs, Parker, Barlow, and SC&M kept Plaintiffs intentionally in the dark regarding the firm's legal representation of Plaintiffs and their interests in violation of Utah Rule of Professional Conduct 1.4—while simultaneously acting to ensure that the firm would be paid even if the illegal activity were halted by the courts. It is difficult to imagine a more textbook example of putting the firm's finances before client (including the Plaintiffs) interests in violation of Utah Rules of Professional Conduct 1.7 and 1.8.

97.     Jeffs records that he was using the instrumentalities created by Parker and SC&M to illegally transfer assets to defraud judgment creditors: "And I am having LeRoy [Jeffs] transfer those lands in Apple Valley and the Gap to Willie Jessop for him to sell it though his businesses

---

[2]   The Utah Pattern of Unlawful Activity Act (PUAA), Utah Code Ann. § 76-10-1603(3) & (4), was modeled after the Federal RICO statute. *See State v. Bell,* 770 P.2d 100, 101 n. 1 (Utah 1988).

so our enemy can't get hold of those lands or monies. And I am having the businesses in Short Creek be used to transfer money to [other FLDS Church-controlled] business to help in this mission. So we are hiding all Church funds now." Priesthood Record, September 4, 2004 (emphasis added).

98.     By 2005, the Federal Bureau of Investigation was engaged in an initial criminal investigation of Jeffs, the FLDS Church, and related entities—as well as a number of Jeffs' favored cohorts. Parker and SC&M continued to represent and advise Jeffs and the FLDS in connection with that investigation, which are central to the claims in the instant civil action. On information and belief, on or around November, 2005, Defendant Parker was provided a copy of most or all of the "Priesthood Record" by the FBI, which had seized the record in its criminal investigation of Defendant Jeffs, and was therefore constructively aware, from that point *at the latest*, of all of Jeffs' admissions contained therein related to the ongoing unlawful activity in which Jeffs himself in that material implicated his joint tortfeasors, Parker & SC&M. In other words, in November 2005, Parker (and through him SC&M) had actual knowledge that their own client, Jeffs, claimed that they were knowingly, intentionally, and materially assisting him in illegal activity through their legal services, to the detriment of their other FLDS clients—including the Plaintiffs. There is no indication that Parker or SC&M took any action to address their ongoing violation of the Rules of Professional Conduct or advise their FLDS clients of the conflict and the material facts regarding the illegal scheme they had concealed .

99.     Sam Barlow authored a memo which indicates that Parker researched the Utah statute under which Parker drafted the 1998 Restatement and noted that it had been changed so that property owned by a trust had to be held in the name of the trustee rather than the trust itself (an attorney's lien by SC&M lists the UEP Trust as both a common law trust and a charitable trust as well as certain deed-holders). This admission establishes Parker and SC&M's ongoing use of the UEP Trust and the superior legal knowledge of Parker and SC&M to control the FLDS Church and the UEP Trust instrumentalities for their own financial gain. With the 1998 Restatement, the corpus of the trust was held in Jeffs' name and under his control. As Jeffs required that the FLDS people contribute all property, possessions and income to the UEP Trust, a fact that was known to Parker and SC&M, through the 1998 Restatement, Jeffs gained control over the assets of the FLDS people. Provided Parker and SC&M remained in Jeffs' good graces, they were ensured payment of their fees. Jeffs' psychological control over the FLDS people, garnered initially, in part, by his control over their assets, persisted long after actual legal control of the Trust was stripped from Jeffs by court order. Lawyer Defendants, operating in concert with Jeffs even after his incarceration, utilized that power and control over the FLDS people to ensure that the Lawyer Defendants would continue to receive income for their representation—even if they had to take position against the interests of their other clients, including the Plaintiffs.

100. On January 1, 2005, Jeffs dedicated the temple foundation at the YFZ Ranch, which by this time was nearing completion. Greater numbers of FLDS were being forced through coercive influences and duress to leave Short Creek to "repent at a distance," while other FLDS were ordered by Jeffs to move to Texas to live in and around that YFZ compound or on other secret "lands of refuge," in "safe houses," or at other secret locations in various western states, as well as in Canada. Jeffs was essentially implementing a program to spirit children, (especially young girls and women) away from their parents and Short Creek because that location was drawing attention from Utah and Arizona law enforcement. The Priesthood Record is replete with accounts of how the 1998 Restatement (though not termed therein as such) was used to control the FLDS who lived on Trust lands in several other states in addition to Utah and Arizona. Jeffs also addressed the concealment of FLDS members (including Jeffs himself, as well as kidnapped and enslaved children) in various western states at the dedication. Plaintiffs herein include persons who were kidnapped and enslaved in this fashion as detailed further below.

101. In anticipation of a coming "showdown" with law enforcement and to secure physical possession of the child slaves (often separated from their parents), Jeffs scattered the vulnerable children and women (whom he had taken from the fathers and husbands whom he was expelling in large numbers) to diverse locations to dominate and oppress them, keep them from escaping, being rescued, or being used as evidence or witnesses in criminal or civil proceedings against him or the FLDS Church. Again, Parker and SC&M's legal representation and services were *key* to Jeff successfully implementing his scheme to obtain absolute control over the FLDS people.

102. As detailed below, the anticipated intervention of law enforcement at the YFZ Ranch occurred as predicted, when the YFZ Ranch was raided by law enforcement officials on April 4, 2008. As discussed herein, Parker and SC&M represented to multiple public officials—including the Attorney General of Utah—that they represented *all* the individual FLDS members (including the Plaintiffs) who lived at the YFZ Ranch in connection with alleged violations of their personal constitutional and civil rights.

103. Media attention to the FLDS rape-mill was growing at this time. Various other religious and philanthropic organizations were becoming aware of the ongoing atrocities of Jeffs and his favored cohorts. Jeffs' atrocities—aided and abetted by Parker and SC&M—would later become the subject of a number of motion pictures, books and documentaries, including New York Times bestsellers "Escape" and "Stolen Innocence" and, more recently, a book written by professional investigator Sam Brower entitled "Prophet's Prey," which was made into a movie by Showtime and Imagine Entertainment under producer Ron Howard. These followed an earlier book by bestselling author Jon Krakauer entitled "Under the Banner of Heaven." This worldwide media attention constitutes yet another avenue of knowledge by which all members of the SC&M

firm knew or should have known that they were actively supporting and facilitating an ongoing criminal enterprise, and thereby breaching their duties to individual clients with conflicting legal interests, such as the Plaintiffs.

104.    On December 13, 2005, state district Judge Lindberg (who was discussed in the above reference to *SC&M v. Lindberg* and was the defendant in *In re UEP Trust*, Case No. 053900848) found in the Utah probate action that the Trust drafted by Parker was structured to benefit, advocate or facilitate the illegal practices of polygamy, bigamy, and sexual activity between adults and minors below the age of consent and reformed the Trust agreement so that it would no longer serve to sanction or provide support for such illegal practices. As otherwise detailed herein, that finding was affirmed (expressly or impliedly) by the Utah Supreme Court.

105.    On information and belief, FBI Special Agent John Broadway (who was the agent in charge of seizing all evidence pertaining to financial dealings of the FLDS Church and UEP Trust) expressed the view (based upon an extensive investigation and detailed analysis of the financial acts of various Defendants herein) that the FLDS Church and the Trust were being operated in an unlawful manner to avoid the payment of taxes.

106.    In 2006, Defendant Jeffs continued to evade law enforcement and the FBI placed him on its infamous Ten Most Wanted List. The Priesthood Record contains references to his plan to flee for a time to Sheridan, Wyoming (to learn to ride motorcycles with which he planned to escape from law enforcement) and how Jeffs planned to spirit his unlawfully obtained 'wives' away to other locations while he was a fugitive.

107.    On May 16, 2006, the Utah Supreme Court affirmed the conviction of Rodney Holm arising out of his rape, under the guise of "spiritual marriage" to a minor child that was arranged by Defendant Jeffs approximately one month after the 1998 Restatement was signed (as discussed further above). Again, beginning in 2002 Parker and SC&M represented Holm in his trial and on appeal. *See State v. Holm*, 137 P.3d 726 (Utah 2006).

108.    On August 2, 2006, Kelly Fischer, an FLDS Church elder, was convicted in Arizona of sexual conduct with a minor and conspiracy to commit sexual conduct with a minor on the orders of Jeffs. On information and belief, there were six men total convicted on the same charges in Mohave County, Arizona at the same time. Earlier, when the underage rape victim "wives" of Kelly Fischer and Dell Barlow had refused to testify against their rapist "husbands" and were threatened with jail for contempt, Jeffs told the FLDS "we owe the lawyers $400,000.00 and it will grow quickly."  He then instructed that "all elders give $500.00" to pay SC&M's legal fees to protect the institution of child rape that they, Jeffs, Parker and SC&M, had built. Parker and SC&M were fully aware that was the purpose for which the FLDS had been ordered by Jeffs to pay their fees.

109.    On August 28, 2006, Defendant Jeffs was arrested in Nevada—ironically during a routine traffic stop. Evidence from the car in which he was riding was lawfully seized, including an audio recording of the rape of Merrianne Jessop (in the company of other "spiritual wives," which Jeffs criminal defense lawyers succeeded in sealing until after Jeffs' conviction).

110.    On December 19, 2006, one of Jeffs' favored cohorts, David Bateman, was convicted in Arizona of illegal sexual conduct with a minor and conspiracy to commit sexual conduct with a minor as the result of being commanded to enter into a "marriage" so that she could be repeatedly raped as a child by Jeffs.

111.    As discussed above, in January 2007 Jeffs (while incarcerated at Purgatory Correctional Facility awaiting trial in Utah), repeatedly confesses that he is a religious fraud and has deceived the FLDS, including the Plaintiffs. He gave instructions that the FLDS people should be told so that they can begin to put their families back together. His attorneys ignored his instructions (in the form of audio and/or video recordings by the jail) and kept this vital information from the FLDS members, including all of the Plaintiffs.

112.    In April of 2007, Jeffs was apparently frustrated that his efforts to tell the FLDS he was a fraud had been stymied, so he attempted to admit in open court that he was a fraud, that he was not a prophet and had never been the Prophet. He was stopped by his defense lawyers. Although Parker was heavily involved in Jeffs' criminal defense, he attempted to keep his involvement secret by meeting with the rest of the defense team at a personal residence in Santa Clara, Utah, and at other places, and by not appearing at the trial. Despite knowing that Jeffs was still trying to publicly confess that he was a religious fraud, Parker made no effort to advise the FLDS members (including the Plaintiffs)—*all of whom were his clients*—that their "Prophet" was, by his own repeated and insistent admissions, not a prophet, but a complete fraud who had engaged in a systematic campaign of rape, torture, enslavement, and terror. Thus, Parker and SC&M actively concealed from their own clients *critical* details that could have made them aware of their unlawful treatment and potential remedies for the same.

113.    On April 20, 2007, another of Jeffs' favored cohorts, Virgil Jessop, was convicted in Arizona of sexual conduct with a minor and conspiracy to commit sexual conduct with a minor, on the orders of Jeffs.

114.    On September 25, 2007, Defendant Jeffs was found guilty and sent to prison in Utah on two counts of being accomplice to rape that arose from his commanding a 14-year-old girl to "marry" her adult cousin and submit to child rape.

115.    On or about April 4, 2008 (as noted above) the FLDS compound in Texas (the YFZ Ranch) was raided by state and Federal agents and over 460 children were temporarily taken into

protective custody.

116.    Subsequently, some ten FLDS men were convicted (or pled guilty to) illegal sexual conduct with minors and were sentenced to long prison terms in Texas. As mentioned above, Jeffs was extradited from Utah to Texas, where he was convicted for raping young girls under the guise of "marriage" and sentenced to life in prison plus twenty years, yet Jeffs' essential facilitators in those and countless other similar crimes—Parker and SC&M—were yet to be recognized by any of the Plaintiffs herein or any law enforcement agency as active participants in the tortious and criminal scheme that had made these crimes possible. As he had in Utah, Parker participated behind the scenes in the criminal defense of Jeffs and the other men by interviewing and organizing teams of defense lawyers and by ensuring that those lawyers did not share information about Jeffs' conduct with the FLDS—to the detriment of his clients (including the Plaintiffs). Again, this intentional withholding of critical information by Parker (and through him SC&M) from a community that had been intentionally isolated from all outside information ensured that the FLDS members (including the Plaintiffs) remained ignorant of the legal wrongs that had been (and still were) being perpetrated against them, and the remedies they may have had at law or equity to right those wrongs.

117.    On April 19, 2008, Defendant Parker issued one of several public statements as the 'spokesman' for the FLDS, stating that America should be "outraged by what's happened to these poor children. If the state can come in and take away their children on the basis of their religious belief and practice, then no one is safe."  The "outrage" he was condemning was not the rape of children, but the efforts by Texas to protect the children. No reasonable attorney could view Parker's statements—given his actual and/or implied knowledge of the unlawful activities occurring on the Ranch—as anything other than the most egregious and shocking example of conduct unbecoming of a member of the Bar in American history.

118.    On April 28, 2008, Defendant Parker wrote a letter to the Texas Department of Family and Protective Services (with copies to Joyce James, Assistant Commissioner, Children Protective Services and Schleicher County Sheriff David Doran) stating: "This firm represents *all* residents of the Yearning for Zion Ranch in Eldorado, Texas in connection with any civil claims arising from your agency's participation in the searches and seizures that occurred at the ranch from April 4 to April 7, 2008. Specifically, we are concerned that the United States Constitutional rights of our clients have been violated by your agency's activities. The purpose of this letter is to remind you of your duty under Texas and Federal law to preserve evidence related to any potential civil claims against your agency, its agents, officers, and investigators" (emphasis added).

119.    In holding themselves out to governmental agencies and officials as representing *all* residents of the FLDS facility known as the YFZ Ranch, Parker and SC&M were continuing to operate under the aegis of their established *individual* attorney-client relationship with each FLDS

member and beneficiary of the UEP Trust. Parker and SC&M made such a representation on the basis that the YFZ Ranch residents were members of the total group of clients with whom these Defendants had *already* entered into an attorney-client relationship and whom these Defendants had undertaken to represent for purposes of protecting their individual rights, as expressly stated in the letter referenced above. Thus, Parker and SC&M again represented to the government and the public that they were the attorneys for the FLDS members, including the Plaintiffs, individually.

120.    On an entirely separate occasion from the Texas raid of the YFZ Ranch, Parker and SC&M again claimed to represent all FLDS members individually. In *The Fundamentalist Church of Jesus Christ of Latter Day Saints, an Association of Individuals, v. Wisan, et al,* (Case. No. 2:08-CV-772-DB), Parker and SC&M brought the action in the name of an Association to enforce the individual constitutional rights of the members. In connection with a motion attacking the standing of the Association to bring claims that are individual and non-assignable as a matter of law, Parker and SC&M were ordered by the court to provide a list of the specific individuals whom they purported to represent as clients. On February 17, 2011, in belated compliance with that court's orders, Parker and SC&M filed a document captioned "Notice of Filing of List of Association Members," representing to the court in a public filing that they were representing those persons identified in an attached petition in order to protect their "*individual* and collective rights and freedoms secured by the Constitution's religion clauses." In that filing, Parker and SC&M also asserted that, "as described in the attached list, *the individuals* who affixed their signatures to the list authorized the pursuit of claims of the nature that underlie the constitutional claims in this action."

121.    Further, in order to avoid any implication that the list of persons whom Parker and SC&M had undertaken as individuals was limited to the several thousand names attached to that filing, Parker and SC&M asserted, "The plaintiff Association is a congregation of members, so its membership is necessarily not a fixed group of individuals," and that "because the plaintiff Association is a congregation of members and its membership is necessarily not a fixed group of individuals, plaintiff may seek to supplement this list in the future as may be necessary," thereby confirming that Parker and SC&M represented *all* individual members of the FLDS Church in connection with the protection of their individual constitutional rights.

122.    In *In re UEP Trust*, discussed above, Parker and SC&M also undertook to represent all individual members of the FLDS Church through their representation of the Association of Individuals. On September 19, 2009, Defendants Parker and SC&M were disqualified as counsel for the FLDS Church in that case. That Order barred SC&M and Parker "from representing any litigant, present or future, adverse to the United Effort Plan Trust in any matter that is the same as, or substantially related to, the Firm's previous representation of the United Effort Plan Trust." The

Order further directed that: "The Firm is also barred from consulting with any litigant, present or future, adverse to the United Effort Plan Trust as to any matter that is the same as, or substantially related to, the Firm's previous representation of the United Effort Plan Trust." However, the Order was later vacated on appeal, and Parker and SC&M continued to actively pursue the scheme and plan in furtherance of the unlawful aims and objectives of the enterprises referenced above, even after being aware of the conflicts associated with and, indeed, the outright illegality of such representation. Moreover, the mere fact that that particular Order was reversed on appeal does not constitute a judicial vindication of the underlying conflict of interest upon which that Order had been initially entered, nor does it constitute a judicial approval of the other wrongful acts and omissions set forth herein. Rather, it establishes the representation by Parker and SC&M of the FLDS members, including the Plaintiffs. Indeed, October 2009, Parker and SC&M, assisted by two other law firms, brought a Petition for Extraordinary Writ before the Utah Supreme Court on behalf of the individual FLDS members. The memorandum in support of the petition states that the "Petitioners are members of the FLDS Church" and argues on behalf of the FLDS member petitioners individually, rather than on behalf of a single Association of members.  SC&M and the other law firms continued to represent the individual petitioners and members of that Association in *In re UEP Trust* through at least June 18, 2019, when the court dismissed that matter.

123.    On various occasions, the Lawyer Defendants have appeared in various courts on behalf of the FLDS enterprise's interests only to later withdraw from the proceedings when they found the courts unreceptive to their arguments in furtherance of the scheme and enterprise detailed herein. These cases include *Jeffs v. Jeffs*, Fifth Judicial District Court, Washington County, State of Utah, Case No. 114500590; *Barlow v. Barlow*, Superior Court of Arizona, Mohave County, Case No. DO 2012-910; *Holm v. Jeffs*, Third Judicial District Court, Salt Lake County, State of Utah, Case No. 113902191; and a pending case brought in Federal court by the United States Department of Labor captioned *Perez v. Paragon Contractors Corp.,* United States District Court, District of Utah, Case No. 2:13cv00281-DS.

124.    For example, in *Holm v. Jeffs*, referenced above, the Lawyer Defendants appeared on behalf of all of the named defendants at a temporary restraining order ("TRO") hearing in December of 2011. After the TRO was granted, Parker attended the preliminary injunction hearing in January 2012 and announced they had appeared by mistake and that Parker and Kenneth Okazaki were actually representing none of the named defendants. The court disagreed, found that Parker and Okazaki were representing *all* of the named defendants and ultimately sanctioned them for not appearing at later hearings. An appeal was taken as to the sanction (assessed in attorney fees), but not on the issue of whether they represented all of the named defendants in that case. Those defendants included Warren Jeffs, Lyle Jeffs, The Fundamentalist Church of Jesus Christ of Latter-day Saints, The Corporation of the President of The Fundamentalist Church of Jesus Christ of Latter-day Saints, The Corporation of the Presiding Bishop of the Fundamentalist Church

of Jesus Christ of Latter-day Saints, and The Fundamentalist Church of Jesus Christ of Latter-day Saints, an Association of Individuals (hereinafter "the FLDS Defendants").

125.    In the aforementioned case of *Holm v. Jeffs*, the Lawyer Defendants sought to justify their inopportune and unsuccessful attempt to withdraw (in connection with which the Lawyer Defendants were sanctioned by the court) by filing the Affidavit of Samuel J. Steed. The Steed Affidavit states in part that Steed "functioned as the liaison between our lawyers and the leadership of the Church . . . monitoring the instigation and conduct of litigation involving members and/or leaders of the FLDS Church and relaying instruction to counsel who might be retained to represent their interests in a given case. On December 22, 2011 I received a phone call from Rod Parker and Ken Okazaki [about a TRO hearing in the *Richard Holm* case] . . .. They asked me if one or more defendants might want them to provide representation . . . . [S]ince I wanted to be aware of any material developments involving FLDS Church members or leadership I asked them [Rod Parker and Ken Okazaki] to participate . . . . They . . . asked me again to get instructions from the defendants as to . . . what their instructions might be for the defense of the claims . . .. Although I worked to get them the instructions . . . I never received instructions from the defendants to defend the case . . .. [T]heir inability to participate . . . as well as any consequences that flowed from both their initial participation and their subsequent inability to participate, was due to lack of direction from the defendants."

126.    The Steed Affidavit amply demonstrates that, among other things, the Lawyer Defendants represent the FLDS Church, the FLDS leaders and all of the FLDS members, including the Plaintiffs, as individual clients (and in various combinations) as dictated by their tactical goals to serve what they deemed best for the FLDS enterprise as determined by FLDS leaders who were ultimately led by Jeffs. In this regard, the Lawyer Defendants were essentially "on call," standing by and willing to perform, at the direction of the leadership of the Church (including Jeffs), representation of any given group of "FLDS Defendants" in any given situation. Thus, the Lawyer Defendants manifested their willingness to represent any or all "FLDS Defendants" without making any independent assessment of the conflicts of interest between the FLDS members, the FLDS leaders (including Jeffs), and SC&M itself despite the firm's knowledge that it had, in fact, actively planned and aided the commission of wrongs against their clients (Plaintiffs).

127.    Parker and SC&M aided and abetted the FLDS enterprise in large-scale tax fraud and fraud on public entitlements (the frequent edicts given by Jeffs directing this conduct were generally referred to as "bleeding the beast," and involved sophisticated understanding of various regulatory schemes controlling public entitlements and benefits as well as state and Federal laws pertaining to taxation). On information and belief, said expertise was augmented or supplied by Parker and SC&M with knowledge (actual or constructive) of how this legal advice would be misused in the future in the perpetration of a pattern and practice felonious conduct.

128.    The FLDS people, including Plaintiffs, have both legal and religious rights that require protection, and they believed that the Lawyer Defendants were representing their individual interests in connection with those rights. The Lawyer Defendants' understanding of FLDS religious convictions did not relieve those Defendants of their legal and ethical obligations to: (1) avoid conflicts in their representation of clients, (2) provide their clients with the facts regarding Jeffs' illegal conduction and admissions, and (3) advise their client regarding their rights rights as individuals and as parents. Had Parker and SC&M timely discharged these duties, many FLDS families, including Plaintiffs, would have realized much earlier that they were caught up in a dangerous religious fraud and would have left the FLDS before suffering extensive injury.  Instead, Parker and SC&M facilitated a blurring, if not a complete erasing, of the lines between religion and the law, causing their FLDS clients to falsely believe that their only *legal* options were to remain absolutely obedient to Jeff or suffer the loss of their families and possession and be eternally damned.  Even after leaving the FLDS, it took these Plaintiffs many years to learn of the role that Parker and SC&M played in facilitating Jeffs' ongoing fraud, and the true extent of Parker and SC&M's misconduct will not be known until the completion of discovery in this case as much has previously (and improperly) been shielded behind the attorney-client privilege..

129.    In conclusion, Parker and SC&M (and its member attorneys) misused their powers as officers of the court and licensed members of the bar to actively aid in the ongoing illegal enterprises detailed herein, including—of particular import—the intentional withholding of information from the FLDS members (including the Plaintiffs) that would have enabled them to discover that they were being treated unlawfully, and that remedies were available at law and equity to stop this unlawful treatment. Indeed, Parker and SC&M directly aided and abetted the enslavement and raping *of their own clients* by Warren Jeffs and his ilk. Parker and SC&M have betrayed their sacred oaths to their clients (including the Plaintiffs) and have shamed this profession. This Complaint seeks to begin to remedy their malfeasance.

## IV. FIRST CLAIM FOR RELIEF — LEGAL MALPRACTICE[3]

Plaintiffs re-incorporate and reallege all other averments set forth or referenced herein as though stated verbatim to the extent that such averments do not conflict with those in this claim.

130.    Plaintiffs are former FLDS members, whom Parker and SC&M claimed to represent individually for the purpose of protecting their civil and constitutional rights as well as their rights in connection with the UEP Trust, and which purposes Plaintiffs believed that Parker

---

[3]   The following fifteen Plaintiffs assert this claim: Sarah Allred, Helen Barlow, Lawrence Barlow, Nolan Barlow, Vergel Barlow, Holly Bistline, Jason Black, Susan Broadbent, Marvin Cooke, Steven Dockstador, Thomas Jeffs, Carole Jessop, May Musser, Amy Nielson, and Alicia Rohbuck. *See Bistline,* 918 F.3d at 889.

and SC&M represented them. On that basis, there existed an actual attorney-client relationship between Parker and SC&M on the one hand and each and every Plaintiff herein on the other hand.

131.    Alternatively, Plaintiffs each subjectively believed that Parker and SC&M represented them, and such belief was reasonable as to each Plaintiff under the unique circumstances present here (e.g. the intentional isolation of Plaintiffs from outside information, such as the fact that Parker and SC&M were acting against their bests interests). *See Bistline,* 918 F.3d at 889.

132.    Finally, Parker and SC&M held themselves out to the public as representing the FLDS and its members. *See e.g.,* https://www.scmlaw.com/person/rodney-r-parker/ ("Rod has represented the Fundamentalist Church of Jesus Christ of Latter-Day Saints in a number of challenges to the group's beliefs and practices, including a challenge to the Utah bigamy law that went to the United States Supreme Court.  In the wake of the 2008 YFZ Ranch raid, in which the court removed 462 children from the Ranch, Rod was the group's media spokesman.").

133.    This attorney-client relationship—actual and/or implied—required Parker and SC&M to adhere to the applicable standard of care as well as the rules governing the practice of law. Those rules and standards required that Parker and SC&M treat Plaintiffs in a fiduciary capacity, placing the interests of their clients above their own, keeping them adequately informed of matters materially affecting their interests and rights within the subject of the representation, to disclose and avoid conflicts of interest and to refer Plaintiffs and other similarly situated persons to separate and independent counsel under the circumstances detailed herein, after first disclosing the legal ramifications and significance of said events to Plaintiffs.

134.    Defendants Parker and SC&M breached the aforementioned duties and other standards of care in the manner detailed herein and to be further proven at trial.

135.    Defendants Parker and SC&M committed legal malpractice by virtue of the intentional, knowing, and/or negligent breaches of the duties referenced herein and other duties to be established through testimony at trial or as may be judicially noticed by the Court, both in the form of negligence and breach of fiduciary duties as recognized under Utah law as two separate theories of legal malpractice.

136.    One purpose of the establishment of legal duties on the part of attorneys, which duties were negligently breached herein is to "guard against and to remedy exploitation of the power lawyers possess over their clients' lives and property." *Christensen & Jensen, P.C. v. Barrett & Daines,* 194 P.3d 931, 938 (Utah 2008). By failing to exercise reasonable care in the practice of law, Parker and SC&M permitted (and, indeed, participated in) the exploitation of the power lawyers possess over their clients' lives and property as more particularly detailed herein.

137.     As referenced above, the fiduciary obligation owed by lawyers (which if breached can be a recognized basis of a claim for legal malpractice) requires lawyers to place the interests of those persons whom Parker and SC&M purported to represent as legal counsel above the interests of Parker and SC&M.

138.     Parker and SC&M were under a duty to inform Plaintiffs of their legal rights and the extent to which said rights were being violated on an ongoing and systematic basis by Jeffs and his favored cohorts within the FLDS in light of the actual or constructive knowledge held by the Lawyer Defendants, who knew or should, in the exercise of reasonable diligence, have recognized the nature of the breaches and violation of their clients' rights so as to provide such disclosure and warnings to them.

139.     Having expressly (or impliedly) undertaken to act as legal counsel for Plaintiffs as averred more particularly herein, Parker and SC&M were required to take the legal action necessary to prevent Jeffs and his favored cohorts from continuing to have the legal capability to exercise the powers granted them by the earlier work of Parker and SC&M on behalf of Jeffs and the FLDS enterprise.

140.     The aforementioned conflict of interest required (as has already been recognized by the courts as detailed above) that Parker and SC&M withdraw from the representation in which they were engaged on behalf of Jeffs and his various instrumentalities in order to avoid harming the interests of the Lawyer Defendants' other clients, including the Plaintiffs herein.

141.     The aforementioned duty (which was also breached by Parker and SC&M) also required them to advise Plaintiffs to seek separate and independent legal counsel, which the Lawyer Defendants never did. Further, Parker and SC&M should have made such advisement in order to inform Plaintiffs so that they could take legal action to rectify the harmful effects of the 1998 Restatement of the UEP Trust before such restatement was actually used for the illegal purposes for which it had been designed, which as discussed herein required its reformation by court order in 2005. Had Parker or anyone as SC&M done so, Plaintiffs could have avoided their enslavement, rape, and the other unlawful acts committed upon them.

142.     Parker and SC&M should have declined to receive payment of their fees by Plaintiffs and other similarly situated persons in view of the fact that either all or the vast majority of the work for which they were paid in this capacity was taken in direct contravention of the rights, feelings, interests and safety of their clients (including Plaintiffs) and/or involved the firm in criminal activity. On this basis, Parker and SC&M should have advised Plaintiffs to forbear from contributing directly to fundraising activities carried out for the stated objective of paying Parker and SC&M for the purported benefit of legal advice and counsel for Plaintiffs.

143.     Parker and SC&M should have informed and advised Plaintiffs in a timely fashion that the true nature of the legal work and the true structure of the legal framework and pattern of tortious activity implemented by SC&M was in furtherance of the unlawful, malicious and tortious plan of Jeffs and his favored cohorts within the FLDS leadership, rather than allowing Plaintiffs to reasonably believe that their interests were being protected under the law because they were represented faithfully and diligently and in conformity with the law by Parker and SC&M, when in fact the opposite was true.

144.     Parker and SC&M were negligent in failing to disclose to Plaintiffs and other similarly situated persons the true nature of the legal work and the true structure of the legal framework and pattern of tortious activity implemented by SC&M was in furtherance of the unlawful, malicious and tortious plan of Jeffs and his favored cohorts within the FLDS leadership, including the fact that the following of Plaintiffs' rights were being violated:

   a.  freedom from unreasonable and unlawful deprivation of property through the use of the instrumentalities described herein, including the legal work of Parker and SC&M;

   b.  freedom from torture, assault, battery, rape, kidnapping, emotional abuse, theft of property, expulsion and destruction of families, incest, and extortion;

   c.  freedom from starvation and servitude;

   d.  the rights of parents to be free from the forced parental surrender of their minor children for involuntary illegal "marriage," statutory and actual rape and other physical exploitation;

   e.  freedom of contract and association, including familial association;

   f.  freedom of religion without the interposition of pedophilic, sadistic, violent, vile and vulgar impulses of a recognized sociopath, resulting in physical injury, arbitrary taking of property and other harms detailed herein;

   g.  freedom from intimidation of sham law enforcement personnel;

   h.  the right to legal counsel not tainted by conflicts of interest; and

   i.  other rights, privileges, and freedoms guaranteed under the laws of the United States and the various states.

145.     The emotional distress, loss of time, loss of funds and income and other economic losses described herein, as well as the bodily injury of those Plaintiffs so affected is a direct and proximate result of the wrongful conduct of Parker and SC&M, including their negligence and

legal malpractice, which directly caused bodily injury and property damage, economic losses, non-economic losses and damaged the legal rights and interests of Plaintiffs and similarly situated persons.

146.    If Parker and SC&M had adhered to the ordinary (or even minimal) standards of professional competence and had done the act they failed to do or not done the act complained about, Plaintiffs would have benefited. For example, if said Lawyer Defendants had not used their power to exploit the Plaintiffs, then Plaintiffs would have benefitted by being spared the damages related to the scheme and plan described herein, which scheme and plan was made possible by Parker and SC&M acting in concert with Warren Jeffs and other FLDS leaders, many of whom are presently incarcerated for the offenses described herein, through the active participation of Parker and SC&M in the planning and execution of a legal strategy to exploit Plaintiffs and similarly situated persons as more particularly described herein.

147.    If Parker and SC&M had acted in concert with their legal obligations as attorneys for Plaintiffs, they would have advised Plaintiffs of the true facts alleged herein, knowledge of which was necessary for Plaintiffs to have been able to make informed decisions about their legal rights and the fact that those legal rights were being violated as otherwise set forth herein.

148.    If Plaintiffs had been advised of these critical facts and their true legal rights by Parker and SC&M who professed to be acting at all relevant times herein as their legal counsel as set forth elsewhere herein, broad knowledge within the FLDS community of the illegal nature of Jeffs' scheme would have made such abuses impossible, and thereby benefitted Plaintiffs.

149.    As a result of the legal malpractice of Parker and SC&M, including negligence and breach of fiduciary duty, Plaintiffs incurred injuries, damages and losses as more particularly identified herein and as to be proven at trial.

## V. SECOND CLAIM FOR RELIEF — BREACH OF FIDUCIARY DUTY[4]

Plaintiffs re-incorporate and reallege all other averments set forth or referenced herein as though stated verbatim to the extent that such averments do not conflict with those in this claim.

150.    In addition to breach of fiduciary duty as a basis for the claim of legal malpractice, Plaintiffs hereby assert a claim for common law breach of fiduciary duty on the basis of the relationship of trust and confidence between Parker and SC&M and the FLDS, including Plaintiffs

---

[4]   The following fifteen Plaintiffs assert this claim: Sarah Allred, Helen Barlow, Lawrence Barlow, Nolan Barlow, Vergel Barlow, Holly Bistline, Jason Black, Susan Broadbent, Marvin Cooke, Steven Dockstador, Thomas Jeffs, Carole Jessop, May Musser, Amy Nielson, and Alicia Rohbuck. *See Bistline,* 918 F.3d at 889.

as described herein, which duty arises independently of an attorney-client relationship when such elements are present between parties, such as where one person places trust and confidence in another with superior knowledge regarding a subject or transaction and that other knowingly or negligently allows the person whose trust has been placed in him to suffer harm as a result of a failure to adhere to the fiduciary standards imposed by law.

151.    The elements referenced in the foregoing paragraph exist under the factual circumstances detailed herein.

152.    Parker and SC&M formed a relationship of trust and confidence with Plaintiffs and similarly situated persons by and through the repeated delivery of authorized statements to them to the effect that Parker and SC&M were acting as the FLDS' lawyers and that they would have to donate substantial funds to pay the fees associated with their individual and group representation by Parker and SC&M.

153.    In addition to forming an attorney-client relationship with Plaintiffs and similarly situated persons by holding themselves out, and allowing themselves to be held out as attorneys for the FLDS, UEP beneficiaries, signatories to a petition filed by Parker and SC&M with a Federal court in Utah court, residents of the YFZ Ranch and through other legal filings and representations, Parker and SC&M also knowingly and intentionally allowed Plaintiffs and similarly situated persons to believe that Parker and SC&M were acting in a position of trust, confidence and with special powers associated with their status as lawyers and their status as business colleagues appointed and anointed by Jeffs, which afforded Parker and SC&M special power over Plaintiffs and similarly situated persons and created a fiduciary relationship between them.

154.    As a result of the fiduciary relationship formed by Parker and SC&M with the Plaintiffs herein, Parker and SC&M had a duty to act in the best interests of such persons and to place their interests above the their own, even if a formal attorney-client relationship (actual or implied) did not exist.

155.    Parker and SC&M breached their fiduciary duties to Plaintiffs by actively facilitating a plan to exploit and harm them as more particularly described herein.

156.    If Parker and SC&M had adhered to the standards applicable to them in view of the fiduciary duties recited elsewhere herein, Plaintiffs would have benefitted, in particular because of the unique relationship between Parker and SC&M and the FLDS Members in which Parker and SC&M were not only their attorneys, but 'blessed' by Jeffs and the FLDS leadership as *the* attorneys—giving Parker and SC&M's word greater power than even an ordinary trusted attorney and law firm would possess.

157.    As a result of the breach of their fiduciary duties by Parker and SC&M, Plaintiffs

incurred injuries, damages and losses as more particularly identified herein and as to be proven at trial.

## VI. THIRD CLAIM FOR RELIEF — FRAUD (INTENTIONAL MISREPRESENTATION AND NONDISCLOSURE)[5]

Plaintiffs re-incorporate and reallege all other averments set forth or referenced herein as though stated verbatim to the extent that such averments do not conflict with those in this claim.

158.    During the years 1998 through at least 2014, Parker and SC&M held themselves out to various Utah courts and to the individual FLDS, including Plaintiffs, as attorneys acting as legal counsel for and in the best interests of Plaintiffs in connection with the protection of their lawful property interests, physical welfare and other legal interests.

159.    The representations, promises and inferences discussed throughout this Complaint were repeated with the knowledge and consent of Parker and SC&M on their behalf in ongoing, weekly and occasionally more frequent meetings in which virtually all the FLDS assembled, either in person or listened remotely to sermons in which Plaintiffs and other similarly situated persons were actively instructed to part with their funds, including sometimes entire paychecks, to "keep the lawyers paid," because "they are representing you and all of your brothers and sisters" and in connection with the administration of affairs of the UEP Trust and the FLDS generally, as well as within more specific legal actions.

160.    On information and belief, Plaintiffs and their fellow FLDS members paid several million dollars during the aforementioned period of time to fund the ongoing legal work of Parker and SC&M under the facade that the Lawyer Defendants were acting in the best interests of, and to protect the civil and individual rights of the individual persons whom they purported to have as clients, including Plaintiffs, as set forth herein.

161.    Parker and SC&M had actual (or at least constructive) knowledge, from conversations between themselves and Defendant Jeffs and his representatives in the FLDS Church leadership, of the ongoing fundraising activities and the express representations upon which these payments were based, and they also knew of the direct individual reliance of the individual FLDS, including Plaintiffs and similarly situated persons, in the form of ongoing personal payments of legal fees to Parker and SC&M, which were being collected on these Defendants' behalf by Defendant Jeffs and his acolytes and favored cronies and delivered or paid

---

[5]    The following twelve Plaintiffs assert this claim: Sarah Allred, Helen Barlow, Vergel Barlow, Holly Bistline, Susan Broadbent, Marvin Cooke, Steven Dockstador, Thomas Jeffs, Carole Jessop, May Musser, Amy Nielson, and Alicia Rohbuck. *See Bistline,* 918 F.3d  at 889.

to Parker and SC&M.

162.  On information and belief, as proven in part by the admissions of Jeffs in the Priesthood Record and various filings made by Defendants, Parker and SC&M were involved in ongoing and direct discussions during the years mentioned to monitor and continue the use of this representation as part of the fundraising program described herein, which was based entirely upon payment of the legal fees of Parker and SC&M by the individual FLDS, including Plaintiffs and similarly situated persons. Parker knowingly allowed Plaintiffs to believe that they were paying legal fees for their own personal benefit when in fact Parker and SC&M not only failed to use those fees to benefit Plaintiffs, but actually used the fees to further the oppression of the Plaintiffs.

163.  The subject of the misrepresentations and non-disclosures detailed herein were material under the circumstances. For example, these misrepresentations included the representations relating to the fact that SC&M held itself out in the capacity of having formed individual personal attorney-client relationships with the FLDS, including, among that group, all of the beneficiaries of the UEP Trust, the FLDS, who executed a petition which was filed in Federal court and all residents of the YFZ Ranch.

164.  The representations made by Parker and SC&M were intended to create the reasonable belief (subjectively and objectively) that those Defendants were acting in the best interests of the individual clients, including Plaintiffs herein, with whom they purported to have formed ongoing attorney-client relationships and that in accord with that status, they were acting to protect those interests, when in fact they intended otherwise and planned to act in direct contravention of those interests as they had been covertly and overtly doing for years. By actively and continuously misrepresenting their true interests and plans, which were derived solely from their association with Jeffs and the enterprise described herein, Parker and SC&M intentionally created Plaintiffs' misapprehension and misunderstanding of the true circumstances, such that Plaintiffs and similarly situated persons, state and Federal courts and the public at large reasonably believed and relied upon false representations made by the Lawyer Defendants with respect to their purported representation of the individual and civil rights of Plaintiffs herein and similarly situated persons. The detrimental reliance of Plaintiff includes their reliance on the Lawyer Defendants to act on their behalf and employ their superior legal knowledge and skill for their benefit as clients, as more particularly detailed herein.

165.  Parker and SC&M either (a) knew the beliefs created by their misrepresentations and nondisclosure of material facts to be false or (b) knew that said representations and omissions were made recklessly with knowledge that there were insufficient grounds upon which to base such a representation.

166.  SC&M and Parker knew that they were not acting in the best interests of the FLDS

(including the Plaintiffs) whom they held themselves out as representing and acting on behalf of, in that they knew from their ongoing interactions with the FLDS and Jeffs that the atrocities and abuses which were intended to be facilitated by said scheme and plan were actually taking place.

167.    SC&M and Parker were kept regularly advised by Jeffs and FLDS leaders and liaisons of the status of the fundraising efforts that were premised on the foregoing for the stated purpose of securing fees for SC&M and Parker rather than for the benefit of the Plaintiffs as their clients.

168.    SC&M and Parker knowingly or recklessly allowed the fundraising activities described herein to continue so that they could profit from the same despite, as anticipated in their response to this Complaint, later claiming that they had no intention of having or honoring an attorney-client relationship with  the FLDS (including Plaintiffs), and that they never intended to act in concert with such attorney-client relationships to the benefit of the individual FLDS, who were being drastically harmed by the scheme and plan described herein which was made possible by the legal machinations and representational actions of Parker and SC&M as set forth herein.

169.    Yet, the false representations and omissions of material fact detailed herein were made and authorized to be made by Parker and SC&M, and by others on behalf of Parker and SC&M, for the purpose of inducing Plaintiffs and other similarly situated persons to act or forbear from acting in the manner detailed elsewhere herein.

170.    Parker, SC&M and Jeffs intended the individual parishioners of the FLDS, including Plaintiffs, to believe that Parker and SC&M were their lawyers, that their special legal knowledge and skill was being applied to the best interests of the individual members in a manner consistent with law, and that they should therefore pay significant personal sums in legal fees to perpetuate the attorney-client relationship.

171.    Plaintiffs acted reasonably and in ignorance of the true facts due to the misleading and secretive nature of the actions and omissions of Jeffs and the Lawyer Defendants as detailed herein, by forbearing from seeking independent legal counsel or taking other legal action that could have been available to them if they had known of it.

172.    Plaintiffs believed the representations frequently made to them with the knowledge, approval and consent of Parker and SC&M regarding the nature and purpose of the legal representation for which they were paying, and did not know of the falsity of these representations or the true plans and motives of Jeffs, Parker, and SC&M, acting in concert, to perpetuate the unlawful and atrocious plan set forth above, which included several years of coerced underage "marriage," deprivation of property interests, physical and mental abuse, destruction of familial associations, intentional infliction of emotional distress, and other injuries more particularly

identified herein.

173.    Plaintiffs relied upon said representations by paying substantial funds out of their pockets for legal fees, in many cases surrendering their entire income for this purpose, and by regularly handing over cash to pay the fees of Parker and SC&M at weekly FLDS meetings.

174.    Plaintiffs and similarly situated persons obeyed the directives leveled to them by Jeffs and his favored cohorts within the FLDS leadership to pay personally for the legal fees to retain Parker and SC&M, while believing that they were being benefitted by such a relationship with Parker & SC&M.

175.    Plaintiffs were damaged in accordance with the illegal and atrocious plan carried out by Jeffs, Parker, and SC&M through practices that the Supreme Court of Utah recognizes as illegal and not in furtherance of constitutionally protected religious or secular interests, and pursuant to which the FLDS Trust was reformed by court order in 2005.

176.    As a result of the fraudulent conduct by Parker and SC&M, Plaintiffs incurred injuries, damages and losses as more particularly identified herein and as to be proven at trial.

## VII. FOURTH CLAIM FOR RELIEF — NEGLIGENT MISREPRESENTATION[6]

Plaintiffs re-incorporate and reallege all other averments set forth or referenced herein as though stated verbatim to the extent that such averments do not conflict with those in this claim

177.    Plaintiffs reasonably believed (subjectively and objectively) the representations and implications knowingly made by and on behalf of Parker and SC&M, and demonstrated that belief by acting to their detriment as detailed herein, including but not limited to steadily and consistently making payments for legal fees over a period of years, obeying the dictates of Jeffs, and forbearing from seeking to obtain the services of separate, independent, and law-abiding legal counsel.

178.    Plaintiffs believed in the false commitments of the Lawyer Defendants to act on their personal behalf. These false promises were expressed and/or knowingly implied by Parker and SC&M and their agents, including Sam Barlow, Willie Jessop and Sam Steed and others. The Lawyer Defendants' had actual or constructive knowledge of facts that were material to their FLDS clients, including the Plaintiffs, under the circumstances, including but not limited to their status as clients of Parker and SC&M and in connection with their rights to property, family associations,

---

[6]    The following twelve Plaintiffs assert this claim: Sarah Allred, Helen Barlow, Vergel Barlow, Holly Bistline, Susan Broadbent, Marvin Cooke, Steven Dockstador, Thomas Jeffs, Carole Jessop, May Musser, Amy Nielson, and Alicia Rohbuck. *See Bistline,* 918 F.3d at 889.

physical security, and other rights enumerated elsewhere herein.

179.    At a minimum, given the intention of Parker and SC&M not to actively protect the interests of the Plaintiffs and others similarly situated persons, it was careless or negligent for Parker and SC&M to allow the fundraising techniques discussed herein to occur, given that numerous fundraising events over a period of years from 1998 through 2014 or later were based upon express and repeated assurances that Parker and SC&M were representing the individual interests of Plaintiffs and similarly situated persons. Parker and SC&M knew or should have known, in the exercise of reasonable diligence as attorneys intimately familiar with the funding of their activities and the actions of the FLDS leadership, including Jeffs, that representations regarding the individual representation and relationships described herein were being made on their behalf in order to garner profits for them in the form of individually paid legal fees. Parker and SC&M knew or should have known that such representations were being made to large groups of FLDS, and taken action to correct the misunderstanding and disabuse the otherwise reasonable belief on the part of those to whom it was made, including Plaintiffs and similarly situated persons, clarifying that Parker and SC&M were not in fact operating in a manner consistent with the personal representation of the Plaintiffs and similarly situated persons.

180.    Parker and SC&M had a pecuniary interest in the fundraising efforts that were based upon the direct representation to Plaintiffs that they were acting as the lawyers for the FLDS, including Plaintiffs, because they gained, on information and belief, several million dollars in fees during the years in question.

181.    Defendants, acting with the superior knowledge of the law and the rules governing the practice of law, and with superior knowledge of their own firm's activities and plans, were in a superior position to the Plaintiffs to know the truth of their plans and goals in the representational activities which they undertook to aid in the unlawful and atrocious plan detailed herein.

182.    Parker and SC&M knew or should have reasonably foreseen that the Plaintiffs and similarly situated persons were likely to rely upon the misrepresentation.

183.    If Parker and SC&M had acted with the degree of care to be expected of reasonable attorneys under the circumstances, they would and should have foreseen that Plaintiffs and similarly situated persons would likely, and in fact did for a period of years, rely upon the misrepresentation by making such payments and by forbearing from hiring separate, independent, and law-abiding counsel to represent their interests.

184.    As a result of the negligently misleading conduct by Parker and SC&M, Plaintiffs incurred injuries, damages and losses as more particularly identified herein and as to be proven at trial.

## VIII. FIFTH CLAIM FOR RELIEF — CIVIL CONSPIRACY[7]

Plaintiffs re-incorporate and reallege all other averments set forth or referenced herein as though stated verbatim to the extent that such averments do not conflict with those in this claim.

185.    As demonstrated by the specific and particularly averments set forth elsewhere herein, Plaintiffs have established the elements of a civil conspiracy, including:

    a.   a combination of two or more persons, in the form of Jeffs and his favored cohorts, working with Parker, SC&M and their agents—any two of which meet this element;

    b.   an object to be accomplished, including the taking of unlawful liberties with the bodies, assets and other property, labors and energies of the Plaintiffs—in short, their oppression in exchange for money or other pecuniary gain (to Parker and SC&M) and sex slaves (for Jeffs and his favored cohorts);

    c.   a meeting of the minds on the object or course of action, as demonstrated by the unwavering and steadfast pursuit of Jeffs' evil goals by Jeffs himself with the active assistance of Parker and SC&M and as also demonstrated in the public statements made by Parker, the audio and video confessions of Jeffs, by his Priesthood Record, and by the Affidavit of Samuel J. Steed and further, as will be proven at trial, from the records of Parker, SC&M and other entities identified herein as well as various government agencies;

    d.   one or more unlawful, overt acts, as detailed herein and as to be further proven at trial including forced labor, slavery, sex trafficking, rape and other sex crimes, kidnapping, tax evasion, and so on;

186.    As a result of the civil conspiracy between Parker, SC&M and its agents, Jeffs and/or his favored cohorts, Plaintiffs incurred injuries, damages and losses as more particularly identified herein and as to be proven at trial.

## IX.  SIXTH CLAIM FOR RELIEF — VIOLATION OF THE TRAFFICKING VICTIMS PROTECTION REAUTHORIZATION ACT (PEONAGE, SLAVERY, AND TRAFFICKING IN PERSONS) AND THE

---

[7]   The following fifteen Plaintiffs assert this claim: Sarah Allred, Helen Barlow, Lawrence Barlow, Nolan Barlow, Vergel Barlow, Holly Bistline, Jason Black, Susan Broadbent, Marvin Cooke, Steven Dockstador, Thomas Jeffs, Carole Jessop, May Musser, Amy Nielson, and Alicia Rohbuck. *See Bistline,* 918 F.3d at 889.

# THIRTEENTH AMENDMENT[8]

Plaintiffs re-incorporate and reallege all other averments set forth or referenced herein as though stated verbatim to the extent that such averments do not conflict with those in this claim.

187.    The conduct detailed herein results in liability on the part of Parker and all persons employed, retained or paid by SC&M from funds generated by them through the unlawful facilitation by them of Jeffs' ongoing scheme and plan to force FLDS parishioners and their children into forced labor, sex trafficking and sexual and other forms of slavery pursuant to the Trafficking Victims Protection Reauthorization Act, 18 U.S.C. §18 U.S.C.A. Pt. I, Ch. 77.

188.    Through the wrongful, tortious and illegal actions of Parker and SC&M, the Lawyer Defendants and their respective partners or shareholders facilitated the providing or obtaining of labor or services in violation of 18 U.S.C. § 1589, with knowing or in reckless disregard of the fact that the venture has engaged in the providing or obtaining of labor or services by any of such means for the benefit of Parker, SC&M and its various partners, shareholders, employees and others whom they paid during the ongoing enterprise they conducted, benefitted financially.

189.    Said financial benefit includes, on information and belief, the payment in millions of dollars in legal fees, the providing of real estate and the remodeling and construction of structures on real estate owned by Parker, SC&M and others in exchange for legal services, for the work directly conducted by Parker and SC&M to further the use of the 1998 Restatement for the purpose of subjecting Plaintiffs and other similarly situated persons to "forced labor" as detailed herein, using the following means that are prohibited under 18 U.S.C. § 1589(a), which provision subjects to the aforementioned liability any person who knowingly or recklessly receives anything of value or financial gain from the obtaining of labor or services of a person by any one of, or by any combination of, the following:

    a.    by means of force, threats of force, physical restraint, or threats of physical restraint to that person or another person;

    b.    by means of serious harm or threats of serious harm to that person or another person;

    c.    by means of the abuse or threatened abuse of law or legal process; or

    d.    by means of any scheme, plan, or pattern intended to cause the person to believe that, if that person did not perform such labor or services, that person or another person

---

[8]   The following nine Plaintiffs assert this claim: Susan Broadbent, Steven Dockstader, Thomas Jeffs, Carole Jessop, Briell Decker, May Musser, Ruby Jessop, Janetta Jessop, and Gina Rohbock. *See Bistline,* 918 F.3d at 889.

would suffer serious harm or physical restraint.

190.    As used in the foregoing paragraph, the term "'abuse or threatened abuse of law or legal process' means the use or threatened use of a law or legal process, whether administrative, civil, or criminal, in any manner or for any purpose for which the law was not designed, in order to exert pressure on another person to cause that person to take some action or refrain from taking some action." 18 U.S.C. § 1589(c). The term "serious harm" means "any harm, whether physical or nonphysical, including psychological, financial, or reputational harm, that is sufficiently serious, under all the surrounding circumstances, to compel a reasonable person of the same background and in the same circumstances to perform or to continue performing labor or services in order to avoid incurring that harm." *Id.*

191.    Labor or services that can form basis of force labor claim under the TVPRA is not limited to work in economic sense and extends to forced sexual acts. *Bistline,* 918 F.3d at 872–73. "Each of these plaintiffs was a teenager at the time she was purportedly ordered into a sexual relationship with a significantly older man—ordered by her Prophet, whom she had been raised since birth to believe "only does right." *Id.* at 873. The Plaintiff-victims age or special vulnerability may be relevant in determining whether particular type or certain degree of physical or legal coercion is sufficient to hold that person to involuntary servitude. *Id.* "In the same way, these plaintiffs' youth and vulnerability, particularly with respect to the parties who were forcing them into this labor, contribute to the plausibility of their allegations under § 1589." *Id.*

192.    As averred above, stemming from the various records created by Defendant Jeffs and provided to the Lawyer Defendants, it has long been known to the Lawyer Defendants that Defendant Jeffs was inflicting serious harm on their FLDS clients. For example, since at least 2000, Jeffs has taught: "An apostate from this work is the most dark person on earth. They are a lier from the beginning . . . and they are led about by their master Lucifer." Defendant Jeffs warned that by "choosing to socialize with apostates, [or by choosing] to join with them in any way, you are choosing to get on the devil's ground." He commanded the FLDS "to stop patronizing businesses of apostates. Stop doing business with them . . .. Come away from them." "The great challenge, according to Jeffs, is that "the apostates are our relatives. If a mother has apostate children, her emotions won't let her give them up, and she invites them into the home, thus desecrating that dedicated home. We want to see them and socialize with them; and every time we do, we weaken our own faith and our ability to stand with the Prophet." *See Our Prophet's Call – "Leave Apostates Alone, severely,"* July 16, 2000.

193.    As detailed herein, Plaintiffs and other similarly situated persons were subject to all of the means set forth herein in order to induce them to work for free or at unlawful rates of compensation for years on end at dangerous, difficult, demeaning and unpleasant jobs as well as at jobs that would be considered acceptable but for the fact that Plaintiffs and other similarly

situated persons were not permitted to keep fair compensation for such work. Plaintiffs were threatened with force, kidnapped, physically restrained, threatened with other harms, deprived of medical care and subjected to other related abuses, including being treated severely as an "apostate," if they failed to cooperate with the dictates of the Prophet as set forth herein in greater detail.

194.   The Lawyer Defendants knowingly or recklessly accepted money or other items of value in connection with sex trafficking of children, the elements of which are pleaded factually elsewhere herein, and includes, in addition to threats of abuse or restraint, coercion or duress, "abuse or threatened abuse of law or legal process," which means "the use or threatened use of a law or legal process, whether administrative, civil, or criminal, in any manner or for any purpose for which the law was not designed, in order to exert pressure on another person to cause that person to take some action or refrain from taking some action."

195.   One or more of the Plaintiffs herein was subject to kidnapping and made into a slave as detailed more particularly below, and the Lawyer Defendants benefited financially from this enslavement in the form of fees paid to them by the Plaintiffs themselves through the FLDS, or by Jeffs and his favored cohorts who profited from the enslavement and forced labor.

196.   The enslavement or involuntary servitude of one or more Plaintiffs was also a *per se* violation of the Thirteen Amendment to the United States Constitution which states: "Neither slavery nor involuntary servitude, except as a punishment for crime whereof the party shall have been duly convicted, shall exist within the United States, or any place subject to their jurisdiction."

197.   As averred more particularly herein, the ongoing legal measures, acts and omissions of Parker and SC&M constitute a violation of § 1589.  "These acts fully support the TVPRA claims when read in light of the complaint as a whole" because "Defendants' knowledge extended beyond the generic religious practices that they had acknowledged as raising "serious legal questions" and included graphic evidence of the ceremonial rape of little girls (which was provided to them by the FBI in 2005 at the latest, and was also garnered from their many representations of church members accused of sexual crimes." *Bistline,* 918 F.3d at 875

198.   Parker, SC&M and their various partners, shareholders and others who shared in the economic bounty of the wrongful conduct alleged herein are therefore subject to civil penalties of the TVPRA as referenced above and in the Act, including disgorgement and other damages. The damages owed by Parker and SC&M include disgorgement of all legal fees they received from the participation of the firm and its attorneys, acting in concert as a single business entity and de-facto legal partnership, pursuant to the mandatory restitution provisions of the TVPRA, 18 U.S.C. § 1593, which include "the greater of the gross income or value to the defendant of the victim's services or labor or the value of the victim's labor as guaranteed under the minimum wage and

overtime guarantees of the Fair Labor Standards Act (29 U.S.C. 201 *et seq*.)."

# X. SEVENTH CLAIM FOR RELIEF — AIDING AND ABETTING THE COMMISSION OF FELONIES

Plaintiffs re-incorporate and reallege all other averments set forth or referenced herein as though stated verbatim to the extent that such averments do not conflict with those in this claim.

199.    As averred more particularly herein, Parker and SC&M (by and through its agents and employees) took affirmative acts in furtherance of the crimes described herein, most (if not all) of which are felonies, with the intent of facilitating the commission of said offenses. *See, e.g.,* 18 U.S.C. § 2; *Rosemond v. United States,* 134 S.Ct. 1240, 1245 (2014).

200.    Parker and SC&M had actual or constructive knowledge of the criminal intent and plans of Jeffs and his favored cohorts as described more fully elsewhere herein. In summary, Parker and SC&M provided ongoing advice and actively participated in the use of legalities and artifices incidental to their role as lawyers in crafting, designing, executing and implementing the instrumentality which they designed, in an ongoing and continuous enterprise (the FLDS Church and the UEP Trust), which have been judicially recognized as having been formed for an illegal purpose in connection with the ongoing rape, kidnapping, extortion and other racketeering activities described herein, while profiting from the same and demonstrating, directly and indirectly, actual knowledge of the illegality of the ongoing operation and their material role in the same.

201.    As documented in the conversations between the Defendants herein, Parker and SC&M had actual knowledge of their potential liability and yet continued on the course of action to which they had been committed since 1998 at the latest, and continued to so operate until at least 2014, despite having full and actual knowledge of the audio and video recordings of Jeffs' several admissions that he was a fraud, the contents of the Priesthood Record and the heinous offenses detailed therein (which in some passages contain explicit references to the "heavenly" experience of child rape, which passages were used as evidence in the Texas prosecution of Warren Jeffs, along with audio recordings of one such rape and photographs of a ceremonial rape chamber, painted all in white with an elevated dais-bed and small audience stand for the ladies in waiting). Notwithstanding their actual knowledge of these misuses of the legal instrumentalities and actions designed and carried out by them, and their stated fear of a suit such as this very action, Parker and SC&M continued to aggressively enforce the powers conferred upon Warren Jeffs by them in such actions as the eviction of non-compliant rape victims from their homes, forcible removal of persons across state lines using the eviction powers claimed by those lawyers under the 1998 Restatement, defense of criminal charges for those of Jeffs' favored cohorts who faced criminal and civil liability

for such atrocious conduct and the ongoing provision of legal advice related to these issues, all the while receiving an income stream paid from the pockets of the parishioners and while threatening to file attorney liens against the very properties that were held by the UEP Trust, which was the central axis of the control mechanism they had devised for Jeffs' use but which Parker and SC&M used against Jeffs in order to keep their income flowing for years on end.

202.    Parker and SC&M are therefore civilly liable for aiding and abetting the commission of the felonies described herein.

# XI. FACTS RELATING TO PARTICULAR PLAINTIFFS

## A.  Alicia Rohbock

203.    On April 21, 1997, Alicia Rohbock was "spiritually married" to Defendant Jeffs' father, former FLDS Prophet Rulon Jeffs, as his (approximately) 23rd "wife." At the time of their marriage, Alicia was 20-years-old and Rulon was 85-years-old. They remained "married" until Rulon's death in September 8, 2002.

204.    Before the FLDS, who were living in Salt Lake City, were instructed to move to Short Creek beginning in 1998, Alicia's father, Ron Rohbock, took her for a walk and claimed that Jeffs, who was gaining control over the FLDS Church and the Defendant Lawyers, had molested one of Jeffs' sisters. At first, Alicia did not know what to think, but when her father was later excommunicated and labeled a "master deceiver," and she therefore believed that he had been lying to her due to her indoctrination by Jeffs and his minions. Later, she made the mistake of writing a letter to Jeffs in which she told him that her apostate father had accused Jeffs of molesting a sister. She thought little of it, believing there was no truth to the accusation, but years later she came to understand that the letter caused Jeffs to view her as a threat and take punitive action against her accordingly.

205.    During most of her five-and-a-half-year marriage to Rulon Jeffs, Alicia served as a trusted personal assistant to Jeffs and as a transcriber of his dictations. She worked with another wife of Rulon Jeffs by the name of Ora Bernice Steed who took shorthand and kept track of the most secret records of the FLDS, including baptism and marriage records.

206.    After Rulon Jeffs' death, Defendant Jeffs hinted to Alicia that she should marry him, but she resisted, having seen his advances toward other of his father's wives, and asked to be allowed to marry his brother, LeRoy Jeffs. LeRoy and Alicia were "spiritually married" by Jeffs on October 15, 2002, and Alicia became one of LeRoy's many wives. At the time, Alicia did not realize that she would pay dearly over the next many years for resisting Defendant Jeffs' 'hints' that he wanted to marry her.

207.    LeRoy was one of the FLDS Church accountants who handled money given by the FLDS to pay for "the lawyers" which included Parker and SC&M. Alicia remembers seeing checks for tens of thousands of dollars made out to SC&M for attorney fees. She, like the other FLDS, knew that the Lawyer Defendants claimed to be working for them in an individual capacity and reasonably believed that the lawyers would protect them in exchange for the large sums of money they were paying for that protection.

208.    On September 27, 2003, Alicia gave birth to her daughter RuLeecia Rohbock in Short Creek. Then in February of 2005, LeRoy Jeffs returned from a long absence with orders from Defendant Jeffs (who was now the Prophet) to instruct her that the Prophet did not consider her qualified to be a mother and that she had to give RuLeecia away. LeRoy then took RuLeecia against Alicia's will and, without further explanation as to where RuLeecia was going or why, disappeared. This act constituted kidnapping of a child by LeRoy for which Jeffs was an accomplice. Alicia, sickened and distressed over the loss of RuLeecia and her 'disqualification' to be a mother, was ordered to move to Mesquite, Nevada. At the time, she was nearly 6 months pregnant with her second daughter, Rachel.

209.    In late March of 2005, Alicia was ordered by Jeffs to separate from LeRoy Jeffs because Jeffs had received a "revelation" that his brother, LeRoy, was a "Son of Perdition." As time went on, Alicia understood that the "revelation" was caused by LeRoy's accusing Jeffs of needing psychological help (which he objectively did and is now receiving in the custody of the State of Texas). This caused Alicia to begin premature contractions and threatened the early delivery of her baby. Alicia was instructed to move to Short Creek where she could deliver Rachel in the FLDS Church-controlled birthing center rather than a proper medical facility. Rachel was born early, on April 6, 2005. At the end of April 2005, Alicia and Rachel were directed to move to Colorado.

210.    On June 24, 2005, while living in Colorado, Alicia and other "wives" of LeRoy Jeffs were summoned by Jeffs to a motel where they and other women were each "spiritually married" by him to yet other men. Alicia was required to "marry" another one of his brothers, Seth Jeffs. Later, in August or September, she was partly reunited with RuLeecia, meaning that they were allowed to live in the same home, but Alicia was not allowed any actual contact with her daughter RuLeecia because she had been disqualified as a mother. Thus, the kidnapping of her child continued.

211.    On October 28, 2005, Seth Jeffs was arrested in Colorado while acting as a courier for Defendant Jeffs, who was then a Federal fugitive and on the FBI's Ten Most Wanted List. After his arrest and prosecution, Seth Jeffs was "corrected" by Jeffs and his "spiritual marriage" to Alicia was dissolved. Later, when Jeffs ended Seth's correction and restored Seth's church status, Alicia was ordered to "remarry" him. Alicia begged the Prophet not to become Seth's wife

again, but Jeffs ordered otherwise and the "remarriage" and took place on May 29, 2006. Jeffs told Alicia that she had no choice and that without the man her spiritual progression would stop. Having been thoroughly indoctrinated by Jeffs and his ilk, she did not have the capability (absent objective legal advice from the Lawyer Defendants regarding her legal rights) to recognize that she was being treated unlawfully and had legal remedies to resist her unlawful treatment.

212.    On January 8, 2007, Seth Jeffs informed Alicia that the Prophet, who by this time was in jail awaiting trial in Utah, had received a revelation that she was immoral (guilty of sexual sin), had lost her priesthood blessing, needed to repent, and needed to work for the privilege of being re-married to Seth. She cried her soul out to Seth professing that she had never been immoral in her life, but Seth wouldn't listen to her and said that if the Prophet said she was immoral, she was immoral even if it happened in another life. In the cult mentality which controlled her thinking, she accepted this explanation. Again, objective legal advice from the Lawyer Defendants could (and should) have assisted her in this decision.

213.    Before this "correction," Alicia had been allowed some contact as a mother with her children, but after the correction, Seth moved her into a tiny room, told her that she no longer had the Holy Ghost and did not have the right to have any contact with her children. Seth "reassigned" RuLeecia and Rachel and gave them to another of his wives, as a caretaker, and ordered that Alicia have nothing to do with them—despite no legal authority whatsoever to terminate Alicia's parental rights. Despite living in the same house, Alicia was not allowed to touch her babies or claim they were hers. One night she tried to sleep near Rachel's crib and received a severe reprimand and was called worthless and a wicked soul. Alicia was required to do dishes and clean the house but was treated as an outcast among her sister-wives and could have no contact with Seth, as she was no longer worthy to be his "wife." The mental torture inflicted upon Alicia by leveraging her indoctrination to paint her as a sinner during this time caused her to grow extremely depressed. It was all she could do each day to keep living.

214.    Alicia found out that she was pregnant again at the end of January 2007 with Seth's child. When she told Seth, he appeared furious and terrified of repercussions from Jeffs for impregnating his "repenting" "wife." Seth ordered her to join him in writing letters to Jeffs confessing the "sin" of her pregnancy.

215.    On September 28, 2007, Alicia was rushed from Colorado to Short Creek to deliver her baby. Her son Brigham "Joshua" Rohbock was born that day at a hospital near Short Creek. Seth, who had just recently completed parole, was so anxious to leave the hospital that, almost immediately after Alicia gave birth, he put her in the back seat of his car with a container to catch the massive amounts of blood she was losing from just having given birth. To avoid getting blood all over the car, Seth would roll down the window and yell back to Alicia to dump the blood out of the container. She was denied (and had no idea she had the right to) proper medical care. Again,

had Parker and SC&M properly advised her of her legal rights related to pregnancy, prenatal care, postpartum care, and medical care in general she could have avoided this dangerous and damaging (mentally and physically) situation.

216.    On November 1, 2007, Seth moved his family, including Alicia's two young daughters, into a house he had built in Colorado. Seth informed Alicia that Jeffs had not found her worthy to go with the family to the new house. Alicia's heart broke again when Seth again kidnapped both her daughters and sent her to a "house of hiding" somewhere in the Colorado mountains. Alicia was ordered to live in the basement of this house with her month-old baby boy. The house had little electricity, no toilets and not enough water to bathe. Alicia melted snow to wash dishes. She would stay up each night, holding her baby as near as she dared to the little fire she kept burning to try and keep him warm during the depth of a Colorado winter.

217.    During her months in this mountain house, Alicia tried with all her soul to be as good as she possibly could to qualify in the eyes of the Prophet to be returned to her girls. She thought she was doing well, but in January 2008, Seth informed her that she still had not qualified to be with her family.

218.    On April 1, 2008, she was quickly taken to Texas after the YFZ Ranch was raided where she was instructed to pretend that she had given permission for her children to be taken away so that the legitimate and lawful efforts of Texas Child Protective Services would be thwarted. In short, she was commanded to obstruct justice—though due to the lack of proper legal advice from Parker and SC&M combined with her indoctrination she had no idea at the time what she was doing was legally and morally wrong. Indeed, until then Alicia had had no idea her daughters were in Texas, and had not seen them or heard from them since November 1, 2007, until she was needed to defend the FLDS leaders after the raid. She also did not know, because Parker and SC&M did not tell her, that her children had been kidnapped and then transported across state lines—a Federal crime.

219.    While in Texas, she witnessed Parker's involvement in unlawfully preventing Texas from successfully protecting FLDS children and she believed that the Lawyer Defendants were protecting her interests. Although Parker and other FLDS lawyers were aware of facts and evidence that convicted Jeffs, Alicia was not, and none of the lawyers that she was relying on and which she understood were protecting the FLDS told her about these critical facts which established that her treatment (and that of the other Plaintiffs) was illegal.

220.    Alicia was grateful to the Texas Court Appointed Special Advocates ("CASA") for temporally reuniting her with her children and monitoring them, but she had to keep that gratitude hidden from FLDS leaders who had instructed mothers to create a scene for the media to create sympathy for the FLDS. After living on the YFZ Ranch while legal proceedings played out, she

was moved again to Colorado. Though this time she at least had her children, she still had no idea that she had an absolute legal right (barring a lawful court order terminating that right) to the custody of her children. She still believed that contact with her children was predicated upon obeying Jeff and his favored cohorts—a belief of which Parker and SC&M knew or should have known she held and had a duty as counsel to advise her was incorrect but did not do so.

221.    In 2011, Alicia was ordered by Jeffs to move to a home in Colorado City, Arizona, where she was in the same house as her children, but again was not allowed to actually mother them. Seth moved Alicia into the garage of this house, which had concrete floors and no facilities, and ordered the rest of the family to "act like you can't see her," a process modern psychologists call "otherization" and which has profound and negative psychological impacts. The garage had no bathroom or dining facilities, so she was moved into a room in the home where she had a cookplate. If she left her room to use the bathroom, she was shunned. While Alicia was kept in her room, she had to sit by helplessly, listening to her daughter's screams as their caretaker disciplined them by restraining them in a chair and scratching their faces until they bled with her long fingernails. RuLeecia and Rachel have scars to this day from that torture they were forced to endure. This conduct constitutes child kidnapping with intent to cause grievous bodily harm—a Federal crime—yet Alicia did not know this critical fact because Parker and SC&M did not tell her.

222.    Throughout 2011 and 2012, all of Seth's family was admitted into the United Order ("UO")—the FLDS equivalent of most favored nation status—with the exception of Alicia and her children. The mental anxiety Alicia experienced from being a 'ghost' in her own home, being found constantly unworthy of religious advancement by the Prophet despite her best efforts, and now having to listen to the physical abuse of her children whom she could not help was absolutely unbearable. Alicia lost all her hair, regularly had high fevers, and developed a blood infection (becoming septic) and was eventually hospitalized.

223.    Utterly broken by the savagery inflicted upon her and her children by FLDS leaders, Alicia desperately approached Seth about moving with her daughters to live with her brother in North Dakota. To stop Alicia from fleeing, Bishop Lyle Jeffs admitted her and her daughters into the UO. The two weeks she spent in the UO with her children were the happiest two weeks she had experienced in her life to that point. However, she soon learned that Lyle Jeffs had admitted her into the UO without first seeking permission from the Prophet. When Jeffs received a report in prison that she had been admitted to the UO, he immediately sent back a revelation that Alicia had engaged in lesbian behavior with her sister, Elizabeth Jessop, and was to be expelled from the FLDS. Alicia had no idea what the word lesbian even meant (and had no way to find out), the accusation was completely false, and even if it had been true it would have been constitutionally protected activity. *See Lawrence vs. Texas,* 539 U.S. 558 (2003). Parker and SC&M did not even

attempt to enlighten Alicia.

224.    After receiving this final revelation from Jeffs, Alicia returned to her home, took her children and fled into the hands of those she believed were apostates and enemies of the FLDS Church, knowing that she was damning herself and her children to Hell for eternity. When Alicia later learned some of the facts that FLDS Church leaders and lawyers had hidden from her, she was physically sick and vomited repeatedly. But, despite that terrible shock, the truth freed her and her children from the cultish thinking that had kept them all prisoners for so many years and she at last realized that she had been subjected to unlawful activity and had remedies available to her.

225.    As discussed extensively herein, Alicia did not know (nor, under these circumstances could she be expected to know) that she had been subjected to unlawful activity for which remedies were available to her at law and equity due to her isolation and the knowing, intentional, fraudulent, and/or negligent misrepresentations by Jeffs, Parker, and SC&M coupled with the indoctrination by Jeffs and his favored cohorts. Nor did Alicia know of or understand Parker and SC&M's involvement in this scheme until long after she had left the FLDS.

226.    Alicia believed that Parker and SC&M were representing her interests and trusted them as her legal advisors. If Parker and SC&M had complied with their legal and ethical duties, including but not limited to avoiding conflicts in the representation of their clients and advising Alicia of her legal rights and the facts surrounding Jeffs' illegal acts and admission of fraud, Alicia would have left the FLDS much earlier and avoided the extensive financial, physical, emotional, and psychological injuries she suffered.

## B.   Ruby Jessop

227.    Ruby, in 2001, at age 14, had to stop attending ninth grade and was forced into a "spiritual marriage" with her second cousin and step-brother Haven Barlow, in a secret spiritual wedding ceremony in an old FLDS Church owned motel in Caliente, Nevada, officiated by Jeffs. Two other young FLDS girls were "married" (raped) the same day at the same motel. Immediately following the "spiritual marriage," Ruby was viciously raped by her stepbrother in an act that qualified as forcible rape on top of statutory rape. Approximately three weeks later, Ruby attempted an escape from the FLDS community to Bountiful, Canada, the home of her brother, Joe C. Jessop, Jr., where she thought she could be safe. However, within days Ruby was kidnapped by FLDS leadership, including Willie Jessop along with the Colorado City Marshals acting under color of law, and taken to the home of Fred Jessop in Hildale, Utah. When the Washington County Sheriff investigated Ruby's disappearance, the FLDS leadership reported to law enforcement that Ruby was on an extended vacation, but did not disclose that she had again been kidnapped and taken across state lines to Idaho to undergo FLDS Church discipline and "correction" for her attempted escape. After one month in total seclusion, and under the complete control of the FLDS

Church leaders, Ruby was allowed to speak with a Utah Department of Child and Family Services representative, to whom she was coached to report that everything was alright, which orders she followed due to her indoctrination. Ruby was then returned to her parents, who then returned Ruby to her illegal marriage and to her abusive stepbrother who continued to rape her.

228.    During the months and years she was held captive under FLDS Church control, Ruby Jessop (still a young girl) continued to be raped and abused by her second cousin and stepbrother, Haven Barlow. Two years after their "spiritual marriage" Ruby and Haven Barlow were instructed by Jeffs to get "legally" married, and during the period from the date of their secret spiritual marriage, through to her later separation from Barlow, Ruby conceived six children with Barlow. In 2008, Ruby was shipped to the YFZ Ranch where she resided at the time of the Texas raid in 2008.

229.    In April 2008, Parker wrote a letter to the Texas Department of Family and Protective Services and identified his law firm as legal counsel representing the FLDS members on the YFZ Ranch, including Ruby Jessop. Parker (and through him SC&M) therefore actually represented Ruby.

230.    In 2012, Ruby successfully escaped from an FLDS compound, however she was unable to escape with her children. Upon her return and insistence that she should have custody of her children, she was denied access to them by the Colorado City Marshal's Office under illegal color of law. Blake Hamilton, Utah attorney for the Colorado City Marshal's Office, claimed that "the Marshal's Office has not ever gotten in the way of people wanting to leave the [FLDS] community," but in June 2013, the United States Department of Justice filed a complaint against the Hildale City, Colorado City and the Marshal's Office alleging civil rights violations including that the Marshal's Office "routinely uses its enforcement authority to enforce the edicts and will of the FLDS [Church]." Ruby was unaware of this action because her attorneys—Parker and SC&M—did not tell her nor advise her of her right to have her children returned to her

231.    Ruby filed a pro se Petition for Emergency Temporary Custody of her children with the Mohave County Superior Court in Arizona and sought to have her petition served on Haven Barlow. However, when investigator Sam Brower and Mohave County Investigator Gary Engles tracked Haven Barlow to the Desereta Gas Station in Colorado City, Utah, and attempted to serve Haven Barlow with Ruby's Petition and summons for a hearing scheduled for January 14, 2013, Haven Barlow left the gas station in his vehicle and the investigators followed. Immediately, and while in pursuit of Haven Barlow, four FLDS Church security vehicles followed the investigators, until moments later when Colorado City Marshal Hyrum Roundy pulled the investigators over, detained them for approximately 30 minutes, and allowed Haven Barlow—a dispatcher employed by the Marshal's Office—to avoid service. Marshall Hyrum Roundy claims that the investigators were "following too close" on the Desereta Gas Station property. Since this incident, the United

States Department of Justice has subpoenaed the surveillance video from the gas station and is investigating this matter. On its face, the actions of Marshal Roundy constituted obstruction of justice.

232.    Following this failed attempt at service of process on Haven Barlow, investigator Sam Brower filed a declaration in Mohave County court detailing the events of the failed service attempt. In response, Parker and SC&M submitted a letter to the Mohave County Superior Court stating: "I am writing to notify the Court that service of process [on Haven Barlow] has not been completed, and ask that the Court postpone the hearing until such time as [Haven Barlow] has been properly served and been afforded sufficient time to retain counsel." Despite Parker's attempt to frustrate Ruby's request for custody of her children, Judge Rick Williams in Mohave County, entered an order awarding Ruby temporary custody of her children. And, unsurprisingly, Judge Williams allowed (ordered) Haven Barlow to be served through the Marshal's Office.

233.    With her new Court order, Ruby sent Sam Brower to complete service on the Colorado City Marshal's Office where Brower went into the Marshal's Office and attempted to hand both divorce papers and the custody order to Marshall Hyrum Roundy. However, in a gesture defying the Court's order, Marshall Roundy refused to accept the papers. Brower then attempted again to hand the legal documents to Marshall Roundy to complete service on Haven Barlow and Marshall Roundy allowed the papers to drop to the ground at the Marshall's feet, again announcing that he would not accept service on behalf of Haven Barlow—one of the Marshall's dispatchers; and, then Marshall Roundy threatened to ticket Sam Brower for littering. On January 17, 2013, despite attorney Hamilton's denials that the Marshal's Office would never block access to Ruby getting access to her children, and despite Parker's attempts to frustrate and delay Ruby getting custody of her children, and only with the assistance of two Mohave County Deputies and a detective who demanded that Marshal's Office dispatcher Haven Barlow release his children, Ruby was reunited with her six children.

234.    Ruby Jessop has endured rape, abuse, kidnapping, torture, and the types of extreme emotional distress that no person—especially a child—should endure, and in the end, only through her heroic efforts and determination was she able to escape the FLDS Church and rejoin her children.

235.    As discussed extensively herein, Ruby did not know (nor, under these unique circumstances could she be expected to know) that she had been subjected to unlawful activity for which remedies were available to her at law and equity due to her isolation and the knowing, intentional, fraudulent, and/or negligent misrepresentations by Jeffs, Parker, and SC&M coupled with the indoctrination by Jeffs and his favored cohorts until she escaped from the FLDS and obtained new counsel. Nor did Ruby know of or understand Parker and SC&M's involvement in this scheme until long after she had left the FLDS.

236.    Ruby believed that Parker and SC&M were representing her interests and trusted them as her legal advisors. If Parker and SC&M had complied with their legal and ethical duties, including but not limited to avoiding legal representation that was expressly adverse to their client, Ruby, and advising Ruby of her legal rights and the facts surrounding Jeffs' illegal acts and admission of fraud, Ruby would have left with her family the FLDS much earlier and avoided the extensive financial, physical, emotional, and psychological injuries she suffered.

## C.  Susie Broadbent

237.    It was the absolute control over Susie Broadbent and her family exercised by the FLDS Church and the lawyers who she believed were protecting her that directed the major events in her life before she escaped from the FLDS Church.

238.    Defendant Jeffs commanded Susie Broadbent to enter into a "spiritual marriage," with her 51-year-old cousin when she was 16 years old. Jeffs performed the marriage in secret as the "mouthpiece" for his father, Rulon Jeffs, who had suffered a stroke.

239.    She and her husband spent that night together. He slept with his arm draped over her. The next day she told her mother she was pregnant because she had slept with her husband. Her mother asked questions and then explained sexual relations (particularly in the husband-wife context). Before that time, Susie Broadbent had never received any kind of sexual education. She had never been informed about, nor did she understand, sexual relations. She was never informed of her right to refuse consent (or that she was not old enough to consent) because her attorneys—Parker and SC&M—never told her.

240.    After she learned what it would take to get pregnant, she was shocked and wanted nothing to do with sexual relations or having babies. Her "husband" already had eleven children with his first wife and four of them were older than her. Refusing to have sex with him put her in direct conflict with FLDS leaders and she had to meet regularly with Jeffs who commanded her to submit sexually to her "husband." The pressure on her became so intense that eventually she had to hide in the canyon above Short Creek to avoid being raped. After she returned from hiding, she succumbed to the pressure to have sex with her "husband" on the night before September 1, 2003. She was not capable—legally or psychologically—of consenting.

241.    She had no children but did have miscarriages, which are known to the medical community to cause severe physical and emotional distress. She was also raped by one of the sons of the first wife of her cousin and was told that she did not deserve to see a doctor. By then she was considered "rebellious" and in need of being "corrected," so she was kidnapped and put in a house in Colorado City with another woman who was also being "corrected." When she acted out by starting to drink and smoke, she was forced farther away and taken to a home in a Mesquite,

70

Nevada. Eventually, it became possible to escape the FLDS Church, which she did, but was immediately cut off from all contact with her FLDS family.

242.    After "marrying," it had become impossible for Susie Broadbent to complete the ninth grade because as a young wife (rape victim), she was expected to obediently take care of a FLDS household. Her experience was typical of the FLDS (including many of the Plaintiffs). Indeed she knew very few FLDS boys who were able to go beyond eighth grade because they had to go to work to earn money for their families and the Prophet and many FLDS girls were taking care of families and being forced into "marriage."

243.    As discussed extensively herein, Susie did not know (nor, under these unique circumstances could she be expected to know) that she had been subjected to unlawful activity for which remedies were available to her at law and equity due to her isolation and the knowing, intentional, fraudulent, and/or negligent misrepresentations by Jeffs, Parker, and SC&M coupled with the indoctrination by Jeffs and his favored cohorts until she escaped from the FLDS and obtained proper new counsel.

244.    Susie believed that Parker and SC&M were representing her interests and trusted them as her legal advisors. Had Parker and SC&M complied with their legal and ethical duties including but not limited to avoiding conflicts in the representation of their clients and advising Susie of her legal rights and the facts surrounding Jeffs' illegal acts and admission of fraud, Susie would have left the FLDS much earlier and avoided the extensive physical, emotional and psychological injuries she suffered.

**D.  Gina Rohbock**

245.    On December 28, 2001, at the command of Defendant Jeffs, Gina Rohbock was "spiritually married" at age 16 to 23-year-old Richard Rohbock. Although Gina did not meet Richard until the day of her "spiritual marriage" to him, he soon engaged in sexual relations with her for the purpose of raising up 'good Priesthood children' as commanded by Jeffs. On April 29, 2002, Gina legally married Richard, and they remained married for 12 years. Gina lacked the legal capacity to consent to sex or marriage given the oppression of the FLDS system that Parker and SC&M aided and abetted.

246.    Gina recalls many FLDS church meetings she attended in which the FLDS leadership gave reports over the pulpit to the congregation about "what our lawyers are doing for us," in which SC&M and Parker were identified or commonly known to be the lawyers for the FLDS people.

247.    In early 2007, Gina, Richard and their two children, Kile Lee Rohbock (age 5) and Robin Alayn Rohbock (age 2) were living in Heber City, Utah, in a house they had been placed in

by the FLDS-run company that Richard was working for at the time. The house had three bedrooms upstairs, two common rooms downstairs, and housed Gina, her family and on average 7 to 10 FLDS men. Richard and the other men worked for the FLDS controlled company, Beagley & Sons Concrete (now known as Phaze Concrete) and were constructing part of the Canyons Ski Resort in Park City, Utah. Gina was tasked by FLDS leadership to cook for and clean up after all the residents of the household. She was not compensated for her service, and her family lived on Richard's paychecks from Beagley & Sons less what the Prophet demanded in tithes (including payments to Parker and SC&M).

248.     In late 2007, Gina attended a company meeting at which it was discussed that Beagley & Sons had "donated" $1,000,000 in 6 months toward attorney fees and the company had been asked to give more. The owner of the company, John Beagley, recommended that everyone forego their *entire* paycheck to pay SC&M's fees, and ask the company to provide their necessities instead.

249.     Gina and Richard refused to forego their paycheck and instead asked that Richard be paid an hourly rate, rather than the daily rate he was then being paid, due to the extreme hours he was working. Richard regularly worked extremely long-hour weeks, sometimes working 24 hours at a time, sleeping 8 hours, and then returning to work for another 24 hours.

250.     Beagley & Sons agreed to pay Richard an hourly wage. Gina and Richard stayed with Beagley & Sons for another 4 months, although Richard received a full paycheck only once or twice during that time. The money was being withheld involuntarily from Richard's monthly paycheck to pay lawyers, including Parker and SC&M, who were part of Defendant Jeff's criminal defense team in Utah.

251.     Toward the end of that 4 months, in early 2008, Beagley & Sons began docking Richard's paycheck to such an extreme that Gina and the family did not have enough money to live on. Although Richard was working 24 out of every 32 hours, the company only paid him for 8 hours or less to avoid paying overtime.

252.     Around March 2008, Richard quit working for Beagley & Sons because of the significant underpayment of his wages. At that time, he was offered a job by Wadman Corporation in Salt Lake City. Wadman had been subcontracting Beagley & Sons for construction on the Canyons, and unlike Beagley & Sons, was not run by the FLDS Church. Wadman offered to hire Richard to take over construction on the Canyons and allowed him to hire his own team to work with. Wadman also offered Richard, Gina and the family a house in Salt Lake City, starting pay of $45.00 per hour and a raise after training.

253.     Richard wanted to take the job and reached out to Lyle Jeffs, FLDS bishop and

favored cohort of Defendant Jeffs, to notify him of the opportunity, as was required of the FLDS. Upon information and belief, knowing that allowing Richard to accept the position with Wadman would take money from Beagley & Sons (who had been donating large amounts of money to pay the FLDS' attorney fees, including fees to Parker and SC&M), Lyle Jeffs instructed Richard "stay with a Priesthood company" and not take the job with Wadman.

254.    Although by this point Defendant Jeffs had been arrested, was being held in the Purgatory Correctional Facility in southern Utah and had admitted on several occasions that he was not a prophet, those admissions, along with the facts known to his defense team as to the nature of Defendant's Jeffs illegal conduct and future convictions (including the audio recording of Jeffs raping 12-year-old Merrianne Jessop) were hidden from Gina and Richard by FLDS leadership, Parker, and SC&M. Had this information been known to them, and proper legal advice provided by Parker and SC&M as both owed to Richard and Gina as their clients, Richard and Gina would not have remained in forced labor but would instead have accepted the position with Wadman.

255.    Gina and Richard based their decision to listen to Lyle Jeffs' order and not take the job with Wadman on their belief that Defendant Jeffs' was The Prophet, which belief had been induced and maintained by the Defendants through fraud.

256.    Around March of 2008, Gina, Richard and the family moved to southern Utah where Richard worked odd jobs with an FLDS company called Sunderland for about a month. Sunderland then merged with Sonora Sun Construction and moved Gina and her family out to Wyoming for a month, then to Great Falls, Montana around May 2008.

257.    In Montana, Richard, Gina and their young children were moved into a house with 27 other people, and Gina was once again tasked with cooking for and cleaning up after the residents of the house. She was not compensated for her efforts, and Richard rarely received even a partial paycheck from Sonora. His entire check was regularly withheld to pay FLDS attorney fees. Gina knew the checks were being withheld to pay attorney fees because the weekly FLDS Sunday meetings were broadcast over a television to her household and FLDS leadership regularly demanded more and more money from all FLDS for attorney fees. During this time $1,000 to $2,000 "donations" were also demanded from each parishioner at least once a month for the express purpose of paying attorneys' fees.

258.    During the first year in Montana, Richard received no pay, though Sonora provided Gina and her family food and the most basic of necessities. After close to a year in Montana, in the summer of 2009, Gina contracted an infection that needed long-term medical attention. She and her children moved back to southern Utah without Richard for medical care and, due to Richard's extreme work schedule (as mandated by the FLDS Church due to the need to pay

attorneys' fees to Parker and SC&M among others), she and her children did not see Richard for 5 to 6 months.

259.    Gina returned to Montana around January 2010 and found that conditions there had severely deteriorated. Sonora had quit providing the large household with the necessities they needed to survive. Gina's little family was starving. Also in early 2010, Gina's son's health deteriorated and he had to be hospitalized. While in the hospital with her son, Gina could not cook the little food she had for the family, and Richard could usually only find the time to bring them one meal a day at the hospital. Gina knew she could not apply for food stamps or any other government aid during this difficult time because Sonora was falsely reporting that they paid Richard a full salary, despite keeping his entire paycheck to pay attorney fees.

260.    At one point, around 2011, when Lyle had requested a total of $4,000 from each elder to pay attorney's fees, Richard permitted Sonora to withhold $2,000 to go toward the requested amount, but Sonora withheld the entire $4,000 and donated it to FLDS leadership without Richard's consent. When Richard questioned where the rest of his paycheck had gone, Sonora explained they withheld the entire $4,000 because they assumed that is what Richard would have wanted. Richard then called Lyle to beg for the ability to send Gina to get food from the Bishop's Store House because they had no money to feed their family. Lyle said Gina could get food from the Store House but only if she paid for it. Richard then tried to explain to Lyle that they had no way to pay for it because his entire paycheck had been donated to attorney's fees. Lyle thanked them for their donation and recommended Richard take out a loan on the title of his car to feed his family rather than retaining any of his paycheck in the future. Richard obeyed and took out a title loan.

261.    There was barely enough food to survive, and Gina gave all of the available food to her young children, rarely eating any herself. During that time, she had a family member from Short Creek give her some over-the-counter HCG, an appetite suppressant, and she began regularly injecting herself to dull the pains of hunger. HCG dosing was a popular method among the FLDS at that time to cope with their lack of food. Most of the FLDS she knew during this time, who were not favored by Jeffs, were starving in order to meet the constant demands for large attorney fee payments. They were not just slaves, they were starving slaves being worked to death to pay for the legal defense of the Prophet and his chosen cohorts.

262.    After a month of dosing, coupled with severe malnourishment, Gina became extremely ill. She could not sleep, became very depressed and paranoid, and experienced memory loss and decreased mental capacity. Richard quit working for Sonora and begged the FLDS leadership for enough money to move his family back to southern Utah to get help for Gina.

263.    Gina was hospitalized for a week in the St. George Dixie Regional Medical Center

where she was treated for malnutrition and emotional distress. She developed a metabolic disorder, likely due to the malnutrition and HCG dosing, that will continue to affect her for the rest of her life. Had Parker and SC&M could have complied with their duties to Gina, she would have been able to make an informed decision and avoid the conditions that ultimately lead to this life-altering illness.

264.    Gina and Richard left the FLDS Church in or around February 2012 because they could not reconcile the perverse teaching and requirements imposed by Defendant Jeffs with what they had been taught by their parents and the FLDS prophet during their youth. After they left, some FLDS friends who had left before them showed them the video of Defendant Jeffs' confession in the Purgatory Correctional Facility and told them about the young girls that had been raped at the YFZ Ranch in Texas. Gina was appalled. She had had no idea what had been happening in the church, nor did she have any knowledge of the crimes for which Defendant Jeffs had been convicted in Utah and Texas. As discussed above, Parker and SC&M had actual knowledge by this point that these crimes had occurred, that individuals (including Jeffs) had been convicted of perpetrating or aiding them, and that Jeffs had admitted that he was no prophet but just a fraud and a rapist.

265.    Again, had Gina had any understanding of what was occurring in Texas or of Defendant Jeffs' confessions and convictions at the times these events actually occurred, she and Richard would have left the FLDS Church and Short Creek and would not have turned down the Wadman job offer.

266.    As discussed extensively herein, Gina did not know (nor, under these unique circumstances, could she be expected to know) that she had been subjected to unlawful activity for which remedies were available to her at law and equity due to her isolation and the knowing, intentional, fraudulent, and/or negligent misrepresentations by Jeffs, Parker, and SC&M coupled with the indoctrination by Jeffs and his favored cohorts until she escaped from the FLDS and obtained proper new counsel.

267.    Gina believed that Parker and SC&M were representing her interests and trusted them as her legal advisors. Had Parker and SC&M complied with their legal and ethical duties including but not limited to avoiding conflicts in the representation of their clients and advising Gina of her legal rights and the facts surrounding Jeffs' illegal acts and admission of fraud, Gina would have left the FLDS with her family much earlier and avoided the extensive financial, physical, emotional, and psychological injuries she suffered.

**E.   Jason Black**

268.    Jason Black was born, raised and married in the "Work," part of which later became

the FLDS Church. Until he left the FLDS Church with his family, he was, by Jeffs' standards, faithful, obedient and attended church meetings in which regular legal updates were given by Sam Barlow, Willie Jessop or others to the FLDS about the status of lawsuits and legal issues related to the FLDS. In those meetings two things were clear to him: Parker and SC&M were the lead attorneys for the FLDS (including the Plaintiffs) and the attorneys needed to be paid by the FLDS for their representation. After Jeffs' arrest in 2006, calls for money to pay the lawyers increased. After the state of Texas raided the YFZ Ranch in 2008, those calls increased yet again.

269.    As a boy, Jason understood that the FLDS felt they were a persecuted people, but that Parker and SC&M would protect them. As discussed above, this is a classic type of oppression wherein the oppressed actually believe that the oppressor is their friend and protector. As a people, the FLDS strived to be perfectly united with their leaders and each other to fall under this legal protection. During all of these years, Jason believed that Parker and SC&M had the people's full interests at heart. He was assured regularly that they were *his* lawyers as well as the lawyers for all the FLDS, including their leaders and the other Plaintiffs. The FLDS were certainly not free to have other lawyers represent them in any way that could impact the people's culture or beliefs. They would not even think of it. If a legal problem arose, the people were put in contact with the Lawyer Defendants. It was literally heresy to retain counsel other than Rod Parker and SC&M unless given explicit permission by Jeffs directly or through other FLDS leaders.

270.    In early 2012, some of the strange things Jason had seen under Jeffs' reign, which he had obediently "put on the shelf" and dismissed from his mind as disloyal thoughts, began to break that barrier. As he began to talk with a friend and consider some of these strange things, more and more of them began to weigh the shelf down until it finally broke. One of the heaviest and last things Jason tried to put on the shelf was the United Order ("UO") teaching that began at the end of 2011.

271.    These teachings threatened to further separate FLDS families. Jason has seen at least a hundred fathers and a dozen mothers sent away from their families, sometimes leaving their children without parents. As the UO teachings were unfolded in late 2011 and early 2012, his biggest fear began to be realized. He was deemed unworthy to be in the UO, but his wife and six daughters were considered worthy to be members. This meant that he would be separated from them. At first, he and his wife were required to separate themselves physically, live in different parts of the home, avoid any physical contact beyond handshakes, and to limit their conversations. As the UO wedge was driven deeper between parents and children, most communications between UO members and non-UO members were stopped, they were required to eat separate food, use separate refrigerators, keep secrets from each other, and, often, live in different places. Again, this is a classic process of oppression by otherization. Yet there was no legal effect to these orders, and none of the FLDS leaders had the lawful authority to separate these families. But Parker and

SC&M failed to advise Jason and the other affected Plaintiffs that they had the right to refuse to be separated. By saying nothing, Parker and SC&M breached their duties to their clients—including Jason.

272.    Based on the facts that Jason had been learning 'outside knowledge' from a friend (an Apostate by Jeffs' definition), he was able to carefully share some of that information with his wife and thus help her ready herself to resist the requirements of the UO. As those requirements became more severe, she was ready to remain with Jason and able to keep the family intact when efforts were made to send him, and then her, away from their children. As a result of having that rare knowledge, Jason was able to keep his immediate family intact, but he lost all but one of his extended family members. He, his wife and their children are considered apostates and share in the heartache suffered by thousands of the FLDS. In addition, he lost his job at an FLDS Church controlled business, and despite his efforts to start his own business in Short Creek, has not been able to fully replace his income because the FLDS Church boycotts apostate business. Although Jason eventually escaped with his core family unit intact,  Parker and SC&M's actions significantly delayed their escape. It was not until much later—less than a year before the instant action was commenced—that Jason learned of Parker and SC&M's misuse their powers as lawyers to make his victimization possible.

273.    After Defendant Jeffs gained control of the Trust, the FLDS people's homes and the FLDS themselves, he engaged in a pattern and practice of separating his followers. First, hundreds of boys and fathers were expelled or sent away to repent and/or work for the FLDS enterprise, then dozens of women were also expelled or sent away to repent and/or work for the FLDS enterprise. "Repentance Homes" were established for this purpose throughout the western states for many of these men and women. Other Repentance Homes were established for boys or girls who are said to need training. At Jason's work, male and female employees had to work separately. Later, his workplace was further divided with UO and non-UO employees working separately. These and other types of separations which divide familial and natural associations had become commonplace.

274.    This ongoing pattern and practice of separating the FLDS has several purposes. First, it keeps the FLDS living in fear of being considered disobedient; second, it makes them strive with all their might to qualify for membership in the UO; third, it limits contact and communication between family and friends leaving the FLDS more vulnerable; and, most importantly, it ultimately separates children from parents so that the children can be trained and raised up to only identify with the leaders of the FLDS Church. *Any* of these four purposes could have been thwarted by timely legal advice from Parker and SC&M that informed Jason and the other Plaintiffs that it was their choice to live this way and there was legal recourse available to them if they elected to leave.

275.     Indeed, like many former FLDS (including the Plaintiffs), shortly before the filing of the instant lawsuit, Jason learned of the critical role the Lawyer Defendants played in the scheme to defraud the FLDS people and felt betrayed and angry. If Parker or SC&M had complied with their legal and ethical duties and avoided conflict in their representation and told the critical truth to the FLDS, innumerable injury to the FLDS, their families and their finances would have been avoided. If they had simply informed FLDS Church leaders: "If you don't tell the people the truth about Warren Jeffs, we will let them know," the same injury would have been avoided. But they did not share that information with any of the FLDS, except the leaders who were helping perpetuate the fraud, indeed they did not even begin to withdraw until years after other lawyers and law firm began to fill their role. The Lawyers Defendants took advantage of the FLDS' sincere religious beliefs regarding their loyalty to, and obedience of, Jeffs and his absolute control over them. It was the perfect storm and they made millions of dollars at the expense of the FLDS for which Jason and similarly situated Plaintiffs (as identified herein) should to be made whole—or at least as whole as the American judicial system can make them with mere money. Had Parker and SC&M discharged their duties to Jason, he would have chosen to protect himself and his family by leaving the FLDS Church much earlier.

## F.  Nolan Barlow

276.     Nolan Barlow, a son of Sam Barlow, was raised in the FLDS Church before it became a dangerous cult under Jeffs. When the internet became available, he set up his father's email and a chat program to aid his father's communications with Parker. Through this and other interactions involving Parker, he, like the other FLDS (including the other Plaintiffs) knew that Parker had become the 'main lawyer' for the FLDS and the individual Plaintiffs. His father regularly referred to them as "their" lawyer in meetings (which Nolan's father recorded) and Parker spoke on their behalf in newspapers and on television news. Parker was considered by the FLDS people to be both their attorney and their spokesperson.

277.     When Jeffs was arrested in August 2006, Nolan did not know why. Nor did he know why Jeffs was tried in September 2007. Nolan's father, who had worked for years with the Lawyer Defendants regularly reported on the legal issues to the FLDS at their church meetings, had been sent away in March 2006 to 'repent at a distance.' This critical information that undermined the very foundation of Jeffs oppression (his purported divine infallibility) was not available to Nolan or the FLDS (including the other Plaintiffs) through the FLDS Church, and non-FLDS sources were strictly off limits. Moreover, the Lawyer Defendants disclosed nothing about *why* Jeffs had been arrested to the FLDS, who, like Nolan Barlow, were sacrificing to pay SC&M's legal bills to defend Jeffs and the FLDS generally.

278.     When the State of Texas raided the YFZ Ranch, Nolan remained ignorant of Jeffs' repeated admissions and the widespread practice in Texas and elsewhere of raping young girls, so

when he was instructed to help design websites to get FLDS children out of the custody of child protective services in Texas, he did so. Indeed, he dug in with gusto, strove to be absolutely obedient to the Prophet who was running the FLDS Church from prison, and within a year after the United Order was introduced for only the worthiest FLDS, he and his wife, LaRee, were inducted.

279.    The United Order meant more restrictive commandments which were difficult to understand so Nolan began investigating to prove the correctness of the restrictions. He also spoke with his brother, Derrell and others who were deemed "apostates" in an effort to convince them they had been deceived. During this process, he learned some of the critical facts that had been kept from him, including Jeffs' confessions which should have been brought to the FLDS and the mysteriously unknown evidence from Utah and Texas that had led to Jeffs' convictions.

280.    This investigation led Nolan to two conclusions: first, that he and the FLDS, not the apostates, had been deceived and, second, that the deception was systematically destroying the FLDS. He also came to realize that the people were not going through "religious tests," as he and the FLDS believed, but were in fact being defrauded through their sincere religious beliefs because critical facts were being kept from them deliberately by their leaders and lawyers who had schemed to take advantage of them. He eventually realized that there had long ago come a point where the leaders and lawyers inescapably knew that they were hurting the FLDS on a large scale and their failure to do anything about it was inhumane.

281.    Had Nolan been advised, for example, of Jeffs' admissions that he was not a prophet, he and his family would have been free to make their own religious choices, would have left the FLDS Church years earlier and would have avoided years of oppression, servitude, financial exploitation and heartache. As it was, he had been a member of the United Order, had lived in what he now recognizes as fear, had given all he had—his personal property, his framing tools and equipment for work, his computers etc.—to the FLDS Church, and each member of his family had done the same, receiving back very little.

282.    Nevertheless, Nolan still understood that Parker was representing his interests as a member of the FLDS Church just as much as the Prophet's or the interests of any other FLDS, and, like the FLDS, he was taught to look to Parker and SC&M for himself, his wife and children if a legal matter arose. He had seen example after example of FLDS people with legal problems contacting FLDS leaders who then referred them to his father or other legal liaisons for the church who, in turn, would contact Parker and SC&M. The Lawyer Defendants served not only as counsel for all the FLDS, but if there was something they could not handle, they would act as a clearinghouse to control FLDS legal representation. That system helped capture the FLDS as clients of the Lawyer Defendants, who, unknown to the FLDS, were doing the bidding of the leaders and keeping their secrets, prevented the FLDS' discovery of critical facts and made the

Lawyer Defendants millions of dollars.

283.    Although Nolan later discovered the wrongness of Jeffs actions, he was not capable of determining the *legal* wrongness of Defendants' concerted and coordinated wrongs, nor even the fact of his *legal* injuries, because Parker and SC&M were actively withholding that information from him in direct violation of their duties to him as a client, and thereby injuring Nolan and his family.

## G.  May Musser

284.    May Musser, who is now 19-years-old, was born and raised in the FLDS Church as a niece of Defendant Jeffs and his brother, Lyle Jeffs. She successfully escaped in fear of being forced into a sexual relationship with an adult **male** member or leader of the FLDS Church by FLDS leaders, including Jeffs, who continues to oversee and run the criminal enterprise from prison in Texas. When her mother and others, who have been kept in the dark by FLDS leaders and lawyers, came after her and got her into their car to take her back, she screamed, fought and made such a scene that they finally let her go.

285.    At age 13, May was illegally required to work at the Hildale Clinic under her older sister's name and fulfilled duties including making patient and staff meals, changing diapers in the nursery, **and** cleaning the birthing center. Although payment was made for May's services, her paychecks were made payable to her older sister and were surrendered to the FLDS Church as part of the church mandated common practice of labor law violations and tax evasion—a portion of which proceeds went to pay the legal bills of Parker and SC&M.  As a girl, May was also required to perform manual work for which she was not paid, which caused an injury to her back, and was not allowed the medical care she needed. Tax and labor laws were violated so that money earned by the FLDS could be used by FLDS leaders to pay attorneys. May recalls seeing entire wheelbarrows at the entrance of the FLDS meetinghouse to collect money "for the lawyers," who May understood to include Parker and others at or affiliated with SC&M who she believed represented her personally.

286.    As an FLDS girl, May knew that she would never be allowed to attend public school, or be given the opportunity to receive a high school education, and feared that the time for her education was running out.  Nevertheless, she tried desperately to obey and was allowed into the United Order.  After being admitted with her family into the UO, May's father was expelled from his family and the FLDS Church and she feared her family would be further divided and split up based on FLDS leader decrees about who was allowed to be a UO member. After her father was ejected, Lyle Jeffs told May "you no longer have a father" and "you can never see him again." Had May known, as Parker and SC&M had a duty to inform her, that Jeffs and his ilk had no lawful authority to terminate her father's parental rights, she would not have lost her father.

287.    May found life as a UO member of the FLDS Church increasingly unbearable, as the strict UO restrictions of what food she could eat, the activities in which she could participate and which family members she could live with got increasingly worse.  Her foremost stressor was living day-to-day with the expectation that a knock at her door would result in her being separated from her mother and siblings and being forced into a traumatizing forced sexual relationship, as had occurred with so many others.

288.    After May was introduced to some of the increased restrictions placed on the UO members, she realized that she could not comply. She and her sister, Rachel, decided that they had to flee.  At that point, they were living in the fortress-like walled Jeffs' compound in Hildale, Utah. May and Rachel used their knowledge of a blind spot between the Jeffs' compound's numerous surveillance cameras, eluded detection and tried to escape by scaling the compound wall in order to hide in the red-rock mountains above Hildale.  They had nowhere else to go. While they were fleeing, their mother, who had somehow learned they were gone chased them with her car and caught them.  May was then handed a phone and found that it was Lyle Jeffs who wanted to speak with her.  They spoke about her father who had been sent away and May was told she was not worthy to be a UO member and that she would have to be moved to a repentance home.

289.    May was "corrected," that is sent away to a home of repentance or correction, where she was cut-off from most communication with her family and watched over by an FLDS "caretaker." While there, she was required to repent and attempt to show her devotion to the FLDS Church—or risk permanent disassociation with her family and community.

290.    May's sister, Vilate Musser, had been separated from her young children—in other words, they were kidnapped from her—and moved to a different repentance home for her correction, but was able to visit May occasionally.  Together, they planned to escape from Short Creek. They came up with a plan to leave when Vilate was allowed to go to an appointment with an eye doctor in St. George.  They had been able to make contact with a sister who was already out of the FLDS and she agreed to wait for them at a park in Short Creek and then whisk them away.  They successfully fled in their sister's car, but Vilate was unable to take her children, who were left in the possession of the FLDS because FLDS leaders had previously kicked the children's father out of the FLDS Church—something they could not have accomplished, as discussed repeatedly herein, without the oppressive perpetuated by Parker and SC&M.

291.    When it was discovered that May and Vilate had not returned from Vilate's appointment with the eye doctor and that they were at their brother Brigham's home in Ivins, Utah, May's mother, Mary Jeffs, came to the home and demanded May's return to the FLDS, but May refused and resisted her mother's demands. Mary Jeffs contacted the Ivins police who forced May, as a minor, into her mother's car. Mary Jeffs then drove May through the streets of St. George, Utah, arguing and debating with May about her return to the FLDS Church and May continued to

refuse to rejoin. Mary called FLDS Church leader, Lyle Jeffs, and had May speak with him, but still May refused to return and resisted in every way possible. Lyle Jeffs explained the consequences of her decision and asked if May was an "apostate" to which May responded, "Yes, I am."

292.    Having quickly acknowledged her apostasy from the FLDS Church and the life to which she was destined as a teenage girl, Lyle Jeffs wanted no more to do with May and her mother drove May back to Brigham Musser's home at which point mother and daughter parted ways, permanently severing May's ties to her family. A few days later, however, May accompanied Vilate and another brother while they returned to Short Creek to demand and secure Vilate's children.

293.    As a result, May was labeled a "Forever No Member" and a "Child Murderer" for having helped get Vilate's children out of Short Creek, and therefore, having "turned traitor to the Prophet," May can never return to the FLDS. Cut-off from the FLDS, May lives without the association of most of her 47 siblings, who Parker and SC&M have denied the knowledge that they are the ones being mistreated.. Thus, May's interests have been harmed as a direct result of Parker and SC&M's breach of their duties to her as their client.

**H.  Holly Bistline**

294.    Holly Bistline was born and raised in Short Creek as part of the FLDS Church. In December of 1991, she married Leslie Bistline with whom she later had four children, Derek, Alyssa, Triston, and Monte. In late 2003, Jeffs instructed Holly to divorce Leslie Bistline, and in compliance with that directive, she contacted Sam Barlow who referred her to Parker, who, in turn, handled their divorce. Earlier in July of 2003, Jeffs had sent Leslie Bistline away from his family to repent at a distance for reasons never understood, and he eventually moved to Idaho. Thereafter, neither Holly, nor her children, had any contact with Leslie Bistline for some 10 years. The family grieved for the loss of their husband and father as if he had died. Holly was not aware—because Parker and SC&M failed to tell her, despite their representation of her during the divorce proceedings in addition to their actual or implied representation of her as an individual member of FLDS (like all of the Plaintiffs)—that she could not be compelled to divorce her husband.

295.    On January 18, 2004, Holly was reassigned by Jeffs to "spiritually marry" James Parley Jessop with whom she had three children, Alma, Parley and Andrea. Holly was his second wife. On April 20, 2013, FLDS Church leader Lyle Jeffs instructed Holly to leave her home with her children and live apart from James Parley Jessop. Due to his obedience to Defendant Jeffs, James Parley Jessop has contacted Holly only twice since April 2013. Holly was able to keep most of her children, although her oldest son, Derek, who had worked with James Parley Jessop on a framing crew since he was about 11-years-old, stayed with his spiritual father, and her sons Triston

and Monti who had been sent to a boys' house by Lyle Jeffs because they were older than 12 and not members of the United Order. The separation from James Parley Jessop was welcome by Holly because he was abusive, but Holly's separation from her sons was extremely painful and lasted until she was able to extract them from the boys' house when she escaped with the other minor children. Holly was not aware—because Parker and SC&M failed to tell her—that Jeffs had no legal authority to terminate her parental rights or separate her from her children.

296.    Her oldest son, Derek, was living with her second spiritual husband when Holly fled the FLDS Church in December 2013, and, since then, Derek has refused to have any contact with his mother, his biological father, Leslie Bistline, or any of his non-FLDS siblings, despite many attempts by his mother to contact him. Holly's oldest daughter, Alyssa, is an adult and was previously a plaintiff in this action.

297.    Before leaving, Holly had no way to fully recognize how much fear and hardship she and her children had been living in as the religious movement she was born into evolved under Jeffs. Like all of the FLDS people she knew, she came from multiple generations of Mormon Fundamentalists and had gradually become vulnerable to exploitation due to her religious sincerity, absolute obedience and the complete trust she had placed in her leaders and the Lawyer Defendants that she thought were protecting her. Despite her trust and the great fear she had been taught of the outside world, life in the FLDS Church had become unbearable for her and her children. The stakes were enormous as she weighed her children's temporal and eternal lives in the balance.

298.    If she had known the basic truth about Jeffs—a truth that Parker and SC&M knew but actively concealed from her—she would have made her choice years earlier. But that information had been intentionally kept from her by her own attorneys. Thus, the idea of leaving with her children terrified her; she had been taught that the outside world was evil, that her children would be destroyed, and it was widely believed in the community that if a mother were to leave with her children, "their blood would be a stain on her skirts forever." Still, Holly had to leave and take that risk.

299.    Leaving the FLDS Church did not result in the destruction of her children as she had been taught. They are safer and happier than they have ever been. But leaving did cost her and her children the associations and relationships they had with parents, brothers, sisters, and most of her extended family and friends. Their FLDS loved ones treat them as apostates and refuse to have any contact with them. Her family also lost their means of financial support even though Leslie Bistline is helping them. They are heartbroken that their loved ones, including Derek, have not been told the truth about Jeffs by the leaders and attorneys (Parker and SC&M) that represent them and in whom they place their trust.

300.    Holly did not learn of Parker and SC&M's involvement in perpetrating Jeffs' religious scheme until long after she left the FLDS. Had Parker and SC&M complied with their legal and ethical duties including but not limited to avoiding conflicts in the representation of their clients and advising Holly of her legal rights and the facts surrounding Jeffs' illegal acts and admission of fraud, Holly would have left the FLDS with her family much earlier and avoided the extensive financial, physical, emotional, and psychological injuries she suffered.

## I.  Lawrence Barlow

301.    Lawrence Barlow was born and raised in Short Creek. At the age of 12, he started working at an FLDS Church-run dairy. At age 14, he was ordered to work at the fire department in Colorado City, Arizona.

302.    He was later employed as a public safety dispatcher for the Town of Colorado City where he worked from 1992 until he was expelled from the FLDS Church.  Lawrence went to school for, was trained in and gained certificates and licenses in various careers, including but not limited search and rescue, firefighting, the police academy and nursing. With each career path, the FLDS leadership directed Lawrence to redirect his efforts in another direction or stifled his ability to maintain his certificates and licenses, depriving him of multiple opportunities for continued employment, future employment and earning potential.

303.    At age 18, he was invited by the then-FLDS Prophet, Rulon Jeffs, to serve on Rulon's personal security detail, working under Wendell Nielson. In 1991 or 1992, FLDS Church security became an official calling and Lawrence was made a part of the security force until Defendant Jeffs took control of the security force in 2002, and Lawrence was dismissed shortly thereafter.

304.    On one occasion, Lawrence accompanied Rulon Jeffs, LeRoy Jeffs, Sam Barlow and Defendant Jeffs to lunch in Salt Lake City where they met with one of the church-sanctioned, FLDS lawyers (known by the FLDS people to Reed Martineau, Rod Parker, Damien Smith and Ken Okazaki).

305.    Damien Smith distanced himself from FLDS legal matters after *Jeffs v. Stubbs*, 970 P.2d 1234 (Utah 1998). In *Stubbs,* the UEP Trust tried to prevent ex-FLDS members from retrieving property they had contributed to the Trust. Lawrence believes this is because Smith could see how the lawyers were being used to take advantage of the FLDS people and did not want his professional reputation damaged.

306.    Lawrence was good friends with Rodney Holm, who was prosecuted by the State of Utah for unlawful sexual conduct with a minor as a result of a "spiritual marriage." Holm was represented by Parker, who Lawrence personally met with throughout Holm's prosecution. It

became quickly apparent to Lawrence that there was a process you were required to follow as a member of the FLDS Church to obtain legal assistance. First, you approach the Prophet for guidance and counsel. Lawyers were not favored by the FLDS—at least until Jeffs was arrested— and if a lawyer was to be used, it was common knowledge that you should only use one that has been "approved of the Lord," as dictated by the Prophet. If a personal legal matter arose that the Prophet felt should be defended, he would direct individual FLDS members to meet with "Brother" Sam Barlow, the legal liaison, who would then connect the member with the approved FLDS lawyers, typically Parker or someone else at SC&M.

307.    Lawrence understood that the FLDS lawyers were "our lawyers" representing "our best interest." Based on his personal experience and observations and noted above, he did not perceive them as the Prophet's lawyers or the Church's lawyers; they were the FLDS members lawyers—meaning his personally as well as the personal lawyers of each individual Plaintiff.

308.    Around 1993 or 1994, Rulon Jeffs asked that all elders give $500 per month as a donation toward attorney fees. Later, around the time of Rulon's death in 2002, Defendant Jeffs spoke on behalf of Rulon, raising the requested attorney fee amount to $1,000 per month from each elder. Lawrence faithfully made these monthly payments as often as he could, which he believed were going to approved FLDS lawyers such as Parker and SC&M, up until Lawrence was expelled from the FLDS Church in 2012.

309.    Lawrence was assigned to spiritually marry Ida Markay Jessop Barlow on January 12, 1996. Their "legal" marriage occurred on December 6, 1996. Lawrence and Markay had ten children, five daughters and five sons. Their marriage has been happy, but not without significant challenges.  Two of their sons have passed away and the remaining three sons have profound mental and physical disabilities, which require constant care by Lawrence, Markay and their daughters.

310.    Despite his sons' physical disabilities, the FLDS leadership constantly moved Lawrence and his family into different houses, many of which were not disability friendly. With each move, Lawrence was expected to renovate or remodel the house to make it livable for his family. When FLDS leadership thought another family was better suited for the house Lawrence had remodeled, Lawrence and his family were moved again and lost the significant time and financial investments put into the houses. Lawrence did not know—because Parker and SC&M did not tell him—that Jeffs had no legal authority over him. Indeed, Parker and SC&M knowingly and intentionally created the very framework with the Trust that caused Lawrence to live on land that Jeffs ruled with an iron fist and subject to his oppression and control. Though Lawrence, an adult, could have voluntarily chosen to donate his property to the Church and follow the dictates of Jeffs to live in the location that Jeffs selected, he did so here without being fully informed of the relevant facts and law and ultimately suffered the loss of time and investments that he would

not have suffered if he had known he had a choice.

311.     Around 2002, Lawrence founded a company based out of Las Vegas called Wearable Technology Integrators, Inc. That company developed a wearable computer that was integrated into military armor and sparked significant interest with special forces and other military units. Despite the fact that Lawrence and his company had gathered over a quarter million dollars from investors and was offered an additional fifteen million dollars or more by the United States to create this product, he was reprimanded on multiple occasions by Jeffs and told he would be damned for building the technology. In or about 2006, he was ordered to assign the business to Jeffs by the then-FLDS Bishop Lyle Jeffs. Thereafter, Defendant Jeffs implied that the technology should be destroyed. Lawrence and his business partners received a severe, chiding "revelation" from Jeffs regarding the technology. Lawrence's business partner, Isaiah Frank Barlow, destroyed the technology shortly thereafter in an effort to restore his standing with Defendant Jeffs. Lawrence received this severe rebuke only two days after his eldest son had died, and he was too distraught and caught up in the cultish thinking to take a stand against the destruction of his technology. Lawrence did not know—because Parker and SC&M, his own attorneys, never told him—that he had no obligation to sign over his business to Jeffs, much less to destroy the technology. If Lawrence had been armed with this information, he would not have complied with Jeffs' commands.

312.     Had Lawrence known then what he has now come to know about Jeffs, he would have safeguarded his company from Jeffs and asserted his rights as a father to control the burial of his son. But he did not know, because Parker and SC&M failed to tell him.

313.     From 2009 to 2011, Lyle Jeffs put Lawrence to work on multiple different tech projects that personally benefitted Lyle, while paying Lawrence nothing for his work. Lyle also sent Lawrence on long work trips doing odd jobs with other priesthood members who were tasked with keeping an eye on him. Again, Lawrence did not know—because Parker and SC&M failed to tell him—that slavery or indentured servitude are illegal under the Thirteenth Amendment (and the TVPRA which Congress passed to enforce the Amendment) and he could neither be compelled to work for free or work at all against his will regardless of pay. Although Lawrence, an adult, could have chosen to work as an unpaid volunteer, Parker and SC&M did not inform Lawrence of the facts and law so that he could make an informed decision. Instead, Parker and SC&M allowed him to believe that Jeffs' word had the same effect as law, even when that word directly contradicted Federal and state law. Lawrence would not have followed Jeffs' dictates if he had known he had legal rights and remedies to protect him and his family from the extreme deprivation (including eternal damnation) Jeffs espoused would befall "apostates" if he disobeyed Jeffs.

314.     On October 28, 2012, Lawrence was traveling to a construction job and received a phone call from the then-FLDS Bishop, Sterling Jessop. The Bishop told Lawrence that the

Prophet had received a revelation from the Lord on his behalf, and he had been found guilty of murder, adultery, sinning against the holy ghost, proving a traitor to the Priesthood, a betrayer of the brethren, a denier of Christ and other such "unforgivable sins." The Bishop then asked Lawrence if he accepted this revelation as "coming from the Lord." Lawrence knew in his heart he was being wrongfully accused but also knew if he denied the revelation was from the Lord, his wife and children would be taken from him before he could make the six-hour drive home. After some pressing from the Bishop, Lawrence eventually chose to accept the revelation was from the Lord, to which the Bishop responded he was to go far away, never return, and have no contact or communication with his wife or family again. Lawrence did not know—because his attorneys, including Parker and SC&M, did not tell him—that he could not be compelled to terminate his parental rights.

315.    When Lawrence was permitted to return to Short Creek the following day, he was given one hour to gather his personal items and leave the community. He had no means of transportation, so the FLDS leadership ordered an FLDS-run automotive body shop to fix up one of Lawrence's vehicles, which was not in working order, and charged Lawrence for the bill. The FLDS Leadership also cleared out Lawrence's office and took possession of his furniture, equipment and other vehicle. Lawrence did not know—because Parker and SC&M, did not tell him—that he could not be compelled to forfeit his property or pay for services for which he did not consent.

316.    Lawrence complied with the order from the Prophet, left Short Creek that day in his partially working vehicle and had no contact with his wife or children for several months, believing that his only hope was to prove his loyalty. Lawrence did not know—because Parker and SC&M, did not tell him—that he could not be compelled to cut off contact with his family.

317.    During the period Lawrence was away, he began to suspect that Jeffs was defrauding the FLDS and destroying FLDS families. For example, FLDS leadership sent Warren Johnson, one of Jeffs' favored cronies, to "assist" Markay with her Supplemental Security Income ("SSI")—a Federal welfare program. Instead, Warren Johnson created a joint account for himself and Markay, directed Markay's SSI into that account, used the SSI to purchase a suburban in his name that he let Markay drive, yet the FLDS leadership maintained complete control over the vehicle despite using Markay's SSI to pay for it. Misappropriation of SSI is a Federal crime and is prohibited by Federal welfare law. *See* 42 U.S.C. § 1007(j)

318.    Lawrence was faced with the impossible dilemma of attempting to contact his family and share his knowledge with them, which would almost certainly push them further away from him as he would be declared a "rank apostate." Or, he would simply have to wait, risk further harm to the and have no contact with them unless and until they were also expelled from the FLDS, or Jeffs permitted him to rejoin.

319.     On February 13, 2013, Markay suffered a massive stroke, which caused her to lose 95% of the functionality of her left brain (as the left side of the brain controls the right side of the body, she was paralyzed on the right side, blind in her right eye and could hardly speak). Markay's near death experience caused her to decide that Lawrence and the sanctity of her family was more important than following the nefarious dictates of Defendant Jeffs. Markay accepted Lawrence back into her life as her husband. Had Parker and SC&M acted in accordance with their duties to either or both Markay or Lawrence, they would never have allowed themselves to be separated, or at the very least would have reunited before Markay suffered her stroke—which may not even have happened but for the stress of separation from her husband while raising a large family under the horrors of Jeffs' regime.

320.     At Jeffs' direction, Lyle Jeffs sent approximately one hundred women to the hospital to 'visit' Markay in one night (and a constant flow of women and family members were sent thereafter), to keep pressure on Markay, in an effort to convince her to leave Lawrence, but she would not. When Markay left the hospital and returned home after weeks of rehabilitation, Bishop Lyle Jeffs personally made contact with her, requiring her to leave Lawrence, but she would not. Due to Markay's refusal to abide by this order, Lawrence and Markay faced strong opposition from FLDS leadership and loyalists, along with their five daughters, whose minds were poisoned against them by Jeffs oppression. Imaginably, the parents of Hitler Youth who stayed behind to fight to the death in the rubble of Berlin in 1945 went through similar anguish when watching their children's indoctrination by the forces of evil rob them of common sense and human reason. Markay experienced profound shunning and harsh behavior from her family, friends and loved ones, which continues to this day. The FLDS leadership also immediately took possession of the family Suburban, depriving Markay of the value of the SSI payments used to make payments toward it. Markay did not know—because Parker and SC&M, did not tell her—Jeffs and his cronies had no right to take her car—paid for from her Federal welfare checks—away from her. Indeed, they failed to tell her that doing so constituted multiple crimes under state (e.g. larceny) and Federal (e.g. misappropriation of welfare) laws. Thus, Lawrence's wife and family suffered due to Parker and SC&M breaches of their duties to Lawrence, Markay, and their children as clients for Parker and the firm.

321.     Upon Lawrence returning home with Markay, the FLDS controlled home health employees that had been providing home health services to their three severely disabled sons, in compliance with Defendant Jeffs' revelation to "Leave Apostates Alone, Severely," would no longer provide services to the family. Lawrence threatened a religious discrimination lawsuit if the company failed to continue providing services. The FLDS-controlled home health employees that had been providing care to the disabled boys then coached Lawrence's daughters how to make it appear that he was abusing them, resulting in criminal and civil charges wrongfully being brought against him. Despite the fact that the charges were false, Lawrence was arrested by the FLDS-

controlled law enforcement. After significant time and expense, the true facts were uncovered, and the Utah State Department of Child and Family Services dismissed its civil case and both Washington County and Iron County declined to prosecute the criminal charges brought by the FLDS controlled law enforcement officers. Lawrence did not know—because Parker and SC&M, did not tell him—that he could have brought a Federal civil rights complaint under 42 U.S.C. § 1983 against the FLDS-controlled law enforcement officers for violation of his civil rights under color of law.

322.    If Parker, as Lawrence's acquaintance and trusted lawyer (or any of the other lawyers he was paying for with his contributions such as others at SC&M) and trusted to protect his best interests and rights had advised Lawrence of the information in their possession about Jeffs' true nature and conduct (such as the hidden agenda behind the 1998 revision of the UEP Trust and the information cited above), Lawrence would have been able to make informed decisions on how to protect his family and himself, and incalculable heartache, pain, and financial ruin could and would have been avoided.

323.    The stress and emotional turmoil from the foregoing events caused Lawrence to be diagnosed with depression. The grieving process for the terrible losses he endured as a faithful member of the FLDS at the hands of FLDS leadership and the Lawyer Defendants continues to this day, requiring medical intervention and the assistance of counselors. The acts and omissions of Parker and SC&M—in violation of their duties towards Lawrence—were an actual and proximate cause of Lawrence's suffering.

## J.  Steven Dockstader

324.    Steven Dockstader was ordered by FLDS leadership to leave his home in Short Creek and move to Texas in late 2004 to participate in the building of the YFZ Ranch. Steven was 12-years-old when he arrived in Eldorado, Texas, on or around December 5, 2004, and was forced to begin engaging in hard physical labor involving working extreme hours late into the night and early mornings without breaks in order to build Jeffs' bunker.

325.    While Steven knew of Parker and saw him personally at the YFZ Ranch when Parker made a statement to the media on behalf of all FLDS YFZ residents—including Steven—as their attorney after the 2008 raid. Steven believed that Parker was his attorney and would represent his individual interests.

326.    During the entire seven years Steven was at the YFZ Ranch, did little other than construction and other forms of hard labor, receiving no payment for his work. He was simply told that he should work hard for the privilege of working harder. Knowing nothing else due to Jeffs' oppression—aided and abetted by Parker and SC&M—that is exactly what he did.  The stress of the labor he engaged in while in Texas caused Steven's appendix to burst, requiring immediate

medical attention and surgery.  Steven did not know—because Parker and SC&M, did not tell him—that this work constituted child slavery and/or indentured servitude and that he could not only refuse to perform the work, but had legal claims against Jeffs' and his attorneys (also Parker and SC&M). If Steven had been advised of his rights, and that there was legal recourse available to him if he were to leave the FLDS, he would have done so much earlier rather than endure the enslavement at the YFZ Ranch.

327.    Upon his return to Short Creek in late 2011, Steven began receiving regular calls from the FLDS leadership requesting donations from all elders. It was common knowledge among the FLDS at that time that even if the donation requests were not specifically earmarked, the majority of the funds were being used to pay attorney fees. These requests sometimes came in the form of phone messages. Certain FLDS members had a phone and a specific numeric code they would sign in with to access the phone system, enabling them to hear recorded messages. Calls for amounts up to $1,000 came almost weekly. Steven made regular payments toward attorney fees for about six months after returning to Short Creek. He also had money taken without his permission from his paycheck when he worked for the FLDS Church controlled company New Era from late 2011 through mid-2012. Steven did not know—because Parker and SC&M, did not tell him—that he had no obligation to make donations and that the unauthorized withholding of funds from his paycheck was an unlawful act. Thus, he could not act to protect his rights because he did not even know that he had any.

328.    Almost immediately after his return to Short Creek in late 2011, Jeffs' favored cohorts who served as FLDS leaders excommunicated and exiled Steven's parents from Short Creek for "murder of the unborn," essentially a catch all sin that included the "sins" of natural or spontaneous miscarriages or using birth control, but was most often used as simply any false and unverifiable reason to expel someone who has fallen out of favor with the Prophet or his cohorts. Steven and his parents did not know—because Parker and SC&M, did not tell them—that miscarriage is not a crime, and that use of birth control is not only noncriminal, but is a constitutionally protected right. *See, e.g., Griswold v. Connecticut,* 381 U.S. 479 (1965).

329.    Immediately after the news of his parents' expulsion, Steven sought an audience with Jeffs' brother, FLDS Bishop Lyle Jeffs, who was and is second in command to Defendant Jeffs (but who takes orders directly from Defendant Jeffs and is a spokesperson without independent authority). Steven sought answers from Lyle Jeffs about why his parents, who he believed to be absolutely loyal and obedient, had been expelled.

330.    Lyle Jeffs, acting under the direction of Defendant Jeffs, refused to meet with Steven and avoided any direct communication with him for at least two years, despite Steven's continual requests for a brief audience. Steven grew frustrated with Lyle constantly dodging him and of the continual requests for tithing, taxes and donations for attorney fees. After Steven's

parents were exiled, in an effort to support themselves, Steven and his brothers started a company together called Wood World on land owned by the UEP Trust.

331.    By early 2013, Wood World had grown to be a successful business, and when Bishop Lyle Jeffs learned of how successful the Dockstader boys had become, he ordered that they pay more in religious "contributions," upon threat of expulsion. Lyle Jeffs also required them to sell much of Wood World's assets and contribute that income to the Prophet and his cohorts through payment to the FLDS entity called the United Order.

332.    Steven was angry that Lyle Jeffs had ignored him for years but then had the nerve to demand payment from Steven's company; but he paid the money nevertheless, fearing the repercussions for disobedience, which include expulsion from the FLDS Church and UEP Trust property where Steven both lived and worked. It was the previous and ongoing legal services of Parker and SC&M that allowed the Trust to use the threat of expulsion from the Trust's real property as one of Jeffs' most powerful tools of oppression. If Steven had known of the facts surrounding Jeffs' arrests and his admission of fraud, or if Steven had been advised that there was any form of recourse available to him if he left the FLDS at that time, he would have done so.

333.    While living in Short Creek, Steven was regularly followed by the private FLDS Church security force that protected Defendant Jeffs' and the FLDS enterprise and by law enforcement in Short Creek who, despite being law enforcement officers, are loyal to Defendant Jeffs. Thus, the local police were in effect Jeffs' personal secret police. Steven became aware of local law enforcement illegally using their databases to search for private information to assist in Jeffs' oppression and turned the evidence he had of their activities into the Federal Bureau of Investigation.

334.    In or around 2013, Steven left Wood World and started his own company called NuWave Group, which again grew successful. Rather than keeping any liquid cash or assets in his business, Steven bought a truck and spent most of his excess money on aftermarket parts for his truck, to avoid being ordered to turn his earnings over to Defendant Jeffs. By the time Lyle Jeffs caught wind of Steven's successful business, Steven had put approximately $50,000 in aftermarket parts into his truck. Steven did not know—because Parker and SC&M, did not tell him—that Jeffs had no right to require that he turn over his business earnings in the first place.

335.    FLDS Church authorities require that all businesses, personal property and real estate deeds, titles, income, and so on be turned over to the church as a condition of membership— and FLDS members are indoctrinated from childhood to believe that membership is a prerequisite of (literally) not going to hell.

336.    Lyle Jeffs rebuked Steven for failing to turn over his income to the United Order

and ordered that Steven's brothers give him an additional reprimand. In response, Steven's brothers began to put pressure on him to comply with the demands of the Bishop. Bishop Jeffs further told Steven's brothers that he had no confidence in Steven, that Steven lived and breathed an apostate element and that they should stop all association with him. Steven's brothers did so even to the extent of locking him out of their house, causing Steven to have to break into his own house to sleep that night. Neither Steven or his brothers knew—because Parker and SC&M, did not tell them—that shutting him out of his own home is illegal, and that he had no obligation to turn over his income to the Church.

337.     Acting under the religious authority of Defendant Jeffs, Bishop Jeffs ordered local church security to monitor Steven in case he attempted to leave and take his younger siblings with him. Steven was told by Lyle Jeffs that if he left and took his siblings who were under eighteen, Steven would be considered by the church to be guilty of murdering them. Shortly after this interaction with his brothers and Bishop Jeffs, Steven left Short Creek alone and joined his expelled parents. Steven did not know—because Parker and SC&M, did not tell him—that returning his siblings to his parents was not only legal, but was in fact remedying Jeffs' kidnapping of them from Steven's parents in the first place.

## K. Marvin Cooke

338.     Marvin Cooke was born and raised in the FLDS Church and due to that indoctrination believed in the United Effort Plan, which in 2012 evolved into the United Order. Under this system of communal slavery and indentured servitude, the FLDS worked and contributed money to the FLDS Church, which controlled or provided the FLDS with what FLDS leaders believed they needed by way of food, clothing, shelter, medical care and legal services. The FLDS Church represented not just a way of living, but over time, it made the FLDS dependent and captive. It also entrapped them because it was their "retirement plan" in this world and their ticket to salvation in the next. All that was required was absolute obedience to the Prophet, who controlled their food, clothing, shelter, medical care, families, marriages, sexual relations, communications, access to information and directed their legal services through the Lawyer Defendants. Marvin and the other Plaintiffs did not know—because Parker and SC&M, did not tell them—that slavery and indentured servitude are illegal, and they had no obligation to obey Jeffs.

339.     While in high school, Marvin started to work in the commercial flooring business, and has continued to work in that industry for decades providing floor coverings for schools, churches, hospitals, residential developments, and other commercial establishments. However, he was forced to contribute to the FLDS Church to provide for his family. Over the years, he was assigned three wives and fathered 23 children. Marvin constructed a home in Colorado City for his large family, valued at approximately $890,000 which was owned and controlled by the UEP

Trust. It was Parker and SC&M's legal services that placed him in a situation where his home was owned by his oppressor.

340.    Marvin believed that Parker (and SC&M) was his lawyer and represented his individual interests. On numerous occasions he was told by FLDS Church leaders that the FLDS "needed to raise one million dollars for Rod [Parker] - for the lawyers." Parker was the "main" lawyer, but Marvin was also aware that there were other lawyers working with him for the FLDS. Marvin understood that Parker and the other lawyers represented the FLDS members individually and the FLDS as an association of those individuals. In response to requests for money for the attorneys, Marvin contributed money as directed. He also routinely contributed his income tax refunds, including his $42,000 refund in 2012. The FLDS leaders made it mandatory that he contribute any tax refund to pay legal fees. Marvin did not know—because Parker and SC&M, did not tell him—that he could not be required to pay money for those legal services. Nor was he informed that he (like the other Plaintiffs) paid legal fees to Parker and SC&M only for Parker and SC&M to act *against* his best interests.

341.    Marvin was astonished to be expelled from the FLDS Church for "child murder" (a miscarriage by one of his wives) and for adultery (the former of which was untrue and the latter of which was untrue under FLDS law which permitted, and often required, multiple marriage) he and his family were commanded to have no contact with each other. Fearing retribution on his wives and children, he had no contact with them for some time. Marvin did not know—because Parker and SC&M, did not tell him—that Jeffs had no right to terminate his parental rights or cut off contact between Marvin and his wives and children.

342.    Upon his expulsion from the FLDS Church, Marvin fell into a depressed state earning only $600 over the first eight agonizing months, living with a friend and struggling to function. He lost his family, his business, and he suffered from severe mental and emotional distress as a result of being expelled from the FLDS Church and cut off from communication with his wives and children whom he loves.

343.    As discussed extensively herein, Marvin did not know (nor, under these unique circumstances could he be expected to know) that he had been subjected to unlawful activity for which remedies were available to him at law and equity due to his isolation and the knowing, intentional, fraudulent, and/or negligent misrepresentations by Jeffs, Parker, and SC&M coupled with the indoctrination by Jeffs and his favored cohorts until she escaped from the FLDS and obtained new counsel. Nor did Marvin know of or understand Parker and SC&M's involvement in this scheme until long after she had left the FLDS.

344.    If Parker and SC&M had complied with their legal and ethical duties, including but not limited to avoiding conflicts in legal representation of clients and advising Marvin of his legal

rights and the facts surrounding Jeffs' illegal acts and admission of fraud, Marvin would have left the FLDS with his family much earlier and avoided the extensive financial, emotional, and psychological injuries he suffered.

## L.  Helen Barlow

345.    Helen moved to Colorado City, Arizona (the Arizona part of Short Creek) with her family in 1986. She was required to marry Vergel Barlow by then-FLDS Prophet Rulon Jeffs, in 1991. After their marriage, Helen and Vergel lived at 45 South Richard Street in Colorado City on UEP Trust property. Despite having built that house themselves, they contributed it to the UEP Trust, as was required of the FLDS people to remain in good standing with FLDS leadership. Helen did not know—because Parker and SC&M, did not tell her—that she could not be required to contribute her property to the Trust.

346.    In or around 2006 or 2007, orders came from Defendant Jeffs that all FLDS elders were to pay $1,000.00 per month toward attorney fees and other expenses. Helen gave her paychecks to Vergel each pay period, and those funds went into a family fund from which the attorney fees were paid. Helen did not know—because Parker and SC&M, did not tell her—that she could not be required to contribute her paychecks to the Church. Though she could have chose to do so voluntarily, she could not make a fully informed decision because Parker and SC&M did not make her aware that she even had a choice.

347.    Helen was familiar with Parker and for years thought of him as *the* lawyer for the FLDS and all of its members individually. In more recent years, she understood there were more FLDS lawyers than just Parker and SC&M. Helen trusted Parker and believed that he had been hired to defend her best interests and the interests of the FLDS members, including the Plaintiffs. The idea that the men she revered as her religious leaders would ever take actions, especially legal actions with the assistance of Parker and SC&M, that were contrary to her best interests or the safety of her family was inconceivable to her due to Jeffs indoctrination. Parker and SC&M did not act to inform their client Helen otherwise, despite a clear duty to do so due to their actual knowledge that she was being misinformed and their actual knowledge of the conflict of interest between her interests and those of Jeffs.

348.    Helen believed that the attorneys' fees to which she regularly contributed her paychecks were going, at least in part to SC&M and Parker. Upon information and belief, some or all of those attorneys' fees were in fact going to Parker and SC&M, and Parker and SC&M knew or should have known those fees came from Helen for her individual representation by the firm.

349.    Helen remembers seeing Parker at FLDS community functions. Parker made his presence known in the community among all the FLDS people. He was widely known as the

favored "gentile" lawyer.

350.    In March of 2006, Vergel's father the previously mentioned "Brother" Sam Barlow—a once-favored cohort of Jeffs who served as a liaison between SC&M and the FLDS—was expelled from the FLDS Church and ordered to leave his family and his home on UEP Trust property in Short Creek. Sam had a large family of multiple wives, and Vergel was selected by Defendant Jeffs to move into his father's house in Colorado City and take care of his former father's family. Vergel and his family, including Helen, obeyed and have lived in that house from 2006 to the present day.

351.    In addition to taking care of his father's wives, many of Vergel's sisters and their families were moved in and out of the residence when his sisters' husbands were expelled. At one time there were seven different families totaling close to 50 people living in the one house.

352.    When the United Order ("UO") was organized by Jeffs in late 2011 into 2012, he and his favored cohorts arbitrarily decided who would have the "privilege" of being part of the UO. All FLDS were ordered to attend a meeting where they were asked a variety of personal questions ranging from whether they partook of worldly pleasures (such as television), to whether their behaviors in the bedroom were appropriate. FLDS leadership announced at that time that any FLDS who had engaged in sexual behavior with their spouses for any purpose other than procreation had sinned. Raping child "spouses" for purposes of procreation was not deemed a sin by Jeffs, but a virtue. Helen did not know—because Parker and SC&M, did not tell her—that raping children is a crime, but conversely sexual relations (even those certain religions may consider a sin) in the privacy of one's home with a consenting person of legal age is not only legal, but constitutionally protected. *See, e.g., Lawrence vs. Texas,* 539 U.S. 558 (2003).

353.    Helen's UO "interview" took place on or around December 7, 2011. Despite the "sins" Helen confessed to Bishop Lyle Jeffs, who conducted the UO interviews, she was selected to be part of the UO. The selection process was entirely arbitrary as some of the sins she confessed were the same as the sins of her sister-wife, Carole, yet Helen was admitted to the UO and Carole was not. Also, for no apparent or stated reason, three of Helen's and Vergel's teenage daughters were not admitted to the UO. No explanation was ever offered to the non-UO members as to why they were not admitted, and they and their family members were left to guess.

354.    The imposition of the UO brought with it a dividing force among the FLDS people, facilitated by Defendant Jeffs' control over the lives and possessions of the FLDS. Anything less than exact compliance with the orders issued by Jeffs or his cohorts commonly resulted in being expelled from the FLDS Church, kicked out of the community and losing all property and possessions. Defendant Jeffs exercised his power of expulsion with a vengeance from the moment he took power. Thus, Jeffs separated those he considered loyal from those he did not and punished

the latter group most harshly.

355.    In or around February 2012, Defendant Jeffs ordered that all non-UO members be moved to a separate section of the houses occupied by the FLDS and that they be restricted from interacting with UO family members living under the same roof to prevent the supposedly unrighteous non-UO members from "tainting" the UO members. This order was to be enforced by the FLDS Bishop. Under these new restrictions, no UO and non-UO member could share a bedroom; UO members were to have a separate kitchen from non-UO members; and only UO members could eat from the food supplied to the FLDS from the Bishop's Storehouse. Non-UO members were left to fend for themselves. Also with the imposition of UO rules, boys were not permitted to eat at the same table as girls. Helen did not know—because Parker and SC&M, did not tell her—that Jeffs had no legal authority to impose *any* of these restrictions.

356.    Helen found it entirely impractical and almost impossible to comply with these and all of the other requirements and restrictions imposed by the UO and regularly did not obey all the separation rules for UO and non-UO members. In addition to the impracticality, the family separation brought incredible emotional turmoil to Helen and her children, consuming their minds and causing them great fear of what might be next. On January 1, 2012, Jeffs ordered separate meetings for the UO to attend, including separate Sunday worship, which the non-UO FLDS could not attend. These meetings occurred three times a week. After the first of these separate meetings for UO members in January 2012, Helen came home and found her three daughters were hysterical. They had locked themselves in their room and would not come out. Helen could tell they felt dirty and confused about why they were unworthy to be a part of the UO—the result of Jeffs indoctrination as enabled by the societal structure facilitated by the legal services from Parker and SC&M.

357.    Due to Helen's failure to abide by all UO rules (impractical or outright impossible as such compliance may have been), she and her family began to lose favor in the eyes of Jeffs and other FLDS leaders. With all of the various families living with them in Sam Barlow's house, there were constantly eyes watching Helen and her family and reporting every "sin" to Bishop Lyle Jeffs, who would presumably report the misdeeds to Defendant Jeffs. In the cult of Warren Jeffs—even family could be informers.

358.    Helen knew that her standing with her employer was contingent on her strict obedience to Jeffs and tried to stay in Jeffs' good graces as long as possible so she could continue providing care for her patients and financial support for her family. Helen worked as a nurse at the Hildale Health Service Center (HHSC) in Hildale, Utah, which was run exclusively by FLDS members in good standing with Defendant Jeffs and his cohorts. Apostate FLDS were not allowed to work at or be treated at the HHSC. Helen did not know—because Parker and SC&M, did not tell her—that a nurse or healthcare facility refusing healthcare services to a person in need is

illegal.

359.    Restrictions were placed on the HHSC similar to those required of the FLDS in their homes. Only UO members could assist or treat UO members, only males could treat males and only females could treat females. These restrictions made it impossible to treat all patients who needed medical assistance. There were no female UO practitioners to treat the adult females who needed medical treatment at the HHSC, and no male or non-UO practitioner could be in the same room with a female patient. Again, Helen did not know—because Parker and SC&M, did not tell her—that these practices were both not legally binding upon her, and were in fact illegal.

360.    Despite the limitations on receiving medical assistance at the HHSC and all other FLDS run medical facilities resulting from the mandated UO/non-UO division, the FLDS were also restricted in seeking or receiving medical attention from non-FLDS run medical facilities. Disobeying the rules, even in emergency circumstances, meant risking expulsion from one's family, home and the FLDS community. Permission to receive medical assistance from non-FLDS practitioners for major surgeries or gynecological work was a privilege granted only to favored FLDS. Helen observed medical emergencies go untreated, including her co-worker at the HHSC who had a cystocele—meaning her bladder was falling out—and she needed surgery to correct the issue. The co-worker waited months for approval from Jeffs or his cohorts to get needed medical attention, and as far as Helen knows the co-worker was never granted permission. Helen and her co-worker did not know—because Parker and SC&M, did not tell them—that they could not be prohibited from seeking outside medical assistance, and that the refusal of the FLDS medical providers to treat "apostates" was illegal.

361.    In December 2012, Defendant Jeffs ordered that all non-UO members move to separate houses apart from their UO family members. Vergel refused to comply with the order and quickly lost Jeffs' favor. Helen, who was commanded to leave Vergel for his disobedience, refused and her employment with HHSC suffered because of it. Helen started losing her FLDS patients because they did not want to be associated with her. Helen's boss, Ezra Nielsen, then demoted her from nursing to inputting computer data. She received her last paycheck in or around April 2013. By about that time, Vergel had also lost his job due to FLDS mandates. Helen and Vergel did not know—because Parker and SC&M, did not tell them—that taking employment action against an employee for refusing to follow an illegal order is itself unlawful.

362.    FLDS leaders had moved all everyone other than Vergel, Helen, Carole and their children (who refused to go) out of Sam Barlow's house, leaving them to pay the utilities in the monstrous house without the FLDS financial assistance they had previously received and needed to support their family. Without FLDS financial assistance or Vergel's or Helen's paychecks they could not make ends meet, and the family was financially devastated. Helen was further devastated and broadly humiliated by being declared an apostate. Without the active, intentional, and knowing

assistance of Parker and SC&M's legal services in developing the Trust, Helen, Vergel, Carole, and their children would not have been living on Trust land and, thereby, under the control of Jeffs and his ilk. As a direct result of Parker and SC&M's legal services in support of Jeffs' illegal (indeed, criminal) activities, Helen lost her home.

363.    As discussed extensively herein, Helen did not know (nor, under these unique circumstances could she be expected to know) that she had been subjected to unlawful activity for which remedies were available to her at law and equity due to her isolation and the knowing, intentional, fraudulent, and/or negligent misrepresentations by Jeffs, Parker, and SC&M coupled with the indoctrination by Jeffs and his favored cohorts until she escaped from the FLDS and obtained new counsel. Nor did Helen know of or understand Parker and SC&M's involvement in this scheme until long after she had left the FLDS.

364.    Helen believed that Parker and SC&M were representing her interests and trusted them as her legal advisors. If Parker and SC&M had complied with their legal and ethical duties, including but not limited to avoiding conflicts in their legal representation of clients and advising Helen of her legal rights and the facts surrounding Jeffs' illegal acts and admission of fraud, Helen and her family would have left the FLDS much earlier and avoided the extensive financial, physical, emotional, and psychological injuries they suffered.

## M.   Vergel Barlow

365.    Vergel Barlow legally married Helen Barlow in 1991 and "spiritually" married Carole Jessop in 2003. Vergel's marriage to Helen was ordered by Rulon Jeffs, the then-Prophet of the FLDS, and his (illegal) marriage to Carole was ordered by Defendant Jeffs. Vergel did not know—because Parker and SC&M, did not tell him—that his marriage to Carole was illegal.

366.    Vergel built a house for his family at 45 South Richard Street in Colorado City, Arizona and "consecrated" (deeded) that home to the UEP Trust, as was required to remain in good standing with FLDS leaders. Vergel did not know—because Parker and SC&M, did not tell him—that Jeffs could not require him to deed his home to the Trust. More critically, it was Parker and SC&M that created the Trust system in the first place, and continued to provide legal services to the same—despite the clear conflict of interest between the interests of Vergel and other FLDS members (including all of the Plaintiffs) who were their individual clients, and Jeffs and the FLDS church, who were also their clients.

367.    Vergel's father, "Brother" Sam Barlow, worked as a liaison between the Lawyer Defendants and the FLDS and their FLDS leaders for many years, during which Vergel learned about FLDS legal matters, including plans in 1997 or 1998 to rewrite the UEP Trust. To the best of Vergel's knowledge, Parker was involved in those discussions, while also defending the UEP

Trust in *Jeffs v. Stubbs*, 970 P.2d 1234 (Utah 1998). In *Stubbs,* the UEP Trust tried to prevent ex-FLDS members from retrieving property they had contributed to the Trust. Vergel did not know—because Parker and SC&M, did not tell him—that there was a potential (and in fact actual) between Parker and SC&M's representation of Jeffs, the Trust, and the Church—and their representation of Vergel.

368.    Vergel's father explained that a large part of the reason for rewriting the Trust was to give Parker and SC&M peace of mind that their fees would be paid. He understood that before the UEP Trust was rewritten, the only assurance that Parker and SC&M had that they would be paid was the unsecured signature of FLDS Prophet, Rulon Jeffs, who was in his late 80's and ill. Vergel did not know—because Parker and SC&M, did not tell him—that impairing his legal rights due to the attorney's desire to be paid is a violation of the Rules of Professional.

369.    The UEP Trust was rewritten or restated in November 1998 to place control over all Trust property in the hands of the Prophet as the only holder of priesthood keys and the corporate soul of the FLDS Church. By restating the Trust in this way, the Prophet was not only given absolute control over the Trust, but the Prophet's signature alone gave Parker and SC&M the ability to place liens on the FLDS' property if their legal fees were not paid. Vergel remembers hearing his father discuss this reason for restating the Trust on multiple occasions. Vergel did not know—because Parker and SC&M, did not tell him—that he had the right to obtain separate counsel to advise him on the negative effects on his legal rights of giving his attorneys the right to put liens on *his* property.

370.    In November 1998 when the Trust was restated, the FLDS, including Vergel, knew that the Prophet, Rulon Jeffs, was ill. But the extent of Rulon's incapacity was kept secret from the people. Defendant Jeffs controlled what little information was given to them about Rulon's incapacity and claimed to be "the mouthpiece and memory of the Prophet." By "speaking for the Prophet," Defendant Jeffs stepped into the Prophet's shoes and took over his roles in late 1998 and early 1999. Defendant Jeffs' assertion of power and authority continued—and became complete—while Rulon Jeffs' mental and physical health continued to decline. Defendant Jeffs formally took the roles of Prophet, President and corporate sole of the FLDS Church and President of the UEP Trust in 2002 after Rulon's death.

371.    Around the time the UEP Trust was restated, Vergel recalls FLDS leadership, including his father Sam Barlow, telling the FLDS during Saturday, Sunday and Monday meetings that rewriting the Trust made it stronger and that it would better protect them. These legal discussions during meetings were generally introduced by Defendant Jeffs. Vergel understood the purpose of the restatement was to secure legal services to him *personally,* as well as the rest of the FLDS members (including all of the Plaintiffs), and Jeffs.

372.    In hindsight, Vergel believes that a major event that facilitated the oppression, of FLDS members by Jeffs was the Lawyer Defendants' rewriting the UEP Trust, because the rewritten Trust gave Defendant Jeffs full control over the homes and all basic needs of the FLDS people, including but not limited to employment, food, clothing and medical attention, allowing him to control all aspects of their lives. Thus, Parker and SC&M had created a system in which failure to obey Jeffs' every dictate and submit to his every whim (including being raped by Jeffs and his favored cohorts) would result in deprivation of family, home and livelihood.

373.    Vergel's father Sam Barlow, as legal liaison between Parker/SC&M and the FLDS, had an office in Short Creek and an office in SC&M's Salt Lake City location. Vergel went to his father's office in the Salt Lake City SC&M location on multiple occasions. While in his father's office at SC&M in Salt Lake and in the Short Creek office, Vergel recalls seeing office equipment and furniture that had SC&M inventory control tags. On information and belief, Sam Barlow also had access to SC&M secretarial staff. Sam Barlow was, accordingly, an agent of SC&M.

374.    Although Vergel cannot remember exactly when his father was given an office at SC&M in Salt Lake, he recalls that his father spent a significant amount of time in Salt Lake City for at least 10 years for the sole purpose of working with SC&M, and during this time, he recalls his father taking an online paralegal class in conjunction with working for Parker and SC&M.

375.    Vergel also recalls Parker spending significant time in Short Creek, attending FLDS community events, including the Harvest Fest and a Fourth of July celebration (before those kinds of activities were discontinued), as well as in numerous meetings with his father. As the trusted lawyer of the FLDS and its members, Parker was welcomed into the lives and homes of the FLDS.. Vergel believed that Parker and SC&M were his lawyers and represented his individual interests as well as the interests of all the individual FLDS members.

376.    Around 2006 or 2007 (after Jeffs had been captured as a Federal fugitive and was being held in the Purgatory Correctional Facility), Jeffs ordered that all FLDS elders were to contribute $1,000 per month toward attorney fees and other expenses. From 2006 to early 2013, Vergel regularly contributed *at least* $1,000 a month from his and his family's' income for that purpose. Vergel did not know—because Parker and SC&M, did not tell him—that he could not be required to contribute funds to Jeffs' legal fees. Moreover, he believed that those fees went to the defense of all FLDS members (including Vergel and all of the Plaintiffs)—when in reality Parker and SC&M were only protecting the interests (insofar as raping children can be an "interest") of Jeffs himself.

377.    After the Texas raid in 2008, the call for attorney fees grew intense. All FLDS people were ordered to contribute *all* their 'extra' income. The FLDS leadership ordered all FLDS people to max out their credit cards, get additional jobs, take loans on their cars and business

equipment, and do anything possible to get more money to contribute toward attorney fees. During that time, Vergel recalls one call in which the FLDS people were asked to forgo paying their utility bills and risk losing power and water to their houses and turn in that money to the Church for payment to "the attorneys." Vergel did not take out loans but he did gather up all the money he and his family could find to contribute to these collection efforts.

378.    As the number of FLDS lawyers and firms increased, FLDS leaders regularly communicated the need for more and more money in gatherings held in the R&W Building. This "need" was communicated in weekly church meetings to the entire FLDS congregation. Because Vergel's father had been expelled from the FLDS Church before the Texas raid, for a time legal reports and orders to contribute money for attorney fees were given by Lindsay Barlow (at the R&W Building gatherings) and later by Willie Jessop to the collective FLDS people, at the direction of Defendant Jeffs. Vergel does not know how he and his family survived being required to contribute so much of their meager income.

379.    After Vergel's father was expelled in 2006, Vergel was instructed to move his large family into Sam Barlow's house and take care of Sam's multiple wives and children. In or around 2007, he was also made a part of the FLDS private security force, known as "Church Security" or the "God Squad," that protected the FLDS Church leaders and their interests in Short Creek, and he remained a part of that security force until 2013 when he lost favor with Defendant Jeffs.

380.    Vergel began losing favor with Defendant Jeffs and his cohorts after the imposition of the UO restrictions on the general FLDS population in late 2011. Vergel was accepted into the UO in April 2011, before the general FLDS population and those who had already been admitted into the UO were aware of the intense restrictions that would soon be imposed. In February 2012, for example, Jeffs ordered that all UO members must have separate bedrooms and eating quarters and eat separate food than non-UO members. Vergel was ordered to never be in a room alone with his wife Carole because she was non-UO. Vergel thought that restriction was ridiculous and refused to follow it. He did not know—because Parker and SC&M did not tell him—that the restriction was also of no legal force and they had a choice to live as they saw fit for their family.

381.    With multiple different families living in the home he shared with his two wives and their 16 children, Vergel was under constant scrutiny, and every violation of UO restrictions was reported to Bishop Lyle Jeffs, who reported directly to Jeffs. In December 2012, Jeffs ordered that all non-UO members be moved to a separate house altogether, meaning Carole and most of her children, along with three of Helen's children, were ordered to moved out. Vergel refused to comply and, as a result, FLDS leaders moved Sam Barlow's wives (including Vergel's mother), Vergel's sisters and all other families away from Vergel's "bad influence."

382.    Similar to his wife Helen, Vergel had been employed as a private caregiver for two

patients, one of which was his brother, Homer. When Vergel's extended family was moved and ordered not to have contact with him, Vergel's patients refused to allow him to treat them, and he lost his sole source of income. Vergel received his last paycheck in or around November 2013 and was dismissed from his Church Security position. Helen had lost her job, and without a source of income, the family was financially devastated.

383.     Between 2011 and 2013, trying to live within the intense UO restrictions caused Vergel to become very depressed and wonder if life was worth living. He was unable to support his family donating all he had and then some to the UO, with additional contributions required for tithing and attorney's fees. He was raising animals to support his family and having contributed everything he owned to the UO, he was dependent on the FLDS leaders who controlled the UO to provide him feed for his animals, but as he lost favor with Jeffs, FLDS leaders stopped providing even that.

384.     Vergel remembers specific discussions that the attorneys' fees had reached upwards of $5,000,000 as a result of the Texas raid. Then in early 2013, there was a call from Jeffs to all FLDS to "bow their backs" and submit everything they had to pay more attorney fees and other expenses. As an experiment, Vergel gathered $1,000. and submitted it. Shortly thereafter, he was given two bales of hay, but not nearly enough to feed all his animals. That $1,000 was his last "donation" and the animal feed again stopped all together. Vergel's animals were starving and he had to sell them for next to nothing because of their emaciated state. Parker and SC&M had so weaponized their attorneys' fees so that paying them was literally a requirement to survive.

385.     Vergel could not reconcile the strange restrictions and rituals that were required of UO members with the religion he grew up believing. He feared every day that his wives would be commanded to leave him and that he would lose them, his children and all his possessions because he could not fully accept the UO and live up to its requirements. In 2013, after he refused to make his wife, Carole, and their six children leave his home, Vergel was declared an apostate.

386.     For years, Vergel had been kept in the dark about Jeffs' multiple confessions that he had never been the Prophet, the overwhelming facts supporting Jeffs' convictions, the mass number of under-aged marriages and the perverse sexual rituals taking place in Texas. Had Vergel been made aware of these critical facts by Parker, who he trusted as his lawyer, or the other lawyers who claimed to be protecting the FLDS people (including those at or related to SC&M), Vergel would have left the FLDS Church with his family and not have been subjected to the suffering he endured before and throughout his involvement in Jeffs' reign.

**N.   Carole Jessop (Barlow)**

387.     In 1999, at age 14, Carole watched as her five older sisters were one after the other

assigned by Defendant Jeffs to marry FLDS men and be raped. Shortly thereafter, Carole noticed that Defendant Jeffs began to pay close attention to her, seeking her out specifically at community functions or after meetings. Rumors began to spread that the Prophet would soon ask Carole to marry him. Carole feared being assigned to marry any FLDS man, especially the Prophet, after witnessing the marriages (and associated rapes) of her older sisters. Then in 2003, shortly after her 18th birthday, Carole was required to meet with Jeffs, who asked Carole if she was ready to be married, and Carole said no. Later that day, she lost her job and was ordered not to associate with any of her friends. Carole understood that these losses were as a result of her "disobedience" to Jeffs in saying she was not yet ready to be married. These losses caused her to fall into a deep depression.

388.    Two weeks later, Carole debated between suicide, marriage or running away from the community into a world she had been raised to fear. The following day, on May 1, 2003, her father brought another message from Jeffs in which Carole was told she was getting married that day to Vergel Barlow, who was already married as discussed above. Carole protested that she was not ready to get married but was told it was her time and she had no choice.

389.    She had never met Vergel. She was upset but faced with the prospect of being expelled and losing her family and the only life she knew, she complied. Carole did not know—because Parker and SC&M did not tell her—that she could not be forced to marry against her will. She and Vergel were married that day within an hour of meeting each other at Jeffs' house. After the wedding, Carole moved in with Vergel, Helen and their six children.

390.    While she was growing up and attending church meetings, Carole was told that Parker was the FLDS' attorney many times. She remembers him attending FLDS community events, recalls him speaking in church meetings a few times, and understood that he was to be trusted as the lawyer protecting her individually as well as all FLDS members (including all of the Plaintiffs).

391.    Having been raised FLDS, Carole experienced significant confusion as the happy Short Creek community she grew up in gradually changed after Jeffs took power and ultimately left thousands of people, including herself, devastated. Before "waking up" from the FLDS traditions she was raised in, Carole saw the devastation resulting from Jeffs' reign as a religious test that was preceding the destruction of the world and ushering in the millennium, an ideology Jeffs constantly promoted among the FLDS. Throughout the years of confusion as the FLDS community Carole was raised in deteriorated, Parker and SC&M remained the trusted lawyers of the FLDS—the lawyers who would provide them legal protection from the apostates and the evil world beyond the FLDS community that sought to destroy the "Priesthood People." She had no idea that Jeffs and the Lawyer Defendants she trusted were preventing her from learning the truth about Jeffs and the facts she needed for protection from him.

392.     From around 2003 until the Texas raid in 2008, FLDS living in the Short Creek community began disappearing without notice. No one seemed to know where they were being taken, but it was widely assumed they had qualified to help Jeffs "build up Zion." It was not until the Texas raid that Carole learned that large numbers of FLDS had been moved to the YFZ Ranch outside of Eldorado, Texas. She began to learn that many other FLDS had been spread across the county to other compounds and to various work camps controlled by Jeffs. Carole had no knowledge of these places or what was occurring there. Jeffs camps were a terrifying threat to the disobedient parishioner.

393.     In March of 2006, Vergel's father Sam Barlow, was expelled from the FLDS and Vergel was instructed to move into his father's home as the caretaker of his father's family. Supporting this extended family was an enormous challenge, especially because around 2005 or 2006, Jeffs issued special calls to the FLDS to contribute funds toward the Lawyer Defendants' attorney fees and other expenses. In or around 2006 or 2007, Jeffs issued an order that all FLDS elders were to pay $1,000 per month toward attorney fees, in addition to what they were already paying in tithes and other in response to other payment requests.

394.     Demands for attorney fees intensified immensely after the Texas raid in 2008 as more and more lawyers got involved to protect the FLDS and their children from the State of Texas and to recover the UEP Trust for Jeffs from the State of Utah, and the FLDS were told to do whatever was necessary to raise the required funds. Carole's family regularly contributed at least $1,000 per month in attorney fees. Demands for these payments usually occurred at Saturday and Monday meetings. Carole believed that the attorney fees were being paid, in large part, to Parker and SC&M, and later to other lawyers and law firms to protect her and the FLDS members' interests. Carole did not know—because Parker and SC&M, did not tell her—that Parker and SC&M were in fact actively working *against* her interests.

395.     When the United Order ("UO") restrictions were imposed by Jeffs in late 2011 into 2012, he and his favored cohorts arbitrarily decided who would have the "privilege" of being part of it. The UO was a dividing force, as the FLDS gave all of their remaining personal property to the FLDS Church before learning whether they or their family members would be allowed membership. Carole was not allowed membership, and by about February 2012, Jeffs had ordered that all non-UO members be moved to separate sections of homes and not interact with UO members to prevent "tainting" the UO members. Carole was not allowed to eat food supplied by the Bishop's Storehouse and was not permitted to be in a room or a car alone with Vergel. She was also required to write regular letters to Defendant Jeffs and other FLDS leaders proclaiming her loyalty to Jeffs, as well as confession letters to the FLDS Bishop. Carole and the rest of the family simply could not keep up with all of the restrictions imposed by the UO. Carole did not know—because Parker and SC&M, did not tell her—that these restrictions were not legally enforceable,

she had a right to choose whether to follow Jeffs, and there was recourse available to her if she chose a different path than that espoused by Jeffs.

396.    In June 2012, Carole was given a second UO interview and was rejected from the UO once again, but her 8 year old son was admitted, resulting in another division in her family. Carole did not know—because Parker and SC&M, did not tell her—that Jeffs had no legal authority to terminate her parental rights over her child.

397.    By late 2012, Carole (who had six children, two of which were infant twins) was being pressured to leave Vergel's home and move into a non-UO house in compliance with Jeffs' move order. However, in Carole's weak state (having recently given birth to the twins), she would have been unable to care for herself and her children if she left the family house. This caused her a significant amount of stress and fear. Vergel was also instructed to leave Carole because she had not been allowed in the UO. Neither Carole, Vergel nor Helen followed these directives, and that resulted in the whole family losing favor with Jeffs and his FLDS leaders.

398.    It was only later that Carole learned of Jeffs' confessions that he was not the prophet and that he was a master deceiver. She then left the FLDS Church and was declared an apostate. Carole also learned of the reasons for Jeffs' conviction in Texas and the perverse sexual rituals he had performed with young girls. If she had not been kept in the dark by Jeffs and the lawyers representing the FLDS about what was really going on, or had been told about Jeffs' confessions, she would have left the FLDS Church and not been subjected to the immense suffering she and her children endured under Jeffs. Prior to leaving the FLDS Church, Carole endured over two years of extreme confusion and fear resulting from the imposition of the UO, causing her to fear daily that she would be sent away and lose her family and children. However, upon leaving the FLDS Church, Carole and her family continued to endure severe persecution from close friends and relatives who remained fervent FLDS members.

## O.  Briell Libertae [or Liberté] Decker (formerly known as Lynette Warner)

399.    Briell Libertae Decker, whose birth name was "Lynette Warner," was born on May 22, 1985, raised in the FLDS Church and for much of her life resided in Hildale, Utah.

400.    On January 18, 2003, when Briell was 18 years old, she was coerced by Jeffs to enter into a plural spiritual marriage with him as the Prophet. Thereafter, she was taken from her home and over the next seven years lived in hiding as one of Jeffs' eighty or so "spiritual wives" (read, as above: rape victims). During those years, she was moved 26 times between secret homes and compounds in Texas, South Dakota, Colorado, Nevada, Wyoming, Arizona and Utah. Thus, she was a kidnapping and sexual assault victim moved across state lines for the purpose of further sexual assault and sex trafficking.

401.     Before and after Jeffs' arrest, Briell was subjected to extensive "training" at the hands of various elite FLDS members. Her training involved, *inter alia*, the deprivation of certain freedoms, foods and personal items; punishments and rewards; intense indoctrination and study; medication; sexual activities; mind control; and her initiation into a kind of secret FLDS Church code language based on a somewhat nonsensical version of the English Language. The training was designed to achieve absolute mental and physical control over her and, in turn, her absolute obedience and loyalty to the FLDS Church and its leader.

402.     She was also instructed that her father, Garth Warner, had not taught her correct FLDS Church principles, allowing sexual abuse to occur in his family, and that her progression in the church required that she openly testify he had not governed his family correctly. Briell did not believe that her father had taught her such incorrect things or that he was responsible for any sexual abuse that occurred, and she became  troubled by being increasingly pressured to have and entertain thoughts of physically harming her father, or allowing him to be harmed, through a doctrine known as "blood atonement." Briell was led to believe that she had to attempt to drown herself in a reservoir in Wyoming so she could be forgiven for her alleged sins.

403.     Throughout her "spiritual marriage" and "training," she was a slave and prisoner of Jeffs and the FLDS Church and was seldom allowed to leave the secret houses and compounds in which she was hidden without being accompanied and watched by a Priesthood "Caretaker." Living in this manner—with constant training, severely restricted liberties, increasing pressure to testify falsely against her father, coercion through mind control, fear for her family and herself, and pressure to participate in or allow blood atonement—became intolerable for Briell, causing her to desperately want to find a way out. However, Briell did not know—because Parker and SC&M, did not tell her—that her treatment was illegal, and she had an absolute right to dissolve her illegal "marriage" with Jeffs and leave the FLDS.

404.     Despite fearing the world outside the insular FLDS Church, knowing she would lose all ties to the only life she had ever known if she fled, and believing she would be damned eternally for doing so, Briell concluded that she must escape and accept that fate. So she began planning her escape from the cult, but her plans failed until she had been placed in her parents' home. Fearing that she and her father were in danger, she jumped from the second-floor deck and ran in her bare feet in search of someone she thought might provide safety. Unfortunately, in her distraught mental state, fearing unwanted publicity and unsure what to do next, she was betrayed and returned to her parents and the cult and within a few days was kidnapped again and secreted away with "Bishop" Lyle Jeffs at his home in Hildale, Utah, which was surrounded by walls.

405.     When Lyle Jeffs was temporally "corrected" by Defendant Jeffs in January or February 2012, Briell was again placed in her parents' home where she stayed in a bedroom with a window that had been screwed shut so she could not get out. On May 22, 2012, she was able to

open the window enough to get out and flee into Utah and, this time, she succeeded in finding people willing and able to help, hide and protect her. With their assistance and relying on her own remarkable inner strength, Briell began to overcome significant challenges and started a new life far from the FLDS Church and its reach in Tennessee. Briell did not know—because Parker and SC&M, did not tell her—that locking her in her room and screwing closed the windows was a crime for which she could seek redress in the courts.

406.    Although Briell has made significant strides to gain her freedom and to protect herself from the FLDS and those who may do her harm, for years she has remained completely terrified that she will be found and made to go back to the FLDS cult. For her own emotional well-being and protection on August 16, 2012 and again of February 21, 2013, a state court in Tennessee entered orders changing her name first from Lynette Warner to Sarina Joy and then from Sarina Joy to Briell Liberté Decker. Yet, the oppression driven into her psyche by Jeffs and his minions left her unable to recognize the fact of her mistreatment from a legal prospective for some time. Later, she relocated to Utah and feeling the need to further protect herself sought to be adopted as an adult by one of the families who had helped her escape the cult. During the years she was held captive by the FLDS Church, Briell developed and suffered mental illness and since escaping has continued to suffer mental illness for which she has often been hospitalized.

407.    Jeffs' ability to control Briell and her parents resulted in Briell being subjected to years of bondage, torture and trafficking; and his ability to control them was only made possible by the lawyers who represented the FLDS, the FLDS Church, the UEP Trust, and FLDS leaders. None of those lawyer ever gave the FLDS members (including Briell and all of the Plaintiffs) the critical information they needed to know about Jeffs, they did not explain how he was systematically destroying them. Far from helping their clients, Parker and SC&M took extensive (apparently tens of millions of dollars) from the FLDS in legal fees while actively assisting Jeffs to oppress them.

## P.  Amy Nielson

408.    Amy Nielson was born in Salt Lake City and raised in what became known as the FLDS Church. In 1991, Amy was placed in an arranged (and illegal) spiritual marriage with Wallace Jeffs as his second wife. Amy had seven children with Wallace, but the marriage was "arranged" and she never fell in love with him. Wallace's first wife, JoAnn Jeffs, prevented Amy from finding the satisfaction in her marriage that she had wanted. When Amy went to FLDS leaders for guidance, she was told that she could receive a "release" from her marriage to Wallace, but she chose not to request the release fearing that she may be even more unhappy in the next arranged marriage. The confusion and emotional turmoil caused by her arranged marriage often caused Amy to pray at night for the Lord to take her life.

409.     Two years after the family moved from Salt Lake City to Short Creek to prepare for the "destructions" prophesied by the FLDS Prophet Warren Jeffs, Wallace and JoAnn were exiled by Defendant Jeffs from the FLDS community along with their children, and Amy was put into hiding in Short Creek with her children. After Wallace was sent away, Amy was told that she would be re-married. Years later, she learned that she was to marry the Prophet as his 61st! wife. To prepare for the marriage to Defendant Jeffs, from time to time Amy was taken out of town and away from possible electronic surveillance to speak by mobile phone with Defendant Jeffs who was on the run as a Federal fugitive. During their last telephone conversation, Jeffs told her he was on his way to Short Creek to marry her. But before Defendant Jeffs made it to Short Creek, he was arrested as a result of a traffic stop north of Las Vegas, Nevada. Amy was made aware of Defendant Jeffs' arrest but did not know the reason for it. She was never told why Jeffs was arrested by her attorneys—Parker and SC&M—despite a clear need to know this critical information, and in fact was explicitly told nothing other than Defendant Jeffs had done nothing wrong and that that the enemies of the Church were trying to destroy the work of the great Prophet.

410.     After Jeffs' arrest, Amy and most of her children were quickly moved into hiding in Colorado, but she was instructed to leave her minor son, Daniel, to live with Lyle Jeffs because of "secret evils." Before moving, Amy was instructed by FLDS leaders to burn her family pictures, keepsakes and evidence of family relationships because things would change and she was not to look back. She did what she was instructed to do and left for Colorado. Amy and her children stayed in Colorado for several years before moving to a secret FLDS compound in South Dakota, called "number 23." As a faithful and obedient follower of the FLDS Prophet, Amy believed that Defendant Jeffs would be delivered from jail and that she would marry him as commanded. Amy did not know—because Parker and SC&M, did not tell her—that none of these "commands" by Jeffs (including termination of her parental rights over Daniel) were legally unenforceable. Their silence cost Amy her son.

411.     In July 2011, Wallace Jeffs filed a lawsuit in Utah naming Amy, Defendant Jeffs, FLDS Bishop Lyle Jeffs and other FLDS leaders as defendants in an effort to locate Amy and their children, re-establish a relationship with his children, and to try to convince Amy that she was being defrauded by the FLDS Church and its leaders. Lyle Jeffs instructed Amy to return to Short Creek temporarily to fight for custody with the understanding that once the legal storm had passed, she was to await Defendant Jeffs' promised deliverance from prison. She was assured that there was already a marriage robe in the FLDS Temple in Texas with her name on it. Amy never made it back to her home.

412.     Like any other FLDS, Amy sought out guidance from the FLDS Bishop regarding the lawsuit against her brought by Wallace. Lyle Jeffs informed her she would be represented by Defendant Parker in the lawsuit and that she also needed to have Parker file a divorce case against

Wallace. Amy obeyed the instruction. She was familiar with Parker and had always understood that he had been chosen by God to protect the people, including her individual interests, and that the people had paid him thousands of dollars for that protection. Lyle Jeffs gave Amy $5,000 in cash to retain Parker as her attorney, and he told her that if anyone asked about the money to tell them it had come from her brother. Amy did not know—because Parker and SC&M, did not tell her—that she could not be forced to divorce her husband. Worse, Parker and SC&M knew that the purpose of the divorce was to ensure that Amy was not informed by her husband of the religious scheme perpetrated by Jeffs, Parker and SC&M.

413.    Lyle Jeffs then set up a meeting for him, Amy and Parker in the St. George offices of SC&M, but cautioned that they could not travel together to the meeting with Parker. Amy was aware that Lyle Jeffs was a defendant and had been served in Wallace's lawsuit and was also being represented by Defendant Parker, but had never been advised of any conflict of interest or told she had the right to obtain independent counsel. When Amy arrived at the offices of SC&M for the meeting that Lyle had arranged, she was directed to an office where Parker and Lyle Jeffs were already meeting. As she walked in, Lyle Jeffs and Parker were joking and laughing together and Amy got the feeling that she was interrupting. After she joined them, she handed Parker the $5,000 in cash. The meeting was short. Lyle had already told Amy that Parker could not tell her anything about Jeffs or she would lose her place in the Church.

414.    On July 18, 2011, Parker wrote a letter to the Court in which he stated: "I represent Amy Jeffs and Lyle Jeffs . . . and we are awaiting instruction regarding representation of Warren Jeffs." In response to a motion for order requiring Lyle Jeffs to appear at a preliminary injunction hearing, on September 9, 2011, Parker filed a notice of withdrawal as counsel for Lyle Jeffs but stated he would continue to represent Amy. From the commencement of Parker's representation of Amy until her deposition in April 2012, Amy often spoke with Parker on his cell phone and exchanged emails on many occasions. The litigation was active for ten months, produced over 70 court filings and did not end until April of 2013. Parker, and through him SC&M, were the actual attorneys of record for Amy Jeffs at the same time as they were working against her interests by facilitating the divorce.

415.    Parker did not prepare Amy for her scheduled deposition; rather, she was called into a meeting with Lyle Jeffs to prepare with him, not Parker, for her deposition. Lyle told her that she would be sitting in front of, and asked questions by, a lawyer who is "the devil himself" and that she should avoid answering questions by responding when she didn't know how to answer with a phrase such as "the Prophet only does right." He emphasized that she should not believe anything she would hear or see during the deposition. Amy did not know—because Parker and SC&M, did not tell her—that lying under oath is a crime.

416.    Amy went to the deposition at Parker's office with one of her son's as her

priesthood "caretaker." Amy met with Parker immediately before the deposition and was simply told that she would hear things she would not want to hear. It was clear to her that neither Lyle Jeffs nor Parker wanted her to hear or believe what would take place in the deposition. Parker and SC&M sought to conceal from Amy and prevent Amy from believing any of the truths she learned at the deposition about Jeffs and the religious fraud he perpetrated in concert with SC&M.

417.    During the deposition, Amy heard and saw evidence that contradicted the edict that "The Prophet only does right." All of the information about Jeffs that Amy learned during her deposition had been concealed from her by the the Lawyer Defendants despite a duty to inform her of the same. She heard Defendant Jeffs in his own voice denounce himself as a religious fraud. She heard him request that the "Priesthood People" be told he was a Master Deceiver. She heard and viewed portions of the evidence used in Texas to convict him of raping little girls--which revealed conduct that would never be tolerated by the vast majority of the FLDS if they had known of it. And although she learned these things and much more during the deposition, she did not acknowledge during the deposition that the confusing puzzle pieces that she had collected in her mind over the years, but had not understood, were quickly starting to form a picture. By the time Amy left SC&M's office and had reached the parking lot, she had decided that she and her family had to leave the FLDS. She was also grateful and relieved that she would not have to marry Defendant Jeffs. She turned to her son and told him that they were "going to California."

418.    Going to California was the first phrase that came to her as she tried to express the realization that life would never be the same, and that with the new understanding she gained from the deposition evidence she would not take her family home. She had to find a way out. Upon returning to Short Creek, she and her children gradually secretly planned to move to Page, Arizona to get away from the FLDS Church.

419.    To prevent further manipulation and harm by FLDS leaders, she instructed her children not to answer the door to their Short Creek residence—even if it was the Bishop Lyle Jeffs. She knew that Lyle Jeffs would realize that the information she obtained in the deposition had began to open her eyes (though the full legal import of the revelations would not become clear until later), and she was scared that he would try to take her children. As preparations to move to Page were made, she was told that her home was under constant video surveillance for her "protection."

420.    As Amy transitioned her children away from the FLDS, she was called a "Master Deceiver" by Lyle Jeffs and treated as an apostate by the FLDS. When she called Parker to tell him that she was out of the FLDS Church and happy, *he stopped taking her calls*. This is not only a patent violation of Utah Rule of Professional Conduct 1.4, but is evidence of Parker and SC&M's loyalty to Warren Jeffs in express derogation of their duties, including the duties of loyalty and zealous advocacy, to their client Amy Nielson.

421.     Although the lawsuit filed by Wallace and the divorce action filed by Amy in which she was being represented by Parker were ongoing, Parker did not return her calls. The last time she was able to reach him by phone he told her "I don't know who you are" and hung up. It was clear to her that at some point he was trying not to represent her because she was no longer part of the FLDS Church. Nether Parker nor SC&M ever properly advised her of his withdrawal. Finally, on August 25, 2014, Amy sent the following email to Parker: "Hi Rod…I dont [sic] ever hear back from you. I need you to release me as a client so I can get this mediation with Wallace done. Please let me know on this as soon as possible." There was no response. Rod Parker's loyalties were to the Warren Jeffs—not to his client Amy Nielson or the laws of the State of Utah he had sworn to uphold.

422.     Although Amy began to understand the dangerous religious scheme Jeffs had established in Short Creek during her deposition in the divorce action in which she was represented by Parker, she did not learn of Parker and SC&M's involvement with the scheme until much later. Instead, she continued to trust Parker and communicate with him until *he* cut off all communication with *her* because she was considered an "apostate."

423.     Defendant Jeffs taught the FLDS that unquestioned and strict blind obedience was better than religious faith and enforced their absolute obedience to him through what Amy realized—only sometime after she left the FLDS Church—was fear, not love. In turn, Parker did not protect the religious liberty of the FLDS—either individually or collectively. Instead, he and SC&M destroyed the religious liberty of the FLDS by withholding from them the very information they needed in order to make their own individual choices. By conspiring with Jeffs and other FLDS leaders and lawyers to prevent Amy (and the other FLDS members, including the other Plaintiffs) from receiving the most critical information they needed, the Lawyer Defendants sealed the enslavement of the FLDS members and violated their legal and ethical obligations to their client Amy Nielson.

424.     Over the course of many years, Amy was taught and understood that Parker and his firm were the "main lawyers" that represented her and the FLDS. She would have never even thought of using other attorneys because no one (including Parker and SC&M) ever advised her she could do so—much less that she had an absolute *right* to do so. Like everyone in the FLDS Church, when legal problems arose, she turned first to her FLDS leaders for direction and then naturally to the Lawyer Defendants she trusted and relied on for protection. So when she needed specific legal help she knew from whom it should be provided. She and Parker had exchanged cellphone numbers so she could easily reach and speak with him whenever she needed advice. She called him frequently, but in all of their conversations he never said a word about the things she needed to know the most to make informed decisions about her children and for herself. Later, after she left the Church, her calls were ignored until Parker finally answered one day and, as noted

above, told her that he did not know who she was.

425.    All through this time, Parker knew Defendant Jeffs was perpetrating a fraud on the FLDS people (all of whom, individually and collectively, were Parker's clients and the clients of SC&M)—and that is what upsets Amy the most: having such critical information withheld from her by people she trusted and paid for her protection and then realizing many months after her deposition that Parker had known it was a fraud all along but never told her the truth. If she had known the facts which Parker helped conceal from her and the FLDS, she would have left the FLDS years earlier and on her own terms with family and friends. Instead she was enslaved and forced to go through hell to avoid going to hell. She and her family gave their family's scarce resources to the FLDS leaders and contributed to the FLDS lawyers (including Parker and SC&M) when told to do so; she and her family moved when that was directed; and she obediently left a minor son to live with the Bishop because of "secret evils." During those years, she was controlled physically and mentally at all times, never able to be who she wanted, and, in turn unable to recognize that her children were doomed to the same fate–all because she did not have the information she needed as a mother, a human being, and a client of Rod Parker and SC&M to make informed decisions for herself and her family.

426.    For years she lived in horrible fear that her children would be taken from her one by one, that her girls would be placed in "marriages" in which they would be raped (even if they were still children) and her boys sent off to work as slaves or indentured services (the difference turning on whether they were unpaid, or paid and then forced to "donate" that money to Parker and SC&M). She was scared whenever Jeffs called and asked her if she would obey his command to be placed in another spiritual marriage, not realizing for a long time that *he* intended to "marry" and rape her himself. She was deprived of the ability to make the most important decisions for her family because she was not provided with the critical information she needed to make informed decisions and was made completely dependent on FLDS leaders after they sent Wallace away. Finally, she was forced to face a deposition in which she was exposed for the first time to information, facts and evidence that Parker had hidden from her. Parker later described similar depositions as a "most cruel thing," but, in truth, the cruel (and flatly illegal) thing was that Parker and SC&M had deprived her of the facts she needed to know in the first place. As evidenced by the fact that Amy Nielson first learned that had been deprived for years of basic human liberties from opposing counsel in deposition during a divorce proceeding, Rod Parker and his colleagues at SC&M had clearly strayed far from their oaths as officers of the court and attorneys at law.

427.    Amy was considered an apostate after learning the truth about Jeffs and the religious scheme perpetrated by Jeff, Parker and SC&M and was cut off from her family, friends, housing, financial support and all that she had ever known. It was horrible and she was scared. She was afraid to tell her children that she was trying to build a new life for them, fearing that they

would treat her as an apostate and leave. She spent time away finding a job and earning money. Whenever she was gone, she had to leave her children within the grasp of the FLDS Church, but she had no other choice—because Parker and SC&M never advised her that Warren Jeffs and his ilk had no authority to terminate her parental rights or control the physical whereabouts of her children. She had to spend hours away working and starting a new life, constantly worried that they would be taken, pressured through "love" by the Church and bow to that pressure not knowing the difference between love and fear. She told them to stay inside, not to answer the door, and to avoid the cameras aimed at their home. But, despite all the harm she and her family endured as part of the FLDS Church and despite their ongoing struggle to make a new life, now that she sees that situation clearly, Amy remains most troubled by the fact that the truth was actively, knowingly, and intentionally withheld from her and that she was betrayed by her own attorneys.

428.     Amy lived the majority of her life in tremendous fear that those who failed to obey Jeffs and his minions would suffer a far greater death and a longer term in the lowest circle of hell with no hope of happiness. The FLDS Church intentionally built and enforced this fear in the FLDS people in order to "protect" the FLDS against 'bitter apostates.' Flashbacks of that fear overwhelm Amy, and it takes a huge effort for her to continue to understand that those feelings are false and there is no longer a need to be afraid. Participating in this lawsuit will make it clear to her friends and family that the fear they feel can end as they take control. As she looks back on her life, Amy wishes intensely that she had known then what she knows now.

**Q.  Sarah Allred**

429.     Sarah was born and raised on a farm to parents who were part of the FLDS Church. She moved to Short Creek in 1998 when she was 18 years old. She was "spiritually" married to Richard Allred on November 18 of that year and then "legally" married to him a month later on December 16, 1998. She bore Richard Allred six children—four girls and two boys. Jenetta was born on November 27, 1999, Sariah was born November 25, 2001, Sedrick was born May 8, 2003, Abraham was born June 14, 2005, Larissa was born June 28, 2008, and Celesta was born on September 21, 2010.

430.     Beginning in 2001, Richard was required by Jeffs to be absent from his family for long periods of time. Sarah knew he was following instructions from Defendant Jeffs, but Richard did not reveal to Sarah where he would go or what he was doing. In 2002, Sarah and her oldest three children were kidnapped and placed in hiding by Defendant Jeffs inside a walled and gated compound known as the "RTJ Block" where they were cut-off from all communications with everyone, except those who lived with them in that compound. In early November of 2003, while still forced to be in hiding, Sarah was moved from the RTJ Block and placed in different rooms in a series of homes in Short Creek. A message from Defendant Jeffs was then delivered to Sarah making it clear that if she as a mother ever stood between him and what the Lord wanted him to

do with the children—by which Jeffs meant let adult men rape them—she would lose her blessings and be damned. Then, her two oldest daughters, Jenetta and Sariah were kidnapped from her by Jeffs (who assured her that she would be able to join them soon—a terrifying prospect given their fate). Jeffs had begun to show particular interest in Sarah's oldest daughter Jenetta and was photographed holding her in his arms. When Jenetta and Sariah were taken, Sarah feared they would also take her infant son, Sedrick, but she managed to keep him, hoping that she would not be seen as disobedient. The fact that a mother feared she would be seen as "disobedient" for not wanting her infant son to join her daughters in chattel and sexual slavery should shock the conscience of any reasonable person.

431.    After about six months, she was again warned by Defendant Jeffs not to "stand between her family and the Lord and his Prophet." Jeffs made it clear that her children belonged to the "Priesthood" (to be raped) and warned her that if she disobeyed she would never see her children again. Sarah did not know—because Parker and SC&M, did not tell her—that Jeffs had no right to terminate her parental rights over her children, nor that his intended raping of them would constitute a crime.

432.    Sarah was then kidnapped with all of her children and sent across state lines Las Vegas where she was imprisoned in a three-bedroom home with four mothers and 13 children who were not allowed to leave or go outside without permission from their priesthood "caretaker" and almost never received that permission. Jeffs was arrested while Sarah lived in Las Vegas. But even in prison, Jeffs continued to show then 7-year-old Jenetta extra attention by sending her notes, letters and messages. When Sarah asked Richard, who she saw only infrequently, how these messages were coming from the Prophet, she was told that he was sending them through the Parker and the other lawyers and by way of a code that made the communication difficult to fully understand. Sarah did not know—because Parker and SC&M, did not tell her—that Parker and other lawyers (including lawyers at SC&M) were facilitating Jeffs' sexual obsession with a seven year old girl—even though both Sarah and young Jenetta were clients of Parker and the firm.

433.    After about a year of imprisonment, all of Sarah's children were again kidnapped from her (to the extent that one can even be kidnapped by the original kidnapper) and moved (again across state lines) to South Dakota. This devastated her, but she feared that if she voiced her opposition too strongly, she would permanently lose her family. Sarah was separated from her children for about five months until she was "allowed" to go back to South Dakota for several months. When the YFZ raid occurred in Texas, Sarah was kidnapped and moved (again across state lines) to Colorado to be imprisoned there. After about six months, Sarah and the children were kidnapped again and moved across state lines back to South Dakota where she gave birth to her fifth child, a daughter named Larissa. She was kidnapped again and sent away with Sariah and the baby for about two months before being 'allowed' back. This time, Sarah and her children

were left mostly intact as a family for a period of nearly two years. During this period of imprisonment, she gave birth to her sixth child Celesta.

434.     Approximately two months after Celesta's birth, word was received from Jeffs that he had atoned for the sins of Richard's family, but that Richard, or someone, would need to pay a price for that or suffer being split-up forever. Sarah 'volunteered' to spare her husband and was kidnapped along with her children and sent across state lines to Short Creek. Soon, however, Jeffs ordered the kidnapping of the children again and sent them again to South Dakota. Sarah was able to keep her two youngest daughters with her, hoping Jeffs would not be told. Sarah did not know—because Parker and SC&M, did not tell her—that Jeffs actions constituted kidnapping and child trafficking across state lines—a state and Federal crime for which she had redress in the courts. They also never advised her that Jeffs had no right to separate her from her children.

435.     Later, her four oldest children were kidnapped from South Dakota and hidden in a secret FLDS compound in Colorado. Sarah feared that Jenetta was going to become Jeffs' "wife," and, thereby, his next child rape victim. She had no idea that Warren Jeffs would never see the outside of a prison cell again—because her attorneys did not tell her.

436.     Jenetta had received messages from Jeffs in prison telling her to save her virginity for him and to protect herself from boys. As a result, Jenetta feared boys and tried to avoid all contact with them. Sarah naturally opposed the raping of her child but believed that Jeffs would be delivered by the Lord from prison. At great risk to herself, Sarah made her negative feelings about the marriage known to the Prophet in a letter hoping he would stop grooming Jenetta—who was 11-years-old at that time—for his future molestation and eventual rape.

437.     Soon after (probably before Jeffs received or read Sarah's letter) Sarah was told that Jeffs would allow her to 'reunite' with her older children on sacred lands and was directed to go to Mancos, Colorado. While in Mancos, Sarah suffered an ATV accident and was hospitalized for several weeks. After she was discharged and had partially recovered, Sarah was told by Richard that Jeffs had received a revelation that she was not worthy to be a mother, that their marriage was revoked, that she had to leave, and that if she obeyed, she would be allowed back in "two months." At the same time, her 10-year-old daughter, Sariah, was informed that she was a wicked, disobedient child and that she was not worthy to live in her father's home. Sarah was again kidnapped and forced to leave her children (except the now-disfavored Sariah) with her to Short Creek. Sarah was assured that she would only be gone for two months.

438.     Sarah left Colorado for two months determined to repent of whatever sin she had committed so she could be reunited with her family. But while repenting, FLDS leaders kidnapped and hid her children. Two months of repentance passed with no call, and then another two months. Finally, having received no call allowing her to reunite with her children she telephoned the

Bishop's office multiple times, only to have her many calls refused. Eventually she received a call back and was directed to meet with Isaac Jeffs. Thinking she would finally be allowed to go back to South Dakota and be with her children, Sarah eagerly meet with Isaac, but he read a message to her from Defendant Jeffs. Jeffs found her unworthy to be a mother and commanded her to "go away forever." The Lawyer Defendants allowed and, upon information and belief, faciliated Jeffs' oppression of the FLDS to continue from his jail cell, to the detriment of this client Sarah Allred and other Plaintiffs.

439.    Like many other expelled parents, Sarah was given no destination other than instruction to "go far away but not past the Mississippi border." She was also firmly instructed not to associate with any FLDS or former FLDS members. Sarah's daughter Sariah was kidnapped from her by men from the Bishop's office. Sarah was paralyzed by fear and the belief she needed to obey no matter what—a critical feature of Jeffs' oppression as discussed repeatedly herein. Utterly broken, she asked if she could at least see or talk with her children, but FLDS leaders would not let her, causing significant damage to her children who were falsely led to believe that she had voluntarily left and betrayed them. The children did not know—because Parker and SC&M, did not tell them—that they and their mother had been slaves for most (and, for some, all) of their lives. In doing so Parker and SC&M knowingly and intentionally participated in forced labor, human trafficking, peonage, and slavery in violation of laws in several states and of the United States.

440.    After resisting as much as she could within the bounds of her oppression, Sarah drove in a crushed, obedient daze until she found herself in North Platte, Nebraska where she knew no one. There she desperately called and called to try to get her children. When the Bishop's office answered, they either hung up or told her that they would have Lyle Jeffs call. They also told her to write letters repenting of her sins. For a long time, she obeyed, writing letter after letter confessing any possible sin she may have ever committed or mistake she may have ever made. She did this for two years, until she could repent and write no more. Even her imagination could produce no more sins for which she could confess guilt. She grew increasingly lonely and feared constantly for her children. Yet Rod Parker and SC&M did nothing to remedy the legal wrongs being perpetrated upon their client.

441.    As the cult thinking started to ease, Sarah began to allow herself to think "forbidden" thoughts and ask herself "forbidden" questions about FLDS Prophet, Defendant Jeffs. Over the next several months she became bolder in her thoughts and questions, reaching a point during the summer where she knew she needed to act to get her children back. She heard rumors that Richard had also been sent away. That summer, she was able to find the help she needed to return to Short Creek to demand the return of her six minor children. In August, she met with Sam Johnson of the Colorado City Marshal's Office, and, with the assistance of her brother, legal

counsel and law enforcement from Washington County, demanded that her children be returned or that the FLDS police charge Lyle Jeffs and those keeping her children with kidnaping.

442.     After difficult negotiations through the FLDS police, her children were eventually brought to Cottonwood Park in Arizona where it took nearly two hours to get them into her car. Her children had been brainwashed against her, caused to believe that they were being taken to their destruction, and taught to resist their mother who they been told and believed had abandoned them and was a wicked apostate. Jeffs, with the assistance of Parker and SC&M through their silence, had managed to convince Sarah's children—kidnapping victims and planned future victims of slavery and/or child rape—that their own mother was the real kidnapper.

443.     Sarah struggled and suffered for several months trying to gain their love, but they refused to acknowledge her as their mother and resisted her, sometimes even physically. They were not the children she had left years earlier when she was instructed to go away to repent for two months. Their minds had been poisoned against her. It would be a long time before a loving mother-child relationship could be reestablished with all of her children—and even under ideal circumstances they can never fully heal.

444.     Sarah knew that Parker was the spokesman and 'head lawyer' for the FLDS and its members—including herself and the other Plaintiffs. She trusted that he was protecting her. If she ever needed help with a legal problem, she knew she would be directed to him because he was one of the few lawyers (and SC&M one of the few firms) approved for the legal needs of the FLDS. She had personally paid money for his services and would never have thought of using a lawyer that had not been approved by FLDS leaders because no one—including Parker and SC&M—told her she had the absolute right to seek independent counsel. Parker's status among the FLDS was their longtime and most trusted lawyer. Richard had also told her that Parker conveyed messages to and from the Prophet while in jail.

445.     As discussed extensively herein, Sarah did not know (nor, under these unique circumstances could she be expected to know) that she had been subjected to unlawful activity for which remedies were available to her at law and equity due to her isolation and the knowing, intentional, fraudulent, and/or negligent misrepresentations by Jeffs, Parker, and SC&M coupled with the indoctrination by Jeffs and his favored cohorts until she escaped from the FLDS and obtained new counsel. Nor did Sarah know of or understand Parker and SC&M's involvement in this scheme until long after she had left the FLDS.

446.     Sarah believed that Parker and SC&M were representing her interests and trusted them as her legal advisors. If Parker and SC&M had complied with their legal and ethical duties, including but not limited to avoiding conflicts in their legal representation of clients and advising Sarah of her legal rights and the facts surrounding Jeffs' illegal acts and admission of fraud, Sarah

would have left the FLDS with her family much earlier and avoided the extensive financial, physical, emotional, and psychological injuries she suffered.

## R.  Thomas Jeffs

447.    Thomas Jeffs is the son of FLDS Bishop Lyle Jeffs (who was recently a Federal fugitive wanted by the FBI and was arrested in 2017) and also the nephew of Defendant Jeffs (who is in prison for life). In his youth, Thomas and his family lived in the Salt Lake Valley in a city known as Herriman, Utah. As a boy, he was taught that the world was evil and that "destructions" would befall Utah before the Winter Olympics, which were held in Utah in 2002. To avoid the fate of the evil world, the FLDS Prophet, Warren Jeffs, gathered the FLDS people in Short Creek to be lifted up to the "Celestial Kingdom" before the predicted destructions would take place. After the FLDS moved to Short Creek and were not lifted up as they were told would occur by Jeffs, the Prophet told the people that they were not lifted up because of their unrighteousness but "God" would give them more time to prove their worthiness.

448.    Part of what was necessary for the people to prove their worthiness was to contribute their means to the Prophet to build up the Kingdom of God on earth. Indeed, for as far back as Thomas can remember, the FLDS leaders required donations from the FLDS people to build up the kingdom—which also required that they pay the fees of their lawyers—widely known among the FLDS (including by Thomas) to be principally Defendant Parker and SC&M. Thomas understood that Parker and SC&M were the "chosen" lawyers who represented the FLDS and believed that they would represent his personal interests. Contributing money for these purposes was understood to be a step toward living the United Order. As noted above, Parker and SC&M had colluded with Jeffs to make payment of their attorneys' fees nothing less than divine commandment.

449.    Before Thomas and his family moved to Short Creek, he recalls multiple occasions when FLDS leaders placed a wheelbarrow at the head of the FLDS congregation held in the Alta Academy in Sandy, Utah in which the FLDS would place their donations for attorneys' fees as they walked past to shake the hands of their leaders. These requests for donations grew more frequent after the family moved to Short Creek in 2001, when Thomas was only 14 years old.

450.    In 2002 (when he was 15 years old), Thomas' formal schooling stopped and he was forced to work for an FLDS screen printing company, AllCo. He worked eight to nine-hour days at least five days a week at AllCo for at least two years in violation of state and Federal child-labor laws. Thomas received approximately one-fourth of each paycheck from AllCo—making him technically an indentured servant rather than a true slave—though distinction is of little comfort to him or his fellow Plaintiffs. The rest was given back to the FLDS leadership who then allocated that money to specific expenses, including attorneys' fees, and to purchase lands for Jeffs'

priesthood purposes. Thomas later learned that one of these lands he helped to purchase was the Texas property known as the YFZ Ranch, code named R17, which was to serve as Jeffs' bolt-hold and bunker because he feared a Waco-style government raid.

451.     Sometime in 2004 (when Thomas was 17 years old) he was reassigned to work for another FLDS controlled company, Dagrow Truss. Although Thomas often received a full paycheck from Dagrow, he was expected to turn over his entire paycheck to his father, Lyle Jeffs (the FLDS Bishop of Short Creek), for payment of FLDS expenses, including attorney fees for Parker and SC&M. For the year Thomas worked at Dagrow, he turned over every paycheck he received to Lyle. Thomas did not know—because Parker and SC&M never told him—that he could not be forced to labor, much less to turn over his pay to the Church.

452.     Beginning in 2005, Thomas was assigned to be part of Lyle's security force and began serving as Lyle's personal bodyguard. As part of the Bishop's security, Thomas took part in constructing many secret hiding places for Lyle to avoid the FBI or other law officials that Lyle feared would come looking for him. In one of the houses in Short Creek, named the Mountain House, Thomas helped to construct a false bookcase, bolted shut with mag locks, and opened only by a hidden phone jack. Thomas also constructed a second hiding place for Lyle in the mountains behind Short Creek. While the room itself is near impossible to spot without knowing its location, upon entrance it appears to be a food storage compartment, complete with a decoy door that opens to an empty room. However, the location also contains a hidden, soundproof room, accessible only by pulling a lever hidden in one of the food storage shelves. Thomas was part of Lyle's security force from 2005 until he left for the YFZ Ranch in 2009, and then again from the end of 2010 until Defendant Jeffs kicked Lyle out of the FLDS to "repent."

453.     Sometime in 2005, Thomas received a "special message" from Defendant Jeffs, who was then in hiding and on the FBI's 10 Most Wanted List, that Thomas was to leave Dagrow and work for the FLDS Storehouse. Thomas was enslaved at the storehouse from 2005 to late 2009 and was never paid for his labor even though some workers (sometimes) received a wage. He had been demoted from indentured servant to slave. Thomas knew that if he had ever received a paycheck, it would have been given directly to Lyle to be used for FLDS purposes—so his status was a distinction without a difference. Of course, Thomas could not appreciate that difference because Parker and SC&M never advised him of the existence—much less the illegality—of his enslavement or servitude in the first place.

454.     During the over four years that Thomas worked at the storehouse, he would frequently sit down with Lyle and divide up all the money that had been "donated" that week. The weekly "donations" regularly ranged between $280,000 and $300,000. After Defendant Jeffs was arrested, Thomas often observed or assisted Lyle to set aside thousands of dollars for the defense attorneys, with Defendant Parker sometimes named specifically as the recipient. Thomas observed

Lyle keeping careful records of the amount of money paid to the attorneys. The attorney fees became even more exorbitant after Jeffs' arrest and the raid on the YFZ Ranch.

455.     As part of his storehouse enslavement, Thomas was chosen to move to Texas around November 2009 to take part in the continued construction of the YFZ Ranch. Thomas was also tasked with taking care of the dairy on the Ranch. Each day on the Ranch for Thomas began at 2:30 a.m., when he would wake to milk, feed and take care of the 250 animals, including 75 milking cows, on the Ranch. Milking lasted until about 5:00 a.m., when the Ranch members had a meeting in which they were given their 'assignments' for the day. From the close of the meeting, until 12:00 p.m., Thomas would work whatever construction job he had been assigned. At 12:00 p.m., he was given a 15-minute lunch break with construction resuming after. At 2:30 p.m., Thomas would once again milk the cows until about 5:00 p.m. After the evening milking, he would return to construction. He, along with the other workers on the Ranch were brought dinner at the job site and given approximately 15 minutes to eat. After eating, Thomas returned to construction, worked until about 12:00 a.m., when he could clean up for the next day and sleep before resuming cow milking at 2:30 a.m. When he and the other workers became exhausted, they were forbidden time off and simply told to pray for strength from the lord to continue performing the work. Knowing that they had been given the chance to work on the most sacred of all FLDS properties, they kept up the grueling schedule despite their exhaustion. Thomas worked on the Ranch until December 31, 2010. He received no pay for his work—he was a slave. It was commonly known during this time that money continued to be given to Defendant Parker, SC&M, and a growing number of other lawyers for their fees. Rod Parker and SC&M directly benefited from the indentured servitude and later enslavement of Thomas Jeffs.

456.     While living on the YFZ Ranch, Thomas was finally allowed into the United Order ("UO") with the spiritually elite, and life changed even more for him. Everything he received had to come from the storehouse, and if the storehouse did not have it, he could not get it. Thomas also had to compile a complete list of all of his possession, down to his toothbrush, and take the list and his possessions to the storehouse. All his possessions were then given to the storehouse with the Bishop standing by, deciding what of his own possessions he would be given back. Whatever the Bishop decided Thomas did not need, he was not given back, and it was given to the storehouse.

457.     On December 31, 2010, Thomas was kicked off the Ranch by Lyle Jeffs, because the Prophet had issued a revelation that Thomas was immoral. Thomas returned to Short Creek from the Ranch and continued to work at the storehouse for another 8 or 9 months. Thomas was then kicked out of the FLDS community in Short Creek in September or October of 2011 and given no reason for his need to repent. He was briefly sent to Idaho to take care of Defendant Jeffs' non-UO member family, then sent to work first for Eco Alliance and then Phaze Construction, both FLDS controlled companies. Throughout this time, Thomas continued to donate most of his

earned money to the storehouse to be used at the discretion of FLDS leaders. Lyle directed him to buy equipment and a truck and to give his paychecks to the storehouse. Throughout 2012 and 2013, Thomas recalls Lyle advising the FLDS people, including himself, to "max-out" their credit cards and turn over the cash to pay attorney fees and other expenses. At the Bishop's request, Thomas took out signature loans and a line of credit to get money he then turned over to FLDS leaders to pay expenses.

458.    Thomas left the FLDS church in 2013 with little of his property, almost $60,000 in debt and ruined credit. He is still in the process of trying to pay off the debt and has been forced to bring a lawsuit against his father to regain some of the equipment he was ordered to buy but had to leave when he left. In addition to being saddled with debt, he has suffered the loss of most of his family, who remain devout FLDS members and who will have no contact with him because he is viewed as an apostate.

459.    Like the other FLDS and most of his family, Thomas had no knowledge of Defendant Jeffs' admission that he was a fraud or the actions for which he was sentenced to life in prison. All of that information was kept from him by FLDS leaders and the lawyers who he trusted for protection. He did not learn the information which would have spared him years of servitude until after he was kicked out of the FLDS, hit rock bottom financially, obtained legal help from non-FLDS lawyers and was shown some of evidence from Jeffs' Texas trial.

**S.   Janetta Jessop**

460.    Janetta Jessop was born and raised in Short Creek to a family who had been devout FLDS for multiple generations. Janetta knew very little of the outside world and strove to be as obedient as possible to FLDS teachings, believing that her eternal salvation depended on it.

461.    In 2003, two months after reaching 16 years of age, Janetta was told she had an appointment with the Prophet, Warren Jeffs. She quickly got dressed and her father escorted her to the Prophet's office within the walled RTJ Block. Upon walking into Jeffs' office, he shook her hand and before she knew it, asked her if she would marry him.

462.    Among the FLDS, marriage to the FLDS Prophet was considered the greatest honor a woman and her family could receive in this earthly life, and Janetta believed that honoring her father and the Priesthood by marrying the Prophet was what God wanted her to do. However, beneath her devotion to the FLDS teaching she also deeply feared that if she said no to Defendant Jeffs, he would find her unworthy, and perhaps even kick her out of the community or send her away from home causing her to lose her family and everything and everyone she ever knew or held dear. Janetta and Defendant Jeffs were "married" right then in the Prophet's office in Hildale, Utah. Janetta became Defendant Jeffs' 63rd wife on October 25, 2003.

463.     After her illegal marriage to Jeffs, she was taken directly to Jeffs' large house and shown around by her sister Velvet, who had been married by Defendant Jeffs to previous FLDS Prophet Rulon Jeffs, but then married to Defendant Jeffs after Rulon Jeffs' death. At dinner that night, Janetta was invited to sit next to Defendant Jeffs in a huge room full of his wives and children. As a girl just barely 16, Janetta found the situation very frightening.

464.     After dinner, Janetta was allowed to return to her father's house to collect what possessions she would need as Defendant Jeffs' newest wife. Her sister Velvet had coached her on what to bring and what not to bring. As a teenager, Janetta had many toys and other things a child would have that she gave to her little sister. She took with her little more with her than some clothes, her sewing machine, and FLDS CDs and books. Janetta did not know at the time she left her father's house that night that she would not see her parents and siblings in Short Creek again for over a year.

465.     Upon returning to her new home, Defendant Jeffs brought Janetta into his room and together they called one of his wives known as Mother Kate. Mother Kate was another of Janetta's sisters who had been married to Rulon Jeffs and then to Defendant Jeffs. Over the phone, Defendant Jeffs introduced Janetta to Mother Kate as his "new wifey." Jeffs then gathered all his wives and children together in the living room to listen to him preach and have family song and prayer before bed. Then the entire household of wives lined up and all gave Defendant Jeffs a kiss goodnight.

466.     FLDS boys and girls are taught to treat each other like "poisonous snakes." Girls receive little if any instruction about "husband wife relations" before marriage because in the FLDS, it is the husband's role to teach wives how babies are made. Moreover, in the FLDS tradition, "husband and wife relations" as Janetta vaguely understood the concept, only occurred for the purpose of having children. She was both relieved and confused when Defendant Jeffs did not make her pregnant that night. When Janetta woke the morning after her marriage, Defendant Jeffs was gone. Janetta had no idea when she married him that he was going into hiding and on the run from the law. But Parker and SC&M knew, because they either represented Jeffs, or at the very least were aware that he was wanted by the law. Yet they failed to advise their client Janetta that she had no obligation to marry Jeffs, much less that she was marrying a wanted felon.

467.     Shortly after the marriage, Jeffs called his family from an undisclosed location and broadcast over the speaker system in the house that he was dividing his wives and children into groups and sending them to different houses in Short Creek for their protection and his. Janetta was sent to a small house in hiding with 20 of Defendant Jeffs' wives and those of Isaac Jeffs' wives who were not already at that location. Janetta shared a room with three other wives. Their main assignment was to kill turkeys, chickens and pheasants, clean them, cook the meat and bottle it for the chosen people who had been moved to "Zion."

468.     While living in Defendant Jeffs' home and the house in hiding, Janetta and the other wives were required to listen to Jeffs' recorded sermons practically all day, every day as they were broadcast over speaker systems. For further training, soon after Janetta married Jeffs, all of his wives in the home in which Janetta was sequestered were required to take a class from him about the "Law of Sarah." Jeffs explained that learning that law meant a wife learning to fully submit herself to her husband. What Janetta did not know was that the Law of Sara, as taught by Jeffs and sometimes known as the "Higher Law of Sarah," also meant wives learning how to submit themselves to each other for the purpose of sexually stimulating each other while Defendant Jeffs watched, listened by telephone, or participated. At the time, Janetta thought Jeffs merely meant loyalty and purity of soul and mind but ended the class by telling his wives that he would explain further what he meant at a later time. This caused Janetta more concern and confusion, as she wondered what more she needed to learn about loyalty and purity or what other practice Defendant Jeffs may be talking about, to which she must submit as his wife. Janetta did not know that the Law of Sarah would become a practice in the secret FLDS compounds being built in Texas, South Dakota and Colorado or that Jeffs would carry on that practice with his wives while in prison—facilitated by his attorneys: Parker and SC&M.

469.     In addition to the concern and anxiety she felt about the Law of Sarah, Janetta already had concerns about Jeffs because he had married all but 11 of his father's wives. Those women and girls were considered to be his "mothers," and marrying the Prophet's wives in that way had previously been unacceptable within the FLDS. In fact, after Rulon Jeffs' death, Defendant Jeffs had firmly chastised any man for even looking at his father's wives. Janetta was also struggling with being in hiding away from her parents and married to Jeffs who was always on the run. She did not know how to be married or what was expected from her and felt confused and abandoned. After the wives were divided up, she began to notice that unless a wife had a child with Defendant Jeffs, she was simply just another person in his household. With Jeffs on the run, her only means of communication with him was to write letters, which she did not knowing if he read or even received them because she never got a letter in return. Janetta felt like she did not matter.

470.     At the end of November 2003, while still secluded in a house of hiding in Short Creek, Janetta received a message from a sister-wife that Defendant Jeffs wanted to see her in his office. Janetta did not even know that he had returned and was surprised that he wanted to see her. She and six other wives met Jeffs in his office and were told that the Lord had chosen them to be moved to "Zion" with all of his children who were under the age of eight. Janetta wondered what she had done to qualify for Zion. She had been feeling down and did not believe she had been living as she needed to qualify. This confused her more, but she was glad that God had found her worthy for Zion. That night, however, soon became very difficult for her as she witnessed the devastation and crying of the faithful mothers and children who were being separated. She too had

been separated from her parents and knew they had no idea where she would be going. Janetta did not know—because Parker and SC&M did not tell her—that Jeffs had no right to force her to move anywhere or separate her sister-wives from each other or their children.

471.     When they arrived in Zion, it was in the mountains somewhere. The ground was covered in snow and it was freezing outside. When she walked into a small the house, she and the other wives were surprised to see a young girl, no older than 13-years-old, holding a baby. Defendant Jeffs introduced Ida Jessop, Janetta's cousin, to them has his "new wifey." Janetta and the children did not sleep in the small home but were moved into the barn. They slept in the barn loft because it was warmer. Rod Parker never told Janetta that forcing a minor to live in a barn in physical and sexual enslavement is illegal.

472.     After Janetta had been in this Zion for a while, she gathered the courage to ask a sister-wife where they were. The wife said they were near one of the "four corners." Janetta found out later that she was in Colorado, having been taken as a sex-slave across state lines. During the time Janetta was in Colorado, she saw lots of FLDS men come through the area building homes and log cabins. The men seemed to work non-stop and she and several other wives were often up almost 24/7 preparing meals and ensuring the needs of these men were taken care of. This was exhausting and contributed to Janetta's growing unhappiness.

473.     Janetta was also disturbed by Defendant Jeffs' obsession with his 13-year- old wife, Ida. Because they lived in a small house, it was difficult for Janetta and the other women to avoid seeing the affection he constantly gave her. Janetta remembers watching them roll around in the snow together showing affection. Jeffs never gave any of his other wives the attention he gave to Ida. This caused a lot of mixed emotions in a house full of women married to the Prophet.

474.     Feeling all the more depressed and low, Janetta began to do things to try and get Defendant Jeffs' attention. When she gave him a kiss goodnight or when she could catch him coming and going, she regularly told him she wanted to talk. She desperately wanted to feel like she was actually married and not just a number. One night, one of the ladies found Janetta and said Jeffs wanted to talk with her. She went to his room believing that the only way to get attention from her husband was to have a baby with him. However, she still had only a vague understanding of what was involved. Janetta approached Defendant Jeffs and told him she wanted to have a baby. Without giving her any explanation, Jeffs told Janetta to take of all her clothes and sit on his lap. She obeyed. He then engaged in sexual activity with her without intercourse.

475.     He then told her to get dressed, explained what it would actually take for her to get pregnant, informed her that she was immoral and that he was sending her back to Short Creek to repent. Janetta was devastated. She felt hurt, betrayed, used and nothing seemed to make sense. None of it makes sense to her even now. But she knew that she had been declared unworthy by the

124

Prophet and would be divorced from him dishonoring her family. She was completely caught up in what she now sees as cult thinking, but at the time she did not know that and was devastated, embarrassed and confused. This was her first sexual experience and she felt like Defendant Jeffs had defiled her, then called her immoral and sent her off to repent. She did not know—because Parker and SC&M did not tell her—that she had just been subjected to felony sexual assault upon a minor, as well as other state and Federal crimes. Thus, she had no way to know that she had legal remedies available to her.

476.    Janetta was driven back to Short Creek around January 2004, temporarily placed back in Jeffs' house, and then moved back into the house in hiding she had left to go to Colorado. She fell apart. As she describes it, she "emotionally lost it." She could not eat, sleep or function, she was extremely depressed. She cried constantly. The ladies in the house tried to make her feel better but nothing seemed to help. She lived in misery and seclusion for almost a year.

477.    Toward the end of 2004, Janetta knew she could not continue to live the way she was living. She was still in hiding, not permitted to leave or contact anyone, and not permitted to use telephones, but she was able to find a phone and snuck down into the basement pantry with it to call her parents. She had had no contact with them for over a year. By the time she got them on the phone, she was so scared and emotional that she could not tell them what was going on or ask for help. After that call, Janetta called her sister, Susie, who had left the cult but still remained in Short Creek. Janetta did not know at the time, but when she disappeared over a year earlier, Susie had filed a missing person report about her. Susie was relieved to hear from Janetta, and Janetta was able to tell Susie that she was in a place she did not want to be and that she wanted to leave.

478.    Janetta had to hang up quickly because she heard someone come down into the basement. One of Isaac Jeffs' wives caught her with the phone and told her that if she did not tell the Prophet that she had disobeyed and used a phone that the wife would. Janetta said she would confess her sin to Jeffs so when he called later, Janetta told him she had used the phone. He then directed her to be sent back to her father's house. Janetta was moved back with her parents in December 2004. That night, Jeffs called her and told her that she would be questioned by someone the next day, and if she were to tell that person anything about where she had been the past year, she would be taken and put into foster care. Janetta did not know—because Parker and SC&M did not tell her—that the people who would be questioning her were government agents charged with ensuring her safety and if she only told them the truth she would have been rescued from slavery.

479.    As Defendant Jeffs had predicted, the next day Janetta and her mother were stopped while driving in Short Creek by investigators who were responding to Susie's missing person report and Janetta's desperate call to her sister. The investigators took Janetta to a Children's Justice Center home in St. George to ask her questions about where she had been. She did not answer any of the questions that he knew Defendant Jeffs would not have wanted her to answer.

After the questioning, Janetta was taken back to her father's house, but the investigators continued to check in on her regularly for the next several months.

480.    During those months, Janetta worked and was treated at the Hildale Clinic. She was regularly prescribed different medications for anxiety and depression. Her medications switched almost weekly, and the doses were very high. At times, she was placed on 200mg of Lithium and a large amount of Seroquel. She often felt like a zombie. Janetta believes that over-medicating her was a way of controlling her behavior. When she was able to act for herself, Janetta acted out by cutting her hair, walking the streets at night, and doing anything she could think of to anger to parents to prove she no longer wanted to be in Short Creek. She was extremely frightened, however, because she knew little to nothing of anything outside of Short Creek, how to leave or where to go. Despite her fear, she desperately tried to run away several times but was caught by the FLDS police based in Short Creek and returned to her FLDS parents. Janetta did not know—because Parker and SC&M did not tell her—that she had legal claims against the FLDS police for violating her constitutional rights.

481.    Although she was paid for her work at the Hildale Clinic, her father had her turn all of the money she earned over to the Prophet for his use to pay FLDS expenses, including attorney fees. Janetta remembers walking through a line to greet FLDS Church leaders at Saturday work meetings and placing her pay in a wheelbarrow. She had been raised to trust and believe that the FLDS lawyers were protecting the FLDS and her, but she was not sure what they were protecting her from. Janetta did not know—because Parker and SC&M did not tell her—that she could not be forced to labor and then forced to turn over her earnings to the Church so that Parker and SC&M could be paid.

482.    After seeking out help from a "gentile"—someone living in Short Creek who had not grown up there and was not FLDS, she left without saying goodbye to her parents. She has not seen her father and has only seen her mother once since she left. They refuse to have any contact with her. Despite leaving, the emotional turmoil Janetta experienced from age 16 still haunts her daily. She has been diagnosed with extreme PTSD and depression. In the past years she has been in and out of hospitals multiple times for psychiatric treatment and as a suicide risk. She left Utah for a year because people and places in southern Utah triggered her PTSD and is finally regularly seeing a counselor, supporting herself, and working hard to become emotionally stable. However, she still has severe depression and regular PTSD nightmares, flashbacks, anxiety and great fear of being trapped, secluded, controlled, manipulated and used.

## XII. PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for judgment in their favor and against Defendants herein,

126

jointly and severally, in an amount that will justly and adequately compensate them for their injuries, damages and losses, having suffered including on account of personal physical injuries and physical sickness, including but not limited to all past and future economic losses, loss of tangible and real property, loss of earnings and loss of earning capacity, medical expenses and other special damages; non-economic loss, such as grief, loss of companionship, loss of comfort, association and society, severe and extreme emotional distress in the past and future, physical impairment and disability, disfigurement, mental pain and suffering, alienation of familial and marital relations, estrangement from community and society; statutory treble damages; disgorgement/forfeiture of legal fees and profits; exemplary or punitive damages; pre-and post-judgment interest as provided by Utah law and Federal law; attorneys' fees, costs of suit and such other and further relief as this Court may deem just and proper in the circumstances.

## XIII. JURY DEMAND

PLAINTIFFS DEMAND TRIAL TO A JURY OF ALL ISSUES SO TRIABLE.

Respectfully submitted this 24th day of June, 2019.

/s Brett Godfrey
Brett Godfrey, Esq.
Godfrey | Johnson, P.C.
9557 S. Kingston Ct.
Denver, CO  80112
(303) 228-0700
*godfrey@gojolaw.com*

## CERTIFICATE OF SERVICE

I hereby certify that on this 24th day of June, 2010, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system, which will send notification of such filing to the following:

Brent O. Hatch, Esq.
Mark F. James, Esq.
Mitchell A. Stephens Esq.
HATCH, JAMES & DODGE, P.C.
10 West Broadway, Suite 400
Salt Lake City, UT 84101

/s Brett Godfrey
Brett Godfrey, Esq.
Godfrey | Johnson, P.C.
9557 S. Kingston Ct.
Denver, CO  80112
(303) 228-0700
godfrey@gojolaw.com